## IN THE UNITED STATES DISTRICT COURT FOR
## THE WESTERN DISTRICT OF OKLAHOMA

|  |  |
|---|---|
| IN RE SANDRIDGE ENERGY, INC. SHAREHOLDER DERIVATIVE LITIGATION | No. CIV-13-102-W<br>Relating to All Derivative Actions<br><br>**VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

**KAPLAN FOX & KILSHEIMER LLP**
Robert N. Kaplan (admitted *pro hac vice*)
Jeffrey P. Campisi (admitted *pro hac vice*)
Irina Kobylevsky (admitted *pro hac vice*)
850 Third Avenue, 14th Floor
New York, New York 10022
Telephone: (212) 687-1980
Facsimile:  (212) 687-7714

**WHITTEN BURRAGE**
Reggie N. Whitten, OBA #9576
Michael Burrage, OBA #1350
Simone Gosnell Fulmer, OBA #17037
Randa K. Reeves, OBA #30695
1215 Classen Drive
Oklahoma City, Oklahoma 73103
Telephone: (405) 516-7800
Facsimile:  (405) 516-7859

*Co-Lead Counsel for Plaintiffs*

Dated: May 1, 2013

Lead Plaintiff Paul Elliot, on behalf of the Paul Elliot IRA R/O ("Elliot"), and Plaintiff Lisa Ezell ("Ezell," collectively with Elliot, "Plaintiffs"), through their counsel of record, bring this action on behalf of Nominal Defendant SandRidge Energy, Inc. ("SandRidge" or the "Company") and allege the following based upon personal knowledge as to those allegations specifically pertaining to Plaintiffs and based upon their counsel's investigation for all other matters. That investigation has included an extensive analysis of publicly available documents concerning SandRidge and other Defendants, including the Company's filings with the U.S. Securities and Exchange Commission ("SEC") and press releases, as well as court filings, land records, filings with government agencies, analyst reports, investor presentations, news articles, and analyses by consultants.

## I.  INTRODUCTION

1.      Plaintiffs bring this shareholder derivative action on behalf of the Company alleging, among other things, that a majority of SandRidge's board of directors (the "Director Defendants," as defined below) breached their fiduciary duties, utilized and wasted corporate assets, and violated Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act").  The Director Defendants owe fiduciary duties of loyalty and care to the Company and its shareholders and are not permitted to use their position of trust and confidence to further their private interests.

2.      Defendant Tom L. Ward ("Ward"), SandRidge's Chief Executive Officer ("CEO") and Chairman of the board, breached his fiduciary duties by wrongfully usurping SandRidge's corporate opportunities for himself and his family at the expense

of SandRidge's shareholders and by engaging in improper related-party transactions and self-dealing.

3.      Specifically, Defendant Ward, individually and through entities controlled by him or members of his family—specifically WCT Resources, LLC ("WCT Resources"), 192 Investments, LLC ("192 Investments"), and TLW Land & Cattle, LP ("TLW Land & Cattle," collectively with WCT Resources and 192 Investments, the "Ward Entity Defendants")—and with the assistance and encouragement of those entities, usurped SandRidge's corporate opportunities by front running the Company and acquiring mineral rights to hundreds of thousands of acres through hundreds of leaseholds immediately next to, adjacent to, or in the same geological exploratory area as the Company's leaseholds, thereby allowing Defendant Ward to enrich himself and his family at the expense of the Company and its shareholders (referred to herein as the "Related-Party Transactions"). Moreover, in numerous instances, Defendant Ward and his family later profited by selling or assigning those mineral interests to the Company through improper related-party transactions without receiving appropriate approvals from a majority of SandRidge's independent and disinterested directors in violation of the Company's own corporate governance procedures and policies.

4.      Additionally, the Director Defendants have breached their fiduciary duties to SandRidge by failing to oversee issues critical to the Company—such as Defendant Ward's usurpation of the Company's corporate opportunities—and by failing adequately to disclose Defendant Ward's Related-Party Transactions with SandRidge.

5.     The Director Defendants have also breached their fiduciary duties by approving extravagant and wasteful executive compensation to Defendant Ward and other senior executives, including total compensation for Defendant Ward of approximately $20.8 million, $25 million, and $21.76 million for 2012, 2011 and 2010, respectively, a time period during which SandRidge's common stock declined by approximately 52%.

6.     Based on the facts alleged in this action and the laws of Delaware, SandRidge's state of incorporation, demand on the SandRidge board to bring this action is a futile and useless act because of, *inter alia*, the multiple conflicts of interest alleged herein.

7.     SandRidge and its shareholders have suffered significant damages as a result of the Director Defendants' breaches of fiduciary duties, and other violations of law by the Director Defendants and the Ward Entity Defendants.  Thus, Plaintiffs seek damages from the Director Defendants and the Ward Entity Defendants and disgorgement of all profits, benefits, and other compensation obtained by the Director Defendants and the Ward Entity Defendants, as well as the reform and improvement of SandRidge's corporate governance.

## II.     JURISDICTION AND VENUE

8.     This Court has subject-matter jurisdiction under 28 U.S.C. § 1332(a)(1) because Plaintiff Elliot is a citizen of New York and Plaintiff Ezell is a citizen of Arizona and no Defendant is a citizen of Arizona or New York. The amount-in-controversy

requirement is satisfied because, as set out below, the amount at stake for SandRidge is in the tens of millions—if not billions—of dollars.

9.      This Court also has subject-matter jurisdiction under 28 U.S.C. § 1331 because Plaintiffs bring a claim under Section 14(a) of the Exchange Act.  Thus, the Court has jurisdiction under 28 U.S.C. § 1367 over the state-law claims alleged insofar as they arise out of the same transactions and occurrences.

10.     This Court has personal jurisdiction over Defendants because SandRidge's principal executive office is located in this District; several of the Director Defendants are citizens of Oklahoma; the Ward Entity Defendants are each organized under Oklahoma law; and all Defendants have conducted business in this District relating to the misconduct alleged in this complaint.

11.     Plaintiffs' action is not a collusive one to confer jurisdiction that the Court would otherwise lack.

12.     Venue is proper in this District under 28 U.S.C. § 1391(a) because SandRidge is headquartered in this District, because many of the violations alleged occurred in this District, and because one or more of the Defendants either resides in or maintains executive offices in this District. Venue is also proper under 28 U.S.C. § 1401 because SandRidge could have filed this action in this District.

### III.    PARTIES

#### A.    *Plaintiffs*

13.     Lead Plaintiff Elliot, as stated in his signed verification (attached hereto as Exhibit "3"), owns shares of SandRidge's common stock in the Paul Elliot IRA R/O, and

has owned and will continue to own shares during this action. Elliot will fairly and adequately represent the interests of SandRidge's shareholders in enforcing the rights of the Company.  He is a citizen of New York.

14.    Plaintiff Ezell, as stated in her signed verification (attached hereto as Exhibit "4"), owns shares of SandRidge's common stock, and has owned and will continue to own shares during this action. Ezell will fairly and adequately represent the interests of SandRidge's shareholders in enforcing the rights of the Company.  She is a citizen of Arizona.

>    B.    **Defendants**

>        i.    **SandRidge**

15.    Nominal Defendant SandRidge is a corporation organized under Delaware law.  SandRidge's headquarters are located at 123 Robert S. Kerr Avenue, Oklahoma City, Oklahoma 73102.  SandRidge's stock trades on the New York Stock Exchange under the symbol "SD." SandRidge is named as a nominal defendant solely in a derivative capacity.

16.    SandRidge is an oil and natural gas exploration company that focuses on drilling low-risk, conventional, high rate-of-return oil wells in shallow carbonate reservoirs.  SandRidge was formed in the summer of 2006 when Defendant Ward bought a controlling interest in Riata Energy, Inc. ("Riata Energy"). Defendant Ward later changed the company's name to "SandRidge."  In 2007, SandRidge became a public company. Its stock was offered at $26 per share, increasing to a high of about $68 per

share in July 2008. On April 30, 2013, SandRidge common stock closed at $5.14 per share.

17.    According to a Company press release (dated January 18, 2013), SandRidge is a leading developer in the Mississippi Lime formation, or "Mississippian Oil Play," as it is known in the industry:

> Over the last several years, your Board and management team have taken strategic actions to transform SandRidge into the leading operator in the Mississippian Lime play of northern Oklahoma and western Kansas. These actions have established SandRidge as an industry leader in what is widely considered to be one of the most valuable oil-rich basins in the United States.

18.    The Mississippian Oil Play is a limestone formation containing natural gas and oil stretching through more than 17 million acres in northern Oklahoma, southern and western Kansas, and a small corner of Nebraska. The Mississippian Oil Play is still in the development stage, and controversy exists about its size and whether it is equally productive across its whole range or whether it has prime areas. As a result, oil and gas exploration companies typically undertake extensive efforts and incur extensive expenses to determine where to acquire leasehold interests, including conducting geological and geophysical surveys and other analyses. Oil and gas exploration companies, like SandRidge, treat information obtained from such analyses as confidential and proprietary and hold such information in the strictest confidence.

19.    Robust growth in the Mississippian Oil Play is a key element of SandRidge's overall strategic plan. To that end, SandRidge has been, and remains, active in developing confidential and proprietary information about the Mississippian Oil Play,

acquiring mineral rights, conducting drilling and exploration activities, and developing infrastructure across the Mississippian Oil Play.

20.     According to SandRidge's presentations at the Goldman Sachs Global Energy Conference (dated January 8, 2013) and the Credit Suisse Energy Summit (dated February 5, 2013), the Company is "dominating" the Mississippian Oil Play:

- SandRidge controls the largest acreage position in the Mississippian Oil Play, constituting approximately 2.3 million acres, and it has identified over 11,000 possible horizontal drilling locations.

- SandRidge has more than 40% of the rigs drilling in the Mississippian Oil Play, consisting of 32 rigs across 200 miles.

- SandRidge has already drilled 600 wells, representing 44% of all wells drilled in the Mississippian Oil Play.

- SandRidge also has 107 disposal wells, making it a leader in water disposal infrastructure, and 384 miles of power line, making it a leader in securing access to power in the Mississippian Oil Play.

21.     According to its Credit Suisse presentation, SandRidge plans to consolidate its holdings in the Mississippian Oil Play through significant additional acquisitions of mineral rights and to drill 581 wells in 2013 while increasing the number of its rigs from 32 to 41.

22.     Finally, according to a SandRidge press release (dated February 20, 2013), since January 2010, SandRidge has invested $500 million in the acquisition of mineral leaseholds in the Mississippian Oil Play and over $1.7 billion in development, drilling capital, and infrastructure in the Mississippian Oil Play.

ii.   **Ward**

23.   Defendant Ward has served as the Chairman of the Board and CEO of the Company since June 2006 and was President from December 2006 to January 2011. Before joining SandRidge, he served as a director, President, and Chief Operating Officer ("COO") of Chesapeake Energy Corporation ("Chesapeake") from the time he co-founded the company in 1989 until February 2006.   Defendant Ward is a citizen of Oklahoma.

iii.   **WCT Resources, L.L.C.**

24.   Defendant WCT Resources is a limited liability company organized under Oklahoma law. Trent Ward, Defendant Ward's son, is WCT Resources' registered agent and CEO. WCT Resources' address is 428 Dean A. McGee Avenue, Oklahoma City, Oklahoma 73102. Notably, until recently, WCT Resources shared its headquarters with SandRidge at 123 Robert S. Kerr Avenue, Oklahoma City, Oklahoma 73102.

25.   WCT Resources is owned by trusts established by Defendant Ward and his wife, Sch'ree Ward, for the benefit of Defendant Ward's children (Ward Children's Trusts). The trustee of the Ward Children's Trusts, Scott C. Hartman, has worked at SandRidge since April 2006 and is currently Executive Business Director at SandRidge. The current COO of WCT Resources, Scott White, was a land manager at SandRidge Energy until 2011.  Based on a comparison of signatures, it appears that Defendant Ward signed certain WCT Resources' documents.

