**IN THE UNITED STATES DISTRICT COURT FOR
THE WESTERN DISTRICT OF OKLAHOMA**

|  |  |
|---|---|
| IN RE SANDRIDGE ENERGY, INC. SHAREHOLDER DERIVATIVE LITIGATION | No. CIV-13-102-W<br>Relating to All Derivative Actions<br><br>**FIRST AMENDED VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

**KAPLAN, FOX & KILSHEIMER LLP**
Robert N. Kaplan (admitted *pro hac vice*)
Jeffrey P. Campisi (admitted *pro hac vice*)
Matthew P. McCahill (admitted *pro hac vice*)
850 Third Avenue, 14th Floor
New York, New York 10022
Telephone: (212) 687-1980
Facsimile: (212) 687-7714

**WHITTEN BURRAGE**
Reggie N. Whitten, OBA #9576
Michael Burrage, OBA #1350
Simone G. Fulmer, OBA #17037
Randa K. Reeves, OBA #30695
1215 Classen Drive
Oklahoma City, Oklahoma 73103
Telephone: (405) 516-7800
Facsimile: (405) 516-7859

*Co-Lead Counsel for Plaintiffs*

Dated: October 9, 2013

# TABLE OF CONTENTS

I.    PRELIMINARY STATEMENT ........................................................................... 1

II.   JURISDICTION AND VENUE ....................................................................... 6

III.  PARTIES ........................................................................................................ 7

   A.      Plaintiffs ................................................................................................ 7

   B.      Nominal Defendant .............................................................................. 8

   C.      Director Defendants ............................................................................. 8

   D.     Ward Entity Defendants........................................................................ 9

IV.  FACTUAL BACKGROUND........................................................................ 10

   A.      Defendant Ward Forms SandRidge, Takes It Public, and Destroys
          Shareholder Value ............................................................................. 10

   B.      SandRidge Builds an Industry-Leading Leasehold Position in the Mississippian ..... 10

   C.      Defendant Ward Forms and Controls The Ward Entity Defendant........................... 12

     i.     Defendant Ward Forms and Controls WCT Resources............................... 12

     ii.    Defendant Ward Forms and Controls 192 Investments............................ 16

     iii.   Conveyances from WCT Resources and 192 Investments to Defendant
          Ward Confirm that He Has an Ownership Interest in Them and Controls Them....... 17

     iv.   Defendant Ward Forms and Controls TLW Land & Cattle........................................ 19

   D.      Through the Ward Entity Defendants, Defendant Ward Front Runs and
          Usurps SandRidge's Opportunities............................................................ 21

     i.     Front-Running in Kansas ................................................................. 23

     ii.    Front-Running and Flipping in Oklahoma................................................ 24

     iii.   Adjacent Acquisitions in Oklahoma .......................................................... 26

     iv.   Conclusion ........................................................................................ 30

**FIRST AMENDED VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE
COMPLAINT – Page 1**

E.    A Major SandRidge Shareholder Corroborates Plaintiffs' Counsel's Investigation .. 31

F.    Defendant Ward's Self-Dealing and Usurpation of Corporate Opportunities in Alfalfa County, Oklahoma.................................................................................. 33

G.    Defendant Ward's Self-Dealing and Usurpation of Corporate Opportunities in Woods County, Oklahoma.................................................................................. 36

H.    Defendant Ward Used SandRidge's Confidential Information .................................. 38

I.    Excessive Executive Compensation and Waste of Corporate Assets ........................ 40

J.    SandRidge's Culture of Poor Corporate Governance .................................................. 46

V.    THE DIRECTOR DEFENDANTS FIDUCIARY DUTIES ................................................. 49

VI.   WARD'S CONDUCT VIOLATED SANDRIDGE'S CODE OF BUSINESS CONDUCT AND ETHICS AND CODE OF FINANCIAL ETHICS ............................... 51

VII.  DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS ......................................... 53

A.    Preliminary Matters ..................................................................................................... 53

B.    The Director Defendants are Collaterally Estopped from Arguing that Demand is Not Excused as to All Claims Asserted in the *Hefner* Action .................. 55

C.    The Director Defendants Are Not Independent Because They Face a Substantial Risk of Personal Liability............................................................................ 56

D.    Defendant Ward Lacks Independence and Disinterestedness ..................................... 64

E.    Defendant Jordan Lacks Independence and Disinterestedness.................................... 65

F.    Defendant Oliver Lacks Independence and Disinterestedness .................................... 68

G.    Defendant Dobson Lacks Independence and Disinterestedness.................................. 72

H.    Defendant Gilliland Lacks Independence and Disinterestedness ............................... 73

I.    Defendant Serota Lacks Independence and Disinterestedness .................................... 75

J.    Defendant Serota is Also Conflicted Because He is a Director of EXCO Resources, a SandRidge Competitor................................................................ 75

K.    Defendant Brewer Lacks Independence and Disinterestedness................................... 76

L.       Defendants Brewer, Dobson, Gilliland, Jordan, Oliver, and Serota
          Are Conflicted Because They Earn Material Amounts of Income
          from Service on SandRidge's Board........................................................ 77

M.      Non-Defendant Director Bennett Lacks Independence and Disinterestedness .......... 78

N.       The TPG-Axon Directors Are Not Independent or Disinterested ............................ 79

O.       Defendants Brewer, Dobson, Gilliland, Jordan, Oliver, and Serota's Lack
          of Independence is Demonstrated by Their Failure to Take Action Against
          Ward for His Violations of the Securities Exchange Act. ......................................... 81

P.       Defendants Oliver, Brewer and Serota Failed in their Duty of Oversight
          as Members of SandRidge's Audit Committee ......................................................... 82

VIII. CAUSES OF ACTION ..................................................................................................... 83

IX.    PRAYER FOR RELIEF .................................................................................................... 94

Lead Plaintiff Paul Elliot, on behalf of the Paul Elliot IRA R/O ("Elliot"), and Plaintiff Lisa Ezell ("Ezell," collectively with Elliot, "Plaintiffs"), through their counsel of record, bring this action on behalf of Nominal Defendant SandRidge Energy, Inc. ("SandRidge" or the "Company") and allege the following based upon personal knowledge as to those allegations specifically pertaining to them and based upon their counsel's investigation for all other matters. That investigation has included an extensive analysis of publicly available documents concerning SandRidge and the other Defendants, including the Company's filings with the U.S. Securities and Exchange Commission ("SEC") and press releases, court filings, land records, public filings with government and regulatory agencies, analyst reports, investor presentations, news articles (whether disseminated in print or electronic media), data accessed through Drillinginfo.com (a commercial data service concerning the oil and gas industry), and analyses by investigators and consultants.

## I.    PRELIMINARY STATEMENT

1.    Plaintiffs bring this shareholder derivative action on behalf of the Company alleging, among other things, the Director Defendants (as that phrase is defined below), including SandRidge's former CEO and Chairman Tom L. Ward ("Defendant Ward"), breached their fiduciary duties and wasted corporate assets.

2.    Plaintiffs' Consolidated Shareholder Derivative Complaint (ECF No. 71, filed on May 1, 2013) set out a broad array of self-dealing, breaches of fiduciary duty, and violations of corporate ethics that Defendant Ward committed, and which the Director Defendants knew about and did nothing to stop in violation of their duty of

**FIRST AMENDED VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT – Page 1**

oversight. This amendment, without the benefit of formal discovery, includes those original allegations and sets out further evidence of Defendants' wrongful conduct during the period from October 25, 2010 to the present (the "Relevant Period").

3.     The allegations set forth below show that Defendant Ward, in violation of his fiduciary duties to SandRidge and its shareholders, the Company's policies and procedures, and his employment agreement, wrongfully usurped SandRidge's corporate opportunities, benefitting himself and his family.

4.     When SandRidge's corporate strategy shifted to focus on oil and gas drilling in the Mississippian in 2010, the value of Defendant Ward's and his family's oil and gas leases in the Mississippian materially increased, and caused Defendant Ward to be conflicted. As the CEO and Chairman of SandRidge, under Delaware law and SandRidge's Ethics Policy, Defendant Ward owed a duty of loyalty to SandRidge and its shareholders. Defendant Ward's and his family's ownership interests in the Mississippian conflicted with Defendant Ward's fiduciary duties to SandRidge, because Defendant Ward and the Ward Entity Defendants were in competition with SandRidge in the Mississippian.

5.     The Company's Ethics Code prohibits SandRidge's officers and directors (like Defendant Ward) from (i) personally taking advantage of investment opportunities that are discovered through the use of Company property, information, or employment position; (ii) using Company property, information, or employment position for personal gain; and (iii) competing with the Company. Officers, directors, and employees owe a duty to the Company to advance its legitimate interests when the opportunity to do so

**FIRST AMENDED VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT – Page 2**

arises.  Pursuant to that same Ethics Code and the Company's corollary Financial Code, Defendant Ward was also barred from "participat[ing] in any outside entity that competes with the Company," and was required to "respect the confidentiality of information acquired in the course of [their] work."

6.     After SandRidge's corporate strategy shifted to focus on the Mississippian, all opportunities in the Mississippian, including without limitation, Defendant Ward's and his surrogates' buying, selling, leasing, transferring, or assigning of oil and gas properties in the Mississippian, were all SandRidge corporate opportunities that should have been but were not offered to SandRidge and were thus taken by Defendant Ward.

7.     As alleged in detail below, Defendant Ward and the Ward Entity Defendants—WCT Resources, L.L.C. ("WCT Resources"), 192 Investments, L.L.C. ("192 Investments"), and TLW Land & Cattle, L.P. ("TLW Land & Cattle")—are surrogates for one another, and Defendant Ward makes all decisions for each of them.

8.     Defendant Ward, through the Ward Entity Defendants, has taken numerous corporate opportunities that should have been offered to SandRidge. For example, during the Relevant Period, in Woods and Alfalfa Counties, Oklahoma, two of the four "core" Mississippian Play counties, WCT Resources (i) has retained one of SandRidge's biggest competitors, Chesapeake, to drill and complete a well on WCT Resources' acreage, and based upon production reports and customary royalties, has earned royalties for itself and for Chesapeake;  and (ii) has "shared" a section with SandRidge and enjoyed tremendous appreciation as Chesapeake has developed and proven adjoining acreage, whereas the

entire section's appreciation should have belonged to SandRidge. Other wrongful acts are detailed below.

9.     Numerous leases in both Woods and Alfalfa counties, moreover, have been conveyed by both TLW Land & Cattle and WCT Resources to third parties for undisclosed consideration, and on many occasions were ultimately conveyed to SandRidge, presumably at far greater prices and net of retained royalty interests. Those conveyances were additional corporate opportunities that Defendant Ward usurped from SandRidge. By taking these opportunities for his own benefit, Defendant Ward was placed in a position inimical to, and in conflict with, his duties to SandRidge and its shareholders – which caused damage to SandRidge and its shareholders.

10.     To date, the Director Defendants have done nothing to address Defendant Ward's wrongdoing. In fact, despite firing Defendant Ward (as described below), the Director Defendants gave him one of the largest severance packages ever seen in the energy industry. The Court should permit Plaintiffs to prosecute the claims against Defendant Ward and the Ward Entity Defendants derivatively on behalf of SandRidge and its shareholders, because the Director Defendants are not disinterested or independent, and therefore demand would have been futile and is excused as to each of the Director Defendants.

11.     In addition, as detailed further below in Section VII.B, the Director Defendants are estopped from asserting that demand is excused in this litigation, by virtue of those defenses having been rejected in *Hefner, derivatively on behalf of SandRidge Energy, Inc. v. Ward, et al.*, Case No. CJ-2013-63, filed in the District Court

of Oklahoma County (the "*Hefner* Action"), a state court case which includes similar claims to those Plaintiffs assert in this litigation.

12.     Throughout the Relevant Period, Defendants Oliver, Dobson, Brewer, Gilliland, Jordan, and Serota knew of Defendant Ward's wrongful conduct; that SandRidge's Ethics Code prohibited Defendant Ward from engaging in competitive conduct and usurping SandRidge's corporate opportunities; and that Defendant Ward's employment agreement forbade such conduct.  In violation of their fiduciary duties of oversight and care, Defendants Oliver, Dobson, Brewer, Gilliland, Jordan, and Serota did nothing to stop him.

13.     The allegations further show that Defendants Oliver, Dobson, Brewer, Gilliland, Jordan, and Serota knew that Defendant Ward and the Ward Entity Defendants were actively competing with SandRidge in the Mississippian, that the Company's focus was to explore and develop oil and gas resources in the Mississippian Play, and that Defendant Ward was taking opportunities from SandRidge.

14.     Because Defendants Oliver, Dobson, Brewer, Gilliland, Jordan, and Serota knew of Defendant Ward's wrongful conduct and did nothing to stop him, their conduct was in bad faith.  Their wrongful conduct cannot be indemnified under Delaware law – and therefore the Director Defendants are exposed to a substantial risk of personal liability, and that, in turn, impairs their independence.

15.     Defendants Oliver, Dobson, Brewer, Gilliland, Jordan, and Serota's lack of independence is further demonstrated by the following facts: (i) faced with accusations in late 2012 by activist shareholder TPG-Axon concerning Defendant Ward's front running

**FIRST AMENDED VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT – Page 5**

and self-dealing that were similar to (but less detailed than) those that follow, Defendants Oliver, Dobson, Brewer, Gilliland, Jordan, and Serota chose to fight TPG-Axon rather than sue Defendant Ward to recover corporate assets and prevent his usurpation of corporate opportunities; (ii) Defendants Oliver, Dobson, Brewer, Gilliland, Jordan, and Serota have extensive personal and lucrative financial relationships with Defendant Ward; (iii) Defendants Oliver, Dobson, Brewer, Gilliland, Jordan, and Serota so assiduously fought TPG-Axon's proxy battle and pursued entrenchment against TPG-Axon that on March 8, 2013, Chancellor Leo Strine of the Delaware Chancery Court found that they had likely breached their fiduciary duties; and finally (iv) after a supposedly thorough but as yet undisclosed internal investigation, in June 2013, Defendants Oliver, Dobson, Brewer, Gilliland, Jordan, and Serota fired Defendant Ward, but paid  him over $90 million worth of severance, including a substantial amount of SandRidge's cash.  The substantial risk of liability, along with the financial and personal conflicts of interest, caused Defendants Oliver, Dobson, Brewer, Gilliland, Jordan, and Serota to lack independence.  Therefore, demand on the Director Defendants would have been futile and is excused.

## II.   JURISDICTION AND VENUE

16.    This Court has subject-matter jurisdiction under 28 U.S.C. § 1332(a)(1) because Plaintiff Elliot is a citizen of New York, Plaintiff Ezell is a citizen of Arizona, and no Defendant is a citizen of either Arizona or New York. The amount-in-controversy requirement is satisfied because, as set out below, the amount at stake for SandRidge is in the hundreds of millions—if not billions—of dollars.

17.     This Court has personal jurisdiction over Defendants because SandRidge's principal executive office is located in this District; several of the Director Defendants are citizens of Oklahoma; the Ward Entity Defendants are each organized under Oklahoma law; and all Defendants have conducted business in this District relating to the misconduct alleged in this complaint.

18.     Plaintiffs' action is not a collusive one to confer jurisdiction that the Court would otherwise lack.

19.     Venue is proper in this District under 28 U.S.C. § 1391(a) because SandRidge is headquartered in this District, because many of the violations alleged occurred in this District, and because one or more of the Defendants either resides in or maintains executive offices in this District. Venue is also proper under 28 U.S.C. § 1401 because SandRidge could have filed this action in this District.

## III.   PARTIES

### A.     *Plaintiffs*

20.     As set forth in the verification attached as Exhibit 1,[1] Lead Plaintiff Elliot owns 50,000 shares of SandRidge's common stock in the Paul Elliot IRA R/O. Elliot has continuously owned SandRidge shares since October 25, 2010, and will continue to own shares during the pendency of this action. Elliot will fairly and adequately represent the interests of SandRidge's shareholders in enforcing the rights of the Company.  He is a citizen of New York.

---

[1] All exhibits cited in this amended complaint are incorporated by reference as if fully set forth herein.

21.    As set forth in the verification attached as Exhibit 2, Plaintiff Ezell owns 200 shares of SandRidge's common stock. Ezell has continuously owned shares since March 23, 2012, and will continue to own shares during the pendency of this action. Ezell will fairly and adequately represent the interests of SandRidge's shareholders in enforcing the rights of the Company.  She is a citizen of Arizona.

### B.    Nominal Defendant

22.    Nominal Defendant SandRidge is a corporation organized under Delaware law.  SandRidge's headquarters is located at 123 Robert S. Kerr Avenue, Oklahoma City, Oklahoma 73102.  SandRidge's stock trades on the New York Stock Exchange under the symbol "SD." As stated on its website, SandRidge is an oil and natural gas exploration company that "focuses on drilling low-risk, conventional, high rate-of-return oil wells in shallow carbonate reservoirs."  SandRidge is named as a nominal defendant solely in a derivative capacity.

### C.    Director Defendants

23.    Defendant Ward was SandRidge's Chairman and CEO from June 2006 until his termination in June 2013. He was also President from December 2006 to January 2011.   Before forming SandRidge, he was a director and the President and Chief Operating Officer of Chesapeake Energy Corporation ("Chesapeake") from the time he co-founded that company in 1989 until February 2006.

24.    Defendant Jim J. Brewer ("Brewer") has been a director of the Company since February 2011.  Defendant Brewer is a citizen of Texas.

25.     Defendant Everett R. Dobson ("Dobson") has been a director of the Company since September 2009.  Defendant Dobson is a citizen of Oklahoma.

26.     Defendant William A. Gilliland ("Gilliland") has been a director of the Company (and its predecessor Riata Energy, Inc. ("Riata Energy")) since January 2006. Defendant Gilliland is a citizen of Texas.

27.     Defendant Daniel W. Jordan ("Jordan") was a director of the Company (and its predecessor Riata Energy) from December 2005 until his resignation in April 2013.  Defendant Jordan is a citizen of Oklahoma.