26.   WCT Resources has no more than seven employees, a miniscule fraction of SandRidge's approximately 2,500 full-time employees. WCT Resources does not have

the personnel necessary to analyze the Mississippian Oil Play to determine where profitable leaseholds are located.

27.     WCT Resources has acquired approximately 475,000 acres of mineral rights in the Mississippian Oil Play, making it the fifth largest acreage holder in the Mississippian Oil Play (behind only SandRidge, Chesapeake, Royal Dutch Shell plc ("Shell"), and Devon Energy Corporation).

28.     WCT Resources is just one of several entities controlled by members of the Ward family that are active participants in the purchase and sale of land and mineral rights in the Mississippian Oil Play.

iv.     **192 Investments, L.L.C.**

29.     Defendant 192 Investments is a limited liability company organized under Oklahoma law. Like WCT Resources, Trent Ward, Defendant Ward's son, is 192 Investment's registered agent, and according to corporate filings with the Oklahoma Secretary of State, as of October 2012, Trent Ward was listed as the manager of 192 Investments. And like SandRidge, 192 Investments has its headquarters at 123 Robert S. Kerr Avenue, Oklahoma City, Oklahoma 73102.

30.     192 Investments has acquired mineral rights to thousands of acres in the Mississippian Oil Play in Kansas, including leaseholds in areas adjacent to SandRidge mineral leaseholds.  In numerous cases, 192 Investments bought those mineral rights just months before SandRidge leased property in adjacent plots, as Kansas land records show. 192 Investments utilized SandRidge's confidential and proprietary information in connection with the acquisition of these mineral leaseholds.

v.   **TLW Land & Cattle, L.P.**

31.     Defendant TLW Land & Cattle is a limited partnership organized under Oklahoma law. Defendant Ward is TLW Land & Cattle's registered agent. Like SandRidge and 192 Investments, TLW Land & Cattle's headquarters is at 123 Robert S. Kerr Avenue, Oklahoma City, Oklahoma 73102.

32.     According to the Company's SEC disclosures, TLW Land & Cattle is an "entity in which [Defendant] Ward has an ownership interest."   Defendant Ward has signed certain TLW Land & Cattle documents as the manager and/or general partner.   As set forth hereafter, using SandRidge's confidential and proprietary information, TLW Land & Cattle has acquired mineral leaseholds in areas adjacent to SandRidge mineral leaseholds.

vi.   **Director Defendants**

33.     Defendant Jim J. Brewer ("Brewer") has served as a director of the Company since February 2011.  Brewer is a citizen of Texas.

34.     Defendant Everett R. Dobson ("Dobson") has served as a director of the Company since September 2009.  Dobson is a citizen of Oklahoma.

35.     Defendant William A. Gilliland ("Gilliland") has served as a director of the Company (and its predecessor Riata Energy) since January 2006.  Gilliland is a citizen of Texas.

36.     Defendant Daniel W. Jordan ("Jordan") has served as a director of the Company (and its predecessor Riata Energy) since December 2005.  Jordan is a citizen of Oklahoma.

37.     Defendant Roy T. Oliver, Jr. ("Oliver") has served as a director of the Company (and its predecessor Riata Energy) since July 2006. Oliver is a citizen of Oklahoma.

38.     Defendant Jeffrey S. Serota ("Serota") has served as a director of the Company since March 2007.  Serota is a citizen of California.

39.     Defendants Ward, Brewer, Dobson, Gilliland, Jordan, Oliver, and Serota are collectively called the "Director Defendants."

## IV.     DEFENDANTS' WRONGFUL CONDUCT

40.     In blatant disregard of SandRidge's Code of Business Conduct and Ethics and in breach of Defendant Ward's fiduciary duties to SandRidge and its shareholders (explained in further detail below), Defendant Ward through the Ward Entity Defendants: (a) competed with the Company; (b) interfered with the performance of the Company and the directors' duties to the Company; (c) engaged in transactions that conflicted with the proper performance of his duties and responsibilities to the Company; (d) impaired his ability to make independent judgments on behalf of the Company; (e) utilized the Company's confidential and proprietary information for personal gain or for the benefit of his family members; and (f) stole investment opportunities that were discovered through the use of Company property and information for his personal gain or the benefit of members of his family.

41.     Further, in direct contravention of SandRidge's Financial Code of Ethics, Defendant Ward did not act with honesty and integrity in handling conflicts of interests

between personal and professional relationships and in protecting the confidentiality of information acquired from SandRidge.

42.     In violation of their fiduciary duties to the Company and its shareholders, the Director Defendants permitted Defendant Ward to usurp corporate opportunities, engage in extensive self-dealing and related-party transactions, and waste corporate assets.  The Director Defendants also violated fiduciary duties by granting excessive and wasteful compensation packages to Defendant Ward and other senior executives.

### A.    *Defendant Ward's Usurpation of SandRidge's Opportunities and Improper Related-Party Transactions*

43.     Defendant Ward and his son, Trent Ward, through the Ward Entity Defendants, directly compete with the Company's acquisition of mineral interests in the Mississippian Oil Play.  Worse yet, Defendant Ward and the Ward Entity Defendants have used SandRidge's confidential and proprietary information to do so.

44.     Because SandRidge is spending billions of dollars in the development and infrastructure of the Mississippian Oil Play, SandRidge's activities will cause the adjacent or contiguous mineral interest holdings of the Ward Entity Defendants to appreciate by millions—if not billions—of dollars.

45.     The Mississippian Oil Play is now the Company's primary focus, and the Company has acknowledged the importance of "quietly and inexpensively" acquiring mineral rights before others start "driving up acreage costs," indicating that the acquisition of mineral rights as quietly and inexpensively as possible is important to creating value for shareholders.

<u>**VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT**</u> **– Page 12**

46.     There are numerous examples of Related-Party Transactions by the Ward Entity Defendants in areas which have been identified at great expense by SandRidge as favorable locations.

47.     In some instances, the Ward Entity Defendants acquired certain property that they then flipped to SandRidge at a profit.

48.     In other instances, the Ward Entity Defendants acquired land or mineral rights shortly before SandRidge acquired adjacent acreage that it planned to develop, increasing the value of the adjacent land or mineral rights purchased by the Ward Entity Defendants.

49.     In some instances, the Ward Entity Defendants sold their adjacent land or mineral rights, at a profit, to SandRidge competitors, such as Shell, and in other instances the Ward Entity Defendants retained the land or mineral rights.

50.     In some instances, the Ward Entity Defendants acquired acreage adjacent to leaseholds already acquired by SandRidge, thus usurping SandRidge's corporate opportunities.

51.     As but one example of numerous Related-Party Transactions, Plaintiffs' counsel's investigation has revealed that in northwest Kansas, within the counties of Sherman, Thomas, Sheridan, Wallace, Logan, and Gove, SandRidge has already leased no fewer than 223 sections (a single section equals 640 acres or one square mile).  In those same counties, and often adjoining or adjacent to SandRidge's sections, WCT Resources has leased no fewer than 403 sections, almost twice the number as SandRidge. Stated differently, in those counties, SandRidge has leased 142,720 acres while WCT

Resources has leased 257,920 acres.  Annexed hereto, as Exhibit "1", is a map showing the proximity of SandRidge's and WCT Resources' mineral leaseholds within the six above-named counties in Kansas. Shockingly, many of WCT Resources' sections are contiguous to SandRidge's sections, and some WCT Resources' sections are surrounded by SandRidge's sections.

52.    More shockingly still, according to deed records in these six counties, WCT Resources acquired its leaseholds in advance of or contemporaneously with SandRidge's acquisition of its leaseholds.   These leaseholds were in areas that SandRidge had identified at great expense as favorable locations, and WCT Resources' acquisitions of these leaseholds were in direct competition with SandRidge, were neither first presented to SandRidge as acquisition prospects nor approved by a majority of independent and disinterested directors as required, and otherwise would have been corporate opportunities for SandRidge.

    *i.*        ***Examples of Front Running and Flipping***

53.    On November 30, 2010, WCT Resources leased mineral rights from the Berry family in Pawnee County, Oklahoma.  Two months later, on January 20, 2011, WCT Resources flipped those leases to SandRidge.

54.    On May 20, 2005, TLW Land & Cattle purchased land and mineral rights from Edwin Herslee in Woods County, Oklahoma. On November 3, 2011, WCT Resources leased mineral rights from TLW Land & Cattle in Woods County, Oklahoma. Six months later, on May 23, 2012, WCT Resources flipped those leases to SandRidge.

55.     On August 5, 2008, TLW Land & Cattle purchased land and mineral rights from the Joy family in Alfalfa County, Oklahoma.   On February 28, 2012, WCT Resources leased those mineral rights from the TLW Land & Cattle.  Seven months later, on August 29, 2012, WCT Resources flipped those leases to SandRidge.

### ii.    *Examples of Adjacent Acquisitions*

56.     Typically, oil and gas exploration companies such as SandRidge acquire land or mineral rights through land acquisition service companies in order to obscure the true purchaser of the land or mineral rights, thereby "quietly and inexpensively" executing their acquisitions.  Land acquisition companies generally work under contract to secure land or mineral rights and then subsequently transfer those rights to the underlying investor or company.

57.     When big players in the industry, such as SandRidge, begin drilling in an area, or are even known to have purchased land or mineral rights in an area, the value of nearby acreage inevitably increases.

58.     On June 20, 2011, Bent Tree Properties assigned mineral rights to WCT Resources in Barber County, Kansas. Bent Tree Properties is a company that provides land acquisition services. WCT Resources frequently appears to work with Bent Tree Properties in the acquisition of land or mineral rights.

59.     Four weeks later, on July 25, 2011, Continental Land Resources assigned mineral rights to SandRidge in adjacent acreage, thereby increasing the value of WCT Resources' mineral rights.  Two months later, on October 26, 2011, WCT Resources assigned these mineral rights to Shell.

60.     On June 6, 2011 to July 5, 2011, Bent Tree Properties assigned mineral rights to WCT Resources and 192 Investments in Barber County, Kansas.  Two weeks later, on July 25, 2011, Continental Land Resources assigned mineral rights to SandRidge in adjacent acreage.  Three months later, on October 26, 2011, WCT Resources and 192 Investments assigned these mineral rights to Shell.

61.     On December 12, 2011, Bent Tree Properties assigned mineral rights to WCT Resources and 192 Investments in Thomas County, Kansas.  Four months later, on April 3, 2012, Manhattan EnergyOne assigned mineral rights to SandRidge in adjacent acreage.  WCT Resources and 192 Investments still retain this acreage.

62.     On January 4, 2012 and February 29, 2012, Bent Tree Properties assigned mineral rights to WCT Resources and 192 Investments in Thomas County, Kansas.  Two months later, on April 3, 2012, Manhattan EnergyOne assigned mineral rights to SandRidge in adjacent acreage.  WCT Resources and 192 Investments still retain this acreage.

63.     On December 19, 2011, Bent Tree Properties assigned mineral rights to WCT Resources and 192 Investments in Thomas County, Kansas.  Four months later, on April 3, 2012 and July 1, 2012, Manhattan EnergyOne assigned mineral rights to SandRidge in adjacent acreage.  WCT Resources and 192 Investments still retain this acreage.

64.     On November 21, 2011, Bent Tree Properties assigned mineral rights to WCT Resources and 192 Investments in Thomas County, Kansas.  Five months later, on

April 3, 2012, Manhattan EnergyOne assigned mineral rights to SandRidge in adjacent acreage.  WCT Resources and 192 Investments still retain this acreage.

65.     On December 19, 2011, Bent Tree Properties assigned mineral rights to WCT Resources and 192 Investments in Thomas County, Kansas.  Four months later, on April 3, 2012, Manhattan EnergyOne assigned mineral rights to SandRidge in adjacent acreage.  WCT Resources and 192 Investments still retain this acreage.

66.     On December 22, 2011, TS Dudley Land Company assigned mineral rights to SandRidge in Finney County, Kansas.  Eleven months later, on November 13, 2012, Sullivan Land Resources assigned mineral rights to WCT Resources in adjacent acreage.  WCT Resources still retains this acreage.