28.     Defendant Roy T. Oliver, Jr. ("Oliver") has been a director of the Company (and its predecessor Riata Energy) since July 2006. Defendant Oliver is a citizen of Oklahoma.

29.     Defendant Jeffrey S. Serota ("Serota") has been a director of the Company since March 2007. Defendant Serota is a citizen of California.

30.     Defendants Ward, Brewer, Dobson, Gilliland, Jordan, Oliver, and Serota are collectively called the "Director Defendants."

### D.     *Ward Entity Defendants*

31.     Defendants WCT Resources and 192 Investments are limited liability companies organized under Oklahoma law.  Both WCT Resources and 192 Investments have the same members: the Trent Lee Ward Trust, the Romi Norel Ward Trust, and the James Davis Ward Trust.  *See* Defendants' 192 Investments' and WCT Resources' disclosure statements, ECF Nos. 87 and 88, respectively, filed on June 4, 2013.  TLW Land & Cattle is a limited partnership organized under Oklahoma law. Defendants WCT

**FIRST AMENDED VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT – Page 9**

Resources, 192 Investments, and TLW Land & Cattle are collectively called the "Ward Entity Defendants."

## IV.  FACTUAL BACKGROUND

### A.  *Defendant Ward Forms SandRidge, Takes it Public, and Destroys Shareholder Value*

32.     SandRidge was formed in the summer of 2006 when Defendant Ward bought a controlling interest in Riata Energy.  Defendant Ward later changed the company's name to "SandRidge."

33.     In 2007, SandRidge became a public company.  In connection with its IPO, SandRidge offered over 28 million shares of common stock to the public at approximately $26 per share.

34.     Under the Director Defendants, SandRidge's post-IPO stock price has tanked. After peaking at more than $65 per share in the summer of 2008, the Company's stock currently trades for about $6 per share.

### B.  *SandRidge Builds an Industry-Leading Leasehold Position in the Mississippian Play*

35.     After repeated shifts in strategy since its IPO, SandRidge began to transition away from gas-dominant assets and began to build an industry-leading leasehold position in the Mississippian Lime formation (or "Mississippian Play"), which is a limestone formation containing oil and natural gas and stretches through more than 17 million acres in northern Oklahoma, southern and western Kansas, and a small corner of Nebraska.

36.   According to a Company press release (dated January 18, 2013, attached here as Exhibit 3), SandRidge is a leading developer in the Mississippian Play:

> Over the last several years, your Board and management team have taken strategic actions to transform SandRidge into the leading operator in the Mississippian Lime play of northern Oklahoma and western Kansas. These actions have established SandRidge as an industry leader in what is widely considered to be one of the most valuable oil-rich basins in the United States.

37.   Robust growth in the Mississippian Play is a key element of SandRidge's overall strategic plan. To that end, SandRidge has been, and remains, active in developing confidential and proprietary information about the Mississippian Play, acquiring mineral rights, conducting drilling and exploration activities, and developing infrastructure across the Mississippian Play.

38.   According to SandRidge's presentations at the Goldman Sachs Global Energy Conference (dated January 8, 2013, attached here as Exhibit 4) and the Credit Suisse Energy Summit (dated February 5, 2013, attached here as Exhibit 5), the Company is "dominating" the Mississippian Play:

- SandRidge controls the largest acreage position in the Mississippian Play, constituting approximately 2.3 million acres, and it has identified over 11,000 possible horizontal drilling locations.

- SandRidge has more than 40% of the rigs drilling in the Mississippian Play, consisting of 32 rigs across 200 miles.

- SandRidge has already drilled 600 wells, representing 44% of all wells drilled in the Mississippian Play.[2]

---

[2] The number of SandRidge horizontal wells alone has since grown to 839.

**FIRST AMENDED VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT – Page 11**

- SandRidge also has 107 disposal wells, making it a leader in water disposal infrastructure, and 384 miles of power line, making it a leader in securing access to power in the Mississippian Play.

- According to the February 5, 2013 Credit Suisse presentation, SandRidge plans to consolidate its holdings in the Mississippian Play through significant additional acquisitions of mineral rights and to drill 581 wells in 2013 while increasing the number of its rigs from 32 to 41.

39.     According to a SandRidge press release (dated February 20, 2013, attached here as Exhibit 6), since January 2010, SandRidge has invested $500 million in the acquisition of mineral leaseholds and over $1.7 billion in development, drilling capital, and infrastructure in the Mississippian Play.  As a result, SandRidge has an abiding interest in all mineral leases available in the Mississippian Play.

40.     Because the Mississippian Play has been the Company's primary focus since at least 2010, the Company has acknowledged the importance of "quietly and inexpensively" acquiring mineral rights before others start "driving up acreage costs," indicating that the acquisition of mineral rights as quietly and inexpensively as possible is important to creating value for shareholders.

### C.     *Defendant Ward Forms and Controls the Ward Entity Defendants*

### i.     **Defendant Ward Forms and Controls WCT Resources**

41.     Defendant Ward's fingerprints are all over WCT Resources.  According to its articles of organization, in 2002, WCT Resources was formed by Shannon Self ("Self"), a member of Chesapeake's board of directors (along with Defendant Ward) from 1993 through 2005, and Chesapeake's primary outside counsel since Defendant Ward co-founded Chesapeake in 1989.  *See* Exhibit 7 (compilation of WCT Resources

public filings with the Oklahoma Secretary of State).  WCT Resources' original principal place of business, moreover, was 6200 North Western Avenue, Oklahoma City, Oklahoma 73118, which was Chesapeake's address.   Self is also listed as WCT Resources' resident agent with an address at 2725 Oklahoma Tower, 210 Park Avenue, Oklahoma City, Oklahoma 73118, an address used by his law firm (The Commercial Law Group (formerly, Self, Giddens & Lees until 2001)) for receipt of service of process on behalf of its clients.

42.     Based on the facts that Defendant Ward was an officer and director of Chesapeake in 2002 when WCT Resources was formed, Self's close relationship with Defendant Ward through Chesapeake, and Self's use of a Chesapeake address as WCT Resources' principal place of business, upon information and belief, Defendant Ward orchestrated WCT Resources' organization and has controlled its activities since its formation in 2002.  For example, Defendant Ward would attend  WCT Resources' semi-annual company meetings (also attended by WCT Resources' CEO, Defendant Ward's son Trent), where Defendant Ward is believed to have discussed WCT Resources' financials and ongoing projects with the company's employees.

43.     Several other facts provide information supporting Plaintiffs' allegations that Defendant Ward controls WCT Resources. First, in its 2003 and 2004 annual certificates filed with the Oklahoma Secretary of State, WCT Resources lists its business address as "c/o Tom L. Ward, Chesapeake Energy Corporation, 6200 North Western Avenue, Oklahoma City, Oklahoma 73118." The 2007 annual certificate for WCT Resources also states "WCT Resources, c/o Tom L. Ward."    Thus, WCT Resources'

own public filings directly tie Defendant Ward to it, which is consistent with his orchestrating its formation and exercising control over it.

44.     Second, according to SandRidge's public filings, WCT Resources is owned by trusts that Defendant Ward and his wife, Schr'ee Ward, established and funded for the benefit of their children (the "Ward Children's Trusts"), showing that Defendant Ward has a substantial interest in its activities.

45.     Third, Scott C. Hartman ("Hartman"), Defendant Ward's personal employee, is the trustee of the Ward Children's Trusts.  In another recent action filed against Defendant Ward in this District, Hartman submitted a sworn declaration in support of Defendant Ward's response to the plaintiff's motion to compel explaining that he was Defendant Ward's personal employee:

> Since April 2006 I have been exclusively working for Tom L. Ward as a tax and business advisor. While I am listed as a SandRidge employee, Mr. Ward personally pays 50% of my salary and bonus. Under his employment agreement with SandRidge, Mr. Ward was entitled to a staff to work on his personal business matters and I was part of that staff. I did not work on SandRidge corporate business matters and 100% of my employment is devoted to Mr. Ward's business affairs.
>
> \* \* \* \*
>
> I have an office at SandRidge and a SandRidge e-mail account, but I use the office and that account solely on Mr. Ward's business matters. I do not work on any matters for SandRidge.

*See* Exhibit 8 (sworn declaration of Scott C. Hartman, dated September 18, 2012, from *Chechele v. Ward*, Case No. 5:10-cv-01286-M (W.D. Okla.) (here, the "*Chechele* Action").

**FIRST AMENDED VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT – Page 14**

46.     Defendant Ward's own declaration in response to the same motion to compel swore to those same facts. *See* Exhibit 9 (sworn declaration of Thomas L. Ward, dated September 17, 2012, in the *Chechele* Action).   Indeed, in a deposition in the *Chechele* Action, Defendant Ward testified that Hartman was "an employee of mine, of Tom Ward, one of my entities or all of my entities."   *See* Exhibit 9-1 (excerpt of Defendant Ward's September 25, 2012 deposition in the *Chechele* Action). Because Hartman is Defendant Ward's personal employee, working on Defendant Ward's personal business matters, and because he was working out of the same SandRidge office as Defendant Ward, upon information and belief, Defendant Ward controlled Hartman who, as trustee of the Ward Children's Trusts, in turn controlled all of the trusts' affairs, including the activities of WCT Resources.

47.     According to its annual filings with the Oklahoma Secretary of State, moreover, after sharing its office with Defendant Ward at Chesapeake, WCT Resources then shared its offices with SandRidge, first at 1601 NW Expressway, Ste. 1600, Oklahoma City, Oklahoma 73118 (the Valliance Tower)[3] and then at 123 Robert S. Kerr Avenue, Oklahoma City, Oklahoma 73102 (SandRidge Headquarters) until July 2011. *See* Exhibit 7.   Moreover, upon information and belief, WCT Resources shared information about its projects with SandRidge, including communications via e-mail and telephone.   That WCT Resources moved its offices to SandRidge's offices after Defendant Ward moved from Chesapeake to SandRidge supports the inference that

---

[3] As set forth in more detail below, the Valliance Tower is one of several properties owned by Defendant Oliver, in which SandRidge, as well as Defendants Ward and Dobson, have leased property.

**FIRST AMENDED VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT – Page 15**

Defendant Ward controls WCT Resources because wherever Defendant Ward is, WCT Resources follows.

### ii.    Defendant Ward Forms and Controls 192 Investments

48.    Defendant Ward's fingerprints are equally all over 192 Investments. In 2004, Tom Blalock ("Blalock") formed 192 Investments.  Since 1991, Blalock has been a partner in the same law firm as Self (the attorney who formed WCT Resources), served on Chesapeake's board of directors for twelve years, and served as Chesapeake's longtime and primary outside counsel.

49.    Moreover, according to its articles of organization, like WCT Resources, 192 Investments' original principal place of business was 6200 North Western Avenue, Oklahoma City, Oklahoma 73118, a Chesapeake address, and Self is listed as its original resident agent at a building (the Oklahoma Tower) that is, as explained below, another property owned by Defendant Oliver and an address used by Self's law firm for receipt of service of process on behalf of its clients. *See* Exhibit 10 (compilation of 192 Investments' public filings with the Oklahoma Secretary of State).

50.    Based on the facts that Defendant Ward was an officer and director of Chesapeake in 2004, Self was a director and the longtime and primary outside counsel for Chesapeake, and 192 Investments used the same address as Chesapeake, upon information and belief, Defendant Ward orchestrated 192 Investments' organization and controls its activities.

51.    Additionally, according to its annual filings with the Oklahoma Secretary of State, 192 Investments has shared its offices with SandRidge since 2006, first at the

**FIRST AMENDED VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT – Page 16**

Valliance Tower, and then at SandRidge's headquarters.  *See* Exhibit 10.    192 Investments' moving its offices to SandRidge's offices after Defendant Ward moved from Chesapeake to SandRidge shows that Defendant Ward controls 192 Investments, because wherever Defendant Ward is, 192 Investments follows.

52.    192 Investments is also specifically named in Defendant Ward's December 20, 2011 Employment Agreement with the Company as an entity through which Defendant Ward may conduct personal business "in areas not being pursued by the Company."  *See* Exhibit 11 (Defendant Ward's 2011 Employment Agreement).  This provision of Defendant Ward's 2011 Employment Agreement shows that the Director Defendants understood Defendant Ward to have a unity of interest with 192 Investments.

53.    Finally, upon information and belief, 192 Investments does not have any employees, which establishes that 192 Investments could only act through others, including Defendant Ward.

### iii. Conveyances from WCT Resources and 192 Investments to Defendant Ward Confirm that He Has an Ownership Interest in Them and Controls Them

54.    A conveyance between WCT Resources and 192 Investments of the land upon which Defendant Ward's son's house is located at 20201 N. Rockwell Oklahoma County, Oklahoma further evidences Defendant Ward's control over, and identity with, WCT Resources and 192 Investments.

55.    Based on deed records, WCT Resources purchased the land in 2003.  *See* Exhibit 12 (Special Warranty Deed from Jeffrey McDougall, dated November 7, 2003). The following year, WCT Resources transferred title to the land to 192 Investments.  *See*

Exhibit 13 (General Warranty Deed dated February 12, 2004, from WCT Resources to 192 Investments).  WCT Resources claimed that the conveyance was tax-exempt under 68 O.S. § 3202.3 (2001) ("The tax imposed by Section 3201 of this title shall not apply to . . . (3) Deeds which, without additional consideration, confirm, correct, modify, or supplement a deed previously recorded."), which applies to a non-sale document from a trust to a limited liability company.  Then, in 2005, 192 Investments transferred title to the property to Defendant Ward and Schr'ee Ward and also claimed that the conveyance was tax exempt as a related-party transaction.  *See* Exhibit 14 (Special Warranty Deed from 192 Investments to Defendant Ward and Schr'ee Ward, dated November 28, 2005).  Thus, WCT Resources relied upon Oklahoma law to avoid taxation in "confirming" a conveyance to 192 Investments, and 192 Investments relied upon Oklahoma law to avoid taxation in the transaction with Defendant Ward and his wife; the inescapable conclusion being that that the individuals and the entities are interchangeable.

56.     Notably, and consistent with the allegations above, the deed transferring title to the land from WCT Resources to 192 Investments states that "the members and membership percentages of WCT Resources are identical to the members and membership percentages of 192 Investments," thus revealing that those two entities are essentially interchangeable.

57.     As detailed above, the evidence is overwhelming that 192 Investments and Defendant Ward are surrogates of one another.  Because 192 Investments and WCT Resources are effectively identical, Defendant Ward and WCT Resources are also surrogates of one another.  Furthermore, Defendant Ward is a member of WCT

**FIRST AMENDED VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT – Page 18**

Resources and 192 Investments – as shown by Exhibits 7 and 10, which reflect Defendant Ward's signature as a "member" of both entities in documents filed with the Oklahoma Secretary of State – and controls their activities since he were able to direct transfer of title to real property, without consideration, to himself (and his wife, Schr'ee Ward) from WCT Resources through 192 Investments.

58.     Finally, upon information and belief, Defendant Ward used Self's law firm to prepare both deeds referenced in the above paragraphs, since the footers on them and the organizational documents for WCT Resources, 192 Investments, and TLW Land & Cattle, in style and substance, reflect that they originated from the same document processing system, and because Self is listed as the person to whom the WCT Resources' deed should be returned after recording.

### iv.     Defendant Ward Forms and Controls TLW Land & Cattle

59.     In 2004, while at Chesapeake, Defendant Ward formed TLW Land & Cattle.  In doing so, he used Self's law firm since, as noted above, the footers on the organization documents for all three Ward Entity Defendants, both in style and substance, reflect that they originated from the same document processing system.

60.     According to its certificate of limited partnership, moreover, TLW Land & Cattle's original principal place of business, like WCT Resources' and 192 Investments', was 6200 North Western Avenue, Oklahoma City, Oklahoma 73118, a Chesapeake address, and its registered office was at the Oklahoma Tower, which as noted above is an address used by Self's law firm for receipt of service of process.  Based upon the facts that Defendant Ward was an officer and director of Chesapeake in 2004, Self was a

Chesapeake director for twelve years and its longtime and primary outside counsel since before then, and TLW Land & Cattle used the same address as Chesapeake, upon information and belief, Defendant Ward orchestrated TLW Land & Cattle's organization and controls its activities.

61.     According to its certificate of limited partnership, moreover, TLW Land & Cattle has only one general partner, TLW Investments, Inc., which also lists its address as 6200 North Western Avenue, Oklahoma City, Oklahoma 73118, a Chesapeake address. *See* Exhibit 15 (compilation of TLW Land & Cattle public filings with the Oklahoma Secretary of State).  Defendant Ward signed TLW Land & Cattle's certificate of limited partnership as the President of its sole general partner, further indicating that Defendant Ward exercises control over it.

62.     TLW Land & Cattle, according to the Company's SEC disclosures, is an "entity in which [Defendant] Ward has an ownership interest."  In another recent action filed against Defendant Ward in this District, Defendant Ward swore to more than that, stating that he is the "owner" of TLW Land & Cattle.  *See* Exhibit 9.  Defendant Ward also signed numerous conveyances for TLW Land & Cattle.  Defendant Ward's ability to control TLW Land & Cattle is thus beyond question.

63.     Like SandRidge, moreover, TLW Land & Cattle's headquarters is at SandRidge's headquarters.  TLW Land & Cattle moving its offices to SandRidge's offices after Defendant Ward moved from Chesapeake to SandRidge shows that Defendant Ward controls TLW Land & Cattle, because wherever Defendant Ward is, TLW Land & Cattle follows.