67.     On January 3, 2012, Bent Tree Properties acquired mineral rights in Sherman County, Kansas.   Two months later, on March 28, 2012, Stable Energy Resources assigned mineral rights to SandRidge in adjacent acreage.  Two weeks later, on April 10, 2012, as well as through transactions on April 25, 2012 and July 13, 2012, Bent Tree assigned those mineral rights to WCT Resources.  WCT Resources still retains this acreage.

68.     On November 30, 2011, Continental Land Resources acquired mineral rights in Wallace County, Kansas.  Four months later, on March 28, 2012, Stable Energy Resources assigned mineral rights to SandRidge in adjacent acreage.  Five months later, on August 2, 2012, Continental assigned its mineral rights to WCT Resources.   WCT Resources still retains this acreage.

69.     On January 13, 2011, Sam B. Rose Oil & Gas assigned mineral rights to WCT Resources in Cowley County, Kansas.  Nine months later, on September 28, 2011, the Kaufman family assigned mineral rights to SandRidge in adjacent acreage.  WCT Resources still retains this acreage.

70.     None of the adjacent acquisitions have been disclosed to shareholders by the Director Defendants and none were approved by a majority of independent and disinterested directors.

71.     The usurpation of SandRidge's corporate opportunities substantially harms the Company in a variety of ways.  First and foremost, the Company loses the ability to drill leaseholds that instead are diverted to the Ward Entity Defendants, and it loses the right to capture hydrocarbons from those leaseholds.

72.     Second, the leaseholds are acquired by the Ward Entity Defendants using material confidential and proprietary Company information and resources without adequate consideration.

73.     Third, by flipping acquired leases to SandRidge without appropriate approvals of a majority of independent and disinterested directors, there is no assurance that SandRidge paid the Ward Entity Defendants fair value for the assets.

74.     Moreover, by front running the Company, Defendant Ward and the Ward Entity Defendants usurped opportunities from SandRidge and its shareholders.

75.     Finally, the transactions confer to the Ward Entity Defendants, without adequate consideration, the benefit of the hundreds of millions of dollars in geological

and geophysical surveys and infrastructure the Company has developed throughout the Mississippian Oil Play.

### iii.    A Major SandRidge Shareholder Corroborates Plaintiffs' Counsel's Investigation

76.    Consistent with Plaintiffs' counsel's investigation, a major SandRidge shareholder, TPG-Axon Management LP and its affiliates ("TPG-Axon") conducted its own investigation which found that the Director Defendants engaged in continued overspending, self-dealing, and incoherent corporate strategy while the Company's performance languished.  TPG-Axon repeatedly expressed its concerns to the Director Defendants in multiple letters to management as well as letters to shareholders.

77.    Consistent with Plaintiffs' counsel's investigation, TPG-Axon's investigation found the following:

> In order to better understand the related party transactions of SandRidge, we engaged investigators to gather additional information for us[.] To obtain this information, it was necessary to directly gather lease information from court houses and record offices across Kansas and Oklahoma[.] We are still early in the process and have much more ground to cover[.] The Mississippian Lime is a vast play covering over 17 million acres, in which SandRidge has leased over 2 million acres[.] To date, we have examined only a small percentage of SandRidge's total acreage[.] **Yet, already, it seems clear to us that entities related to the Ward family have been active competitors to SandRidge Energy in the acquisition and sale of mineral rights[.]**  In the interest of transparency, we are providing examples of transactions we have discovered to help illustrate the nature of activity we are observing[.] Our investigation continues, and we expect to update stockholders as we learn more[.]
>
> **To date, we have discovered that many entities affiliated with the Ward family have been active in acquiring acreage and mineral rights in the Mississippian Lime[.]   In particular, TLW Land & Cattle, WCT Resources and 192 Investments are entities that have acquired meaningful acreage in the Mississippian Lime.  Each of these entities is**

**related to Tom Ward or his immediate family, and has shared an
address with SandRidge at various points in the past[.]**

We have found many occurrences of flipping and purchases in the same
areas where SandRidge acquires mineral rights[.] In a number of instances,
WCT Resources has moved ahead of the company to acquire mineral rights
from third parties, and then flipped them to SandRidge just weeks or
months later[.][1]

More worryingly, it appears that WCT Resources has acquired acreage in
advance of purchases by SandRidge in the same area, and then either sold it
to third parties or kept it . . . .[2]

**We believe the fact pattern suggests that SandRidge shareholders may
have been disadvantaged by the actions of Mr. Ward and his family[.]
We believe the company may not have fully properly disclosed the
nature of these transactions to stockholders.** In addition, if Mr. Ward did
not disclose the full extent of these transactions to the company, we believe
this may be cause for termination.

(alterations, footnotes, and emphasis added).

78.     In November 2012, TPG-Axon mounted a proxy fight against the Director

Defendants.  TPG-Axon informed the Director Defendants that it intended to conduct a

consent solicitation seeking shareholder support for three proposals: (1) to amend

SandRidge's bylaws to de-stagger the board of directors; (2) to remove the Director

Defendants for cause; and (3) to replace the Director Defendants with a slate of TPG-

Axon nominees.

79.     After a lengthy battle in which the Director Defendants "acted with an

absence of good faith and reasonableness inconsistent with their fiduciary duties," as

---

[1] Referred to above as "flipping" or "front running."
[2] Referred to above as "adjacent acquisitions."

found by Chancellor Strine of the Delaware Chancery Court,[3] TPG-Axon and SandRidge entered into a settlement agreement on March 13, 2013 pursuant to which the board adopted a resolution increasing the number of board seats from seven to eleven, nominating four of TPG-Axon's nominees to fill the new seats, and requiring SandRidge to pay TPG-Axon up to $3.5 million for its expenses in connection with its consent solicitation and stockholder nomination, the settlement agreement and related matters.

80.     Although TPG-Axon has gained limited board positions, its settlement with the Company did not provide for corporate governance reforms and improvements, and has done nothing to redress the damage to the Company and its shareholders.   The conflicted Director Defendants still control the board.

B.     *SandRidge's Proxies Failed to Disclose the Adjacent Acquisitions*

81.     SandRidge has disclosed some transactions with the Ward Entity Defendants, however, these disclosures were incomplete and materially false and misleading because they failed to inform investors that Defendant Ward, through the Ward Entity Defendants, had engaged, and continued to engage, in numerous other Related-Party Transactions.

82.     Since 2008, SandRidge has disclosed $9.5 million of payments to the Ward Entity Defendants ($3.9 million to TLW Land & Cattle and $5.6 million to WCT Resources).   However, Defendant Ward and the Ward Entity Defendants have engaged in

---

[3] *Kallick v. SandRidge Energy, Inc.*, C.A. No. 8182-CS, 2013 WL 868942, at *16 (Del. Ch. Mar. 8, 2013) (hereinafter "*Kallick*").

numerous other Related-Party Transactions which were not disclosed to investors until TPG-Axon launched its proxy contest.

83.     On April 25, 2011, "[b]y Order of the Board of Directors," the Director Defendants caused SandRidge to file the 2011 proxy with the SEC on Form 14A.  That filing stated, in part:

> We lease rights to minerals under certain areas of land in northwest Oklahoma from TLW Land & Cattle LP ("TLW-LC"), an entity in which Mr. Ward has an ownership interest. In 2010, we developed some of the surface lands associated with these mineral interests and paid $33,046 to TLW-LC pursuant to the development. We also paid royalties totaling $302,554 to TLW-LC in connection with the production of oil and natural gas from these properties.
>
> In September 2010, we purchased a portion of the working interest in leases covering acreage in northeast Oklahoma from WCT Resources, L.L.C., a limited liability company formed in 2002 and owned by trusts established in 1989 for the benefit of Mr. Ward's children ("WCT"), for $1,791,120, and in January 2011, we acquired a working interest in additional acreage in the area for $391,955. Our Board approved the transactions in accordance with its Related Party Transactions Policy. WCT also participates as a working interest owner in wells we operate in northwest Oklahoma, and during 2010, we paid revenue of $242,363 to WCT as a working interest owner.

84.     On April 26, 2012, "[b]y Order of the Board of Directors," the Director Defendants caused SandRidge to file the 2012 proxy with the SEC on Form 14A.  That filing stated, in part:

> We own wells on certain areas of land in northwest Oklahoma under which TLW Land & Cattle LP ("TLW-LC"), an entity in which Mr. Ward has an ownership interest, owns a royalty interest. In 2011, we paid royalties totaling $925,735 to TLW-LC in connection with the production of oil and natural gas from these properties. . . .
>
> In January 2011, we purchased a portion of the working interest in leases covering acreage in northeast Oklahoma from WCT Resources, L.L.C., a limited liability company formed in 2002 and owned by trusts established

in 1989 for the benefit of Mr. Ward's children ("WCT"), for $391,955. WCT also participates as a working interest owner in wells we operate in northwest Oklahoma, and during 2011, we paid revenue of $168,196 to WCT as a working interest owner.

85.    On January 15, 2013, the Director Defendants caused SandRidge to file Amendment No. 2 to SandRidge's proxy statement with the SEC on Schedule 14A.  That filing stated, in part:

> In 2012, we paid royalties totaling $1,424,253 to TLW-LC in connection with the production of oil and natural gas from these properties. In May 2012 and August 2012, we purchased a portion of the working interest in leases covering acreage in northern Oklahoma from WCT Resources, L.L.C., a limited liability company formed in 2002 and owned by trusts established in 1989 for the benefit of Mr. Ward's children ("WCT"), for $333,612 and $480,000, respectively. WCT also participates as a working interest owner in wells we operate in northwest Oklahoma, and during 2011, we paid revenue of $290,462 to WCT as a working interest owner. WCT is an independent oil and gas company in which Mr. Ward retains no financial interest nor has any management or operational involvement.

86.    However, the statements in ¶¶ 83-85 were materially false and misleading when made because they failed to disclose that Defendant Ward, through the Ward Entity Defendants, had been engaging in extensive adjacent acquisitions, thus usurping SandRidge's corporate opportunities and misappropriating SandRidge's confidential and proprietary information.

87.    Moreover, contrary to the statement in the January 15, 2013 proxy amendment in ¶ 85, as alleged above, WCT Resources is not independent.  Defendant Ward's family has a financial interest in WCT Resources and Defendant Ward himself has been involved in the management of WCT Resources.

C.      *Excessive Executive Compensation and Waste of Corporate Assets*

88.      The board's "Compensation Committee" is established by charter, which requires its members to "review, evaluate and approve the agreements, plans, policies and programs of the Company to compensate the Company's corporate officers and directors" and to "review, modify (if necessary) and approve corporate goals and objectives relevant to the compensation of the Company's Chief Executive Officer . . . ." The charter makes it clear that the committee "should consider the Company's performance and relative stockholder return" in setting compensation.

89.      In blatant disregard of the charter of SandRidge's Compensation Committee and their fiduciary duties to SandRidge and its shareholders, the Director Defendants have continuously approved egregious, expensive, and wasteful compensation for Defendant Ward and other senior SandRidge executives.  In addition the Director Defendants have allowed Defendant Ward to take advantage of extravagant perquisites at SandRidge's expense and to funnel millions of dollars away from SandRidge to Ward-related interests, including payments to the Ward Entity Defendants.

90.      Defendant Ward's compensation cannot be justified by SandRidge's stock performance, and in fact, his compensation is shocking relative to the performance and the size of the Company.  Over the past five years, despite its stock price declining 80%, the Company has paid Defendant Ward more than *$150 million* in compensation, representing 6% of the total current market capitalization of the Company.

91.      In 2012, Defendant Ward's total compensation was $20.8 million, while SandRidge stock declined 22%.  In 2011, the Director Defendants approved

compensation of more than $25 million for Defendant Ward, which represented half of the Company's earnings for 2011 and was an increase of approximately 16% over his 2010 compensation. Defendant Ward was among the highest-paid energy executives in 2011, even though the Company's revenue of $1.4 billion placed it in the bottom half of publicly traded exploration and production companies. For 2010, Defendant Ward received $21.76 million in compensation, an increase of a whopping 58% over his 2009 compensation, while the Company's share price declined 26%.