64.     Also, according to TLW Land & Cattle's 2006 and 2007 annual filings with the Oklahoma Secretary of State and a 2007 affidavit of mailing filed with the Oklahoma Corporation Commission, both TLW Investments, Inc. and TLW Land & Cattle, entities that Defendant Ward controls and owns, have used the same P.O. Box (P.O. Box 54525, Oklahoma City, Oklahoma 73154) as WCT Resources. *See* Exhibit 15 and Exhibit 16 (Affidavit of Mailing, dated August 3, 2007, filed with the Oklahoma Corporation Commission).   Based on the deed to them from 192 Investments described above, moreover, Defendant Ward and Schr'ee Ward have also used the same P.O. Box for personal tax notices.  *See* Exhibit 14.  From these facts, too, one may reasonably infer that Defendant Ward has an ownership interest in and controls TLW Land & Cattle.

65.     Finally, upon information and belief, TLW Land & Cattle does not have any employees, which establishes that TLW Land & Cattle could only act through others, including Defendant Ward.

### D.     *Through the Ward Entity Defendants, Defendant Ward Front Runs and Usurps SandRidge's Opportunities*

66.     Plaintiffs now turn to Defendant Ward's activities through WCT Resources, 192 Investments, and TLW Land & Cattle. Of particular import, WCT Resources has acquired approximately 475,000 acres of mineral rights in the Mississippian Play, the area in which SandRidge was trying to "quietly and inexpensively" build its industry-leading acreage position.

67.     Based on the size of its leaseholds, WCT Resources is the fifth largest acreage holder in the Mississippian Play (behind only SandRidge, Chesapeake, Royal

Dutch Shell plc, and Devon Energy Corporation). Despite the vast scale of its holdings, however, WCT Resources' company directory lists only seven employees (compared to SandRidge's approximately 2,500 full-time employees) – a staffing which is wholly inadequate to conduct the operations of an independent oil and gas company.  Since WCT Resources shared its offices with SandRidge from 2006 through July 11, 2011, upon information and belief, WCT Resources used SandRidge's personnel and confidential information to evaluate potential acreage opportunities and make acquisitions.[4]

68.    According to a February 20, 2013 *NewsOK* article entitled "CEO Tom Ward's Family Poised to Benefit from SandRidge Spending," industry analyst Mark Hanson of Morningstar reached the same conclusion, stating: "It seems improbable that [WCT Resources] could amass a position of that size without knowledge of what SandRidge knows. It does not pass the logic test."

69.    Upon information and belief, and based upon the facts alleged in this amended complaint, it is a reasonable inference that WCT Resources has used SandRidge's personnel and confidential information. The current COO of WCT Resources, Scott White ("White"), was a land manager at SandRidge Energy until 2011. In his capacity as a former SandRidge land manager, and in his capacity as an officer of a firm with well-known ties to Defendant Ward, White had the influence to direct SandRidge's personnel for Defendant Ward's personal purposes, including those for the

---

[4]    However, under Delaware law, Plaintiffs' usurpation of corporate opportunity claims do not require Plaintiffs to allege or prove that SandRidge's confidential or proprietary information was used by Defendant Ward or the Ward Entity Defendants.

**FIRST AMENDED VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT – Page 22**

benefit of WCT Resources.   Upon information and belief, White had access to and received SandRidge's confidential information. White was thus positioned to pass along SandRidge's confidential information regarding potential acreage opportunities to WCT Resources.

70.     As set forth below, like WCT Resources, 192 Investments has also acquired mineral rights to thousands of acres in the Mississippian Play in Kansas, including leaseholds in areas adjacent to SandRidge mineral leaseholds.  In numerous cases, 192 Investments bought those mineral rights just months before SandRidge leased property in adjacent plots, as Kansas land records show. TLW Land & Cattle, like WCT Resources and 192 Investments, has also acquired mineral leaseholds in areas adjacent to SandRidge mineral leaseholds.

### i.     Front-Running in Kansas

71.     Plaintiffs' counsel's investigation has revealed that Defendant Ward, through WCT Resources, has engaged in significant front-running in northwest Kansas, within the counties of Sherman, Thomas, Sheridan, Wallace, Logan, and Gove. In those counties, SandRidge has already leased no fewer than 223 sections (a single section equals 640 acres or one square mile).

72.     In those same counties, WCT Resources has leased no fewer than 403 sections, almost twice the number as SandRidge. Stated differently, in those counties, SandRidge has leased 142,720 acres while WCT Resources has leased 257,920 acres. *See* Exhibit 17 (map of Carbon Creek Resources Northwest Kansas Leases).  Many of WCT Resources' sections are contiguous to SandRidge's sections, and certain of WCT

Resources' sections are surrounded by SandRidge's sections.   Thus, WCT Resources' sections are directly in SandRidge's key business areas and are integral SandRidge opportunities.

73.     According to deed records in these six counties, moreover, WCT Resources acquired its leaseholds in advance of or contemporaneously with SandRidge's acquisition of its leaseholds.   The WCT Resources leaseholds were in areas that SandRidge had identified at great expense as favorable locations.   WCT Resources' acquisitions of those leaseholds were in direct competition with SandRidge, were neither first presented to SandRidge as acquisition prospects nor approved by a majority of independent and disinterested directors as required, and otherwise would have been corporate opportunities for SandRidge.

### ii.     Front-Running and Flipping in Oklahoma

74.     There are numerous examples of related-party transactions by the Ward Entity Defendants in areas that have been identified at great expense by SandRidge as favorable locations.

75.     In some instances, the Ward Entity Defendants acquired certain property that they then flipped to SandRidge. In other instances, the Ward Entity Defendants acquired land or mineral rights shortly before SandRidge acquired adjacent acreage that it planned to develop, increasing the value of the adjacent land or mineral rights the Ward Entity Defendants had purchased.   In some instances, the Ward Entity Defendants sold their adjacent land or mineral rights to SandRidge competitors, such as Shell, and in other instances the Ward Entity Defendants retained the land or mineral rights, which

appreciated due to SandRidge's investments of shareholder resources.  In some instances, the Ward Entity Defendants acquired acreage adjacent to leaseholds that SandRidge had already acquired, thus usurping SandRidge's corporate opportunities.

76.     On November 30, 2010, WCT Resources leased mineral rights in Pawnee County, Oklahoma, improperly usurping an opportunity that should have gone to SandRidge – a company whose explicit corporate goal as of 2010 had been the development of the Mississippian.  Two months later, on January 20, 2011, WCT Resources flipped those leases to SandRidge, improperly profiting from the transaction.

77.     On November 3, 2011, TLW Land & Cattle leased land and mineral rights in Woods County, Oklahoma to WCT Resources, without first offering them to SandRidge.  Six months later, on May 23, 2012, WCT Resources flipped those leases to SandRidge, improperly profiting from the transaction.

78.     On February 28, 2012, TLW Land & Cattle leased land and mineral rights in Alfalfa County, Oklahoma to WCT Resources, without first offering them to SandRidge.  Seven months later, on August 29, 2012, WCT Resources flipped those leases to SandRidge, improperly profiting from the transaction.

79.     In or around December, 2010, SandRidge and WCT Resources owned a working interest in mineral rights in a property known as Quail Run (Section 16-28N-14W) in Woods County, Oklahoma.  TLW Land & Cattle owned the surface rights.

80.      On December 14, 2010, TLW Land & Cattle sold the surface rights at Quail Run (Section 16-28N-14W) to Larry Noble, an individual unrelated to SandRidge. This was a corporate opportunity that Defendant Ward should have offered to SandRidge.

**FIRST AMENDED VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT – Page 25**

81.     On April 23, 2012, WCT Resources assigned wellbore rights in Quail Run to Schr'ee Ward, the wife of Defendant Tom Ward. This was a corporate opportunity that Defendant Ward should have offered to SandRidge.

82.     On May 23, 2012, SandRidge started drilling in the Quail Run/Noble 1-16 well – conferring benefits, through the assignment described immediately above, to Defendant Ward's wife, instead of conferring the entire benefit of the Noble 1-16 well to SandRidge.

### iii.     Adjacent Acquisitions in Kansas

83.     When big players in the industry, such as SandRidge, begin drilling in an area, or are even known to have purchased land or mineral rights in an area, the value of nearby acreage inevitably increases.     The Ward Entity Defendants' acquisition of adjacent acreage is another way in which Defendant Ward wrongfully took SandRidge's corporate opportunities.

<u>The First Set of Barber County Acquisitions</u>

84.     On June 20, 2011, WCT Resources acquired mineral rights in Barber County, Kansas. This was a corporate opportunity that Defendant Ward should have made available to SandRidge.

85.     Four weeks later, on July 25, 2011, SandRidge acquired adjacent acreage to WCT Resources' Barber County property, thereby increasing the value of WCT Resources' mineral rights.  Yet the mineral rights owned by WCT Resources, as well as

any appreciation of those rights as a result of SandRidge's investment in the adjacent property, should have inured to SandRidge, not Defendant Ward and WCT Resources.

86.     Two months later, on October 26, 2011, WCT Resources assigned this set of Barber County mineral rights to Shell, improperly profiting from the transaction.  This was also a corporate opportunity that Defendant Ward should have offered to SandRidge.

<u>The Second Set of Barber County Acquisitions</u>

87.     On June 6, 2011 to July 5, 2011, WCT Resources and 192 Investments acquired additional mineral rights in Barber County, Kansas.  This was a corporate opportunity that Defendant Ward should have offered to SandRidge.  Two weeks later, on July 25, 2011, SandRidge acquired acreage adjacent to the Barber County property.

88.     Three months later, on October 26, 2011, WCT Resources and 192 Investments assigned those mineral rights to Shell, improperly profiting therefrom. This was also a corporate opportunity that Defendant Ward should have made available to SandRidge.

<u>The First Set of Thomas County Acquisitions</u>

89.     On December 12, 2011, WCT Resources and 192 Investments acquired mineral rights in Thomas County, Kansas.   This was a corporate opportunity that Defendant Ward should have offered to SandRidge.

90.     Four months later, on April 3, 2012, SandRidge acquired adjacent acreage. WCT Resources and 192 Investments retain their Thomas County acreage. To the extent that the value of WCT Resources and 192 Investments' rights has increased, the benefits

of that appreciation should have gone to SandRidge – not WCT Resources and 192 Investments.

The Second Set of Thomas County Acquisitions

91.   On January 4, 2012 and February 29, 2012, WCT Resources and 192 Investments acquired additional mineral rights in Thomas County, Kansas.  These were corporate opportunities that Defendant Ward should have offered to SandRidge.

92.   Two months later, on April 3, 2012, SandRidge acquired adjacent acreage. WCT Resources and 192 Investments retain the additional Thomas County acreage.  To the extent that the value of WCT Resources and 192 Investments' rights has increased, the benefits of that appreciation should have gone to SandRidge – not WCT Resources and 192 Investments.

The Third Set of Thomas County Acquisitions

93.   On December 19, 2011, WCT Resources and 192 Investments acquired more mineral rights in Thomas County, Kansas.  To the extent that the value of WCT Resources and 192 Investments' rights has increased, the benefits of that appreciation should have gone to SandRidge – not WCT Resources and 192 Investments.

94.   Four months later, on April 3, 2012 and July 1, 2012, SandRidge acquired adjacent acreage.  WCT Resources and 192 Investments retain that acreage.  To the extent that the value of WCT Resources and 192 Investments' rights has increased, the benefits of that appreciation should have gone to SandRidge – not WCT Resources and 192 Investments.

## The Fourth Set of Thomas County Acquisitions

95.    On November 21, 2011, WCT Resources and 192 Investments acquired additional mineral rights in Thomas County, Kansas.  These were corporate opportunities that Defendant Ward should have offered to SandRidge.

96.    Five months later, on April 3, 2012, SandRidge acquired acreage adjacent to the Thomas County property.  WCT Resources and 192 Investments retain that acreage.  To the extent that the value of WCT Resources and 192 Investments' rights has increased, the benefits of that appreciation should have gone to SandRidge – not WCT Resources and 192 Investments.

## The Finney, Sherman, Wallace, and County Acquisitions

97.    On December 22, 2011, SandRidge acquired mineral rights in Finney County, Kansas.  Eleven months later, on November 13, 2012, WCT Resources acquired adjacent acreage.  This was a corporate opportunity that Defendant Ward should have offered to SandRidge.

98.    On March 28, 2012, SandRidge acquired mineral rights in Sherman County, Kansas.  Two weeks later, on April 10, 2012, as well as through transactions on April 25, 2012 and July 13, 2012, WCT Resources acquired adjacent acreage.  These were corporate opportunities that Defendant Ward should have made available to SandRidge.  WCT Resources retains that acreage.  To the extent that the value of WCT Resources' rights has increased, the benefits of that appreciation should have gone to SandRidge – not WCT Resources.

99.   On March 28, 2012, SandRidge acquired mineral rights in Wallace County, Kansas.   On August 2, 2012, WCT Resources acquired adjacent acreage. This was a corporate opportunity that Defendant Ward should have offered to SandRidge.   WCT Resources retains that acreage.   To the extent that the value of WCT Resources' rights has increased, the benefits of that appreciation should have gone to SandRidge – not WCT Resources.

100.   On January 13, 2011, WCT Resources acquired mineral rights in Cowley County, Kansas. This was a corporate opportunity that Defendant Ward should have offered to SandRidge.   Nine months later, on September 28, 2011, SandRidge acquired adjacent acreage.   WCT Resources retains that acreage.   To the extent that the value of WCT Resources' rights has increased, the benefits of that appreciation should have gone to SandRidge – not WCT Resources.

101.   None of the Ward Entity Defendants' adjacent acquisitions have been disclosed to shareholders by the Director Defendants, and none were approved by a majority of independent and disinterested directors.

### iv.   Conclusion

102.   By front running the Company, Defendant Ward, through the Ward Entity Defendants, has usurped opportunities from SandRidge. The usurpation of SandRidge's corporate opportunities substantially harms the Company in a variety of ways.

103.   First and foremost, the Company lost the ability to drill on leaseholds that instead are diverted to the Ward Entity Defendants, and it lost the right to capture hydrocarbons from those leaseholds.

104.    Second, based on the allegations above, the leaseholds acquired by the Ward Entity Defendants were obtained through the use of SandRidge's material confidential and proprietary Company information and resources without adequate consideration to SandRidge.

105.    Third, by flipping acquired leases to SandRidge without appropriate approvals of a majority of independent and disinterested directors, there is no assurance that SandRidge paid the Ward Entity Defendants fair value for the assets.

106.    Finally, the Ward Entity Defendants have benefitted, at no cost, from the hundreds of millions of dollars in infrastructure the Company has developed throughout the Mississippian Play.

### E.    A Major SandRidge Shareholder Corroborates Plaintiffs' Counsel's Investigation

107.    Consistent with Plaintiffs' counsel's investigation, TPG-Axon, a major SandRidge shareholder, conducted its own investigation concerning Defendant Ward's front running and questioning the board's oversight of his activities.

108.    TPG-Axon's investigation led to a report that it made available to all SandRidge shareholders.  Among other things, TPG-Axon's report found the following, which include some of the information detailed in this Amended Complaint:

> In order to better understand the related party transactions of SandRidge, we engaged investigators to gather additional information for us[.] To obtain this information, it was necessary to directly gather lease information from court houses and record offices across Kansas and Oklahoma[.] We are still early in the process and have much more ground to cover[.] The Mississippian Lime is a vast play covering over 17 million acres, in which SandRidge has leased over 2 million acres[.] To date, we have examined only a small percentage of SandRidge's total acreage[.] **Yet,**

**already, it seems clear to us that entities related to the Ward family have been active competitors to SandRidge Energy in the acquisition and sale of mineral rights[.]**In the interest of transparency, we are providing examples of transactions we have discovered to help illustrate the nature of activity we are observing[.] Our investigation continues, and we expect to update stockholders as we learn more[.]

**To date, we have discovered that many entities affiliated with the Ward family have been active in acquiring acreage and mineral rights in the Mississippian Lime[.]   In particular, TLW Land & Cattle, WCT Resources and 192 Investments are entities that have acquired meaningful acreage in the Mississippian Lime.  Each of these entities is related to Tom Ward or his immediate family, and has shared an address with SandRidge at various points in the past[.]**

We have found many occurrences of flipping and purchases in the same areas where SandRidge acquires mineral rights[.] In a number of instances, WCT Resources has moved ahead of the company to acquire mineral rights from third parties, and then flipped them to SandRidge just weeks or months later[.]

More worryingly, it appears that WCT Resources has acquired acreage in advance of purchases by SandRidge in the same area, and then either sold it to third parties or kept it . . . .

**We believe the fact pattern suggests that SandRidge shareholders may have been disadvantaged by the actions of Mr. Ward and his family[.] We believe the company may not have fully properly disclosed the nature of these transactions to stockholders.** In addition, if Mr. Ward did not disclose the full extent of these transactions to the company, we believe this may be cause for termination.

*See* Exhibit 18 (TPG-Axon "SandRidge Related-Party Transactions" presentation, dated

January 2013) (emphases added)).

109.   In addition to those TPG-Axon investigation materials that echo Plaintiffs'

allegations, Plaintiffs have developed additional facts showing Defendant Ward's self-

dealing and usurpation of corporate opportunities throughout the Mississippian.  The

following paragraphs detail the additional facts Plaintiffs have developed about Defendant Ward's misconduct.

**F.    Defendant Ward's Self-Dealing and Usurpation of Corporate Opportunities in Alfalfa County, Oklahoma**

110.    Alfalfa County, Oklahoma is one of four counties (Alfalfa, Woods, Garfield, and Grant) where SandRidge has been focusing its efforts in exploiting the Mississippian Play.  As set forth above, SandRidge has spent hundreds of millions of dollars in building infrastructure in that area in the form of electrical power, disposal wells, and other assets that make drilling in the Mississippian Play economically feasible. As such, SandRidge has an interest in all mineral leases available in the Mississippian Play, but in the four-county Oklahoma area in particular.