92.     In contrast, "peer" companies whose stock price per share *increased* during the same time period nevertheless paid their CEOs significantly less than SandRidge paid Defendant Ward.  For example, the CEO at Forest Oil Corp. received $4.2 million in 2010 while its stock price increased 73% that year.  Likewise, in 2010, Newfield Exploration Co. stock increased 50% and its CEO was awarded $5.2 million in compensation.  In 2012, Pioneer Natural Resources, Co.'s stock price increased 81%, while its CEO was awarded $8.6 million in compensation.[4]

93.     Defendant Ward has been one of the highest compensated CEOs in the country while at SandRidge, as well as one of the highest paid energy CEOs.  During the same period, SandRidge ranked among the worst in the country for losing shareholder value as reflected in the decline in the price per share of SandRidge's common stock and return on investment compared to its peers.

---

[4] SandRidge lists these companies among its "peers" in its SEC filings. *See, e,g,,* SandRidge Proxy (Form 14A) (April 26, 2012), at p. 26.

94.     Among SandRidge's competitors, not a single CEO received compensation even close to that of Defendant Ward in 2010. A review of CEO compensation at oil and gas companies far larger than SandRidge shows that Defendant Ward's compensation was near the highest of any company in the industry. For example, William Klesse, CEO of Valero Energy Corp., received $11.1 million in compensation in 2010; L.L. Elsenhaus of Sunoco Logistics Partners received $11.7 million; J.S. Watson of Chevron Corp. received $16.3 million; J.J. Mulva, CEO of ConocoPhilips received $17.9 million; John Hess of Hess Corp. received $18.2 million; and R.W. Tillerson of Exxon Mobil Corp. (a company whose market capitalization in 2010 was over 120 times greater than SandRidge's) received $28.9 million.

95.     Similarly, the Director Defendants have continuously approved excessive, expensive, and wasteful compensation packages for SandRidge's other senior executive officers despite the Company's poor performance. For example, SandRidge's former President and COO, Matthew K. Grubb ("Grubb"), received an aggregate of $16.6 million in total compensation for 2010, 2011 and 2012, including $2.6 million in salary and $2.7 million in cash bonuses. SandRidge's Chief Financial Officer, James D. Bennett ("Bennett"), who joined SandRidge in January 2011, received total compensation of over $11 million for 2011 and 2012, including $1.4 million in salary and over $1.4 million in cash bonuses. SandRidge's former Executive Vice President of Exploration, Todd N. Tipton ("Tipton"), received total compensation of $5.5 million for 2010, 2011 and 2012, including $1.3 million in salary and $1.2 million in cash bonuses. SandRidge's former Executive Vice President of Reservoir Engineering, Rodney E. Johnson

("Johnson"), received total compensation of $5.4 million for 2010, 2011 and 2012, including $1.3 million in salary and $1.3 million in cash bonuses.[5]

96.     As part of their compensation packages, these senior executives were also awarded shares of SandRidge stock, which they then sold at a profit.  Grubb sold 276,778 shares of SandRidge stock for net proceeds of approximately $1.7 million; Bennett sold 150,968 shares of SandRidge stock for net proceeds of approximately $900,000; Tipton sold 223,448 shares of SandRidge stock for net proceeds of approximately $1.6 million; and Johnson sold 174,369 shares of SandRidge stock for net proceeds of approximately $816,000.

97.     The Company also pays almost $1 million year to provide personal accounting services to Defendant Ward. The Company spends millions of dollars each year sponsoring the professional basketball team, the Oklahoma City Thunder ("Thunder") (of which Defendants Ward and Defendant Dobson are co-owners), and pays for luxury suites at the arena.  The Company has four jets (two of which are large size intercontinental jets, and one of which is one of the most expensive corporate jets in the market), and over fifteen full time employees dedicated to maintaining and flying these jets. SandRidge provides unlimited personal usage of these jets to Defendant Ward—last year that included dozens of personal flights to Scottsdale (Defendant Ward's vacation home), and numerous weekend trips to locales such as Las Vegas, Los Angeles,

---

[5] On April 26, 2013, Tipton and Johnson informed the Company of their intentions to retire and resign, respectively, effective May 10, 2013.  On March 15, 2013, Grubb also resigned from the Company.

and the Bahamas. None of these expenditures have added or adds value to SandRidge and are a waste of the Company's corporate assets.

98.     In addition to receiving millions of dollars in compensation and exorbitant perquisites from SandRidge, Defendant Ward also usurped SandRidge's corporate opportunities for his own benefit in violation of his fiduciary duties, his employment agreement and SandRidge's Ethics Code (defined below).

99.     Paragraph 3 of Defendant Ward's June 8, 2006 Employment Agreement ("2006 Employment Agreement") provides that Ward "will not . . . directly or indirectly invest in, participate in or acquire an interest in any oil and gas business . . . ."

100.     However, as set forth above, in breach of his fiduciary duties and in violation of his 2006 Employment Agreement, Defendant Ward, through the Ward Entity Defendants, competed with SandRidge and wrongfully took corporate opportunities from SandRidge.

101.     As alleged above, Defendant Ward and the Ward Entity Defendants diverted millions of dollars away from SandRidge by engaging in the Related-Party Transactions, and the Director Defendants allowed Ward to engage in this egregious conduct, effectively funneling money out of SandRidge.

102.     SandRidge has disclosed $9.5 million of payments to the Ward Entity Defendants since 2008, but, as discussed above, millions of dollars in Related-Party Transactions have not been quantified and were not disclosed to investors until TPG-Axon launched its proxy contest.

103.    SandRidge's self-dealing and conflicted transactions with the Ward Entity Defendants violated Defendant Ward's 2006 Employment Agreement, SandRidge's own Ethics Code, and Defendant Ward's fiduciary duties to SandRidge and its shareholders.

104.    In December 2011, without adequate consideration and in violation of the Director Defendants' fiduciary duties, the Director Defendants amended Defendant Ward's 2006 Employment Agreement and, among other things, expressly permitted Defendant Ward to engage in outside oil and gas businesses so long as the business was "in areas not being pursued by the Company" (the "Amended Employment Agreement").

105.    The Director Defendants' decision to allow Defendant Ward the flexibility to engage in outside oil and gas businesses, even if such businesses were in areas not being pursued by SandRidge, was contrary to the best interests of the Company and its shareholders because such side businesses created conflicts that were and are inconsistent with Defendant Ward's duty of loyalty to SandRidge.

106.    Accordingly, allowing Defendant Ward to engage in outside oil and gas businesses "in areas not being pursued by the Company" was a waste of corporate assets, and was not an exercise of valid business judgment by the Director Defendants, and therefore was a breach of the Director Defendants' fiduciary duties.

D.    *Self-Dealing*

107.    In breach of their fiduciary duties, the Director Defendants also permitted Defendant Ward to engage in self-dealing that runs contrary to the best interest of the Company and its shareholders.

108.   The Company permitted Defendant Ward to participate in a "well participation program."  The program permitted executives to purchase interests in wells being developed by the Company and, in exchange for payments towards costs of the well, the executive received a share of revenue from the well.

109.   On October 9, 2008, the Company terminated the "well participation program" and paid Defendant Ward $67.3 million in cash for his interests.  At the same time, however, the natural gas and stock markets were collapsing and SandRidge faced potential bankruptcy.  As of the end of the third quarter of 2008, SandRidge had $898 million in cash and cash equivalents on a consolidated basis.  Thus the Company spent nearly 7.5% of its cash on gas wells at a time when gas prices were rapidly falling.

110.   Defendant Ward purchased ranchland with his $67 million payment from the "well participation program."  He then leased the properties back to SandRidge.  In 2008 alone, the Company made royalty payments totaling over $850,000 to Defendant Ward for the land and paid over $1 million in revenue to a trust established by Defendant Ward for development of the land.

111.   In September 2010, the Company bought a working interest in some of Defendant Ward's properties, paying him $1.8 million while also paying him revenue and/or royalties on his lands totaling over $500,000.

112.   Additionally with the $67 million, Defendant Ward bought an ownership interest in the Thunder basketball team and then had the Company pay the team millions of dollars per year in sponsorship and luxury suite payments.

VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT – Page 30

113. In October 2009, the Company entered into a four-year agreement to license a suite at the arena where the Thunder plays. The annual license fee for 2009 was $200,000 with the provision that it could increase each year up to 3%. The Company also entered into a five-year agreement to pay an average annual sponsorship fee of approximately $3,275,000 for advertising and promotional activities related to the Thunder.

114. Additionally, the Company paid Defendant Ward hundreds of thousands of dollars for use of basketball tickets by SandRidge employees. In 2010, 2011, and 2012, for example, SandRidge paid Defendant Ward approximately $321,000, $244,000, and $284,000, respectively, for the use of basketball tickets by SandRidge employees.

### E. SandRidge's Poor Corporate Governance

115. According to the Corporate Governance Guidelines of SandRidge's Board of Directors, dated March 1, 2011, "[t]he basic responsibility of each director is to exercise his or her business judgment to act in what he or she reasonably believes to be in the best interests of the Company and its stockholders." However, SandRidge's corporate charter and bylaws protect and entrench the Director Defendants' positions to the detriment of the Company and its shareholders.

116. For example, SandRidge's board is "staggered" or "classified," which means approximately one-third of SandRidge's directors stand for election in a given year. At each annual shareholder meeting, SandRidge shareholders elect a successor to each of the directors whose term expires on the date of the meeting, or re-elect each such director, with each successor or re-elected director to serve a three-year term.

117. A staggered board thus serves as a powerful antitakeover device, entrenches the board, unduly protects the Director Defendants from shareholder influence, and fosters an environment in which the Director Defendants look out for themselves instead of the best interest of SandRidge and its shareholders.

118. Another manner in which the Director Defendants have entrenched themselves is by restricting shareholders' ability to call a special meeting.

119. Shareholders' ability to call a special stockholders' meeting enables them to replace directors (or change the bylaws) between annual meetings if they believe that circumstances warrant such an intervention. SandRidge's special meeting rules (Article 7 of its charter and Article II, Section 4 of its bylaws) require approval by those holding 50% of common shares to hold a special meeting of stockholders. Because SandRidge's share ownership is dispersed, organizing enough shareholders to meet this threshold is difficult, if not impossible.

120. Moreover, SandRidge's Corporate Governance Guidelines hinder shareholders' ability to hold the Director Defendants accountable by forbidding shareholder access to the corporate proxy, or failing to otherwise provide any mechanisms for shareholders to formally or informally recommend candidates to SandRidge's board.

121. The Director Defendants' conduct in response to shareholder criticism of the board and the Company's performance illustrates the Director Defendants' poor corporate governance and disregard for the rights of shareholders, and constitutes a breach of their duty of loyalty to the Company and its shareholders.

122.   As alleged above, in November 2012, TPG-Axon mounted a proxy fight against the Director Defendants.   TPG-Axon informed the Director Defendants that it intended to conduct a consent solicitation seeking shareholder support for three proposals: (1) to amend SandRidge's bylaws to de-stagger the board of directors; (2) to remove the Director Defendants for cause; and (3) to replace all of them with a slate of TPG-Axon nominees.

123.   In response, the Director Defendants entrenched themselves by adopting a "poison pill" that makes it difficult for a shareholder to accumulate shares and oust the board, particularly where, as here, the board is staggered.   Further, the Director Defendants adopted certain amendments to the Company's bylaws, including an amendment to provide that the affirmative vote of the holders of a majority of the voting power of the outstanding shares shall be required for stockholders to amend certain sections of the bylaws, including those relating to the classification of directors, the number of directors and the filling of vacancies on the board and newly-created directorships.

124.   While four TPG directors have been added to SandRidge's board, the Director Defendants continue to control the board and SandRidge's poor corporate governance structure remains in place and continues damage the Company and negatively affect shareholder value.