111.    By instrument dated August 22, 2011, TLW Land & Cattle conveyed to WCT Resources an oil and gas lease over portions of Section 1, Township 25N, Range 12W (1-25-12) in Alfalfa County, Oklahoma.  This was a corporate opportunity that Defendant Ward should have made available to SandRidge.  That transaction is reflected on the attached Exhibit 19 (Alfalfa County PowerPoint, at p. 2).  An actual image of the lease is included in Exhibit 19, and Defendant Ward's signature is reflected on the lease. Thus, in an area of particularized interest to SandRidge's exploration and production activities and on a date well after SandRidge had shifted its primary focus to drilling and exploration activities in that specific area, Defendant Ward, instead of offering the lease to SandRidge, personally delivered it to WCT Resources.  Defendant Ward, as settlor of the Ward Children's Trust, made initial determinations as to assets that would fund the

trust.  Furthermore, in instances where, on behalf of TLW Land & Cattle, he conveyed the right to drill mineral interests to WCT Resources, Defendant Ward continued to direct which assets WCT Resources would own and control.

112.   To underscore the significance to SandRidge of the lease TLW Land & Cattle conveyed to WCT Resources, the conveyance resulted in WCT Resources and SandRidge sharing adjoining portions of this same section in Alfalfa County.  Beginning in March 2011 and continuing through December 2011, SandRidge took a total of six separate leases (*see* Exhibit 19) to amass the drilling rights in half the section; in the midst of those acquisitions WCT Resources acquired its interest in the other half in the transaction Defendant Ward authorized on behalf of TLW Land & Cattle.  As a result, mineral ownership is divided diagonally through the middle of Section 1-25-12, with WCT Resources owning the southeast corner and SandRidge the northwest.  A map of the section with a depiction of the respective leasehold rights of WCT Resources and SandRidge as reflected on page 4 of Exhibit 19.

113.   Upon information and belief, WCT Resources' and SandRidge's leases were obtained in direct response to leasing and drilling activity undertaken by Chesapeake, one of SandRidge's most important competitors.  Beginning in November 2010, Chesapeake began leasing mineral rights over a broad area surrounding Section 1-25-12 that WCT Resources and SandRidge had come to share.  Page 5 of Exhibit 19 is a map depicting the various mineral interests Chesapeake holds in areas immediately adjacent to Section 1-25-12 that WCT Resources and SandRidge share.

**FIRST AMENDED VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT** – Page 34

114.    A map on page 6 of Exhibit 19 again depicts Section 1-25-12 that WCT Resources and SandRidge share and shows the completion dates of Chesapeake wells in surrounding sections.  Immediately to the west of the WCT/SandRidge Section 1-25-12 is the Chesapeake #1H Schanbacher 2-25-12 horizontal well that was spud on April 24, 2011 and completed on September 14, 2011, approximately one month after Defendant Ward, on behalf of TLW Land & Cattle, conveyed to WCT Resources the mineral interests for the half of the section WCT Resources would ultimately share with SandRidge.   This well was successfully completed in the Mississippian Lime and confirmed the presence of oil and gas in the immediate vicinity of Section 1-25-12. Subsequently, the Chesapeake #1H Clifford 36-26-12 was successfully completed in the Mississippian formation, reporting 174 barrels of oil per day ("bopd"), 1,461 million cubic feet of gas per day ("mcfpd") on initial test dated April 28, 2013.  This well is directly north and adjacent to Section 1-25-12 and demonstrates commercial rates of production being developed adjacent to the subject WCT Resources/SandRidge leasehold.  Further enhancing the value of Section 1-25-12, on April 10, 2013 the Chesapeake #1H TDR 12-25-12 was also completed in the Mississippian formation at a rate of 255 bopd and 3,152 mcfpd directly south and adjacent to Section 1-25-12. Utilizing industry accepted practice of decline curve analysis, the estimated discounted net present value ("NPV") of each completed well to the operator is $7.87 million. Additionally, for the mineral owner who has leased at 25% royalty, each well completed on the 640-acre unit produces royalty income of $4.02 million.  Given these metrics, it

can be estimated that the future royalty revenue to be derived from as many as four wells drilled on Section 1-25-12 net to the 320 acres held by WCT Resources is $8.04 million.

115.    As a result of the leasing and drilling activity in the sections surrounding the WCT Resources/SandRidge section, both SandRidge and WCT Resources gained tremendous value resulting from the development of key production infrastructure that was developed from the fact that the geology was proven to be economic over those leases that are adjacent to the newly drilled and completed wells.  The economic benefits reaped by WCT Resources should have been conferred upon SandRidge and its shareholders.

### G.    Defendant Ward's Self-Dealing and Usurpation of Corporate Opportunities in Woods County, Oklahoma

116.    WCT Resources has also done business with SandRidge's direct competitor, Chesapeake.  In Woods County, Oklahoma, WCT Resources executed a lease with Chesapeake and Chesapeake has completed a producing well on WCT Resources' property in Section 6-28-19.  The lease should have been in favor of SandRidge, and SandRidge should have reaped the benefit of typical revenues once the well was drilled and producing.  Instead, the lease is in favor of Chesapeake, and SandRidge will not enjoy the economic benefit of a producing well.  To date, based on industry standard economic projections, WCT Resources will receive royalties in the amount of $753,970 and Chesapeake has drilled a well worth $7.87 million.  The value that Chesapeake received would have been received by SandRidge if WCT Resources/Defendant Ward

had presented the lease drilling opportunity to SandRidge.  Defendant Ward's failure to present the opportunity breached his fiduciary duties to the Company.

117.   Woods County, Oklahoma is included in what is recognized by the "industry at large" as the core of the Mississippian Play.  Woods County is a principal focus of SandRidge's Mississippian Play activity.  WCT Resources has leased 7,142 acres in Woods County alone, and its leases derive from one of only two sources:  TLW Land & Cattle and 192 Investments.  Of the total acreage WCT Resources leased in Woods County, 6,742 acres was acquired from TLW Land & Cattle and 400 acres was acquired from 192 Investments.

118.   In all but one of the leases WCT Resources acquired from TLW Land & Cattle, TLW Land & Cattle retained a 0.25 royalty interest.  In the one other transaction, which occurred on May 26, 2006, TLW Land & Cattle retained a 0.1875 royalty.  In each of the lease transactions with 192 Investments, 192 Investments retained a 0.125 royalty.

119.   The pattern of self-dealing and usurpation of corporate opportunity in Woods County could not be clearer.  First, a Ward Entity Defendant acquired leasehold acreage in a SandRidge core area.  That is the first opportunity not presented to SandRidge in breach of Defendant Ward's fiduciary duties.  Second, a Ward Entity Defendant decided to dispose of its lease, but instead of offering to convey the interest to SandRidge, in certain instances the Ward Entity Defendant offered it to another Ward Entity Defendant, WCT Resources.  WCT Resources stripped out as much as a 25% royalty interest for itself, which it retained when WCT Resources later assigned the lease to SandRidge.  Those are additional breaches.  In other instances, TLW Land & Cattle

**FIRST AMENDED VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT – Page 37**

leased directly to SandRidge, but retained a 25% royalty interest.   That is another actionable breach.  In a yet another breach, WCT Resources assigned wellbore interests in a complete well (the Noble 1-16 well) to Defendant Ward's wife, Schr'ee.

### H.   Defendant Ward Used SandRidge's Confidential Information

120.   The Mississippian is what is commonly known in the oil and gas industry as a "resource play," meaning that commercial recovery of hydrocarbons will occur over large geographic areas, much broader in extent than the conventional oil found in structurally trapped fields on a historical basis.   The initial development of such an unconventional play requires that a large number of wells will ultimately have to be drilled over a large area.  Since 2007, the oil and gas industry has been actively pursuing the drilling and development of the Mississippian Play. Beginning in 2009, SandRidge emerged alongside of Chesapeake as the two horizontal drilling leaders in the play. In fact, of the 1,336 horizontal wells drilled since 2009, SandRidge has drilled 839 or 63% of all wells.  The potential commercial play area is vast and covers nine active counties in Oklahoma and twenty in Kansas.   The manner in which a resource play is developed indicates how the Ward Entity Defendants have used confidential and proprietary information worth hundreds of millions of dollars in their acquisition activities.

121.   As an initial matter, because companies like SandRidge and Chesapeake typically obscure their lease acquisition activities in order to keep their interest in a given area out of the public spotlight (in an attempt to control the inevitable inflation of lease costs when mineral owners find out that industry leaders are interested in their land), they typically acquire leases utilizing brokers or agents, who subsequently assign title to those

mineral lease interests to the company at a later date.   Defendant Ward, as CEO of SandRidge, was in a position to know the identities of brokers and agents acting on behalf of SandRidge and the geographic locations of its acquisitions.   It is not happenstance, therefore, that the Ward Entity Defendants have acquired massive acreage adjacent to SandRidge acreage, many times themselves utilizing the subterfuge afforded by using brokers and agents.   SandRidge is expending tremendous resources to optimize the properties it acquires.

122.   The Mississippian is not a new region for oil and gas exploration and production.   Initial production from the Mississippian was first established in the 1920s and thousands of vertical wells have been drilled and completed in Oklahoma and Kansas since that time.   However, technological innovations in horizontal drilling, and multi stage fracture stimulation (known as "fracking") completion technologies, have unlocked previously unavailable potential in the play.   Because of its history as a producing formation, however, there is an incredible amount of historical geological data that any prudent exploration company would analyze before adopting an acquisition strategy.

123.   Moreover, a prudent exploration company would develop new geological information to confirm its analysis of the historical data.   In fact, between 2007 and 2009 SandRidge drilled mostly vertical wells.   On information and belief, those wells were drilled to confirm geological concepts, gather subsurface geological data in the form of drill cutting samples and cores, update reservoir analysis, and test for the presence and quality of hydrocarbon saturation.

124.    An exploration company acquires data at substantial cost, both in the acquisition of historical and third party developed information and by drilling and completing new wells.  The cost to analyze and learn from this data, while coordinating the analysis and field efforts between various disciplines (including but not limited to geology, geophysics, land and lease acquisition, reservoir engineering and economics, drilling engineering, and completion and production engineering) can run into the millions of dollars.  That is the reason this type of work is most effectively pursued by the large independent exploration companies such as SandRidge, Chesapeake, and others who can maintain the internal technical staff and who have the financial capability to undertake this type of work.

125.    With 2500 employees, including a staff of geologists, SandRidge is equipped to perform the analysis to exploit the Mississippian Play.  Upon information and belief, it has spent hundreds of millions of shareholder dollars doing just that.

126.    Staffed with only seven employees and one contract geologist, WCT Resources is not sufficiently prepared to undertake its own independent analysis of the Mississippian Play in support of the lease acquisition program undertaken by WCT Resources, which upon information and belief, exceeds a scope of 475,000 acres.  Of the Ward Entity Defendants, WCT Resources is the only entity with any employees.  Upon information and belief, and the facts alleged here, it is a reasonable inference that the Ward Entity Defendants relied almost exclusively on SandRidge's activities and information in making their acquisition decisions.

## I.      *Excessive Executive Compensation and Waste of Corporate Assets*

127.    The board's "Compensation Committee" is established by charter, which requires its members to "review, evaluate and approve the agreements, plans, policies and programs of the Company to compensate the Company's corporate officers and directors" and to "review, modify (if necessary) and approve corporate goals and objectives relevant to the compensation of the Company's Chief Executive Officer . . . ." The charter makes it clear that the committee "should consider the Company's performance and relative stockholder return" in setting compensation.

128.    In blatant disregard of the charter of SandRidge's Compensation Committee and their fiduciary duties to SandRidge and its shareholders, the Director Defendants have continuously approved egregious, expensive, and wasteful compensation for Defendant Ward and other senior SandRidge executives.  In addition the Director Defendants have allowed Defendant Ward to take advantage of extravagant perquisites at SandRidge's expense and to funnel millions of dollars from SandRidge to Ward-related interests, including payments to the Ward Entity Defendants.

129.    Defendant Ward's compensation cannot be justified by SandRidge's stock performance, and in fact, his compensation is shocking relative to the performance and the size of the Company.  Over the past five years, despite its stock price declining 80%, the Company has paid Defendant Ward more than *$150 million* in compensation, representing 6% of the total current market capitalization of the Company.

130.    In 2012, Defendant Ward's total compensation was $20.8 million, while SandRidge stock declined 22%.  In 2011, the Director Defendants approved compensation of more than $25 million for Defendant Ward, which represented half of

the Company's earnings for 2011 and was an increase of approximately 16% over his 2010 compensation. Defendant Ward was among the highest-paid energy executives in 2011, even though the Company's revenue of $1.4 billion placed it in the bottom half of publicly traded exploration and production companies. For 2010, Defendant Ward received $21.76 million in compensation, an increase of a whopping 58% over his 2009 compensation, while the Company's share price declined 26%.

131.    In contrast, firms that SandRidge considered "peer" companies during the Relevant Period – whose stock price per share *increased* during that time – nevertheless paid their CEOs significantly less than SandRidge paid Defendant Ward.  For example, the CEO at Forest Oil Corp. received $4.2 million in 2010 while its stock price increased 73% that year.  Likewise, in 2010, Newfield Exploration Co. stock increased 50% and its CEO was awarded $5.2 million in compensation.  In 2012, Pioneer Natural Resources, Co.'s stock price increased 81%, while its CEO was awarded $8.6 million in compensation.[5]

132.    Defendant Ward has been one of the highest compensated CEOs in the country while at SandRidge, as well as one of the highest paid energy CEOs.  During the same period, SandRidge ranked among the worst in the country for losing shareholder value as reflected in the decline in the price per share of SandRidge's common stock and return on investment compared to its peers.

---

[5]     SandRidge lists these companies among its "peers" in its SEC filings during the Relevant Period. *See, e.g.,* SandRidge Proxy (Form 14A), filed April 26, 2012, at p. 26.

**FIRST AMENDED VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT – Page 42**

133.    Among SandRidge's competitors, not a single CEO received compensation even close to that of Defendant Ward in 2010.  A review of CEO compensation at oil and gas companies far larger than SandRidge shows that Defendant Ward's compensation was near the highest of any company in the industry.  For example, William Klesse, CEO of Valero Energy Corp., received $11.1 million in compensation in 2010; L.L. Elsenhaus of Sunoco Logistics Partners received $11.7 million; J.S. Watson of Chevron Corp. received $16.3 million; J.J. Mulva, CEO of Conoco Philips received $17.9 million; John Hess of Hess Corp. received $18.2 million; and R.W. Tillerson of Exxon Mobil Corp. (a company whose market capitalization in 2010 was over 120 times greater than SandRidge's) received $28.9 million.

134.    Similarly, the Director Defendants have continuously approved excessive, expensive, and wasteful compensation packages for SandRidge's other senior executive officers despite the Company's poor performance.  For example, SandRidge's former President and COO, Matthew K. Grubb ("Grubb"), received an aggregate of $16.6 million in total compensation for 2010, 2011, and 2012, including $2.6 million in salary and $2.7 million in cash bonuses.  SandRidge's Chief Financial Officer, non-defendant director James D. Bennett (here, "Bennett"), who joined SandRidge in January 2011, received total compensation of over $11 million for 2011 and 2012, including $1.4 million in salary and over $1.4 million in cash bonuses.  SandRidge's former Executive Vice President of Exploration, Todd N. Tipton ("Tipton"), received total compensation of $5.5 million for 2010, 2011 and 2012, including $1.3 million in salary and $1.2 million in cash bonuses.  SandRidge's former Executive Vice President of Reservoir Engineering,

**FIRST AMENDED VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT – Page 43**

Rodney E. Johnson ("Johnson"), received total compensation of $5.4 million for 2010, 2011 and 2012, including $1.3 million in salary and $1.3 million in cash bonuses.[6]

135.   As part of their compensation packages, these senior executives were also awarded shares of SandRidge stock, which they then sold at a profit.  Grubb sold 276,778 shares of SandRidge stock for net proceeds of approximately $1.7 million; Bennett sold 150,968 shares of SandRidge stock for net proceeds of approximately $900,000; Tipton sold 223,448 shares of SandRidge stock for net proceeds of approximately $1.6 million; and Johnson sold 174,369 shares of SandRidge stock for net proceeds of approximately $816,000.

136.   The Company also paid almost $1 million per year to provide personal accounting services to Defendant Ward.  The Company has four jets (two of which are large size intercontinental jets, and one of which is one of the most expensive corporate jets on the market), and over fifteen full time employees dedicated to maintaining and flying these jets.  SandRidge provided unlimited personal usage of these jets to Defendant Ward (last year that included dozens of personal flights to Scottsdale, where Defendant Ward has a vacation home), and numerous weekend trips to locales such as Las Vegas, Los Angeles, and the Bahamas. None of these expenditures have added or adds value to SandRidge and are a waste of the Company's corporate assets.

137.   In addition to receiving millions of dollars in compensation and exorbitant perquisites from SandRidge, Defendant Ward also usurped SandRidge's corporate

---

[6]   On April 26, 2013, Tipton and Johnson informed the Company of their intentions to retire and resign, respectively, effective May 10, 2013.  On March 15, 2013, Grubb also resigned from the Company.

opportunities for his own benefit in violation of his fiduciary duties, his employment agreement and SandRidge's Ethics Code (described in further detail below).

138.    Paragraph 3 of Defendant Ward's June 8, 2006 Employment Agreement (the "2006 Employment Agreement") provides that Defendant Ward "will not . . . directly or indirectly invest in, participate in or acquire an interest in any oil and gas business . . . ."

139.    However, as set forth above, in breach of his fiduciary duties and in violation of his 2006 Employment Agreement, Defendant Ward, through the Ward Entity Defendants, competed with SandRidge and wrongfully took corporate opportunities from SandRidge.

140.    As alleged above, Defendant Ward and the Ward Entity Defendants diverted millions of dollars from SandRidge by engaging in various related-party transactions, and the Director Defendants allowed Ward to engage in this egregious conduct, effectively funneling money out of SandRidge.

141.    SandRidge has disclosed $9.5 million of payments to the Ward Entity Defendants, but, as discussed above, millions of dollars in related-party transactions have not been quantified and were not disclosed to investors until TPG-Axon launched its proxy contest.