## V.   THE DIRECTOR DEFENDANTS' FIDUCIARY DUTIES

125.   Because of their ability to control SandRidge's business and corporate affairs, the Director Defendants owe SandRidge and its shareholders fiduciary duties of

loyalty, good faith, candor, and due care, and they are required to use their utmost ability to control and manage SandRidge in a just, fair, honest, and equitable manner. The Director Defendants are required always to act in furtherance of SandRidge's best interests and that of its shareholders and to benefit all shareholders equally, not in furtherance of their personal interests or benefit.

126.    SandRidge's directors and officers owe SandRidge and its shareholders fiduciary duties of loyalty, good faith, due care, and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

127.    In addition to their duty of candor, as officers and/or directors of a publicly held company, the Director Defendants had a duty promptly to disseminate accurate and truthful information regarding the Company's operations, finances, financial condition, and present and future business prospects so that the market price of the Company's stock would be based on truthful and accurate information.

128.    In accordance with their fiduciary duties, SandRidge's directors and officers are required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the Company's affairs and assets. Specifically, SandRidge's officers and directors are required to:

    i.      conduct the affairs of the Company in an efficient, business-like manner in order to achieve the highest quality performance of its business;

    ii.     put the interests of the Company and its shareholders ahead of their personal interests and refrain from self-dealing;

iii.      maintain the confidentially of the Company's information;

iv.      avoid wasting the Company's assets and maximize the value of the Company's stock;

v.      remain informed as to how the Company conducts its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, and take steps to correct those conditions or practices and make the disclosures as necessary to comply with federal and state securities laws;

vi.      ensure that the Company complies with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public concerning, among other things, material related-party transactions;

vii.      ensure that the Company is operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state, and local laws, and rules and regulations; and

viii.      ensure that all decisions are the product of independent business judgment and not the result of outside influences or entrenchment motives.

129.   The Director Defendants violated their fiduciary duties through the conduct alleged above and exhibited an absence of good faith and a conscious disregard for activities that have seriously injured the Company.

130.   The Director Defendants have breached their duties of loyalty, good faith, care, candor, and oversight by knowingly or recklessly allowing Defendant Ward to

engage in self-interested and conflicted behavior, by failing to prevent Defendant Ward from taking those improper and illegal actions, and by granting wasteful compensation packages to Defendant Ward and other senior executives.

## VI.   SANDRIDGE'S CODE OF BUSINESS CONDUCT AND ETHICS AND CODE OF FINANCIAL ETHICS

131.   SandRidge has adopted a Code of Business Conduct and Ethics (the "Ethics Code") and a Financial Code of Ethics ("Financial Code").  The Director Defendants' conduct complained of above directly conflicts with and violates their obligations under the Company's codes of conduct and Corporate Governance Guidelines (described above) in violation of their fiduciary duties, thus making them personally liable to the Company.

132.   SandRidge's Ethics Code contains standards for, among other things, the following: (a) conflicts of interest; (b) corporate opportunities; and (c) the protection and proper use of Company assets.  However, Defendants blatantly acted in violation of the Ethics Code as set forth above.

133.   Under the heading "Conflicts of Interest," SandRidge's Ethics Code states:

A conflict of interest occurs when an officer, director or employee's private interest interferes in any way—or appears to interfere—with the interests of the Company. Conflicts of interest include, but are not limited to, the following:

• Ownership in an enterprise that does business with, seeks to do business with, or is a *competitor* of the Company;

.   .   .

• Participation in any outside activity that *competes* with the Company or that *interferes* with the *performance* of an employee, officer or director's duties to the Company.

No officer, director or employee shall hold a position of material interest in an *entity that conflicts with or appears to conflict with, proper performance of Company duties and responsibilities* or the ability to make independent judgments regarding transactions between SandRidge and the entity. Employees, officers and directors may not use their positions, Company assets, or *confidential information gained in connection with their employment* or involvement with the Company for *personal gain* or for the *benefit of a family member* or any outside party.

(emphasis added.)

134.   Under the heading "Corporate Opportunities," SandRidge's Ethics Code states:

SandRidge officers, directors and employees are prohibited from (a) personally taking advantage of investment opportunities that are discovered through the use of Company property, information or position; (b) using Company property, information or position for personal gain; and (c) competing with the Company. Officers, directors and employees owe a duty to the Company to advance its legitimate interests when the opportunity to do so arises.

135.   And under the heading "Protection and Proper Use of Company Assets," SandRidge's Ethics Code states:

All Company assets should be used for legitimate purposes and protected against theft, waste, or loss. Company assets include, but are not limited to, cash, land, buildings, equipment, inventory, vehicles, appliances, (i.e., telephones, computers, copiers, etc.) and intangible items such as business plans, prospects and Company records, name, logo and tag line.

136.   Additionally, SandRidge has adopted a Financial Code for its senior financial officers, which includes Defendant Ward as CEO. Like the Ethics Code, it requires each senior officer to "[a]ct ethically with honesty and integrity, including the ethical handling of all actual or apparent conflicts of interest between personal and

professional relationships," and to "[r]espect the confidentiality of information acquired in the course of his work."

137.    As set forth above, Defendant Ward and the Director Defendants blatantly violated SandRidge's Ethics Code, Financial Code and Corporate Governance Guidelines.

## VII.    DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

138.    Plaintiffs bring this action derivatively in the right and for the benefit of SandRidge to redress injuries suffered, and to be suffered, by SandRidge as a direct and proximate result of the Director Defendants' breaches of fiduciary duties, corporate waste, and violations of Section 14(a) of the Exchange Act; the aiding and abetting of the Director Defendants' breaches of fiduciary duties by the Ward Entity Defendants; and the Ward Entity Defendants' misappropriation of corporate assets, civil conspiracy, constructive fraud, and unjust enrichment.

139.    Plaintiffs will fairly and adequately protect the interests of the Company and its shareholders and have retained counsel competent and experienced in derivative litigation. Plaintiffs own SandRidge stock and owned SandRidge stock during the relevant period. Plaintiffs understand their obligation to hold their stock throughout the duration of this action and are prepared to do so. Plaintiffs will continue to vigorously and conscientiously litigate this action and fulfill their responsibilities in representing SandRidge's interests.

140.   Because of the facts alleged in this complaint, under the laws of Delaware, the Company's state of incorporation, a pre-suit demand on SandRidge's board to bring this action is excused because such a demand would have been a futile and useless act.

141.   From the time the initial complaint in this action was filed until March 13, 2013, when TPG-Axon obtained four board seats as a result of a settlement with the Company, SandRidge's board consisted solely of the seven Director Defendants.  Thus, for all claims validly in litigation before March 13, 2013, Plaintiffs need only show that a majority of the board (four of seven) were not independent or disinterested to show that demand is futile and thus excused.  Because all seven Director Defendants—the entire board before March 13, 2013—were not independent or disinterested, demand is futile and thus excused for all claims in litigation before March 13, 2013.

142.   Additionally, demand is futile, and thus excused, for the claims brought after March 13, 2013—the claims against the Ward Entity Defendants—because a majority of the board is not independent and disinterested.  As of March 13, 2013, the Director Defendants, then seven of the eleven-member board, were not independent or disinterested, so demand is futile and thus excused for all claims in litigation including those first asserted when there was an eleven-member board.

143.   Moreover, the acts of the Directors Defendants complained of herein, including allowing Defendant Ward and the Ward Entity Defendants to usurp corporate opportunities and misappropriate corporate assets and granting excessive and wasteful compensation to the senior executive officers, were not the product of a valid exercise of business judgment, and thus demand is excused as futile.

## A.   *The Director Defendants Are Not Independent and Disinterested*

144.   Demand against the board is futile for several reasons.  First, the Delaware Court of Chancery has found that the Director Defendants have likely violated their fiduciary duty of loyalty by attempting to entrench themselves, indicating a glaring lack of loyalty to the Company generally.

145.   Second, after TPG-Axon engaged the Director Defendants in a proxy contest and flagged for the board some of the Related-Party Transactions and other breaches of fiduciary duties complained of herein, in addition to taking steps to entrench themselves on the board, the Director Defendants issued several statements exonerating Defendant Ward and saying that no wrongdoing had taken place, thereby aligning themselves with Defendant Ward, and likewise indicating a lack of loyalty to the Company.

146.   Third, the Director Defendants approved an egregious employment contract that allows Defendant Ward to engage in behavior that is antithetical to the best interests of the Company, has no valid business purpose, and violates the Company's Ethics Code and Defendant Ward's duty of loyalty.

147.   Finally, as set forth below, the Director Defendants have numerous significant business and personal relationships with Defendant Ward and through him with the Ward Entity Defendants and are beholden to Defendant Ward.

148.   In a related suit in Delaware Chancery Court, Chancellor Strine found the Director Defendants' "thin and shifting arguments" in support of their efforts to maintain control over the Company (presumably at least in part to attempt to insulate themselves

from liability for the actions set out herein) were done "with an absence of good faith and reasonableness inconsistent with their fiduciary duties." *Kallick*, 2013 WL 868942, at *16.

149.   In response to TPG-Axon's consent solicitation seeking to: (1) amend SandRidge's bylaws to de-stagger the board of directors; (2) remove the Director Defendants; and (3) replace the Director Defendants with a slate of TPG-Axon nominees, the Director Defendants adopted a poison pill, made it harder for shareholders to take action by written consent, amended the Company's bylaws to require an affirmative vote of over 50% of stockholders to amend any part of the bylaws concerning the election of directors, and launched a campaign opposing TPG-Axon's consent solicitation and urging SandRidge shareholders to vote against TPG-Axon's proposals.

150.   The Director Defendants then attempted to restrict the statutory 60-day period for TPG-Axon's consent solicitation by announcing that the period had begun on December 19, 2012, before TPG-Axon filed its definitive or preliminary proxy statements.   TPG-Axon filed suit challenging this maneuver, and the Company later settled this dispute by agreeing that the period began on January 15, 2013, when TPG-Axon filed its definitive proxy statement.

151.   Moreover, in opposing TPG-Axon's consent solicitation, the Director Defendants falsely represented to SandRidge shareholders that the election of the TPG-Axon nominees would constitute a "change in control" with respect to SandRidge's credit agreements, which would trigger the right of SandRidge's lenders to require SandRidge

to repurchase $4.3 billion worth of notes, and that "[t]he Company may not have sufficient liquidity to fund" the purchase.

152.   However, the next day, the Director Defendants reversed their earlier statement and admitted that there was no danger that the Company's lenders would require such a repurchase because the debt was trading at prices above the repurchase price.

153.   Moreover, as Chancellor Strine found in *Kallick*, the Director Defendants could have easily neutralized the "change in control" provisions by approving the TPG-Axon nominees without supporting their election. 2013 WL 868942, at *13.   Under Delaware law, the board may only refuse to grant approval of the opposing slate if it determines that the slate posed such a material threat of harm to the company that approving them would be a breach of their duty of loyalty.

154.   Chancellor Strine found that the Director Defendants had no reason to withhold their approval of the TPG-Axon slate and that in doing so "[the Director] [D]efendants are *likely violating their fiduciary duty of loyalty* to SandRidge and its stockholders." *Id.* at *7 (emphasis added).   Having found that plaintiff "has a strong likelihood of success on the merits," Chancellor Strine enjoined the Director Defendants from soliciting consent revocations until they approved the TPG-Axon slate of nominees. *Id.* at *16. Chancellor Strine explained that "[g]iven the cloud the incumbent board has *intentionally* flown over the voting decisions and the *absence of any rational, good faith justification for its non-decision as to approval*, I believe this limited injunctive relief is proportionate and equitable." *Id.* (emphasis added).

**VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT** – **Page 42**

155.    Further, the Director Defendants are clearly not independent and disinterested as they have vigorously defended Defendant Ward and attempted to exonerate his activities on several occasions, further exhibiting that Defendant Ward dominates and controls the Director Defendants and that they are beholden to him. On January 25, 2013, the Company issued a press release in which it publicly responded to shareholder allegations that Defendant Ward and WCT Resources, among other things, have directly competed with the Company in the Mississippian Oil Play through front running the acquisition of mineral rights. According to the press release, the Company has "reviewed issues related to these allegations several times over the Company's history and has found no wrongdoing to have taken place." Soon afterwards, the Company reiterated this same statement in a February 4, 2013 shareholder presentation. And, on February 20, 2013, the Company again publicly defended Defendant Ward in another press release saying that "the Board has found no evidence of wrongdoing."