142.    SandRidge's self-dealing and conflicted transactions with the Ward Entity Defendants violated Defendant Ward's 2006 Employment Agreement, SandRidge's own Ethics Code, and Defendant Ward's fiduciary duties to SandRidge and its shareholders.

143.    In December 2011, without adequate consideration and in violation of the Director Defendants' fiduciary duties, the Director Defendants amended Defendant Ward's 2006 Employment Agreement and, among other things, expressly permitted Defendant Ward to engage in outside oil and gas businesses so long as the business was "in areas not being pursued by the Company" (the "Amended Employment Agreement").

144.    The Director Defendants' decision to allow Defendant Ward to engage in outside oil and gas businesses, even if such businesses were in areas not being pursued by SandRidge, was contrary to the best interests of the Company and its shareholders because such side businesses created additional conflicts that were and are inconsistent with Defendant Ward's duty of loyalty to SandRidge.

145.    Accordingly, allowing Defendant Ward to engage in outside oil and gas businesses "in areas not being pursued by the Company" was a waste of corporate assets, and was not an exercise of valid business judgment by the Director Defendants, and therefore was a breach of the Director Defendants' fiduciary duties.

### J.    *SandRidge's Culture of Poor Corporate Governance*

146.    According to the Corporate Governance Guidelines of SandRidge's Board of Directors, dated March 1, 2011, "[t]he basic responsibility of each director is to exercise his or her business judgment to act in what he or she reasonably believes to be in the best interests of the Company and its stockholders."   However, SandRidge's corporate charter and bylaws protected and entrenched the Director Defendants' positions to the detriment of the Company and its shareholders.

147.     For example, SandRidge's board is "staggered" or "classified," which means approximately one-third of SandRidge's directors stand for election in a given year.  At each annual shareholder meeting, SandRidge shareholders elect a successor to each of the directors whose term expires on the date of the meeting, or re-elect each such director, with each successor or re-elected director to serve a three-year term.

148.     A staggered board thus serves as a powerful antitakeover device, entrenches the board, unduly protects SandRidge's board of directors from shareholder influence, and fostered an environment in which the Director Defendants look out for themselves instead of the best interest of SandRidge and its shareholders.

149.     Another manner in which the Director Defendants entrenched themselves is by restricting shareholders' ability to call a special meeting.

150.     Shareholders' ability to call a special stockholders' meeting enables them to replace directors (or change the bylaws) between annual meetings if they believe that circumstances warrant such an intervention.  SandRidge's special meeting rules (Article 7 of its charter and Article II, Section 4 of its bylaws) require approval by those holding 50% of common shares to hold a special meeting of stockholders.  Because SandRidge's share ownership is dispersed, organizing enough shareholders to meet this threshold is difficult, if not impossible.

151.     Moreover, SandRidge's Corporate Governance Guidelines hinder shareholders' ability to hold the Director Defendants accountable by forbidding shareholder access to the corporate proxy, or failing to otherwise provide any

mechanisms for shareholders to formally or informally recommend candidates to SandRidge's board.

152.   The Director Defendants' conduct in response to shareholder criticism of the board and the Company's performance illustrates the Director Defendants' poor corporate governance and disregard for the rights of shareholders, and constitutes a breach of their duty of loyalty to the Company and its shareholders.

153.   As described above, starting in November 2012, TPG-Axon mounted a proxy fight against the Director Defendants.   TPG-Axon informed the Director Defendants that it intended to conduct a consent solicitation seeking shareholder support for three proposals: (i) to amend SandRidge's bylaws to de-stagger the board of directors; (ii) to remove the Director Defendants for cause; and (iii) to replace all of them with a slate of TPG-Axon nominees.

154.   In response, the Director Defendants entrenched themselves by adopting a "poison pill" that makes it difficult for a shareholder to accumulate shares and oust the board, particularly where, as here, the board is staggered.   Further, the Director Defendants adopted certain amendments to the Company's bylaws, including an amendment to provide that the affirmative vote of the holders of a majority of the voting power of the outstanding shares shall be required for stockholders to amend certain sections of the bylaws, including those relating to the classification of directors, the number of directors and the filling of vacancies on the board and newly-created directorships.

**FIRST AMENDED VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT** – Page 48

155.    While four TPG-Axon directors have been added to SandRidge's board, Defendants Oliver, Serota, Dobson, Gilliland, and Brewer continue to control the board and SandRidge's poor corporate governance structure in large part remains in place and continues to damage the Company and negatively affect shareholder value.

## V.    THE DIRECTOR DEFENDANTS' FIDUCIARY DUTIES

156.    Because of their ability to control SandRidge's business and corporate affairs, the Director Defendants owe SandRidge and its shareholders fiduciary duties of loyalty, good faith, candor, and due care, and they are required to use their utmost ability to control and manage SandRidge in a just, fair, honest, and equitable manner.   The Director Defendants are required always to act in furtherance of SandRidge's best interests and that of its shareholders and to benefit all shareholders equally, not in furtherance of their personal interests or benefit.

157.    Under Delaware law, SandRidge's directors and officers owe SandRidge and its shareholders fiduciary duties of loyalty, good faith, due care, and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

158.    In addition to their duty of candor, as officers and/or directors of a publicly held company, the Director Defendants had a duty promptly to disseminate accurate and truthful information regarding the Company's operations, finances, financial condition, and present and future business prospects so that the market price of the Company's stock would be based on truthful and accurate information.

159.    In accordance with their fiduciary duties, SandRidge's directors and officers are required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the Company's affairs and assets. Specifically, SandRidge's officers and directors are required to:

(a)    conduct the affairs of the Company in an efficient, business-like manner in order to achieve the highest quality performance of its business;

(b)    put the interests of the Company and its shareholders ahead of their personal interests and refrain from self-dealing;

(c)    maintain the confidentiality of the Company's information;

(d)    avoid wasting the Company's assets and maximize the value of the Company's stock;

(e)    remain informed as to how the Company conducts its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, and take steps to correct those conditions or practices and make the disclosures as necessary to comply with federal and state securities laws;

(f)    ensure that the Company complies with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public concerning, among other things, material related-party transactions;

(g)    ensure that the Company is operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state, and local laws, and rules and regulations; and

(h)    ensure that all decisions are the product of independent business judgment and not the result of outside influences or entrenchment motives.

160.    The Director Defendants violated their fiduciary duties through the conduct alleged above and exhibited an absence of good faith and a conscious disregard for activities that have seriously injured the Company.

161.    The Director Defendants have breached their duties of loyalty, good faith, care, candor, and oversight by knowingly or recklessly allowing Defendant Ward to engage in self-interested and conflicted behavior, by failing to prevent Defendant Ward from taking those improper and illegal actions, and by granting wasteful compensation packages to Defendant Ward and other senior executives.

## VI.    WARD'S CONDUCT VIOLATED SANDRIDGE'S CODE OF BUSINESS CONDUCT AND ETHICS AND CODE OF FINANCIAL ETHICS

162.    SandRidge has adopted a Code of Business Conduct and Ethics (the "Ethics Code") and a Financial Code of Ethics ("Financial Code").  Defendant Ward's conduct complained of above directly conflicts with and violates their obligations under the Company's codes of conduct and Corporate Governance Guidelines (described above) in violation of his fiduciary duties, thus making Ward personally liable to the Company.

163.    SandRidge's Ethics Code contains standards for, among other things, the following: (i) conflicts of interest; (ii) corporate opportunities; and (iii) the protection and proper use of Company assets.  However, Defendant Ward blatantly acted in violation of the Ethics Code as set forth above.

164.    Under the heading "Conflicts of Interest," SandRidge's Ethics Code states:

A conflict of interest occurs when an officer, director or employee's private interest interferes in any way—or appears to interfere—with the interests of the Company. Conflicts of interest include, but are not limited to, the following:

• Ownership in an enterprise that does business with, seeks to do business with, or is a *competitor* of the Company;

.   .   .

• Participation in any outside activity that *competes* with the Company or that *interferes* with the *performance* of an employee, officer or director's duties to the Company.

No officer, director or employee shall hold a position of material interest in an *entity that conflicts with or appears to conflict with, proper performance of Company duties and responsibilities* or the ability to make independent judgments regarding transactions between SandRidge and the entity. Employees, officers and directors may not use their positions, Company assets, or *confidential information gained in connection with their employment* or involvement with the Company for *personal gain* or for the *benefit of a family member* or any outside party.

(emphasis added.)

165.   Under the heading "Corporate Opportunities," SandRidge's Ethics Code states:

SandRidge officers, directors and employees are prohibited from (a) personally taking advantage of investment opportunities that are discovered through the use of Company property, information or position; (b) using Company property, information or position for personal gain; and (c) competing with the Company. Officers, directors and employees owe a duty to the Company to advance its legitimate interests when the opportunity to do so arises.

166.   And under the heading "Protection and Proper Use of Company Assets," SandRidge's Ethics Code states:

All Company assets should be used for legitimate purposes and protected against theft, waste, or loss. Company assets include, but are not limited to, cash, land, buildings, equipment, inventory, vehicles, appliances, (i.e., telephones, computers, copiers, etc.) and intangible items such as business plans, prospects and Company records, name, logo and tag line.

167.   Additionally, SandRidge has adopted a Financial Code for its senior financial officers, which includes Defendant Ward as CEO. Like the Ethics Code, it requires each senior officer to "[a]ct ethically with honesty and integrity, including the ethical handling of all actual or apparent conflicts of interest between personal and

**FIRST AMENDED VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT – Page 52**

professional relationships," and to "[r]espect the confidentiality of information acquired in the course of his work."

168.   As set forth here, the Director Defendants knew of and approved these policies, and failed to enforce them, due to their disabling conflicts of interest and lack of independence.

## VII.   DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

### A.   *Preliminary Matters*

169.   Plaintiffs bring this action derivatively in the right and for the benefit of SandRidge to redress injuries suffered, and to be suffered, by SandRidge as a direct and proximate result of the Director Defendants' breaches of fiduciary duties and corporate waste; the aiding and abetting of Defendant Ward's breaches of fiduciary duties by the Ward Entity Defendants; and the Ward Entity Defendants' misappropriation of corporate assets and unjust enrichment.

170.   Plaintiffs will fairly and adequately protect the interests of the Company and its shareholders and have retained counsel competent and experienced in derivative litigation.   Plaintiffs own SandRidge stock and owned SandRidge stock during the Relevant Period. Plaintiffs understand their obligation to hold their stock throughout the duration of this action and are prepared to do so.   Plaintiffs will continue to vigorously and conscientiously litigate this action and fulfill their responsibilities in representing SandRidge's interests.

171.   Because of the facts alleged in this complaint, under the laws of Delaware, the Company's state of incorporation, a pre-suit demand on SandRidge's board to bring this action is excused because such a demand would have been a futile and useless act.

172.   From the time the initial complaint in this action was filed until March 13, 2013, when TPG-Axon obtained four board seats as a result of a settlement with the Company, SandRidge's board consisted solely of the seven Director Defendants. Thus, for all claims validly in litigation before March 13, 2013, Plaintiffs need only show that a majority of the board (four of seven) were not independent or disinterested to show that demand is futile and thus excused. Because all seven Director Defendants—the entire board before March 13, 2013—were not independent or disinterested, demand is futile and thus excused for all claims in litigation before March 13, 2013.

173.   Additionally, demand is futile, and thus excused, for the claims brought after March 13, 2013—the claims against the Ward Entity Defendants—because a majority of the board is not independent and disinterested.  As of March 13, 2013, the Director Defendants, then seven of the eleven-member board, were not independent or disinterested, so demand is futile and thus excused for all claims in litigation including those first asserted when there was an eleven-member board.

174.   Demand is futile, and thus excused, for the claims brought as of the filing of this amended complaint.  As detailed below, all of SandRidge's current directors – the five "legacy" directors who remained after the TPG-Axon settlement (Defendants Oliver, Dobson, Brewer, Serota and Gilliland), non-defendant director Bennett (SandRidge's current CEO), and those four current directors nominated by activist investor TPG-Axon

**FIRST AMENDED VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT – Page 54**

(Stephen C. Beasley, Edward W. Moneypenny, Alan J. Weber and Dan A. Westbrook, referred to collectively here as the "TPG-Axon Directors") – are all interested or otherwise conflicted.

### B.    The Director Defendants are Collaterally Estopped from Arguing that Demand is Not Excused as to All Claims Asserted in the Hefner Action

175.    In January 2013, Plaintiff Dale Hefner ("Hefner") filed the *Hefner* Action as a derivative action against the Director Defendants.  Except for allegations regarding front running and flipping made in this action, which Hefner has not alleged, Hefner's pleading makes some of the same allegations made in this action regarding breach of fiduciary duty and corporate waste.  Soon after Hefner filed his case, the Director Defendants moved to dismiss based on Hefner's alleged failure to have established that demand upon them was futile, and the parties submitted extensive briefing on the demand futility issue.

176.    State court Judge Patricia Parrish heard oral argument on the Director Defendants' motion to dismiss on September 12, 2013. *See* Exhibit 20 (transcript of the September 12, 2013 hearing in the *Hefner* Action).  Faced with Hefner's demand futility allegations — which were far less robust and cogent than those presented in this amended complaint — Judge Parrish determined that the demand was futile and thus was excused. *See* Exhibit 21 (September 18, 2013 letter from Judge Parrish to the parties in the *Hefner* Action).

177.    Thus, based on Judge Parrish's ruling, the Director Defendants are now collaterally estopped from arguing that demand is not excused as to all claims contained

in Hefner's petition. The U.S. Supreme Court endorsed the offensive use of collateral estoppel and has explicitly applied it in a shareholder action, *see Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326-333 (1979), and later shareholder plaintiffs have successfully argued collateral estoppel in its wake. *See, e.g., In re Ivan F. Boesky Sec. Litig.*, 848 F. Supp. 1119, 1122-25 (S.D.N.Y. 1994).

C.      ***The Director Defendants Are Not Independent Because They Face a Substantial Risk of Personal Liability***

178.    The Director Defendants have exhibited a long history of taking actions that are not in the best interests of the Company and that violate their duty of loyalty to the Company and its shareholders.   The Director Defendants knew about Ward's wrongful conduct and failed in their duty of oversight to stop Ward.  Defendants acted with knowledge and in bad faith – conduct that cannot be indemnified by SandRidge under Delaware law, and therefore exposes the Director Defendants to a substantial risk of personal liability and they are not independent.

179.    Defendant Ward faces a substantial likelihood of personal liability arising from his breaches of fiduciary duty as he has wrongfully placed his personal interests and his family's interests ahead of SandRidge's interests and those of its shareholders.

180.    As to the other Director Defendants, the acts complained of include their knowing approval or conscious disregard of Defendant Ward's breaches of his fiduciary duties, including violations of SandRidge's Ethics Code, Financial Code, and Corporate Governance Guidelines.

181.    The Company maintains a written policy that requires material related-party transactions to be reviewed and approved, such as the transactions between the Company and the Ward Entity Defendants.

182.    The Director Defendants exhibited a systematic failure to fulfill their fiduciary duties, which could not have been an exercise of good faith business judgment and amounted to bad faith, gross negligence and extreme recklessness.

183.    The Director Defendants are exposed to substantial personal liability because of their failure to put in place or enforce appropriate controls necessary to assure that all actions were in the best interest of the Company and its shareholders as opposed to those of Defendant Ward.

184.    The Director Defendants knew of Defendant Ward's wrongdoing and waste and did nothing to prevent it, to stop it, or to prosecute this action. It is inconceivable that the Director Defendants did not know that the Ward Entity Defendants were improperly taking SandRidge corporate opportunities by acquiring hundreds of thousands of acres of mineral rights in the Mississippian Play at the same time as the Company and in adjacent acreage.

185.    Because the Director Defendants approved, turned a blind eye, and/or permitted the wrongs alleged herein to have occurred or recklessly disregarded the wrongs complained of herein, they are not disinterested parties.

186.    For these reasons, the actions of the board and the relationships between and among the Director Defendants described above have impaired the board's ability to validly exercise its business judgment and have rendered the board members incapable of

**FIRST AMENDED VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT – Page 57**

reaching an independent decision as to whether to accept a demand by Plaintiffs and to pursue claims on behalf of the Company, including against themselves.

187.   By the beginning of the Relevant Period, the Director Defendants knew of Ward's conflicts of interest, and that the Ward Entity Defendants were competing with SandRidge in the Mississippian, and that Ward was wrongfully taking SandRidge's corporate opportunities for himself.

188.   SandRidge's Proxy statements filed with the SEC throughout the Relevant Period (which were issued on behalf of the Director Defendants) show that the Director Defendants were well aware of Ward's conduct.  According to SandRidge's Proxy's:

    a.   In 2010, SandRidge leased rights to minerals under certain areas of land in the Mississippian from TLW Land & Cattle.  Also in 2010, SandRidge developed some of the surface lands associated with these mineral interests and paid $33,046 to TLW Land & Cattle pursuant to the development. SandRidge also paid royalties totaling $302,554 to TLW Land & Cattle in connection with the production of oil and natural gas from these properties.

    b.   In September 2010, SandRidge purchased a portion of the working interest in leases covering acreage in the Mississippian from WCT Resources, for $1,791,120, and in January 2011, SandRidge acquired a working interest in additional acreage in the area for $391,955.

    c.   WCT Resources participated as a working interest owner in wells SandRidge operates in the Mississippian, and during 2010, SandRidge paid revenue of $242,363 to WCT Resources as a working interest owner.

    d.   In 2011, SandRidge paid royalties totaling $925,735 to TLW Land & Cattle in connection with the production of oil and natural gas from properties in the Mississippian. In 2011, SandRidge paid revenue of $168,196 to WCT as a working interest owner.

    e.   In 2012, SandRidge paid royalties totaling $1,424,253 to TLW-LC in connection with the production of oil and natural gas in the Mississippian.

f.     In May 2012 and August 2012, SandRidge purchased a portion of the working interest in leases covering acreage in the Mississippian from WCT Resources for $333,612 and $480,000, respectively.