156.    Additionally, as explained in more detail above, the Director Defendants, without explanation, approved amendments to Defendant Ward's 2006 Employment Agreement that allowed Defendant Ward to engage in oil and gas businesses in conflict with Defendant Ward's duties to the Company without receiving adequate consideration for giving him this right. That act by the Director Defendants cannot be attributed to any rational business purpose, contravenes the Company's Ethics Code, violates the board's duty of loyalty, and wastes corporate assets.  Likewise, the Directors Defendants paid Defendant Ward 7.5% of the Company's total cash for his well interests in 2008.  These shocking actions by the Director Defendants are strong evidence of Defendant Ward's

domination and control over the board and the Director Defendants' repeated capitulation to Defendant Ward's desires.

157.    Further, as set forth in greater detail below, the Director Defendants have engaged in self-dealing and related-party transactions.

158.    The Director Defendants have exhibited a history of taking actions that are not in the best interests of the Company and that violate their duty of loyalty to the Company and its shareholders.   Accordingly, their lack of loyalty to the Company indicates that a demand would be futile.

### B.       *Defendant Ward Lacks Independence and Disinterestedness*

159.    In addition to the factors applicable to the Director Defendants as a group, Defendant Ward lacks both the independence and disinterestedness required to impartially consider a demand by Plaintiffs.  Defendant Ward could not comply with the fiduciary duties to independently consider a demand to bring the claims alleged herein as he is interested in the Related-Party Transactions and other wrongful conduct alleged herein.

160.    Indeed, he and members of his family are beneficiaries of the Related-Party Transactions, and he is the beneficiary of the wasteful compensation, including substantial monetary compensation and other benefits from the Company—totaling over $150 million, and self-dealing alleged herein.  Thus, Defendant Ward would not be able to vigorously prosecute any such action and cannot, in good faith, exercise independent business judgment to determine whether to bring this action against himself, the other Director Defendants and/or the Ward Entity Defendants.

### C.    *Defendant Ward Dominates and Controls the other Director Defendants*

161.   Defendant Ward, as CEO and Chairman, and holder of a substantial percentage of SandRidge's outstanding common stock (between 5% to 25% between 2006 and 2013), controlled and dominated SandRidge's board.   Defendant Ward conferred great wealth upon Defendants Oliver, Jordan, Gilliland, Serota, Dobson, and Brewer, who, like Ward, treated SandRidge like their own personal piggybank.

162.   As alleged in detail below, through related-party transactions, and fees for service on the Company's board, Defendant Ward transferred tens of millions of dollars of shareholder money to Defendants Oliver, Jordan, Gilliland, Serota, Dobson, and Brewer.  Defendants Oliver, Jordan, Gilliland, Serota, Dobson, and Brewer, as directors, set their own fees.

163.   In return, Defendants Oliver, Jordan, Gilliland, Serota, Dobson, and Brewer knowingly permitted Defendant Ward to engage in the wrongful conduct alleged above for his and his family's own personal economic gain, and approved exorbitant compensation and perquisites for Defendant Ward and other payments to Ward-related interests.

164.   Indeed, Defendants Oliver, Jordan, Gilliland, Serota, Dobson, and Brewer's failure to disclose Defendant Ward's adjacent acquisitions demonstrates that they are not independent.   Although Defendants Oliver, Jordan, Gilliland, Serota, Dobson, and Brewer knew of or should have known of Defendant Ward's improper front running transactions and his competition and interference with SandRidge's business, they failed to stop his wrongful conduct and disclose these transactions to SandRidge investors.

165.    The Charter of the Nominating & Governance Committee dated March 1, 2011, provides, in part, that the Committee "will consider that a director's independence may be jeopardized if (a) his or her compensation and perquisites exceed customary levels, (b) the Company makes substantial charitable contributions to organizations with which the director is affiliated or (c) the Company enters into consulting contracts with (or provides other indirect forms of compensation to) the director or an organization with which the director is affiliated."

166.    The economic benefits conferred on the Director Defendants are so substantial that they are not able to impartially consider whether to bring the claims alleged in this complaint.

### D.    Defendant Dobson Lacks Independence and Disinterestedness

167.    In addition to the factors applicable to the Director Defendants as a group, Defendant Dobson lacks both the independence and disinterestedness required to impartially consider a demand by Plaintiffs. Defendant Dobson could not comply with the fiduciary duties to independently consider a demand to bring the claims alleged herein because he is dominated and controlled by, and beholden to, Defendant Ward.

168.    Defendant Dobson joined the board on September 22, 2009.  In 2006, Defendants Ward and Dobson were among the 8 original partners that purchased the NBA's Seattle SuperSonics and the WNBA's Seattle Storm professional basketball teams for $350 million.  In July 2008, the Seattle SuperSonics moved to Oklahoma City and were renamed the Thunder.   Defendants Ward and Dobson own a 19.23% and 3.85% interest, respectively, of the Thunder.  SandRidge entered into an agreement related to the

sponsorship of the team in September 2008.  Under the five-year agreement, SandRidge paid approximately $16.4 million for advertising and promotional activities related to the Thunder.

169.    In October 2009, SandRidge entered into an agreement to license a suite at the arena where the Thunder plays its home games. Under the four-year agreement, SandRidge agreed to pay an annual license fee in return for access to the suite during Thunder games and for other events held at the arena. The annual license fee for the first year is $200,000 and may increase up to 3% each year.

170.    For his service as a director, Defendant Dobson earned $118,753 in 2009, including a cash payment of $50,000; $400,006 in 2010, including a cash payment of $125,000; $375,000 in 2011, including a cash payment of $100,000; and $387,503 in 2012, including a cash payment of $112,500.

171.    Thus, Defendant Dobson would not be able to vigorously prosecute any such action and cannot, in good faith, exercise independent business judgment to determine whether to bring this action against Defendant Ward, himself, the other Director Defendants, and/or the Ward Entity Defendants.

### E.    *Defendant Gilliland Lacks Independence and Disinterestedness*

172.    In addition to the factors applicable to the Director Defendants as a group, Defendant Gilliland lacks both the independence and disinterestedness required to impartially consider a demand by Plaintiffs. Defendant Gilliland could not comply with the fiduciary duties to independently consider a demand to bring the claims alleged herein because he has engaged in numerous transactions with the Company, including

assisting it in acquisitions and acquiring interests in related companies and selling an office building to the Company.

173.    Defendant Gilliland was hand-selected to serve on the board by Defendant Ward in January 2006.  Gilliland is loyal and beholden to Defendant Ward, such that Gilliland is not independent.  In December 2005, SandRidge acquired interests in PetroSource, certain acreage in the Piceance Basin and projects in Missouri and Nevada from Gillco Energy, L.P., an entity controlled by Gilliland, for approximately $21.1 million in SandRidge common stock.

174.    In February 2006, SandRidge acquired an office building in Midland, Texas from a partnership affiliated with Gilliland for $950,000.

175.    For his service as a director, Gilliland earned $92,385 in 2006, including a cash payment of $78,000; $129,215 in 2007, including a cash payment of $100,000; $189,877 in 2008, including a cash payment of $125,000; $300,006 in 2009, including a cash payment of $62,500; $400,006 in 2010, including a cash payment of $125,000; $375,000 in 2011, including a cash payment of $100,000; and $387,503 in 2012, including a cash payment of $112,500.

176.    Thus, Defendant Gilliland would not be able to vigorously prosecute any such action and cannot, in good faith, exercise independent business judgment to determine whether to bring this action against Defendant Ward, himself, the other Director Defendants, and/or the Ward Entity Defendants.

### F.   *Defendant Jordan Lacks Independence and Disinterestedness*

177.   In addition to the factors applicable to the Director Defendants as a group, Defendant Jordan lacks both the independence and disinterestedness required to impartially consider a demand by Plaintiffs because he is a former employee of SandRidge, having been its Vice President.

178.   In December 2005, Defendant Jordan was hand-selected to serve on the board by Defendant Ward.   Defendant Jordan is loyal and beholden to Defendant Ward, such that Jordan would not exercise independence.   Defendant Jordan was also a member of the Compensation Committee when it recommended to the board the outsized compensation awards to Defendant Ward.

179.   Defendant Jordan was also a member of the Nominating and Corporate Governance Committee and thus was aware of the breaches of fiduciary duties and violations of the Code of Business Conduct and Ethics alleged herein.

180.   From October 2005 through August 2006, Jordan served as SandRidge's Vice President, Business.   In December 2005, SandRidge acquired from Defendant Jordan interests in certain Piceance Basin acreage and West Texas undeveloped acreage, and the remaining 50% interest in Lariat Compression Co., making it a wholly-owned subsidiary of SandRidge, for approximately $21.3 million in SandRidge common stock.

181.   In March 2006, SandRidge acquired Jordan's 12.5% interest in PetroSource for $5,489,401. In July 2006, SandRidge acquired Defendant Jordan's interests in certain natural gas and oil producing properties for $9,000,000.  For the years 2004, 2005, 2006 and 2007, SandRidge paid Defendant Jordan $1,532,000, $2,113,020, $1,496,598 and

$6,156, respectively, for Defendant Jordan's capital contributions to SandRidge's drilling projects.

182.   In June 2007, SandRidge purchased all of the interests in twelve producing wells and one well being drilled, which interests were owned by Wallace Jordan, LLC, a limited liability company a majority interest of which is owned and controlled by Jordan ("Wallace Jordan"). In addition and as a part of this same transaction, SandRidge purchased the interest owned by Wallace Jordan in the Sabino pipeline and the West Piñon Gathering System and certain oil and gas leases covering lands in Pecos County, Texas, as well as the interest owned by Defendant Jordan individually in Integra Energy. The purchase price for these assets was $3.3 million plus the reimbursement of approximately $236,000 of costs attributable to Wallace Jordan's 10% working interest in one of SandRidge's wells.

183.   These transactions with SandRidge raise a question as to Defendant Jordan's loyalty to SandRidge and make him independence-impaired because he is beholden to, and financially dependent on, Defendant Ward.

184.   For his service as a director, Defendant Jordan earned $62,259 in 2006, including a cash payment of $50,000; $130,564 in 2007, including a cash payment of $100,000; $189,877 in 2008, including a cash payment of $125,000; $300,006 in 2009, including a cash payment of $62,500; $400,006 in 2010, including a cash payment of $125,000; $375,000 in 2011, including a cash payment of $100,000; and $387,503 in 2012, including a cash payment of $112,500.

185.    In its settlement with SandRidge, TPG-Axon called for Defendant Jordan's resignation from his position as director effective on June 30, 2013.  Defendant Jordan, in fact, tendered his resignation effective April 29, 2013.

186.    Thus, Defendant Jordan would not be able to vigorously prosecute any such action and cannot, in good faith, exercise independent business judgment to determine whether to bring this action against Defendant Ward, himself, the other Director Defendants, and/or the Ward Entity Defendants.

### G.    *Defendant Oliver Lacks Independence and Disinterestedness*

187.    In addition to the factors applicable to the Director Defendants as a group, Defendant Oliver lacks both the independence and disinterestedness required to impartially consider a demand by Plaintiffs.

188.    Defendant Oliver was hand-selected by Ward and appointed as a director on July 13, 2006.  In September 2006, SandRidge entered into a new facilities lease with Defendant Oliver. The lease extended to August 2009 with annual rental payments of $1.1 million in 2007, $1.4 million in 2008 and $565,000 million in 2009.

189.    The lease was not renewed prior to its termination due to the relocation of all of SandRidge's employees from the facility to SandRidge's downtown Oklahoma City headquarters.  SandRidge reportedly spent $100 million to renovate the Kerr-McGee Tower and four other buildings to be called SandRidge Commons.  Despite the massive investment of shareholder wealth in expansion of SandRidge's office space, in 2011, the Company resumed renting space in a building owned by an entity that is partially owned by Defendant Oliver with annual rent being approximately $510,000.