189.   Based on information provided by SandRidge's counsel, the Director Defendants knew about the September 2010, January 2011, and May/August 2012 transactions, as they were considered by SandRidge's board of directors and memorialized such in meeting minutes.

190.   In addition, the Director Defendants face a substantial risk of personal liability for their wrongful entrenchment.  In November 2012, TPG-Axon mounted a serious challenge to Defendant Ward's leadership and the board's control over the Company.  TPG-Axon informed the Director Defendants that it intended to conduct a consent solicitation seeking shareholder support for three proposals: (i) to amend SandRidge's bylaws to de-stagger the board of directors; (ii) to remove all of the Director Defendants for cause; and (iii) to replace the Director Defendants with a slate of TPG-Axon nominees.

191.   In response to TPG-Axon's consent solicitation, the Director Defendants adopted a poison pill, made it harder for shareholders to take action by written consent, amended the Company's bylaws to require an affirmative vote of over 50% of stockholders to amend any part of the bylaws concerning the election of directors, and launched a campaign opposing TPG-Axon's consent solicitation and urging SandRidge shareholders to vote against TPG-Axon's proposals.

192.   The Director Defendants then attempted to restrict the statutory 60-day period for TPG-Axon's consent solicitation by announcing that the period had begun on December 19, 2012, before TPG-Axon filed its definitive or preliminary proxy statements.   TPG-Axon filed suit challenging this maneuver, and the Company later settled this dispute by agreeing that the period began on January 15, 2013, when TPG-Axon filed its definitive proxy statement.

193.   In opposing TPG-Axon's consent solicitation, moreover, the Director Defendants falsely represented to SandRidge shareholders that the election of the TPG-Axon nominees would constitute a "change in control" with respect to SandRidge's credit agreements, which would trigger the right of SandRidge's lenders to require SandRidge to repurchase $4.3 billion worth of notes, and that "[t]he Company may not have sufficient liquidity to fund" the purchase.   The next day, however, the Director Defendants reversed their earlier statement and admitted that there was no danger that the Company's lenders would require such a repurchase because the debt was trading at prices above the repurchase price.

194.   During the proxy contest, TPG-Axon publicly campaigned against the Director Defendants based on allegations similar to those in this action concerning Defendant Ward's relationship to WCT Resources and WCT Resources' front running and flipping of leaseholds.   *See* Exhibit 18.   In response, on January 25, 2013, the Company issued a press release exonerating Defendant Ward.   *See* Exhibit 22 (January 25, 2013 press release).   According to the press release, the Company has "*reviewed issues related to these allegations several times over the Company's history and has*

**FIRST AMENDED VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT – Page 60**

*found no wrongdoing to have taken place*." *Id.* (emphasis added).   Soon afterwards, the Company reiterated this same statement in a February 4, 2013 shareholder presentation. And, on February 20, 2013, the Company again publicly defended Defendant Ward in another press release saying that "the Board has found no evidence of wrongdoing."   *See* Exhibit 23 (February 20, 2013 press release).   Thus, the board made it clear that it was not going to take action against Defendant Ward.

195.   On March 8, 2013, Chancellor Strine, in part based on the testimony of Defendant Jordan, found that the Director Defendants had no reason to withhold their approval of the TPG-Axon slate and that in doing so "[the Director] [D]efendants are *likely violating their fiduciary duty of loyalty* to SandRidge and its stockholders."   *Kallick v. SandRidge Energy, Inc.*, C.A. No. 8182-CS, 2013 WL 868942, at *7 (Del. Ch. Mar. 8, 2013) (here, "*Kallick*"). Having found that plaintiff "has a strong likelihood of success on the merits," Chancellor Strine enjoined the Director Defendants from soliciting consent revocations until they approved the TPG-Axon slate of nominees.   *Id.* at *16. Chancellor Strine explained that "[g]iven the cloud the incumbent board has *intentionally* flown over the voting decisions and the *absence of any rational, good faith justification for its non-decision as to approval*, I believe this limited injunctive relief is proportionate and equitable."   *Id.* (emphasis added).   Finally, Chancellor Strine found that the Director Defendants could have easily neutralized the "change of control" provisions by approving the TPG-Axon nominees without supporting their election.   *Id.* at *13.

196.   TPG-Axon and SandRidge entered into a settlement agreement on March 13, 2013 pursuant to which the board adopted a resolution increasing the number of

board seats from seven to eleven, nominating four of TPG-Axon's nominees to fill the new seats, and requiring SandRidge to pay TPG-Axon up to $3.5 million for its expenses in connection with its consent solicitation and stockholder nomination, the settlement agreement and related matters.[7]  Thus, the TPG-Axon nominees received their seats on the board, in part, through making some of the same front running and flipping allegations that Plaintiffs now make.  In other words, rather than sue Defendant Ward for his breaches of fiduciary duty, the Director Defendants instead chose to cede major control to the entity making self-dealing allegations.

197.    Counsel for the *Kallick* plaintiff have sought an award of $5 million for attorneys' fees and reimbursement of expenses from SandRidge.  This motion is currently pending in Delaware Chancery Court.

198.    The structure of the settlement reflects that the Director Defendants are beholden to Defendant Ward.  The settlement required Defendant Jordan to resign by April 30, 2013 and it also required two other (unspecified) directors to resign by June 30, 2013 in the event the Director Defendants did not terminate Defendant Ward.

199.    These resignations, both actual and contingent, further call into question the Director Defendants' ability to consider a demand. *See Rich v. Chong*, Civ. A. No. 7616-VCG, 2013 WL 1914520, at *6, *9-10 (Del. Chan. Apr. 2013) (director resignations may show that demand is excused); *In re China Agritech, Inc. S'holders Derivative Litig.*, 2013 WL 2181514, at *21 (Del. Ch. May 21, 2013) (same).

---

[7]    Although TPG-Axon has gained limited board positions, its settlement with the Company did not provide for corporate governance reforms and improvements, and has done nothing to redress the damage to the Company and its shareholders.

**FIRST AMENDED VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT – Page 62**

200.    Defendant Jordan's resignation supports a reasonable inference that he could not meaningfully supervise Defendant Ward, which in turn contributes to an inference that he could not properly consider a litigation demand. *See In re China Agritech, Inc. S'holders Derivative Litig.*, 2013 WL 2181514, at *21. Likewise, the fact that two other Director Defendants agreed to resign in the event Defendant Ward remained at SandRidge contributes to the inference that they are independence impaired, since they were willing to give up their board seats to keep Defendant Ward from becoming disassociated with the Company, which in turn contributes to an inference that they could not properly consider a litigation demand. *See id.*

201.    Finally, there is no better proof of what the Director Defendants would have done with a demand than how they treated Defendant Ward. First, they publicly declared, after a "four-month independent investigation," that Defendant Ward has done no wrong and terminated him without cause.[8]  Although they should have terminated him for cause based on the allegations TPG-Axon made during its proxy context and the similar allegations the Plaintiffs have made herein, they gave Defendant Ward *$90 million* of the stockholders' money as a parting gift.[9]

---

[8]     Exhibit 25 (SandRidge's Form 8-K, dated June 19, 2013).
[9]     The *Wall Street Journal* said this about Defendant Ward's termination: "[T]he founder's fall is being cushioned by about $90 million dollars, one of the larger severance packages ever seen in the energy industry." *See* Exhibit 26 ("SandRidge CEO Ousted, Gets $90 Million Exit Pay," dated June 19, 2013).

**FIRST AMENDED VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT** – Page 63

### D.      Defendant Ward Lacks Independence and Disinterestedness

202.    In addition to the factors applicable to the Director Defendants as a group, Defendant Ward lacks both the independence and disinterestedness required to impartially consider a demand by Plaintiffs.

203.    Defendant Ward could not comply with the fiduciary duties to independently consider a demand to bring the claims alleged against himself and his family herein as he is interested in the front running, flipping, and related-party transactions alleged in this complaint.

204.    He and members of his family are beneficiaries of his usurpation of SandRidge's corporate opportunities and related-party transactions, and he is the beneficiary of the wasteful compensation, including substantial monetary compensation and other benefits from the Company—totaling over $150 million, and self-dealing alleged herein.  Thus, Defendant Ward would not be able to vigorously prosecute any such action and cannot, in good faith, exercise independent business judgment to determine whether to bring this action against himself, the other Director Defendants and/or the Ward Entity Defendants.

205.    Defendant Ward, as CEO and Chairman, and holder of a substantial percentage of SandRidge's outstanding common stock (between 5% to 25% between 2006 and 2013), controlled and dominated SandRidge's board.   Defendant Ward conferred great wealth upon Defendants Oliver, Jordan, Gilliland, Serota, Dobson, and Brewer, who, like Ward, treated SandRidge like their own personal piggybank.

206.   As alleged in detail below, through related-party transactions, and fees for service on the Company's board, Defendant Ward transferred tens of millions of dollars of shareholder money to Defendants Oliver, Jordan, Gilliland, Serota, Dobson, and Brewer.  Defendants Oliver, Jordan, Gilliland, Serota, Dobson, and Brewer, as directors, set their own fees.

207.   In return, Defendants Oliver, Jordan, Gilliland, Serota, Dobson, and Brewer knowingly permitted Defendant Ward to engage in the wrongful conduct alleged above for his and his family's own personal economic gain, and approved exorbitant compensation and perquisites for Defendant Ward and other payments to Ward-related interests.

208.   Under SandRidge's Charter of the Nominating & Governance Committee dated March 1, 2011,the Director Defendants are not independent.  The Charter provides, in part, that the Committee "will consider that a director's independence may be jeopardized if (a) his or her compensation and perquisites exceed customary levels . . . or (c) the Company enters into consulting contracts with (or provides other indirect forms of compensation to) the director or an organization with which the director is affiliated."

209.   The economic benefits conferred on the Director Defendants are so substantial that they are not able to impartially consider whether to bring the claims alleged in this amended complaint.

### E.   *Defendant Jordan Lacks Independence and Disinterestedness*

210.   In addition to the factors applicable to the Director Defendants as a group, Defendant Jordan lacks both the independence and disinterestedness required to

**FIRST AMENDED VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT** – Page 65

impartially consider a demand by Plaintiffs because he is a former employee of SandRidge, having been its Vice President.

211.    According to his sworn deposition testimony in *Kallick*, Defendant Jordan and Defendant Ward have been "good friends" since the mid-1980s.  From the mid-1980s until Defendant Ward joined Chesapeake, Defendant Jordan co-invested alongside Defendant Ward in Defendant Ward's drilling ventures through TLW Investments, Inc.

212.    In December 2005, Defendant Jordan was hand-selected to serve on the board by Defendant Ward.  Defendant Jordan is loyal and beholden to Defendant Ward, such that Jordan would not exercise independence.  Defendant Jordan was also a member of the Compensation Committee when it recommended to the board the outsized compensation awards to Defendant Ward.

213.    Defendant Jordan was also a member of the Nominating and Corporate Governance Committee and thus was aware of the breaches of fiduciary duties and violations of the Code of Business Conduct and Ethics alleged herein.

214.    From October 2005 through August 2006, Jordan served as SandRidge's Vice President, Business.   In December 2005, SandRidge acquired from Defendant Jordan interests in certain Permian Basin acreage and West Texas undeveloped acreage, and the remaining 50% interest in Lariat Compression Co., making it a wholly-owned subsidiary of SandRidge, for approximately $21.3 million in SandRidge common stock.

215.    In March 2006, SandRidge acquired Jordan's 12.5% interest in PetroSource for $5,489,401.

**FIRST AMENDED VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT – Page 66**

216.   In July 2006, SandRidge acquired Defendant Jordan's interests in certain natural gas and oil producing properties for $9,000,000.  For the years 2004, 2005, 2006 and 2007, SandRidge paid Defendant Jordan $1,532,000, $2,113,020, $1,496,598, and $6,156, respectively, for Defendant Jordan's capital contributions to SandRidge's drilling projects.

217.   In June 2007, SandRidge purchased all of the interests in twelve producing wells and one well being drilled, which interests were owned by Wallace Jordan, LLC, a limited liability company a majority interest of which is owned and controlled by Jordan ("Wallace Jordan").  In addition and as a part of this same transaction, SandRidge purchased the interest owned by Wallace Jordan in the Sabino pipeline and the West Piñon Gathering System and certain oil and gas leases covering lands in Pecos County, Texas, as well as the interest owned by Defendant Jordan individually in Integra Energy. The purchase price for these assets was $3.3 million plus the reimbursement of approximately $236,000 of costs attributable to Wallace Jordan's 10% working interest in one of SandRidge's wells.

218.   These transactions with SandRidge raise a question as to Defendant Jordan's loyalty to SandRidge and make him independence-impaired because he is beholden to, and financially dependent on, Defendant Ward.

219.   In or around April 20, 2011, Defendant Jordan borrowed an undisclosed amount from Valliance Bank, an entity in which Defendant Oliver has an ownership interest.

**FIRST AMENDED VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT** – Page 67

220.    For his service as a director, Defendant Jordan was paid $62,259 in 2006, including a cash payment of $50,000; $130,564 in 2007, including a cash payment of $100,000; $189,877 in 2008, including a cash payment of $125,000; $300,006 in 2009, including a cash payment of $62,500; $400,006 in 2010, including a cash payment of $125,000; $375,000 in 2011, including a cash payment of $100,000; and $387,503 in 2012, including a cash payment of $112,500.

221.    Additionally, as described above, its settlement with SandRidge, TPG-Axon called for Defendant Jordan's resignation from his position as director effective on June 30, 2013, and Defendant Jordan, in fact, tendered his resignation effective April 29, 2013.

222.    For these reasons, Defendant Jordan would not be able to vigorously prosecute any such action and cannot, in good faith, exercise independent business judgment to determine whether to bring this action against Defendant Ward, himself, the other Director Defendants, and/or the Ward Entity Defendants.

### F.    *Defendant Oliver Lacks Independence and Disinterestedness*

223.    In addition to the factors applicable to the Director Defendants as a group, Defendant Oliver lacks both the independence and disinterestedness required to impartially consider a demand by Plaintiffs.

224.    Defendant Oliver was hand-selected by Ward and appointed as a director on July 13, 2006.  In September 2006, SandRidge entered into a new facilities lease with Defendant Oliver. The lease extended to August 2009 with annual rental payments of $1.1 million in 2007, $1.4 million in 2008, and $565,000 million in 2009.

**FIRST AMENDED VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT – Page 68**

225.   The lease was not renewed prior to its termination due to the relocation of all of SandRidge's employees from the facility to SandRidge's downtown Oklahoma City headquarters.   SandRidge reportedly spent $100 million to renovate the Kerr-McGee Tower and four other buildings to be called SandRidge Commons into Class A commercial real estate.

226.   Despite the massive investment of shareholder wealth in expansion of SandRidge's office space, in 2012, SandRidge leased approximately 36,000 square feet of Class B commercial space on the 12-14th floors of 204 North Robinson Avenue in Oklahoma City, known as City Place, with annual rent being approximately $510,000. This transaction was material to Defendant Oliver because SandRidge occupied approximately15% of City Place's total square footage.

227.   Defendant Oliver's business relationship with SandRidge impairs his duty of loyalty to the Company and the shareholders and makes him independence-impaired because he is beholden to, and financially dependent on, Defendant Ward.   Moreover, because Defendant Oliver was hand-selected to serve on the board by Defendant Ward, he is loyal and beholden to him, such that he would not exercise independence.

228.   For his service as a director on the Company's board, Defendant Oliver was paid $64,385 in 2006, including a cash payment of $50,000, $129,215 in 2007, including a cash payment of $100,000; $189,877 in 2008, including a cash payment of $125,000; $300,006 in 2009, including a cash payment of $62,500; $400,006 in 2010, including a

cash payment of $125,000; $375,000 in 2011, including a cash payment of $100,000; and $387,503 in 2012, including a cash payment of $112,500.

229.    Defendant Oliver was also a member of the Compensation Committee when it recommended to the board the outsized compensation awards to Defendant Ward. Defendant Oliver was also a member of the Nominating and Corporate Governance Committee and thus was aware of the breaches of duties and the Code of Business Conduct and Ethics alleged herein.

230.    Buffalo Creek Minerals, L.L.C. ("Buffalo Creek Minerals") and Sandstone Acquisition Energy Corp. ("Sandstone") are entities in which Defendant Oliver has an ownership interest.

231.    Buffalo Creek Mineral is a royalty interest owner in wells that SandRidge operates in northwest Oklahoma.  During 2012, SandRidge paid $398,907 to Buffalo Creek Minerals related to its royalty interests.

232.    Sandstone is an Oklahoma corporation that does business at 101 North Robinson  Street, Oklahoma City, Oklahoma, a property known as Corporate Tower in which Defendant Oliver has an ownership interest.

233.    R.T. Oliver Investments Inc., Sandstone and Valliance Bank, all entities in which Defendant Oliver has an ownership interest, operate from the same office suite at Corporate Tower and appear on the same website (www.rtoliverinvestments.com). According to SandRidge's SEC filings, Defendant Oliver is President of R.T. Oliver Investments, Inc., Chairman and President of Valliance Bank, N.A

234.   Based on a review of public records concerning oil and gas leases in Oklahoma, Sandstone has been actively buying and selling oil and gas properties throughout Oklahoma.

235.   Defendant Oliver has an ownership interest in Leadership Square at 211 North Robinson Avenue, in Oklahoma City.  The Oklahoma City Thunder and the Professional Basketball Club LLC, companies in which Defendants Ward and Dobson have an ownership interest, lease office space at Leadership Square.

236.   Defendant Oliver has an ownership interest in Oklahoma Tower at 210 Park Avenue in Oklahoma City.  Crowe & Dunleavy, SandRidge's counsel, leases office space in Oklahoma Tower.  Dorchester Capital Corp., whose chairman Clayton Bennett, is Chairman of the Thunder, and Defendant Ward's and Defendant Dobson's partner in the Thunder, leases space in the Oklahoma Tower.