190.    Defendant Oliver's business relationship with SandRidge impairs his duty of loyalty to the Company and the shareholders and makes him independence-impaired because he is beholden to, and financially dependent on, Defendant Ward. Moreover, because Defendant Oliver was hand-selected to serve on the board by Defendant Ward, he is loyal and beholden to him, such that he would not exercise independence.

191.    For his service as a director on the Company's board, Defendant Oliver earned $64,385 in 2006, including a cash payment of $50,000, $129,215 in 2007, including a cash payment of $100,000; $189,877 in 2008, including a cash payment of $125,000; $300,006 in 2009, including a cash payment of $62,500; $400,006 in 2010, including a cash payment of $125,000; $375,000 in 2011, including a cash payment of $100,000; and $387,503 in 2012, including a cash payment of $112,500.

192.    Defendant Oliver was also a member of the Compensation Committee when it recommended to the board the outsized compensation awards to Defendant Ward. Defendant Oliver was also a member of the Nominating and Corporate Governance Committee and thus was aware of the breaches of duties and the Code of Business Conduct and Ethics alleged herein.

193.    Thus, Defendant Oliver would not be able to vigorously prosecute any such action and cannot, in good faith, exercise independent business judgment to determine whether to bring this action against himself, Defendant Ward, the other Director Defendants, and/or the Ward Entity Defendants.

### H.    *Defendant Serota Lacks Independence and Disinterestedness*

194.   In addition to the factors applicable to the Director Defendants as a group, Defendant Serota lacks both the independence and disinterestedness required to impartially consider a demand by Plaintiffs.  In March 2007, Defendant Serota was hand-selected to serve on the board by Defendant Ward.   Defendant Serota is loyal and beholden to Defendant Ward, such that Serota would not exercise independence. Defendant Serota is a senior partner at Area Management, LLC, which in May 2008 sold 2.5 million shares of SandRidge common stock for gross proceeds of $135 million.

195.   For his service as a director, Defendant Serota earned $87,500 in cash for 2007; $160,308 in 2008, including a cash payment of $125,000; $300,006 in 2009, including a cash payment of $37,500; $362,506 in 2010, including a cash payment of $87,500; $375,000 in 2011, including a cash payment of $100,000; and $362,000 in 2012, including cash payment of $87,500.

196.   Thus, Defendant Serota would not be able to vigorously prosecute any such action and cannot, in good faith, exercise independent business judgment to determine whether to bring this action against himself, Defendant Ward, the other Director Defendants, and/or the Ward Entity Defendants.

### I.    *Defendant Brewer Lacks Independence and Disinterestedness*

197.   In addition to the factors applicable to the Director Defendants as a group, Defendant Brewer lacks both the independence and disinterestedness required to impartially consider a demand by Plaintiffs. Defendant Brewer received significant income from SandRidge for his service on the board.  According to SandRidge's proxy

statements, Defendant Brewer, who joined the board on February 28, 2011 earned $297,937 for the 10 months he served on the board in 2011; and $387,503 in 2012, including a cash payment of $112,500.

### J. Defendants Brewer, Gilliland, Jordan, and Oliver Are Conflicted Because They Approved Ward's Compensation

198. The Director Defendants have served on SandRidge committees. Specifically, Defendants Brewer, Gilliland, Jordan, and Oliver have served on the Compensation Committee, and are charged with reviewing, evaluating, and approving plans, policies, and programs for compensation of Company officers, including Defendant Ward. Indeed, the Compensation Committee set the wasteful compensation for Defendant Ward and the other senior executive officers and approved Defendant Ward's Amended Employment Agreement complained of herein.

199. They are thus directly implicated in the improper and illegal acts giving rise to this complaint. Thus, Defendants Brewer, Gilliland, Jordan, and Oliver would not be able to vigorously prosecute any such action and cannot, in good faith, exercise independent business judgment to determine whether to bring this action against themselves.

### K. Defendants Brewer, Dobson, Gilliland, Jordan, Oliver, and Serota Are Conflicted Because They Earn Material Amounts of Income from Service on SandRidge's Board

200. As set forth above, Defendants Brewer, Dobson, Gilliland, Jordan, Oliver, and Serota have received significant income from the Company for their service on the Company's board, thus making demand upon them futile.

201.    As alleged above, Defendants Brewer, Dobson, Gilliland, Jordan, Oliver, and Serota earned as director fees between  $362,000  and $387,500 in 2012, and as high as $400,000/year in 2010.[6]  The board is therefore one of the top 20 companies in the nation for director compensation.  By way of reference, directors at the largest energy company in the world (Exxon Mobil) were paid less in 2012 than the lowest paid SandRidge director.  With the exception of two directors who received large one-time grants of stock upon first being elected to Exxon Mobil's board in 2012, directors at Exxon Mobil received between $326,133 and $336,133 in total compensation for 2012. However, in 2012, Exxon Mobil was 125 times bigger than SandRidge based on market capitalization.

202.    The compensation of the Director Defendants materially exceeds usual and customary directors' fees and creates a reasonable doubt as to the Director Defendants' independence.

203.    Moreover, the Director Defendants' blatant attempt to entrench themselves in response to TPG-Axon's proxy contest is evidence that the compensation received for their positions on the SandRidge Board was material to each of them.

204.    The Director Defendants have received material substantial monetary compensation and other benefits from the Company and cannot be considered independent and disinterested.

---

[6] In 2012, SandRidge's board met seventeen times, amounting to fees of approximately $22,800 per Director Defendant per meeting.  In 2011, SandRidge's board met six times, amounting to fees of approximately $62,500 per Director Defendant per meeting.

**VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT** – Page 55

### L.      *The Director Defendants Face a Substantial Risk of Liability*

205.    The Director Defendants face a substantial likelihood of personal liability arising from their breaches of fiduciary duties and other violations of law.

206.    Defendant Ward faces a substantial likelihood of personal liability arising from his breaches of fiduciary duty as he has wrongfully placed his personal interests and his family's interests ahead of SandRidge's interests and those of its shareholders.

207.    As to the other Director Defendants, the acts complained of include their knowing approval or conscious disregard of Defendant Ward's breaches of his fiduciary duties, including violations of SandRidge's Ethics Code, Financial Code, and Corporate Governance Guidelines.

208.    The Company maintains a written policy that requires material related-party transactions to be reviewed and approved, such as the transactions between the Company and the Ward Entity Defendants.

209.    The Director Defendants exhibited a systematic failure to fulfill their fiduciary duties, which could not have been an exercise of good faith business judgment and amounted to bad faith, gross negligence and extreme recklessness.

210.    The Director Defendants are exposed to substantial personal liability because of their failure to put in place or enforce appropriate controls necessary to assure that all actions were in the best interest of the Company and its shareholders as opposed to those of Defendant Ward.

211.    The Director Defendants knew of Defendant Ward's wrongdoing and waste and did nothing to prevent it, to stop it, or to prosecute this Action. Simply put, it is

inconceivable that the Director Defendants did not know that the Ward Entity Defendants were improperly taking SandRidge corporate opportunities by acquiring hundreds of thousands of acres of mineral rights in the Mississippian Oil Play at the same time as the Company and in adjacent acreage.

212.   Because the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred or recklessly disregarded the wrongs complained of herein, they are not disinterested parties.

213.   As set forth in detail above, a court in Delaware has already found that there is a likelihood that the directors breached their fiduciary duties to SandRidge and its shareholders.

214.   Additionally, SandRidge and the Director Defendants have been, and will continue to be, subjected to investigations and lawsuits for the actions alleged herein, including a related action in Oklahoma state court and a related federal securities action, yet, not surprisingly, the Director Defendants have not pursued Defendant Ward or others—such as the Ward Entity Defendants—who were responsible for that wrongful conduct to attempt to stop that conduct or recover for SandRidge any part of the damages the Company has suffered and will continue to suffer.

215.   For these reasons, the actions of the board and the relationships between and among the Director Defendants described above have impaired the board's ability to validly exercise its business judgment and have rendered the board members incapable of reaching an independent decision as to whether to accept a demand by Plaintiffs and to pursue claims on behalf of the Company, including against themselves.

**VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT** – **Page 57**

## VIII.  CAUSES OF ACTION

### FIRST CAUSE OF ACTION

**Against Defendant Ward For Breach of Fiduciary Duties**

216.    Plaintiffs incorporate by reference and re-allege each allegation contained above.

217.    Defendant Ward owes SandRidge certain fiduciary duties as set out above.

218.    Defendant Ward has breached his fiduciary duties of loyalty, good faith, fair dealing, and due care because, among other things, he:

      i.    allowed his private interests to interfere with the interests of the Company;

      ii.    has a relationship with one or more entities that competes directly with the Company;

      iii.    participates in outside activities that compete directly with the Company and/or that interfere with the performance of his duties to the Company; and

      iv.    used Company assets and confidential information gained in connection with his employment or involvement with the Company for personal gain and/or for the benefit of a family member's or another outside party, and to compete with and interfere with Company business.

219.    In violation of his fiduciary duties to SandRidge and shareholders, Defendant Ward took SandRidge business opportunities for his own benefit.  SandRidge is and was financially able to exploit these opportunities; the opportunities were and are within SandRidge's line of business; SandRidge and its shareholders had and have an

interest or expectancy in the opportunities. By taking these opportunities for his own benefit, Defendant Ward was placed in a position inimical to, and in conflict with, his duties to SandRidge and its shareholders.

220.   As a direct and proximate result of Defendant Ward's breaches of fiduciary duties, SandRidge has been damaged, not only monetarily, but also to its corporate image and goodwill. That damage includes, among other things, severe damage to the share price of SandRidge, resulting in an increase cost of capital, the waste of corporate assets, and reputational harm.

## SECOND CAUSE OF ACTION

### Against the Director Defendants for Breach of Fiduciary Duties

221.   Plaintiffs incorporate by reference and re-allege each allegation contained above.

222.   The Director Defendants owe SandRidge certain fiduciary duties as set out above.

223.   The Director Defendants have breached their fiduciary duties of loyalty, good faith, oversight, supervision, reasonable inquiry, candor, and due care.

224.   The Director Defendants have a duty to the Company and its shareholders to establish and maintain adequate internal controls to ensure the Company is operated in a prudent and lawful manner. The Director Defendants utterly failed to implement any reporting or information system or controls; or having implemented such a system or controls, consciously failed to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention. The Director

Defendants knew they were not discharging their fiduciary obligations and/or demonstrated a conscious disregard for their responsibilities and acted in bad faith.

225. The Director Defendants, however, engaged in a sustained and systematic failure to exercise their fiduciary duties. Among other things, the Director Defendants failed to ensure that the Company's officers and directors, including Defendant Ward, complied with its Ethics Code, Financial Code, and Corporate Governance Guidelines and made adequate and accurate disclosures about Defendant Ward's activities to shareholders through SandRidge's SEC filings.

226. The Director Defendants' disclosures to SandRidge investors concerning Defendant Ward's improper Related-Party Transactions were materially misleading. The Director Defendants authorized and prepared the Company's proxy statements and had a duty to disclose all material Related-Party Transactions. The Director Defendants knew of Defendant Ward's conduct and knowingly and intentionally and in bad faith failed to disclose that conduct.

227. The Director Defendants' conduct in response to TPG-Axon's consent solicitation breached their fiduciary duties to SandRidge and its shareholders. Chancellor Strine already found the Director Defendants' "thin and shifting arguments" in support of their efforts to maintain control over the Company were done "with an absence of good faith and reasonableness inconsistent with their fiduciary duties." *Kallick*, 2013 WL 868942, at *16.

228. As a direct and proximate result of the Director Defendants' breaches of their fiduciary duties, SandRidge has been damaged, not only monetarily, but also with

respect to its corporate image and goodwill.  That damage includes, among other things, severe damage to the share price of SandRidge, resulting in an increase cost of capital, the waste of corporate assets, and reputational harm.