237.   Based on these facts, under SandRidge's Charter of the Nominating & Governance Committee, Defendant Oliver's independence has been jeopardized because SandRidge provides indirect forms of compensation to Defendant Oliver and/or an organization with which Defendant Oliver is affiliated.

238.   For these reasons, Defendant Oliver would not be able to vigorously prosecute any such action and cannot, in good faith, exercise independent business judgment to determine whether to bring this action against himself, Defendant Ward, the other Director Defendants, and/or the Ward Entity Defendants.

### G.     *Defendant Dobson Lacks Independence and Disinterestedness*

239.    In addition to the factors applicable to the Director Defendants as a group, Defendant Dobson lacks both the independence and disinterestedness required to impartially consider a demand by Plaintiffs. Defendant Dobson could not comply with the fiduciary duties to independently consider a demand to bring the claims alleged herein because he is dominated and controlled by, and beholden to, Defendant Ward.

240.    Defendant Dobson joined the board on September 22, 2009.  In 2006, Defendants Ward and Dobson were among the eight original partners that purchased the NBA's Seattle SuperSonics and the WNBA's Seattle Storm professional basketball teams for $350 million.  In July 2008, the Seattle SuperSonics moved to Oklahoma City and were renamed the Thunder.   Defendants Ward and Dobson own a 19.23% and 3.85% interest, respectively, of the Thunder.  SandRidge entered into an agreement related to the sponsorship of the team in September 2008.  Under the five-year agreement, SandRidge paid approximately $16.4 million for advertising and promotional activities related to the Thunder.

241.    In October 2009, SandRidge entered into an agreement to license a suite at the arena where the Thunder plays its home games. Under the four-year agreement, SandRidge agreed to pay an annual license fee in return for access to the suite during Thunder games and for other events held at the arena. The annual license fee for the first year is $200,000 and may increase up to 3% each year.

242.    For his service as a director, Defendant Dobson was paid $118,753 in 2009, including a cash payment of $50,000; $400,006 in 2010, including a cash payment of

$125,000; $375,000 in 2011, including a cash payment of $100,000; and $387,503 in 2012, including a cash payment of $112,500.

243.   Defendant Dobson is the owner of Dobson Ranch LLC, an Oklahoma limited liability company.  Dobson Ranch owns oil and gas property in Beckham County, Oklahoma in which Defendant WCT Resources and SandRidge have had an ownership interest (referred to in documents as Dobson Ranch #1-20, DR 5-31, or Dobson Ranch 5-31).  In August 2010, Defendant WCT Resources pledged its ownership interest in Dobson Ranch as collateral for certain financing.

244.   Based on these facts, under SandRidge's Charter of the Nominating & Governance Committee, Defendant Dobson's independence has been jeopardized because SandRidge or provides indirect forms of compensation to Dobson and/ or an organization with which Defendant Dobson is affiliated.

245.   For these reasons, Defendant Dobson would not be able to vigorously prosecute any such action and cannot, in good faith, exercise independent business judgment to determine whether to bring this action against Defendant Ward, himself, the other Director Defendants, and/or the Ward Entity Defendants.

### H.   *Defendant Gilliland Lacks Independence and Disinterestedness*

246.   In addition to the factors applicable to the Director Defendants as a group, Defendant Gilliland lacks both the independence and disinterestedness required to impartially consider a demand by Plaintiffs. Defendant Gilliland could not comply with the fiduciary duties to independently consider a demand to bring the claims alleged herein because he has engaged in numerous transactions with the Company, including

**FIRST AMENDED VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT – Page 73**

assisting it in acquisitions and acquiring interests in related companies and selling an office building to the Company.

247.   Defendant Gilliland was hand-selected to serve on the board by Defendant Ward in January 2006.   Defendant Gilliland is loyal and beholden to Defendant Ward, such that Gilliland is not independent.   In December 2005, SandRidge acquired interests in PetroSource, certain acreage in the Piceance Basin and projects in Missouri and Nevada from Gillco Energy, L.P., an entity controlled by Defendant Gilliland, for approximately $21.1 million in SandRidge common stock.

248.   Defendant Gilliand's grandson, Andrew Hall, worked at SandRidge for Ward in 2012 creating industry comparable analysis reports.

249.   In February 2006, SandRidge acquired an office building in Midland, Texas from a partnership affiliated with Defendant Gilliland for $950,000.

250.   For his service as a director, Defendant Gilliland was paid $92,385 in 2006, including a cash payment of $78,000; $129,215 in 2007, including a cash payment of $100,000; $189,877 in 2008, including a cash payment of $125,000; $300,006 in 2009, including a cash payment of $62,500; $400,006 in 2010, including a cash payment of $125,000; $375,000 in 2011, including a cash payment of $100,000; and $387,503 in 2012, including a cash payment of $112,500.

251.   For these reasons, Defendant Gilliland would not be able to vigorously prosecute any such action and cannot, in good faith, exercise independent business judgment to determine whether to bring this action against Defendant Ward, himself, the other Director Defendants, and/or the Ward Entity Defendants.

**FIRST AMENDED VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT – Page 74**

### I.      *Defendant Serota Lacks Independence and Disinterestedness*

252.    In addition to the factors applicable to the Director Defendants as a group, Defendant Serota lacks both the independence and disinterestedness required to impartially consider a demand by Plaintiffs.  In March 2007, Defendant Serota was hand-selected to serve on the board by Defendant Ward. Defendant Serota is loyal and beholden to Defendant Ward, such that Defendant Serota would not exercise independence.

253.    Defendant Serota is a senior partner at Ares Management, LLC, which in May 2008 sold 2.5 million shares of SandRidge common stock for gross proceeds of $135 million.

254.    As of June 30, 2013 Ares Management continues to hold 2.5 million shares of SandRidge common stock.

255.    For his service as a director, Defendant Serota was paid $87,500 in cash for 2007; $160,308 in 2008, including a cash payment of $125,000; $300,006 in 2009, including a cash payment of $37,500; $362,506 in 2010, including a cash payment of $87,500; $375,000 in 2011, including a cash payment of $100,000; and $362,000 in 2012, including a cash payment of $87,500.

### J.      *Defendant Serota is Also Conflicted Because He is a Director of EXCO Resources, a SandRidge Competitor*

256.    Defendant Serota cannot independently consider allegations relating to Defendant Ward's lack of loyalty to SandRidge and its shareholders because Defendant Serota's loyalties are similarly divided between competitors.

257.     Defendant Serota is a director and senior advisor to Exco Resources, Inc. According to its SEC filings, Exco Resources purports to be an oil and natural gas company engaged in the exploration, exploitation, development and production of onshore U.S. oil and natural gas properties – including principal operations in the Permian Basin in West Texas.

258.     According to SandRidge's website, in addition to the Mississippian and other regions, SandRidge focuses its exploration and production activities in the Permian Basin.

259.     Defendant Serota's dual role as a director of both SandRidge and Exco Resources causes him to be conflicted, and his loyalties are divided between competitors. For these reasons, as well as those outlined in Section VII.I above, Defendant Serota would not be able to vigorously prosecute any such action and cannot, in good faith, exercise independent business judgment to determine whether to bring this action against himself, Defendant Ward, the other Director Defendants, and/or the Ward Entity Defendants.

### K.     Defendant Brewer Lacks Independence and Disinterestedness

260.     In addition to the factors applicable to the Director Defendants as a group, Defendant Brewer lacks both the independence and disinterestedness required to impartially consider a demand by Plaintiffs. Defendant Brewer received significant income from SandRidge for his service on the board.  According to SandRidge's proxy statements, Defendant Brewer, who joined the board on February 28, 2011was paid

$297,937 for the 10 months he served on the board in 2011; and $387,503 in 2012, including a cash payment of $112,500.

> **L.     Defendants Brewer, Dobson, Gilliland, Jordan, Oliver, and Serota Are Conflicted Because They Earn Material Amounts of Income from Service on SandRidge's Board**

261.    As set forth above, Defendants Brewer, Dobson, Gilliland, Jordan, Oliver, and Serota have received significant income from the Company for their service on the Company's board, thus making demand upon them futile.

262.    As alleged above, Defendants Brewer, Dobson, Gilliland, Jordan, Oliver, and Serota were paid as director fees between  $362,000  and $387,500 in 2012, and as high as $400,000/year in 2010.[10]  The board is therefore one of the top 20 companies in the nation for director compensation.  By way of reference, directors at the largest energy company in the world (Exxon Mobil) were paid less in 2012 than the lowest paid SandRidge director.  With the exception of two directors who received large one-time grants of stock upon first being elected to Exxon Mobil's board in 2012, directors at Exxon Mobil received between $326,133 and $336,133 in total compensation for 2012. However, in 2012, Exxon Mobil was 125 times larger than SandRidge based on market capitalization.

263.    The compensation of the Director Defendants materially exceeds usual and customary directors' fees and creates a reasonable doubt as to the Director Defendants' independence.

---

[10] In 2012, SandRidge's board met seventeen times, amounting to fees of approximately $22,800 per Director Defendant per meeting.  In 2011, SandRidge's board met six times, amounting to fees of approximately $62,500 per Director Defendant per meeting.

**FIRST AMENDED VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT – Page 77**

264. Moreover, the Director Defendants' blatant attempts to entrench themselves in response to TPG-Axon's proxy contest is evidence that the compensation received for their positions on the SandRidge Board was material to each of them.

265. The Director Defendants have received material substantial monetary compensation and other benefits from the Company and cannot be considered independent and disinterested.

266. In addition, demand would have been futile as to the non-defendant directors Bennett and the TPG-Axon Directors.

### M. Non-Defendant Director Bennett Lacks Independence and Disinterestedness

267. SandRidge's current CEO and director Bennett is not disinterested and independent. Bennett is not independent and is conflicted because he engaged in certain of the wrongful conduct and/or was a beneficiary of certain wrongful conduct alleged herein, and is conflicted because he currently serves as CEO and Chairman of the Company. As a senior officer of SandRidge, Bennett owed the company fiduciary duties. In 2011 – 2012, when Defendant Ward was still Chairman and CEO, Bennett received total compensation of over $11 million for 2011 and 2012, including $1.4 million in salary and over $1.4 million in cash bonuses. This excessive compensation made Bennett beholden to Defendant Ward and/or members of the Compensation Committee, and ensured that Bennett both (a) turned a blind eye to Defendant Ward's self-dealing while Bennett was SandRidge's President in 2011 – 2012, and (b) disregarded his fiduciary obligations to the Company and its shareholders when Bennett became a SandRidge

director in August 2013.  As such, demand on the SandRidge current board of directors, including non-defendant director Bennett, would have been futile.

268.   In addition, non-defendant director Bennett is conflicted, and cannot exercise independent judgment regarding any decision to pursue litigation against Defendant Ward and his fellow directors, because from the time he was hired at SandRidge in 2011 until the present, he has been under the direct and continual supervision of either Defendant Ward (while Defendant Ward was SandRidge's President) and/or the Company's board.  Non-defendant director Bennett's employment agreement with SandRidge – including the provisions for his compensation, set by the conflicted members of the board's Compensation Committee (as detailed above) – make him beholden to Defendant Ward and the Director Defendants.  *See* Exhibit 24 (excerpts of SandRidge's Form 8-K, filed December 27, 2011).

### N.   *The TPG-Axon Directors Are Not Independent or Disinterested*

269.   The TPG-Axon Directors – who were agents of TPG-Axon in that they were nominated to the SandRidge board specifically to represent TPG-Axon's interests – were not disinterested or independent because they are legally incapable of bringing such claims.  As agents of TPG-Axon, the March 13, 2013 settlement agreement between SandRidge and TPG-Axon released any and all claims that TPG-Axon and its agents – which included the TPG-Axon Directors – could have brought against SandRidge, Defendant Ward and/or the Director Defendants.  Demand on SandRidge's current board of directors would therefore have been just as futile as demand on the board in place when Plaintiffs filed their initial complaint at the beginning of 2013.

**FIRST AMENDED VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT** – Page 79

270.    Throughout the proxy battle and disputes described above, TPG-Axon continually represented that the TPG-Axon Directors would act on TPG-Axon's behalf to inject independence and oversight into SandRidge's corporate governance.  For example, TPG-Axon's proxy solicitations made clear that the TPG-Axon Directors were being nominated to the SandRidge board to further TPG-Axon's goals of imposing better corporate governance on SandRidge.  *See* Exhibit 27, at p. 62 (excerpts of TPG-Axon's Schedule 14A proxy filing, filed on February 8, 2013).  As such, the TPG-Axon Directors were agents of TPG-Axon, in that as directors, they fulfilled TPG-Axon's goals of ensuring that the newly revamped SandRidge board was ostensibly independent.

271.    The March 13, 2013 settlement agreement between SandRidge and TPG-Axon reads in relevant part as follows:

> The TPG-Axon Group, for themselves and their members, officers, assigns, agents and successors, past and present, hereby agree and confirm that, effective from and after the date of this Agreement, they hereby acknowledge full and complete satisfaction of, and covenant not to sue, and forever fully release and discharge each [of SandRidge, Defendant Ward, the Director Defendants and non-defendant director Bennett] of, and hold each [of SandRidge, Defendant Ward, the Director Defendants and non-defendant director Bennett] harmless from, any and all rights, claims, warranties, demands, debts, obligations, liabilities, costs, attorneys' fees, expenses, suits, losses and causes of action ("Claims") of any nature whatsoever, whether known or unknown, suspected or unsuspected, occurring at any time of period of time on or prior to the date of the execution of this Agreement (including the future effects of such occurrences, acts or omissions). . .

*See* Exhibit 28 (excerpts of SandRidge's Form SC 13D/A, filed March 15, 2013).[11]

272.    In addition, the so-called "standstill" provisions of the March 13, 2013 TPG-Axon settlement agreement mandate that TPG-Axon refrain from suing either SandRidge (even in a derivative capacity), or any of the Company's current or former officers or directors.  *See* Exhibit 28.

273.    Because of the terms of the settlement agreement, the TPG-Axon Directors cannot bring any claims against any of the defendants named in this amended complaint, and are legally precluded from deciding to bring any claims against those defendants because those claims had been released.  Moreover, the TPG-Axon Directors voted in favor of Defendant Ward's excessive severance package, depleting the Company's cash reserves at crucial time. As such, demand on the current SandRidge board, including the TPG-Axon Directors, would have been futile.

**O.    Defendants Brewer, Dobson, Gilliland, Jordan, Oliver, and Serota's Lack of Independence is Further Demonstrated by Their Failure to Take Action Against Defendant Ward for His Violations of the Securities Exchange Act.**

274.    In the *Chechele* Action, a SandRidge investor sought disgorgement from Defendant Ward pursuant to Section 16(b) of the Securities Exchange Act, 15 U.S.C. §78p(b), of profits Defendant Ward was alleged to have made in connection with certain transactions in SandRidge's common stock.  Defendants Oliver, Serota, Brewer, Dobson,

---

[11] The settlement agreement also explicitly released any claims SandRidge may have had against the TPG-Axon Directors.  *See* Exhibit 28.

**FIRST AMENDED VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT – Page 81**

Gilliland,  and Jordan's response to wrongdoing alleged in the *Chechele* Action shows that when confronted with Defendant Ward's wrongdoing, Defendants Oliver, Serota, Brewer, Dobson, Gilliland, and Jordan were incapable of acting independent of Defendant Ward.

275.   On August 6, 2010, counsel for the plaintiffs in the *Chechele* Action sent a letter to the Director Defendants, alleging that their investigation revealed that Defendant Ward "may be liable  . . . under Section 16(b) for short swing profits."  On October 1, 2010, the Director Defendants sent a reply letter to the *Chechele* plaintiffs, essentially stating that they found that Defendant Ward had not engaged in any wrongdoing.

276.   In November, 2012, on the eve of trial, Defendant Ward settled the *Chechele* Action claims for $5 million.  Defendant Ward's legal fees were paid by SandRidge.

## P. Defendants Oliver, Brewer, and Serota Failed in their Duty of Oversight as Members of SandRidge's Audit Committee

277.   During the Relevant Period, Defendants Oliver, Brewer, and Serota were members of SandRidge's Audit Committee, which met four times in 2011 and four times in 2012.

278.   The Audit Committee's charter provides that the purpose of the Committee is to assist the board in fulfilling its oversight responsibilities relating to (among other things) compliance by the Company with legal and regulatory requirements, including the Company's disclosure controls and procedures.

279.    The Audit Committee had the authority to retain independent counsel, accountants, or others to advise the Committee or assist in the conduct of an investigation, and was responsible for instituting and overseeing special investigations. As alleged above, however, Defendants Brewer, Oliver, and Serota knew about Defendant Ward's competition with SandRidge, and did nothing to stop him.  Defendants Brewer, Oliver, and Serota had the power, and indeed the responsibility, to investigate Defendant Ward's conduct – and they should have done so.  Their failure to use their powers as members of SandRidge's Audit Committee is further proof of their lack of independence.

## VIII.  CAUSES OF ACTION

### FIRST CAUSE OF ACTION

### Against Defendant Ward for Breach of Fiduciary Duties for Usurpation of Corporate Opportunities

280.    Plaintiffs incorporate by reference and re-allege each allegation contained above.

281.    Defendant Ward owes SandRidge certain fiduciary duties as set out above.

282.    Defendant Ward has breached his fiduciary duties of loyalty, good faith, fair dealing, and due care because, among other things, he:

(a)    allowed his private interests to interfere and conflict with the interests of the Company;

(b)    has a relationship with one or more entities that competes directly with the Company;

(c)     participated in outside activities that compete directly with the Company and/or that interfere with the performance of his duties to the Company; and

(d)     used Company assets and confidential information, including trade secrets (as that term is defined by Oklahoma's Uniform Trade Secrets Act, 78 O.S. §§ 85 *et seq*.) gained in connection with his employment or involvement with the Company for personal gain, and/or for the benefit of a family member's or another outside party, and to compete with and interfere with Company business.