## THIRD CAUSE OF ACTION

### Against the Director Defendants for Waste of Corporate Assets

229.    Plaintiffs incorporate by reference and re-allege each allegation contained above.

230.    The Director Defendants' conduct constitutes a waste of SandRidge's assets.   Specifically, the Director Defendants approved extravagant and wasteful compensation to Defendant Ward and other senior executives, as set forth herein, including without limitation, the provisions of the Amended Employment Agreement.  In addition, the Director Defendants granted Defendant Ward significant wasteful perquisites at the Company's expense.   Finally, the Director Defendants funneled millions of dollars out of the Company for Defendant Ward's benefit, including to the Ward Defendant Entities.

231.    The Director Defendants' conduct exchanged corporate assets for consideration so disproportionately small as to lie beyond the range at which any reasonable person might be willing to trade, and was an exchange that was so one-sided that no business person of ordinary, sound judgment could conclude that SandRidge received adequate consideration.

232.    The facts alleged above raise a reasonable doubt as to whether these transactions were so one-sided as to be beyond the outer limit of the Director Defendants' discretion.

233.    Because of the Director Defendants' waste of corporate assets, they are liable to the Company.

### FOURTH CAUSE OF ACTION

### Against the Ward Entity Defendants for Aiding and Abetting

234.    Plaintiffs incorporate by reference and re-allege each allegation contained above.

235.    The Director Defendants owe SandRidge certain fiduciary duties as set out above.

236.    By committing the acts alleged, the Director Defendants breached their fiduciary duties to SandRidge.

237.    The Ward Entity Defendants colluded or aided and abetted Defendant Ward's breaches of fiduciary duties and were active and knowing participants in Defendant Ward's breaches of fiduciary duties. Additionally, the Ward Entity Defendants colluded or aided and abetted the other Director Defendants' breaches of fiduciary duties and were active and knowing participants in the Director Defendants' breaches of fiduciary duties. Specifically, Defendant Ward and the other Director Defendants provided SandRidge's confidential and proprietary information to the Ward Entity Defendants, which Defendant Ward and the Ward Entity Defendants then used to usurp SandRidge's corporate opportunities.

238.   As a direct and proximate result of the Ward Entity Defendants' aiding and abetting the Director Defendants' breaches of fiduciary duties, SandRidge has been damaged by the use of its confidential and proprietary information to usurp its corporate opportunities.

## FIFTH CAUSE OF ACTION

### Against Defendant Ward and the Ward Entity Defendants for Misappropriation

239.   Plaintiffs incorporate by reference and re-allege each allegation contained above.

240.   Defendant Ward and the Ward Entity Defendants misappropriated SandRidge's confidential and proprietary information, and further wrongfully used that confidential and proprietary information to SandRidge's detriment by usurping SandRidge's corporate opportunities, which SandRidge was and is financially able to exploit, were and are within SandRidge's line of business, and in which the Company and its shareholders had and have an interest or expectancy in the opportunities, thus placing Defendant Ward in a position inimical to, and in conflict with, his duties to SandRidge and its shareholders.

241.   As a direct and proximate result of Defendant Ward's and the Ward Entity Defendants' misappropriation, SandRidge has been damaged by the use of its confidential and proprietary information to misappropriate its corporate opportunities.

## SIXTH CAUSE OF ACTION

### Against Defendant Ward and the Ward Entity Defendants for Civil Conspiracy

242.   Plaintiffs incorporate by reference and re-allege each allegation contained above.

243.   Defendant Ward and the Ward Entity Defendants have conspired to do an unlawful act by unlawful means. Specifically, Defendant Ward and the Ward Entity Defendants conspired to misappropriate SandRidge's confidential and proprietary information and to use that confidential and proprietary information to usurp SandRidge of its corporate opportunities.

244.   As a direct and proximate result of the conspiracy between Defendant Ward and the Ward Entity Defendants, SandRidge has been damaged by the use of its confidential and proprietary information to usurp its corporate opportunities.

## SEVENTH CAUSE OF ACTION

### Against the Defendant Ward and the Ward Entity Defendants for Constructive Fraud in Violation of 15 Okl. St. § 59

245.   Plaintiffs incorporate by reference and re-allege each allegation contained above.

246.   Defendant Ward owes SandRidge certain fiduciary duties as set out above.

247.   Defendant Ward and his family, through the Ward Entity Defendants, concealed or failed to fully disclose to SandRidge the true nature and extent of the Related-Party Transactions and self-dealing and misled SandRidge to the detriment of the

Company and its shareholders, and gained an unfair advantage over SandRidge and wrongfully usurped the Company's corporate opportunities.

248.   As a direct and proximate result of Defendant Ward and the Ward Entity Defendants' concealment or failure to disclose, misappropriation of corporate opportunities and interference with SandRidge's prospective economic advantage, SandRidge and its shareholders have been damaged.

## EIGHTH CAUSE OF ACTION

### Against the Ward Entity Defendants for Unjust Enrichment

249.   Plaintiffs incorporate by reference and re-allege each allegation contained above.

250.   The Ward Entity Defendants have unfairly benefited through the use of Company assets and confidential information, gained in connection with Defendant Ward's employment or involvement with SandRidge, to directly compete and interfere with SandRidge's business.

251.   SandRidge has a reasonable expectation of being offered all corporate opportunities from Defendant Ward relating to the acquisition of mineral interests and development in the Mississippian Oil Play.

252.   The Ward Entity Defendants have unfairly benefited from Defendant Ward's usurpation of SandRidge's corporate opportunities.

253.   As a direct and proximate result of the wrongful conduct complained of herein, SandRidge has been damaged and the Ward Entity Defendants have been unjustly enriched to the detriment of SandRidge and its Shareholders.

254.    To allow the Ward Entity Defendants to retain the benefits of SandRidge's corporate opportunities wrongfully usurped from the Company would result in substantial and unjust enrichment. In accordance with equity and good conscience, the Ward Entity Defendants ought not to be allowed to retain such a benefit that should have rightfully gone to SandRidge.

### NINTH CAUSE OF ACTION

### Against the Director Defendants for
### Violations of Section 14(a) of the Exchange Act

255.    Plaintiffs incorporate by reference and re-alleges each allegation contained above.

256.    For purposes of this count, Plaintiffs expressly disclaim any allegations of fraud. This count does not sound in fraud and is based solely upon the Director Defendants' negligent conduct.

257.    Rule 14a-9, promulgated under § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

258.    In the Company's proxy statements filed with the SEC and disseminated to stockholders for the purpose of soliciting proxies or consent revocations, including, but not limited to, on April 25, 2011, April 26, 2012 and January 15, 2013 (collectively, the "Proxies"), the Director Defendants issued materially false and misleading statements

concerning Defendant Ward's related-party and conflicted transactions because they failed to disclose the adjacent acquisitions engaged in by the Ward Entity Defendants.

259.   In the exercise of reasonable care, the Director Defendants should have known that the statements contained in the Proxies were materially false and misleading.

260.   The misrepresentations and omissions in the Proxies were material to Plaintiffs. The Proxies were an essential link in the accomplishment of the continuation of the wrongdoing alleged herein.

261.   The Company was damaged as a result of the Director Defendants' material misrepresentations in the Proxies.

## IX.   PRAYER FOR RELIEF

Plaintiffs demand judgment as follows:

A.   Determining that this action is a proper derivative action maintainable under law and demand is excused;

B.   Awarding against all Defendants and in favor of SandRidge the damages sustained by the Company as a result of the Director Defendants' breaches of their fiduciary duties and the Ward Entity Defendants' illegal and improper acts;

C.   Imposing a constructive trust over all mineral rights usurped and misappropriated from the Company by Defendant Ward and the Ward Entity Defendants;

D.   Awarding SandRidge restitution from Defendants and ordering disgorgement of all profits, benefits, and other compensation obtained by the Defendants;

E.   Directing SandRidge to take all necessary actions to reform and improve its corporate governance and internal procedures, to comply with the Company's existing

governance obligations and all applicable laws, to implement the reforms and improvements set forth in Exhibit "2" of this complaint, and to protect the Company and its shareholders from a recurrence of the damaging events described herein;

F.      Awarding to Plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

G.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury.

DATED: May 1, 2013

/s/ Michael  Burrage_____
Reggie N. Whitten, OBA #9576
Michael Burrage, OBA #1350
Simone Gosnell Fulmer, OBA #17037
Randa K. Reeves, OBA # 30695
**WHITTEN BURRAGE**
1215 Classen Drive
Oklahoma City, Oklahoma 73103
Telephone:   (405) 516-7800
Facsimile:    (405) 516-7859
rwhitten@whittenburragelaw.com
mburrage@whittenburragelaw.com
sfulmer@ whittenburragelaw.com
rreeves@ whittenburragelaw.com

-and-

**KAPLAN FOX & KILSHEIMER LLP**
Robert N. Kaplan (admitted *pro hac vice*)
Jeffrey P. Campisi (admitted *pro hac vice*)
Irina Kobylevsky (admitted *pro hac vice*)
850 Third Avenue, 14th Floor
New York, New York 10022
Telephone:   (212) 687-1980
Facsimile:    (212) 687-7714

rkaplan@kaplanfox.com
jcampisi@kaplanfox.com
ikobylevsky@kaplanfox.com

***Co-Lead Counsel for the Plaintiffs***


***Other Plaintiffs Counsel:***

**JACKSON WALKER L.L.P.**
Mark T. Josephs
Texas State Bar No. 11031400
(admitted *pro hac vice*)
Andrew D. Graham
Texas State Bar No. 24041002
(admitted *pro hac vice*)
901 Main Street, Suite 6000
Dallas, Texas  75202
Telephone:    (214) 953-6000
Facsimile:    (214) 953-5822
mjosephs@jw.com
agraham@jw.com

-and-

**GABLEGOTWALS**
W.A. Drew Edmondson, OBA #2628
Gregory T. Metcalfe, OBA #19526
Thomas W. Gruber, OA #3647
One Leadership Square, 15th Floor
211 N. Robinson
Oklahoma City, Oklahoma  73102
Telephone:    (405) 235-5500
Facsimile:    (405) 235-2875
dedmondson@gablelaw.com
gmetcalfe@gablelaw.com
tgruber@gablelaw.com

*Liaison Counsel for Plaintiffs:*

**FEDERMAN & SHERWOOD**
William B. Federman, OBA #2853
10205 North Pennsylvania
Oklahoma City, Oklahoma  73120
Telephone:    (405) 235-1560
Facsimile:    (405) 239-2112
wbf@federmanlaw.com

## CERTIFICATE OF SERVICE

<u>X</u>      I hereby certify that on May 1, 2013, I electronically transmitted the attached document to the Clerk of the Court using the ECF System for filing.  Based on the records currently on file, the Clerk of Court will transmit a Notice of Electronic Filing to the following ECF registrants:

Amanda F Lawrence  alawrence@scott-scott.com,
Andrew D Graham  agraham@jw.com
Brian B Alexander  balexander@cov.com
C Williams Phillips  cphillips@cov.com
Gregory T Metcalfe  gmetcalfe@gablelaw.com,
Irina Kobylevsky  ikobylevsky@kaplanfox.com
James E Dunn  jim@usattorney.com,
Jeffrey P Campisi  jcampisi@kaplanfox.com
Joseph P Guglielmo  jguglielmo@scott-scott.com
Louis N Boyarsky  lboyarsky@glancylaw.com
Mark P Gimbel  mgimbel@cov.com
Mark T Josephs  mjosephs@jw.com,
Michael Burrage  mburrage@whittenburragelaw.com,
Randa Kay Reeves  rreeves@whittenburragelaw.com,
Reggie N Whitten  rwhitten@whittenburragelaw.com,
Robert N Kaplan  rkaplan@kaplanfox.com
Simone Gosnell Fulmer  sfulmer@whittenburragelaw.com
Thomas B Snyder  thomas.snyder@crowedunlevy.com,
Thomas William Gruber  tgruber@gablelaw.com,
William A Edmondson  dedmondson@gablelaw.com,
William B Federman  wbf@federmanlaw.com,

/s/ Michael Burrage

**VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT – Page 70**