283.    In violation of his fiduciary duties to SandRidge and shareholders, Defendant Ward usurped SandRidge business opportunities for his and his family's benefit.   SandRidge is and was financially able to exploit these opportunities; the opportunities were and are within SandRidge's line of business; SandRidge and its shareholders had and have an interest or expectancy in the opportunities.   By usurping these opportunities for himself, Defendant Ward was placed in a position inimical to, and in conflict with, his duties to SandRidge and its shareholders.

284.    As a direct and proximate result of Defendant Ward's breaches of fiduciary duties, SandRidge has been damaged, not only monetarily, but also to its corporate image and goodwill. That damage includes, among other things, severe damage to the share price of SandRidge, resulting in an increase cost of capital, the waste of corporate assets, and reputational harm.

## SECOND CAUSE OF ACTION

**Against the Director Defendants for Breach of Fiduciary Duties of Care Pursuant to**
***In re Caremark International, Inc. Derivative Litigation*, 698 A.2d 959 (Del. Ch. 1996)**

285.    Plaintiffs incorporate by reference and re-allege each allegation contained above.

286.    The Director Defendants have a duty to the Company and its shareholders to establish and maintain adequate internal controls to ensure the Company is operated in a prudent and lawful manner. The Director Defendants utterly failed to implement any reporting or information system or controls; or having implemented such a system or controls, consciously failed to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention. The Director Defendants knew they were not discharging their fiduciary obligations and/or demonstrated a conscious disregard for their responsibilities and acted in bad faith.

287.    The Director Defendants, however, engaged in a sustained and systematic failure to exercise their fiduciary duties. Among other things, the Director Defendants failed to ensure that the Company's officers and directors, including Defendant Ward, complied with its Ethics Code, Financial Code, and Corporate Governance Guidelines and made adequate and accurate disclosures about Defendant Ward's activities to shareholders through SandRidge's SEC filings.

288.    The Director Defendants' disclosures to SandRidge investors concerning Defendant Ward's improper related-party transactions were materially misleading.  The Director Defendants knew of Defendant Ward's conduct and knowingly and intentionally and in bad faith failed to disclose that conduct.

289.    The Director Defendants' conduct in response to TPG-Axon's consent solicitation breached their fiduciary duties to SandRidge and its shareholders.  Chancellor Strine already found the Director Defendants' "thin and shifting arguments" in support of their efforts to maintain control over the Company were done "with an absence of good

**FIRST AMENDED VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT – Page 85**

faith and reasonableness inconsistent with their fiduciary duties." *Kallick*, 2013 WL 868942, at *16.

290.   As a direct and proximate result of the Director Defendants' breaches of their fiduciary duties, SandRidge has been damaged, not only monetarily, but also with respect to its corporate image and goodwill.  That damage includes, among other things, severe damage to the share price of SandRidge, resulting in an increase cost of capital, the waste of corporate assets, and reputational harm.

### THIRD CAUSE OF ACTION

### Against the Director Defendants for Waste of Corporate Assets

291.   Plaintiffs incorporate by reference and re-allege each allegation contained above.

292.   The Director Defendants' conduct constitutes a waste of SandRidge's assets.   Specifically, the Director Defendants approved extravagant and wasteful compensation to Defendant Ward and other senior executives, as set forth herein, including without limitation, the provisions of the 2011 Employment Agreement.   In addition, the Director Defendants granted Defendant Ward significant wasteful perquisites at the Company's expense.   Finally, the Director Defendants funneled millions of dollars out of the Company for Defendant Ward's benefit, including to the Ward Defendant Entities.

293.   The Director Defendants' conduct exchanged corporate assets for consideration so disproportionately small as to lie beyond the range at which any reasonable person might be willing to trade, and was an exchange that was so one-sided

that no business person of ordinary, sound judgment could conclude that SandRidge received adequate consideration.

294.    The facts alleged above raise a reasonable doubt as to whether these transactions were so one-sided as to be beyond the outer limit of the Director Defendants' discretion.

295.    Because of the Director Defendants' waste of corporate assets, they are liable to the Company.

## FOURTH CAUSE OF ACTION

### Against the Ward Entity Defendants for Aiding and Abetting Defendant Ward's Breaches of Fiduciary Duty

296.    Plaintiffs incorporate by reference and re-allege each allegation contained above.

297.    Defendant Ward owed SandRidge and its shareholders fiduciary duties, as set forth above.   Defendant Ward breached those duties with the knowledge and substantial assistance of the Ward Entity Defendants.

298.    While the Ward Entity Defendants may have been used for some permissible purposes – for example, as a limited-liability corporation owned by the Ward's Children's Trust, Defendant WCT Resources may shelter Ward's children from estate taxes – they also performed a critical, and decidedly impermissible, role in Defendant Ward's breaches of fiduciary duty.

299.    The Ward Entity Defendants were a necessary component of Defendant Ward's efforts to usurp SandRidge's corporate opportunities, and those efforts could not

succeed without the substantial assistance of the Ward Entities. The Ward Entity Defendants gave Defendant Ward a vehicle to efficiently acquire, retain, and sell land in the Mississippian.

300.   The Ward Entity Defendants aided and abetted Defendant Ward's breaches of fiduciary duties and were active and knowing participants in Defendant Ward's breaches of fiduciary duties. Defendant Ward used the Ward Entity Defendants to usurp SandRidge's corporate opportunities.

301.   As alleged above, Defendant Ward established WCT Resources and 192 Investments, determined what assets were put into these companies, and participated in their management. Similarly, TLW Land & Cattle is managed by Defendant Ward.

302.   Defendant Ward's knowledge of his breaches is imputed to the Ward Entity Defendants.   Accordingly, the Ward Entity Defendants' participation in Defendant Ward's underlying breaches of fiduciary duty was made with the full knowledge that their participation would assist Defendant Ward in breaching his fiduciary duties.

303.   As a direct and proximate result of the Ward Entity Defendants' aiding and abetting Defendant Ward's breaches of fiduciary duties, SandRidge has been, and continues to be, damaged.

## FIFTH CAUSE OF ACTION

**Against Defendant Ward and the Ward Entity Defendants for Misappropriation of SandRidge's Confidential and Proprietary Information, Including Trade Secrets Covered by Oklahoma's Uniform Trade Secrets Act ("USTA"), 78 O.S. §§ 85 *et seq.***

304.   Plaintiffs incorporate by reference and re-allege each allegation contained above.

305.    Section 86(4) of Oklahoma's USTA defines "trade secret" as "information . . . that derives independent economic value, potential or actual, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and is subject of efforts that are reasonable under the circumstances to maintain its secrecy."  Defendant Ward had access to information that qualified as "trade secrets" under Oklahoma's USTA, and therefore the Ward Entity Defendants – as surrogates of Defendant Ward – had such access.

306.    Defendant Ward and the Ward Entity Defendants misappropriated SandRidge's confidential and proprietary information, including the Company's trade secrets, and further wrongfully used that confidential and proprietary information to SandRidge's detriment by usurping SandRidge's corporate opportunities, which SandRidge was and is financially able to exploit, were and are within SandRidge's line of business, and in which the Company and its shareholders had and have an interest or expectancy in the opportunities, thus placing Defendant Ward in a position inimical to, and in conflict with, his duties to SandRidge and its shareholders.

307.    Defendant Ward served as President of SandRidge from 2006 until at least 2011, and served as CEO and Chairman through July, 2013.  In that role, Defendant Ward was privy to data about the Mississippian that was developed (at great expense) by the Company's engineers, geologists, and technicians.  For example, according to SandRidge's 2010 10-K, the Company's 18-member "Reservoir Engineering Department" – which was responsible for monitoring asset performance and tracking production history as well as other geologic, economic, ownership, and engineering data

– reported directly to SandRidge's President, Defendant Ward.     Defendant Ward had access to internal SandRidge information about the Mississippian – indeed, it was part of the Company "internal controls" policy to ensure that Defendant Ward had access to that information.   *See* Exhibit 29 (excerpts of SandRidge's 2010 Form 10-K).

308.   In addition to the functions performed by units like the Reservoir Engineering Department, SandRidge expended considerable resources developing information about the Mississippian, information which was a crucial component of the Company's stated strategy to explore, develop, and exploit that area's hydrocarbon deposits.  For example, SandRidge's 15-member geology unit monitored the activity of SandRidge's competitors in the Mississippian using an expensive subscription service sold by a company called IHS.  IHS' subscription database included data on drilling permits and production information throughout the Mississippian, which IHS gathered from state and federal agencies and then sold to subscribers like SandRidge.  Relying on their expertise and judgment, SandRidge's geologists and technicians used this data to estimate the potential exploitability of underground accumulations of oil and natural gas, furthering the Company's goals of fully developing the Mississippian.

309.   SandRidge's geology unit would analyze the IHS data to create color-coded maps showing the activities of SandRidge's competitors in the Mississippian.  Those maps were then provided directly to Defendant Ward and other senior managers at SandRidge, and at least one former employee of the Company's geology unit personally delivered such maps to Defendant Ward's office during the Relevant Period.  These maps

provided critical competitive intelligence to SandRidge as it expanded into the Mississippian after 2009.

310.     This kind of information was a trade secret under the controlling Oklahoma statute: it was valuable to SandRidge precisely because it was not meant to be shared with entities other than SandRidge, and SandRidge employees sought to maintain the secrecy of such information.  According to a former SandRidge geology unit employee, neither the employee nor any of the employee's co-workers in that unit would have ever shared SandRidge data with Defendant WCT Resources, Chesapeake, or any of SandRidge's other competitors.  Indeed, as a SandRidge shareholder by virtue of participation in the Company's 401(k) plan, the former employee wanted the Company (and its stock) to do well, and sharing such information with anyone outside of SandRidge would have gone against the former employee's own financial interests as a SandRidge shareholder.  In other words, it would have been detrimental to SandRidge, and SandRidge's shareholders, if any of the Company's competitors used that dearly obtained information for their own benefit.  Yet that is exactly what Defendant Ward and his entities did.  In fact, upon information and belief, WCT Resources employees communicated with SandRidge about WCT Resources' projects, via both e-mail and telephone.

311.     SandRidge and its shareholders were the sole intended beneficiaries of the Company's confidential, proprietary information; it was meant to ensure that the Company and its shareholders profited from the Company's stated goals of fully developing the Mississippian.  As the Company's President and CEO, Defendant Ward

had an obligation to the Company and its shareholders to maintain the secrecy of the information he obtained by virtue of his position at SandRidge.  Defendant Ward was not meant to personally benefit from that information, and was certainly not meant to misuse it to the detriment of the Company and its owners.

312.   Moreover, even though his employment agreement was amended in 2011 to give Defendant Ward permission to engage in "outside oil and gas businesses," the amendment did not (either explicitly or implicitly) give the Company's consent to use the information Defendant Ward obtained through his position at the Company.  In fact, the 2011 amendment only allowed Defendant Ward to engage in such businesses "in areas not being pursued by . . . [SandRidge]."  Yet Defendant Ward improperly used SandRidge's confidential information and did the opposite: acquired, retained, and/or sold leaseholds in the Mississippian – an area that SandRidge was pursuing in its entirety, in line with its stated corporate strategy.

313.   As a direct and proximate result of Defendant Ward's and the Ward Entity Defendants' misappropriation, SandRidge has been damaged by the use of its confidential and proprietary information, including trade secrets as that term is defined under Oklahoma's USTA, to misappropriate its corporate opportunities.   Such misappropriation included taking SandRidge's trade secrets (including, but not limited to, the information and data given to Defendant Ward by the Company's Reservoir Engineering Department and geology unit) and using those trade secrets for his own benefit in buying, selling, and retaining valuable leaseholds throughout the Mississippian.

## SIXTH CAUSE OF ACTION

### Against the Ward Entity Defendants for Unjust Enrichment

314.   Plaintiffs incorporate by reference and re-allege each allegation contained above.

315.   The Ward Entity Defendants have unfairly benefited through the use of Company assets and confidential information, gained in connection with Defendant Ward's employment or involvement with SandRidge, to directly compete and interfere with SandRidge's business.

316.   SandRidge has a reasonable expectation of being offered all corporate opportunities from Defendant Ward relating to the acquisition of mineral interests and development in the Mississippian Play.

317.   The Ward Entity Defendants have unfairly benefited from Defendant Ward's usurpation of SandRidge's corporate opportunities.

318.   As a direct and proximate result of the wrongful conduct complained of herein, SandRidge has been damaged and the Ward Entity Defendants have been unjustly enriched to the detriment of SandRidge and its shareholders.

319.   To allow the Ward Entity Defendants to retain the benefits of SandRidge's corporate opportunities wrongfully usurped from the Company would result in substantial and unjust enrichment. In accordance with equity and good conscience, the Ward Entity Defendants ought not to be allowed to retain such a benefit that should have rightfully gone to SandRidge.

## IX.    PRAYER FOR RELIEF

Plaintiffs demand judgment as follows:

(a)    Determining that this action is a proper derivative action maintainable under law and demand is excused;

(b)    Awarding against all Defendants and in favor of SandRidge the damages sustained by the Company as a result of the Director Defendants' breaches of their fiduciary duties and the Ward Entity Defendants' illegal and improper acts;

(c)    Imposing a constructive trust over all mineral rights usurped and misappropriated from the Company by Defendant Ward and the Ward Entity Defendants;

(d)    Awarding SandRidge restitution from Defendants and ordering disgorgement of all profits, benefits, and other compensation obtained by the Defendants;

(e)    Directing SandRidge to take all necessary actions to reform and improve its corporate governance and internal procedures, to comply with the Company's existing governance obligations and all applicable laws, to implement the reforms and improvements set forth in Exhibit 30 of this amended complaint, and to protect the Company and its shareholders from a recurrence of the damaging events described herein;

(f)    Awarding to Plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

(g)    Granting such other and further relief as the Court deems just and proper.

**FIRST AMENDED VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT – Page 94**

## JURY DEMAND

Plaintiffs demand a trial by jury.

DATED: October 9, 2013

/s/ Michael  Burrage
Reggie N. Whitten, OBA #9576
Michael Burrage, OBA #1350
Simone G. Fulmer, OBA #17037
Randa K. Reeves, OBA # 30695
**WHITTEN BURRAGE**
1215 Classen Drive
Oklahoma City, Oklahoma 73103
Telephone:   (405) 516-7800
Facsimile:    (405) 516-7859
rwhitten@whittenburragelaw.com
mburrage@whittenburragelaw.com
sfulmer@whittenburragelaw.com
rreeves@whittenburragelaw.com

-and-

**KAPLAN FOX & KILSHEIMER LLP**
Robert N. Kaplan (admitted *pro hac vice*)
Jeffrey P. Campisi (admitted *pro hac vice*)
Matthew P. McCahill (admitted *pro hac vice*)
850 Third Avenue, 14th Floor
New York, New York 10022
Telephone:   (212) 687-1980
Facsimile:    (212) 687-7714
rkaplan@kaplanfox.com
jcampisi@kaplanfox.com
mmccahill@kaplanfox.com

*Co-Lead Counsel for the Plaintiffs*

*Other Plaintiffs' Counsel:*

**JACKSON WALKER L.L.P.**
Mark T. Josephs
Texas State Bar No. 11031400
(admitted *pro hac vice*)
Andrew D. Graham
Texas State Bar No. 24041002
(admitted *pro hac vice*)
901 Main Street, Suite 6000
Dallas, Texas  75202
Telephone:    (214) 953-6000
Facsimile:     (214) 953-5822
mjosephs@jw.com
agraham@jw.com

**GABLEGOTWALS**
W.A. Drew Edmondson, OBA #2628
Gregory T. Metcalfe, OBA #19526
Thomas W. Gruber, OA #3647
One Leadership Square, 15th Floor
211 N. Robinson
Oklahoma City, Oklahoma  73102
Telephone:    (405) 235-5500
Facsimile:     (405) 235-2875
dedmondson@gablelaw.com
gmetcalfe@gablelaw.com
tgruber@gablelaw.com

*Liaison Counsel for Plaintiffs:*

**FEDERMAN & SHERWOOD**
William B. Federman, OBA #2853
10205 North Pennsylvania
Oklahoma City, Oklahoma  73120
Telephone:    (405) 235-1560
Facsimile:     (405) 239-2112
wbf@federmanlaw.com

## CERTIFICATE OF SERVICE

<u>X</u>      I hereby certify that on October 9, 2013, I electronically transmitted the attached document to the Clerk of the Court using the ECF System for filing.  Based on the records currently on file, the Clerk of Court will transmit a Notice of Electronic Filing to the following ECF registrants:

Amanda F. Lawrence  alawrence@scott-scott.com,
Andrew D. Graham  agraham@jw.com
Brian B. Alexander  balexander@cov.com
C. Williams Phillips  cphillips@cov.com
Gregory T. Metcalfe  gmetcalfe@gablelaw.com,
James E. Dunn  jim@usattorney.com,
Jeffrey P. Campisi  jcampisi@kaplanfox.com
Joseph P. Guglielmo  jguglielmo@scott-scott.com
Louis N. Boyarsky  lboyarsky@glancylaw.com
Mark P. Gimbel  mgimbel@cov.com
Mark T. Josephs  mjosephs@jw.com
Matthew P. McCahill mmccahill@kaplanfox.com
Michael Burrage  mburrage@whittenburragelaw.com,
Randa K. Reeves  rreeves@whittenburragelaw.com,
Reggie N. Whitten  rwhitten@whittenburragelaw.com,
Robert N. Kaplan  rkaplan@kaplanfox.com
Simone G. Fulmer  sfulmer@whittenburragelaw.com
Thomas B. Snyder  thomas.snyder@crowedunlevy.com,
Thomas William Gruber  tgruber@gablelaw.com,
William A. Edmondson  dedmondson@gablelaw.com,
William B. Federman  wbf@federmanlaw.com,

/s/ Michael Burrage

**FIRST AMENDED VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT** –