
**FILED**

IN THE UNITED STATES DISTRICT COURT FOR

SEP 2 2 2014

CARMELITA REEDER SHINN, CLERK
U.S. DIST. COURT, WESTERN DIST. OKLA.
BY _____ ,DEPUTY

THE WESTERN DISTRICT OF OKLAHOMA

IN RE SANDRIDGE ENERGY, INC.           )       No. CIV-13-102-W
SHAREHOLDER DERIVATIVE LITIGATION   )

Relating to All Derivative Actions

## ORDER

This matter comes before the Court on the Motion to Dismiss Plaintiffs' Amended

Consolidated Shareholder Derivative Complaint filed pursuant to Rules 23.1 and 12(b)(6),

F.R.Civ.P., by nominal defendant SandRidge Energy, Inc. ("SandRidge"), and defendants

Jim J. Brewer, Everett R. Dobson, William A. Gilliland, Daniel W. Jordan, Roy T. Oliver, Jr.,

and Jeffrey S. Serota. Lead plaintiff Paul Elliot, on behalf of the Paul Elliot IRA R/O

("Elliot"), and plaintiff Lisa Ezell have responded in opposition, and SandRidge and the

individual movants have filed a reply. Based upon the allegations in the first amended

verified consolidated shareholder derivative complaint ("Amended Complaint"), the Court

makes its determination.

The plaintiffs brought this derivative action on behalf of SandRidge[1] and in addition

to the individual movants, who are or were members of SandRidge's Board of Directors

("Board" or "Directors"[2]), during the relevant period,[3] the plaintiffs have named as

---

[1]SandRidge is a corporation that is organized under Delaware law and has its headquarters in Oklahoma City, Oklahoma. See Doc. 142 at 12, ¶ 22. It was formed in 2006 by defendant Tom L. Ward, see id. at 14, ¶ 32, and citing the description found on SandRidge's website, the plaintiffs have asserted that "SandRidge is an oil and natural gas exploration company that 'focuses on drilling low-risk, conventional, high rate-of-return oil wells in shallow carbonate reservoirs.'" Id. at 12, ¶ 22.

[2]The plaintiffs have alleged that Brewer, Dobson and Serota have served as SandRidge Directors since February 2011, see id. at 12, ¶ 24, September 2009, see id. at 13, ¶ 25, and March 2007, see id. ¶ 29, respectively, and that Gilliland and Oliver have served as Directors of SandRidge and its predecessor, Riata Energy, Inc. ("Riata"), since January 2006, see id. ¶ 26, and July 2006, see id. ¶ 28, respectively. Jordan also served as a Director of SandRidge and Riata from December 2005 to April 2013, see id. ¶ 27, and as a SandRidge vice president from October

defendants Tom L. Ward ("Ward"), former SandRidge chief executive officer and Board chairman,[4] and three entities–WCT Resources, L.L.C. ("WCT"),[5] 192 Investments, L.L.C. ("192 LLC"),[6] and TLW Land & Cattle, L.P. ("TLW")[7]–that the plaintiffs have labeled "the Ward Entity Defendants." Doc. 142 at 7, ¶ 7.

In summarizing the movants' alleged wrongful conduct, the plaintiffs have claimed that these Directors not only, "[i]n violation of their fiduciary duties of oversight and care, . . . did nothing to stop," id. at 9, ¶ 12, Ward's alleged "self-dealing, breaches of fiduciary

---

2005 to August 2006. See id. at 70, ¶ 214.

[3]For purposes of this lawsuit, the period from October 25, 2010, to the present is the "Relevant Period." See id. at 6, ¶ 2.

[4]Ward, who is also included in the Amended Complaint's definition of "Director," see id. at 13, ¶ 30, served as SandRidge's chairman and chief executive officer from June 2006 until his employment was terminated in June 2013. See id. at 12, ¶ 23. Ward also served as SandRidge's president from December 2006 to January 2011. See id. Before he founded SandRidge in 2006, Ward was a director, the president and the chief operating officer of Chesapeake Energy Corporation ("Chesapeake"). See id. Ward's individual challenges to the Amended Complaint are addressed in a separate Order issued this date.

[5]WCT is described in the Amended Complaint as an Oklahoma limited liability company, see id. at 13, ¶ 31, which was formed in 2002 by Shannon Self, a member of Chesapeake's Board of Directors. See id. at 16, ¶ 41. Trent Ward is WCT's chief executive officer, see id. at 17, ¶ 42, and the company is alleged to have only seven (7) employees and one contract geologist. See id. at 44, ¶ 126. It has as its members trusts established and funded by Ward and his wife, Schr'ee Ward, for the benefit of their children: the Trent Lee Ward Trust, the Romi Norel Ward Trust and the James Davis Ward Trust. See id. at 18, ¶ 44; id. at 13, ¶ 31 (citations omitted). The trustee of these trusts is Scott C. Hartman, who is alleged to be "Ward's personal employee." See id. at 18, ¶ 45.

[6]192 LLC is also an Oklahoma limited liability company, see id. at 13, ¶ 31; it was formed in 2004 by Tom Blalock, see id. at 20, ¶ 48, a partner in the same law firm as Self and a former member of Chesapeake's Board of Directors. See id. Like WCT, 192 LLC has as its members the Trent Lee Ward Trust, the Romi Norel Ward Trust and the James Davis Ward Trust, see id. at 13, ¶ 31, but unlike WCT, 192 LLC has no employees. See id. at 21, ¶ 53.

[7]TLW, a limited partnership organized under Oklahoma law, see id. at 13, ¶ 31, was formed by Ward in 2004, see id. at 23, ¶ 59, when Ward was employed at Chesapeake. The plaintiffs have contended that TLW has no employees, see id. at 25, ¶ 65, and "only one general partner, TLW Investments, Inc.," id. at 24, ¶ 61, for which Ward serves as president. See id.

duty, and violations of corporate ethics," id. at 5, ¶ 2, but also, in violation of their fiduciary "duties of loyalty, good faith[ ] . . . [and] candor," id. at 55, ¶ 161,

> knowingly or recklessly allow[ed] . . . Ward to engage in self-interested and conflicted behavior, by failing to prevent . . . [him] from taking . . . improper and illegal actions, and by granting wasteful compensation packages to [him] . . . and other senior executives.

Id.

Relying extensively on information publicized by a hedge-fund stockholder, collectively referred to as TPG-Axon Group ("TPG-Axon"),[8] the plaintiffs have asserted two causes of action against the Directors: "Breach of Fiduciary Duties of Care Pursuant to In re Caremark International, Inc. Derivative Action, 698 A.2d 959 (Del. Ch. 1996)," see Doc. 142 at 88, and "Waste of Corporate Assets." See id. at 90. The movants have challenged the plausibility of the allegations in support of these claims, see Doc. 147 at 29, as well as argued that the lawsuit should be dismissed in its entirety due to the plaintiffs' failure to adequately plead demand futility.[9] Because the plaintiffs' assertion that demand is excused as to both claims depends in part on whether the Amended Complaint contains sufficient well-pleaded factual allegations to show that the Directors are potentially liable on the plaintiffs' claims for relief in addition to whether the Directors were incapable of making an impartial decision regarding whether to pursue these claims, the Court has first

---

[8]In 2012, TPG-Axon engaged in a solicitation of consents from SandRidge stockholders to, inter alia, remove the seven (7) members of SandRidge's Board, who at that time were Ward and the individual movants. In papers published in January 2013, TPG-Axon criticized Board members and questioned transactions between SandRidge and Ward and the Ward Entity Defendants, given the fact that the latter had been active competitors of SandRidge in the acquisition and sale of mineral rights in the Mississippian Play. See, e.g., Doc. 142-19.

[9]WCT and 192 LLC as well as Ward and TLW have also argued that the plaintiffs have failed to adequately allege demand futility. See Doc. 146 at 9-11; Doc. 148 at 8 n.1.

addressed the Directors' challenges to the plaintiffs' two claims and whether, under Rule

12(b)(6), F.R.Civ.P., such causes of action should be dismissed for failure to state claims

for relief.[10]

---

[10]In <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544 (2007), the United States Supreme Court set forth the standards that this Court must use in determining whether dismissal, as the defendants have requested, is warranted under Rule 12(b)(6), F.R.Civ.P. The Supreme Court held in accordance with Rule 8, that a complaint must contain "enough facts to state a claim to relief that is plausible on its face." 550 U.S. at 570. The United States Court of Appeals for the Tenth Circuit has stated that <u>Twombly</u> imposes a "burden . . . on the plaintiff[s] to frame a 'complaint with enough factual matter (taken as true) to suggest' that . . . [they are] entitled to relief." <u>Robbins v. Oklahoma</u>, 519 F.3d 1242, 1247 (10th Cir. 2008)(quoting <u>Twombly</u>, 550 U.S. at 556). The allegations in Amended Complaint must therefore "be enough that, if assumed to be true, . . . [Elliot and Ezell] plausibly (not just speculatively) ha[ve] a claim for relief [against these defendants]." <u>Id.</u> (footnote omitted).

The Court's task at this stage is to determine whether "there are well-pleaded factual allegations," <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 679 (2009), in the challenged pleading, and if so, the "[C]ourt should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." <u>Id.</u>

> A claim has facial plausibility when the plaintiff pleads factual content that allows the [C]ourt to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'"

<u>Id.</u> at 678 (citations omitted).

In this connection, the Amended Complaint "'must contain either direct or inferential allegations respecting all the material elements (as articulated and informed by state law, which are) necessary to sustain a recovery under some viable legal theory.'" <u>Bryson v. Gonzales</u>, 534 F.3d 1282, 1286 (10th Cir. 2008)(quotation and further citation omitted). While "[t]he nature and specificity of the allegations required to state a plausible claim will vary based on context," <u>Kansas Penn Gaming, LLC v. Collins</u>, 656 F.3d 1210, 1215 (10th Cir. 2011)(citations omitted), neither "'naked assertion[s]' devoid of 'further factual enhancement,'" <u>Iqbal</u>, 556 U.S. at 678 (quoting <u>Twombly</u>, 550 U.S. at 557), nor "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory allegations, . . . suffice." <u>Id.</u> (citing <u>Twombly</u>, 550 U.S. at 555). "[T]he <u>Twombly/Iqbal</u> standard recognizes a plaintiff should have at least some relevant information to make the claims plausible on their face." <u>Khalik v. United Air Lines</u>, 671 F.3d 1188, 1193 (10th Cir. 2012). "[I]t demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation," <u>Iqbal</u>, 556 U.S. at 678 (citing <u>Twombly</u>, 550 U.S. at 555 (further citation omitted)), and more than "mere 'labels and conclusions,' and 'a formulaic recitation of the elements of a cause of action' . . . ." <u>Kansas Penn Gaming</u>, 656 F.3d at 1214 (quoting <u>Twombly</u>, 550 U.S. at 555).

In the second claim for relief, entitled "Breach of Fiduciary Duties of Care[11] Pursuant

to In re Caremark International, Inc. Derivative Action, 698 A.2d 959 (Del. Ch. 1996)," see

Doc. 142 at 88, the plaintiffs have alleged

(1) that the Directors owe a duty to SandRidge and its shareholders "to establish

and maintain adequate internal controls to ensure . . . [SandRidge] is operated in a prudent

and lawful manner[,]" id. at 89, ¶ 286;

(2) that they "utterly failed to implement any reporting or information system or

controls; or having implemented such a system or controls, consciously failed to monitor

or oversee its operations thus disabling themselves from being informed of risks or

problems requiring their attention[,]" id.;

(3) that the Directors "knew they were not discharging their fiduciary obligations

and/or demonstrated a conscious disregard for their responsibilities and acted in bad

<hr>

[11]Despite their use of the phrase "duty of care," see, e.g., Doc. 142 at 9, ¶ 12, in their Amended Complaint, including in the title of their second cause of action, see id. at 88, Elliot and Ezell have chastised the defendants for "mischaracterizing" their "claims as based on the duty of care." Doc. 150 at 10. The plaintiffs have contended that "[a]ll of [their] . . . claims are based on breaches of the duty of loyalty . . . ." Id. The distinction in this case is significant.

As the Delaware Supreme Court recognized in Stone ex rel. AmSouth Bancorporation v. Ritter, 911 A.2d 362 (Del. 2006), critical to a director's potential liability is whether his conduct can be exculpated by the corporation's certificate of incorporation. E.g., id. at 367 (citing 8 Del. Code § 102). Provisions in that certificate "can exculpate directors from monetary liability for a breach of the duty of care, but not for conduct that is not in good faith or a breach of the duty of loyalty." Id. (footnote omitted)(emphasis added).

Pursuant to SandRidge's Certificate of Incorporation, see Doc. 147-5, "[a] director . . . shall not be liable to the corporation or its stockholders for monetary damages for breach of fiduciary duty . . . , except to the extent such exemption for liability or limitation thereof is not permitted under the General Corporation Law of the State of Delaware . . . . Id. at 4, Article Nine. Title 8, section 102(b)(7) of the Delaware Code provides that each certificate of incorporation may contain "[a] provision eliminating or limiting the personal liability of a director to the corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, provided that such provision shall not eliminate or limit the liability of a director: (i) [f]or any breach of the director's duty of loyalty to the corporation or its or its stockholders; (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law; . . . or (iv) for any transaction from which the director derived an improper personal benefit."

faith[,]" id., and "engaged in a sustained and systematic failure to exercise their fiduciary duties[,]" id. ¶ 287, by inter alia, "fail[ing] to ensure that . . . [SandRidge's] officers and directors, including . . . Ward, complied with its [Code of Business Conduct and Ethics . . . , Financial Code [of Ethics], and Corporate Governance Guidelines and made adequate and accurate disclosures about . . . Ward's activities to shareholders through SandRidge's [Securities and Exchange Commission ("SEC")] filings[,]" id.; and

(4) that their "disclosures to SandRidge investors concerning . . . Ward's improper related-party transactions were materially misleading[,]" id. ¶ 288, because they "knew of . . . Ward's conduct and knowingly and intentionally and in bad faith failed to disclose that conduct." Id.

In Caremark, the Delaware Court of Chancery addressed the plaintiffs' charge that the director defendants had breached "their duty of attention or care in connection with the on-going operation of the corporation's business," 698 A.2d at 967, and had "violated a duty to be active monitors of corporate performance." The court recognized that "liability to the corporation for a loss may . . . rise from an unconsidered failure of the board to act in circumstances in which due attention would, arguably, have prevented the loss." Id. "Generally where a claim of directorial liability for corporate loss is predicated upon ignorance of liability creating activities within the corporation, . . . only a sustained or systematic failure of the board to exercise oversight–such as an utter failure to attempt to assure a reasonable information and reporting system exists–will establish the lack of good faith that is a necessary condition to liability." Id. at 971.

Thereafter, in Stone ex rel. AmSouth Bancorporation v. Ritter, 911 A.2d 362 (Del. 2006), the Delaware Supreme Court expounded on and clarified fiduciary liability under

Caremark. It found that "the Caremark standard for so-called 'oversight' liability draws heavily upon the concept of director failure to act in good faith." Id. at 369. Indeed, as the court noted,

[t]he phraseology used in Caremark . . . describing the lack of good faith as a "necessary condition to liability" . . . is deliberate. The purpose of that formulation is to communicate that a failure to act in good faith is not conduct that results, ipso facto, in the direct imposition of fiduciary liability. The failure to act in good faith may result in liability because the requirement to act in good faith "is a subsidiary element[,]" i.e., a condition, "of the fundamental duty of loyalty." It follows that because a showing of bad faith conduct . . . is essential to establish director oversight liability, the fiduciary duty violated by that conduct is the duty of loyalty.

Id. at 369-70 (footnotes omitted).

In those instances where the failure to act in good faith is grounded on a claim, as here, that "'the fiduciary intentionally fails to act in the face of a known duty to act, demonstrating a conscious disregard for his duties,'" id. at 369 (quotation omitted), the plaintiffs, to establish liability and prevail on a claim of director oversight, must at this stage allege that

(a) the [D]irectors utterly failed to implement any reporting or information system or controls; or (b) having implemented such a system or controls, consciously failed to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention.

Id. at 370 (footnotes omitted)(emphasis in original). "In either case, imposition of liability requires a showing that the [D]irectors knew that they were not discharging their fiduciary obligations." Id. (footnote omitted).

The Directors have argued that Elliot and Ezell have failed to make the requisite showing and that they are therefore entitled to dismissal of this claim. They have relied on the plaintiffs' allegations in the Amended Complaint that establish the existence of an

7

Audit Committee and Nominating and Governance Committee as well as the plaintiffs' allegations regarding SandRidge's governing documents[12] and have argued that such allegations belie any claim that SandRidge and its Board failed to implement reporting or information systems or controls in discharging their oversight responsibilities. This argument might be meritorious if the plaintiffs were relying solely on the first <u>Caremark</u> predicate: that "the directors utterly failed to implement <u>any</u> reporting or information system or controls." <u>Id</u>. at 370 (emphasis added).[13]

For the reasons hereafter stated, the allegations in the Amended Complaint arguably support <u>Caremark's</u> alternative predicate.[14] That is to say, the plaintiffs' allegations give rise to the inference that the Directors, having implemented corporate reporting and information systems and controls through their various committees and governing documents that should have ensured that Ward's "participation in outside oil and gas drilling" was restricted to "areas not being pursued by," Doc. 142-12 at 3, ¶ 3.1,

---

[12]To the extent, if any, the plaintiffs have alleged that the Directors breached any provisions of these guidelines and code, such claims alone would fail to hold the Directors liable. <u>E.g.</u>, <u>Brehm v. Eisner</u>, 746 A.2d 244, 256 (Del. 2000)(law of corporate fiduciary duties and remedies for violation of those duties are distinct from goals of ideal corporate governance practices; the latter are not required by corporation law and do not define standards of liability).

[13]The mere fact, however, that SandRidge had "internal controls" in place such as an Audit Committee, which through its charter is charged with "assist[ing] the [B]oard in fulfilling its oversight responsibilities," Doc. 142 at 86, ¶ 278, is not enough. What <u>Caremark</u> requires are meaningful controls. <u>See</u> <u>Rich ex rel. Fuqi International, Inc. v. Yu Kwai Chong</u>, 66 A.3d 963, 983 (Del. Ch. 2013)
SandRidge's Audit Committee met the minimum number of times annually: members Brewer, Dobson and Serota met four times in fiscal year 2011, <u>see</u> Doc. 142 at 86, ¶ 277; Doc. 147-7 at 8, and members Brewer, Dobson, Edward W. Moneypenny and Serota met four times in fiscal year 2012, <u>see</u> Doc. 142 at 86, ¶ 277; Doc. 147-6 at 10; yet, according to the plaintiffs, this committee took no action to investigate Ward's alleged competitive and conflicted conduct despite the size, scope and duration of WCT, 192 LLC and TLW's activities in the Mississippian Play.

[14]<u>See</u>, <u>e.g.</u>, <u>Rich</u>, 66 A.3d at 983 (even if company had some system of internal controls in place, board's failure to monitor that system may support breach of fiduciary duty).

SandRidge, as required by his 2011 Employment Agreement, and that he did not engage in competitive, conflicted and self-dealing activities in the Mississippian Play, nevertheless consciously disregarded certain "red flags," as described in the Amended Complaint, that would have put the Directors on notice of Ward's alleged usurpation of corporate opportunities and arguably, his alleged misappropriation of SandRidge's confidential and proprietary information, which allowed the Ward Entity Defendants to make acquisition decisions in the Mississippian Play.

The "red flags" or "clear warnings," to which the plaintiffs have contended the Directors "turned a blind eye," Doc. 142 at 61, ¶ 185, and that the Directors consciously failed to heed to prevent further alleged wrongdoing,[15] are those allegations set forth in the Amended Complaint pertaining to the Ward Entity Defendants and Ward's control over, and domination of, the same (as the Court has determined in Orders issued this date), the Directors' approval of transactions involving SandRidge, Ward, WCT, 192 LLC and/or TLW in the Mississippian formation at Board meetings (as reflected in certain SEC filings in 2010, 2011, 2012, see Doc. 142 at 62-63, ¶ 188,[16] and memorialized in Audit Committee

---

[15]See Lyondell Chemical Co. v. Ryan, 970 A.2d 235, 243 (Del. 2009)(if directors failed to do all they should have under the circumstances, they breached their duty of care; only if they knowingly and completely failed to undertake their responsibilities would they breach their duty of loyalty).

[16]In SEC statements, SandRidge disclosed the following:

(a) "[i]n 2010, SandRidge leased rights to minerals . . . in the Mississippian [formation] from TLW," Doc. 142 at 62, ¶ 188(a), as well as "developed some of the surface lands associated with these mineral interests and paid $33,046 to TLW . . . pursuant to the development[, and] . . . paid royalties totaling $302,554 to TLW . . . in connection with the production of oil and natural gas from these properties[,]" id.; see Doc. 147-8 at 32;

(b) "[i]n September 2010, SandRidge purchased a portion of the working interest in leases covering acreage in the Mississippian [formation] from WCT . . . , for $1,791,120, and in January 2011, . . . acquired a working interest in additional acreage in the area for $391,955[,]" id. ¶ 188(b); see Doc. 147-8 at 32;

9

meeting minutes, see id. at 63, ¶ 189, and the Directors' knowledge of, and participation in, Chechele v. Ward, No. CIV-10-1286-M (W.D. Okla.).[17]

As stated, "[t]he essence of a Caremark claim is a breach of the duty of loyalty . . . [that] aris[es] from a director's bad-faith failure to exercise oversight over the company." Rich ex rel. Fugi International, Inc. v. Yu Kwai Chong, 66 A.3d 963, 980 (Del. Ch. 2013) (footnote omitted); e.g., Guttman v. Huang, 823 A.2d 492, 506 (Del. Ch. 2003)(Caremark articulates standard for liability for failures of oversight that requires showing that directors breached duty of loyalty by failing to attend to duties in good faith). And acknowledging that "[a] Caremark claim is 'possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment,'" Rich, 66 A.3d at 980 (quotation omitted), the Court, nevertheless finds, upon construing the Amended Complaint in the light most

---

(c) "WCT . . . participated as a working interest owner in wells SandRidge operates in the Mississippian [Play], and during 2010, SandRidge paid revenue of $242,363 to WCT . . . as a working interest owner[,]" id. ¶ 188(c); see Doc. 147-8 at 32;

(d) "[i]n 2011, SandRidge paid royalties totaling $925,735 to TLW . . . in connection with the production of oil and natural gas from properties in the Mississippian [formation and] . . . paid revenue of $168,196 to WCT as a working interest owner[,]" id. ¶ 188(d); see Doc. 147-7 at 29;

(e) "[i]n 2012, SandRidge paid royalties totaling $1,424,253 to TLW . . . in connection with the production of oil and natural gas in the Mississippian [Play,]" id. ¶ 188(e); see Doc. 147-6 at 35; and

(f) "[i]n May 2012 and August 2012, SandRidge purchased a portion of the working interest in leases covering acreage in the Mississippian [formation] from WCT . . . for $333,612 and $480,000, respectively." Id. at 63, ¶ 188(e). See Doc. 147-6 at 35.

[17]In Chechele, which was grounded on Section 16(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78p(b), a SandRidge investor sought disgorgement of "short swing profits" from Ward that he (Ward) had allegedly made in connection with certain transactions involving SandRidge common stock. While Oliver, Serota, Brewer, Dobson and Gilliland had responded to the allegations in October 2010 by "essentially stating that they found that . . . Ward had not engaged in any wrongdoing," Doc. 142 at 86, ¶ 275, in November 2012, Ward settled the action for $5 million, see id. ¶ 276, and SandRidge paid Ward's legal fees. See id.; Doc. 147-6 at 35 (Ward agreed to pay SandRidge $5 million in four installments over four years; SandRidge agreed to pay plaintiff's and Ward's legal fees).

10

favorable to the plaintiffs,[18] that the allegations therein permit the Court to infer that the Directors, by ignoring Ward and the Ward Entity Defendants' problematic activities in the Mississippian Play and by failing to investigate further the related-party transactions, which "created . . . conflicts that were and are inconsistent with . . . Ward's duty of loyalty to SandRidge," Doc. 142 at 50, ¶ 144, "knew they were not fulfilling their fiduciary duties," Rich, 66 A.3d at 981 (footnote omitted), "thereby demonstrating a conscious disregard for their responsibilities[.]" Id.; e.g., Stone, 911 A.2d at 370 (directors knew they were not discharging fiduciary duties, thereby suggesting conscious decision to take no action in response to red flags of wrongdoing within company). Directors "'cannot act loyally towards the corporation unless [they] . . . act[ ] in the good faith belief that [their] . . . actions are in the corporation's best interest,'" Stone, 911 A.2d at 370 (quoting Guttman, 823 A.2d at 506 n.34), and the Court finds under Twombly and Iqbal that Elliot and Ezell have sufficiently advanced well-pleaded factual allegations regarding whether the Directors breached their duty of loyalty by failing to exercise their oversight responsibilities in good faith.

The Directors have also challenged the third cause of action in the Amended Complaint, wherein the plaintiffs have alleged that the Directors' "conduct constitutes a waste of SandRidge's assets." Doc. 142 at 90, ¶ 292. As Delaware courts recognize, "waste is 'an extreme test," Official Committee of Unsecured Creditors of Integrated Health

---

[18]"Twombly does not require a court at the motion-to-dismiss stage to consider whether the factual allegations are probably true." 556 U.S. at 696. The United States Supreme Court "made it clear, on the contrary, that a court must take the allegations as true, no matter how skeptical the court may be." Iqbal, 556 U.S. at 696 (citing Twombly, 550 U.S. at 555)(court must proceed on assumption that all allegations in complaint are true (even if doubtful in fact))(further citation omitted).

Services, Inc. v. Elkins, 2004 WL 1949290 *17 (Del. Ch. 2004)(quotation omitted), and "is a standard rarely satisfied . . . ." Id.; e.g., TVI Corporation v. Gallagher, 2013 WL 5809271 *17 (Del. Ch. 2013)(recognizing "standard for corporate waste as onerous, stringent, extremely high, and very rarely satisfied"). In an attempt to meet the necessary pleading standard in light of Twombly and Iqbal, the plaintiffs have complained about the Directors' approval of "extravagant and wasteful compensation to . . . Ward and other senior executives," Doc. 142 at 90, ¶ 292, their grant to Ward of "significant wasteful perquisites at . . . [SandRidge's] expense[,]" id., their "funnel[ing of] millions of dollars out of . . . [SandRidge] for . . . Ward's [and the Ward Entity Defendants'] benefit," id., and their decision in December 2011 to amend Ward's 2006 Employment Agreement, see Docs. 154-4, 142-12, to "allow . . . Ward to engage in outside oil and gas business in areas not being pursued by . . . [SandRidge].'" Doc. 142 at 50, ¶ 145.

Although the plaintiffs have contended that the Directors' "exchange[ ] [of] corporate assets for consideration so disproportionately small . . . was [in each instance] an exchange that was so one-sided that no business person of ordinary, sound judgment could conclude that SandRidge received adequate consideration," id. at 90-91, ¶ 293, the Directors have nevertheless argued that dismissal of this claim for relief and its various supporting theories is warranted because the plaintiffs have failed to allege that SandRidge either "'received no consideration [for each exchange of corporate assets], or that . . . [each] transfer of . . . assets served no corporate purpose.'" Doc. 147 at 29 (quotation omitted). Case law requires the Court, "[i]n evaluating . . . [the plaintiffs'] waste claim, . . . [to] look to the exchange [or transfer] itself," Elkins *17 (emphasis deleted), and determine whether the exchange or transfer "was so egregious or irrational that it could not have been

based on a valid assessment of the corporation's best interests." White v. Panic, 783 A.2d 543, 554 n.36 (Del. 2001)(citations omitted). Thus, to establish that the Directors are guilty of corporate waste because they squandered corporate assets at this stage, the plaintiffs must plead facts showing "an exchange that is so one sided that no business person of ordinary, sound judgment could conclude that . . . [SandRidge] has received adequate consideration." Glazer v. Zapata Corporation, 658 A.2d 176, 183 (Del. Ch. 1993).

In support of their first theory—"extravagant and wasteful compensation," the plaintiffs have averred

(1) that Board had established a "Compensation Committee"[19] ("Committee"), the members of which were charged with the responsibility "to 'review, evaluate and approve the agreements, plans, policies and programs . . . to compensate the . . . officers and directors' and to 'review, modify (if necessary) and approve corporate goals and objectives relevant to the compensation of [SandRidge's] . . . [c]hief [e]xecutive [o]fficer . . . [,]'" Doc. 142 at 45, ¶ 127;

(2) that the Board had drafted a Committee charter that outlined the responsibilities and duties of the Committee and made "clear that the [C]ommittee 'should consider

_____

[19]For the fiscal year ending December 31, 2010, SandRidge reported in an SEC filing that the elected members of the Compensation Committee, Gilliland (chairman), Jordan and Oliver, had retained the services of an independent compensation consulting firm, Longnecker & Associates ("Longnecker"), "to perform comparative analyses of compensation paid by exploration and production companies that compete with [SandRidge] . . . in the labor and capital markets." Doc. 147-8 at 8. For the fiscal years ending December 31, 2011, and December 31, 2012, SandRidge again reported in SEC filings that Committee members (Beasley, Brewer and Gilliland (who had remained Committee chairman) in 2011, and Beasley (who was then chairman), Brewer and Gilliland in 2012), had likewise employed Longnecker for the same purpose. See Doc. 147-7 at 8; Doc. 147-6 at 10.

[SandRidge's] . . . performance and relative stockholder return' in setting compensation[,]" id.;

(3) that "[i]n blatant disregard of th[is] charter . . . and their fiduciary duties to SandRidge and its shareholders, the Director[s] . . . have continuously approved egregious, expensive, and wasteful compensation for . . . Ward and other senior SandRidge executives[,]" id. ¶ 128;

(4) that "Ward's compensation cannot be justified by SandRidge's stock performance, and in fact, his compensation is shocking relative to . . . [SandRidge's] size . . . ," id. ¶ 129;

(5) that "[o]ver the past five years, despite its stock price declining 80%, [SandRidge] . . . has paid . . . Ward more than $150 million in compensation, representing 6% of [SandRidge's] . . . total current market capitalization," Id. (emphasis deleted);

(6) that "[i]n 2012, . . . Ward's total compensation was $20.8 million, while SandRidge stock declined 22%[,]" id. ¶ 130;

(7) that "[i]n 2011, the Director[s] . . . approved compensation of more than $25 million for . . . Ward, which represented half of [SandRidge's] . . . earnings for 2011," id. at 45-46, ¶ 130, and which made Ward one of "the highest-paid energy executives in 2011, even though [SandRidge's] . . . revenue of $1.4 billion placed it in the bottom half of publicly traded exploration and production companies[,]" id. at 46, ¶ 130;

(8) that Ward's 2011 compensation "was an increase of approximately 16% over his 2010 compensation[,]" id., which totaled "$21.76 million . . . , an increase of . . . 58% over his 2009 compensation, while [SandRidge's] . . . share price declined 26%[,]" id.;

(9) that "[i]n contrast, firms that SandRidge considered 'peer' companies[20] during the [r]elevant [p]eriod[21]–whose stock price per share increased during that time–nevertheless paid their [chief executive officers] significantly less than SandRidge paid . . . Ward[,]" id. ¶ 131 (emphasis deleted);

(10) that such "peer" companies include Forest Oil Corp[oration], the chief executive officer of which "received $4.2 million in 2010 while its stock price increased 73% that year[,]" id. Newfield Exploration Company, which awarded its chief executive officer "$5.2 million in compensation," id., while its "stock increased 50%," id., and Pioneer Natural Resources Company, which paid its chief executive officer "$8.6 million in compensation," id. (footnote omitted), which its "stock increased 81%," id.;[22] and

---

[20]In its SEC filings, SandRidge listed those companies it considered its "peers." See, e.g., Doc. 147-6; Doc. 147-7; Doc. 147-8; Doc. 154-2.

[21]See n.3 supra.

[22]In its 2010 disclosures, the Compensation Committee advised that it had reviewed the information assembled by Longnecker to ensure that the compensation paid to SandRidge's executive officers was "competitive," Doc. 147-8 at 13, and for comparison purposes, it examined the executive compensation programs of two groups, which were identified as "Mid-sized Peer Companies" and "Large Peer Companies." See id. at 14. Forest Oil Corporation ("Forest"), Newfield Exploration Company ("Newfield") and Pioneer Natural Resources Company ("Pioneer"), the three entities identified in the Amended Complaint, were included the former group of eleven (11) companies. See id.

In its 2011 disclosures, the Compensation Committee, reviewing information gathered by Longnecker, see Doc. 147-7 at 12, again examined the executive compensation programs of the two groups. See id. Forest, Newfield and Pioneer were again ranked as "mid-sized peer companies." See id.

In 2012, the Compensation Committee reported that it had continued to evaluate the compensation paid to SandRidge's executive officers based upon information provided by Longnecker and had again categorized the "peer" companies as "mid-sized" and "large." See Doc. 147-6 at 16. Only two of the three companies–Newfield and Pioneer–were listed in the first category in 2012, which had increased to twelve (12) companies. See id. The Committee also disclosed in its 2012 filing that it had begun to "receive[ ] input from stockholders regarding the design, competitiveness, and function of . . . [SandRidge's] executive compensation programs." Id. at 12.

The Compensation Committee further advised in its 2013 statement that "[b]eginning in

(11) that "Ward has been one of the highest compensated [chief executive officers] in the country while at SandRidge, as well as one of the highest paid energy [chief executive officers,]" id. ¶ 132, even though SandRidge "[d]uring the same period . . . ranked among the worst in the country for losing shareholder value as reflected in the decline in the price per share of SandRidge's common stock and return on investment compared to its peers." Id.

Eliot and Ezell have further alleged in connection with their claim that the Directors "approved exorbitant compensation," id. at 69, ¶ 207, for Ward,

(1) that "[a]mong SandRidge's competitors, not a single [chief executive officer] received compensation even close to that of . . . Ward in 2010[,]" id. at 47, ¶ 133, and that "[a] review of [chief executive officer] compensation at oil and gas companies far larger than SandRidge shows that . . . Ward's compensation was near the highest of any company in the industry," id. as evidenced by the following examples of compensation paid to the following chief executive officers: William Klesse, Valero Energy Corporation, $11.1 million, L.L. Elsenhaus, Sunoco Logistics Partners, $11.7 million, J.S. Watson, Chevron Corporation, $16.3 million, J.J. Mulva, Conoco Philips, $17.9 million, John Hess, Hess Corporation, $18.2 million, and R.W. Tillerson, Exxon Mobil Corporation (the market capitalization of which in 2010 was alleged to be over 120 times greater than SandRidge's), $28.9 million, see id.;

---

2013, the . . . Committee [had] adopted a new peer group against which to compare the competitiveness of . . . [SandRidge's] executive compensation and performance." Doc. 154-2 at 22. SandRidge dispensed with the two categories and listed eighteen (18) exploration and production companies that "all ha[d] annual revenues between $1 billion and $3.5 billion," id., and again included only two of the three companies, Newfield and Pioneer, identified in the Amended Complaint. See id.

(2) that SandRidge's other senior executive officers likewise received "excessive, expensive and wasteful compensation packages . . . despite . . . [SandRidge's] poor performance," id. ¶ 134, as demonstrated by the following:

(a) Matthew K. Grubb, SandRidge's former president and chief operating officer,[23] received an aggregate of $16.6 million in compensation for 2010, 2011 and 2012, including $2.6 million in salary and $2.7 million in cash bonuses, see id.;

(b) James D. Bennett, as chief financial officer, received a total of over $11 million in compensation for 2011 and 2012, including $1.4 million in salary and over $1.4 million in cash bonuses, see id.;

(c) Todd N. Tipton, former executive vice president of exploration,[24] received total compensation of $5.5 million for 2010, 2011 and 2012, including $1.3 million in salary and $1.2 million in cash bonuses, see id.;

(d) Rodney E. Johnson, former executive vice president of reservoir engineering,[25] received total compensation of $5.4 million for 2010, 2011 and 2012, including $1.3 million in salary and $1.3 million in cash bonuses, see id. at 47-48, ¶ 134;[26]

---

[23]Grubb resigned from SandRidge on March 15, 2013. See Doc. 142 at 48, n.6; Doc. 147-6 at 13.

[24]Tipton retired, effective May 10, 2013. See id.

[25]Johnson resigned, also effective May 10, 2013. See id.

[26]In its SEC filing for the fiscal year ending December 31, 2012, SandRidge had reported that it "intended for the amount of total direct compensation to be provided to . . . [its] executive officers[, save its chief executive officer,] to be above the 90th and below the 75th percentiles of the amounts of total direct compensation provided to executive officers at mid-sized [p]eer [c]ompanies and large [p]eer [c]ompanies, respectively." Doc. 147-6 at 17. The total cash compensation paid to Grubb and Bennett in 2012 ranked above the 90th percentile of compensation paid at mid-sized peer companies and below the 75th percentile of compensation paid at large peer companies. See id. Tipton's compensation that year ranked below the 75th percentile and below the 50th percentile

17

and

(3) that these senior executives were also awarded, as part of their compensation packages, "shares of SandRidge stock, which they then sold at a profit[:] Grubb sold 276,778 shares of SandRidge stock for net proceeds of approximately $1.7 million; Bennett sold 150,968 shares of SandRidge stock for net proceeds of approximately $900,000; Tipton sold 223,448 shares of SandRidge stock for net proceeds of approximately $1.6 million; and Johnson sold 174,369 shares of SandRidge stock for net proceeds of approximately $816,000." Id. at 48, ¶ 135.

---

of compensation paid at mid-sized peer companies and large peer companies, respectively. See id. Johnson's 2012 compensation ranked below the 90th percentile and below the 90th percentile of compensation paid at mid-sized peer companies and large peer companies, respectively. See id.

In its SEC filing for the prior fiscal year, 2011, SandRidge had reported that the total cash compensation paid to Grubb and Bennett that year ranked above the 90th percentile of compensation paid at mid-sized peer companies and below the 75th percentile of compensation paid at large peer companies. See Doc. 147-7 at 13. Tipton's compensation ranked below the 75th percentile and below the 50th percentile of compensation paid at mid-sized peer companies and large peer companies, respectively, see id., and Johnson's 2011 compensation ranked above the 90th percentile of compensation paid at mid-sized peer companies, but below the 90th percentile of compensation paid at large peer companies. See id.

In its 2010 fiscal year SEC filing, SandRidge had reported that the total cash compensation paid to Grubb that year ranked above the 90th percentile of compensation paid at mid-sized peer companies and below the 75th percentile of compensation paid at large peer companies. See Doc. 147-8 at 14. Tipton's compensation that year ranked at the 75th percentile and below the 50th percentile of compensation paid at mid-sized peer companies and large peer companies, respectively, see id., and Johnson's 2011 compensation ranked below both the 90th percentile of compensation paid at mid-sized peer companies and at large peer companies. See id.

In support of their second theory–"significant wasteful perquisites,"[27] the plaintiffs

have complained not only about SandRidge's payment of "almost $1 million per year to

provide personal accounting services to . . . Ward[,]" id. ¶ 136, but also about the Board's

decision to provide "unlimited personal usage," id., of SandRidge's four jets[28] to Ward,

which resulted in "dozens of personal flights to Scottsdale, where . . . Ward has a vacation

home[ ], and numerous weekend trips to locales such as Las Vegas, Los Angeles, and the

Bahamas." Id.

Finally, in support of their third and fourth theories of waste–the "funnel[ing of]

millions of dollars out of . . . [SandRidge] for . . . Ward's [and the Ward Entity Defendants']

benefit," id. at 90, ¶ 292, Elliot and Ezell have alleged that the Directors permitted Ward,

through the Ward Entity Defendants, to "divert[ ] millions of dollars from SandRidge," id.

_____

[27]In its SEC filing for the fiscal year ending December 31, 2012, SandRidge stated that "perquisites should not play a large role in . . . [its] executive officers' total compensation," Doc. 147-6 at 20, and that "[a]s a result, the perquisites and other personal benefits . . .provide[d] to . . . executive officers are limited." Id. SandRidge reported that under the terms of Ward's employment agreement, "the fees and expenses related to one membership in a club in the Oklahoma City, Oklahoma area," id., were paid and that Ward was "provide[d] . . . accounting support from certain . . . [SandRidge] employees for his personal investments," id., but that he had "reimburse[d] . . . [SandRidge] for half of each such accounting support employee's annual salary and cash bonus." Id.

SandRidge further stated that it had "agreed to provide access to an aircraft at . . . [SandRidge's] expense for the personal travel of . . . Ward and his family and guests who accompany him or them," id., and that "from time to time, . . . [to] provide[ ] personal security services to . . . Ward and his family." Id.

That filing essentially parroted SandRidge's 2010 and 2011 SEC filings regarding club membership, accounting support, aircraft use and personal security services. See Doc. 147-8 at 17; Doc. 147-7 at 16.

[28]The plaintiffs have complained that two of these aircraft "are large size intercontinental jets, [that] . . . one [jet] . . . is one of the most expensive corporate jets on the market," Doc. 142 at 48, ¶ 136, and that "over fifteen full time employees [are] dedicated to maintaining and flying these jets." Id.

19

at 49, ¶ 140, and to "compete[ ] with SandRidge and wrongfully [take] corporate opportunities from SandRidge," id. ¶ 139, as evidenced by the following:

(1) SandRidge's payment of $9.5 million to the Ward Entity Defendants, see id. ¶ 141; see , e.g., id. at 62-63, ¶ 188,[29] in addition to the "millions of dollars in related-party transactions [that] have not been quantified and were not disclosed to investors until TPG-Axon launched its proxy contest," id.; and

(2) the Board's amendment in 2001 of Ward's 2006 Employment Agreement, which amendment permitted Ward, as stated, "to engage in outside oil and gas businesses so long as the business was 'in areas not being pursued by [SandRidge] . . . ,'" id. at 50, ¶ 143, because the amendment did not benefit SandRidge and these competitive businesses were contrary to SandRidge's best interests.

"[T]he doctrine of waste is a residual protection for stockholders that polices the outer boundaries of the broad field of discretion afforded directors," Seinfeld v. Slager, 2012 WL 2501105 *3 (Del. Ch. 2012), and "[a]s such, a plaintiff faces an uphill battle in bringing a waste claim." Id. If the corporation has received "any substantial consideration," Brehm, 746 A.2d 244, 263 (Del. 2000)(emphasis deleted), and if a board has made "a good faith judgment that in the circumstances the transaction is worthwhile," id. (emphasis deleted), "'a finding of waste is inappropriate, even if hindsight proves that the transaction may have been ill-advised.'" Seinfeld *3 (quotation omitted). Moreover, "when dealing with a board's decision on executive compensation, its substantive decision is entitled to great deference." Elkins *17; e.g., Brehm, 746 A.2d at 263.

---

[29]See Doc. 142-19 at 5 (since 2008, SandRidge has disclosed $9.5 million in payments to Ward and Ward Entity Defendants–$3.9 million to TLW and $5.6 million to WCT).

Mindful of such deference given to a board's executive compensation transaction or its determination that particular individual warrants a large amount of money and particular perquisites or that certain transactions are worthwhile, the Court, upon consideration of the allegations in the Amended Complaint as viewed in a light most favorable to the plaintiffs,[30] finds that Eliot and Ezell at this stage of the proceedings have sufficiently averred that the Directors may have committed corporate waste by excessively compensating Ward and other senior executives (as compared to executives of "peer" companies and to SandRidge's performance) and by paying Ward and/or by approving transactions with the Ward Entity Defendants, when Ward and these entities were allegedly engaged in competitive and conflicting activities, all at a time when SandRidge stock was declining. As the Delaware Supreme Court has noted, "[t]he payment of a contractually obligated amount cannot constitute waste, unless the contractual obligation is itself wasteful," In re Walt Disney Co. Derivative Litigation, 906 A.2d 27, 74 (Del. 2006), and in this case, based upon the disparity between the compensation received by Ward and other SandRidge executive officers and the compensation received by executive officers of peer companies and in light of Ward and the Ward Entity Defendants' activities in the Mississippian formation, the plaintiffs' allegations permit the Court to infer that the contractual obligations described in the Amended Complaint constitute an excessive percentage of SandRidge revenues during the relevant period and could be characterized as serving no corporate purpose. These findings are without prejudice to further examination should the evidence eventually establish a rational basis for the Directors'

---

[30]See n.18 supra.

21

conclusion that the amount of compensation paid and the perquisites granted to these individuals[31] or the Directors' decision that approval of the transactions described herein was appropriate and benefitted SandRidge.[32]

Having determined in this Order that the plaintiffs have stated grounds for relief against the Directors that are plausible under Rule 12(b)(6), supra, and having determined in Orders issued this date that claims remain against Ward, WCT, 192 LLC and TLW, the Court must determine whether the plaintiffs' contentions that "a pre-suit demand on SandRidge's [B]oard to bring this action . . . would have been a futile and useless act," Doc. 142 at 58, ¶ 171, and that demand is therefore "excused as to each of the Director[s] . . . ," id. at 8, ¶ 10, are correct.

Through their derivative claims, Elliot and Ezell have sought to stand in SandRidge's shoes, without its approval, and assert their instant claims for relief. "It is only proper for them to do so if there is a sufficient reason to believe that [SandRidge's] . . . Board is 'incapable of making an impartial decision regarding the pursuit of the litigation.'" In re Ebix, Inc. Stockholder Litigation, 2014 WL 3696655 *19 (Del. Ch. 2014)(quoting Wood v. Baum, 953 A.2d 136, 140 (Del. 2008)). Thus, shareholders like Elliot and Ezell may "bring a derivative action [such as the case-at-bar] to enforce a right that the corporation . . . may

---

[31]See nn. 20, 22, 26 (setting forth Directors' attempts to obtain guidance before making compensation decisions).

[32]No doubt in exchange for the compensation and benefits Ward, Grubb, Bennett, Tipton and Johnson received, they each in their individual positions, as they have suggested, performed important roles within SandRidge; nevertheless, the plaintiffs' allegations, when viewed in the light most favorable to them, permit the Court to conclude at this stage that it is not inconceivable that Eliot and Ezell could show that the Directors' decisions to pay these salaries, to award cash bonuses and stock and to grant the perquisites are "'so one sided that no business person of ordinary, sound judgment could conclude that [SandRidge] . . . has received adequate consideration,'" TVI Corporation *17 (quotation omitted), in return.

properly assert but has failed to enforce," Rule 23.1(a), F.R.Civ.P., but to do so, the shareholder in any verified pleading he or she files must, inter alia,

> state with particularity:
>
> (A) any effort by the [shareholder] . . . to obtain the desired action from the directors . . . ; and
>
> (B) the reasons for not obtaining the action or not making the effort.

Rule 23.1(b)(3)(A)-(B), supra.

In this connection, while Rule 23.1 "provides the procedural vehicle for addressing the adequacy of [the] . . . plaintiff[s'] pleadings, '[t]he substantive requirements of demand are a matter of state law.'" Freedman v. Redstone, 753 F.3d 416, 424 (3d Cir. 2014) (quotation omitted). The law of Delaware–the state of SandRidge's incorporation–therefore governs the issue of demand futility, e.g., Kamen v. Kemper Financial Services, Inc., 500 U.S. 90, 108-09 (1991), and that law recognizes that the demand futility standard that the Court must apply "embodies one of the fundamental principles of Delaware corporate law: '[t]he business and affairs' of the corporation–including the decision about whether to file a lawsuit–is 'managed by or under the direction of a board of directors.'" In re Ebix *19 (footnote omitted).

"The two demand futility tests . . . –as outlined by the [Delaware] Supreme Court in Aronson v. Lewis,[ 473 A.2d 805 (Del. 1984), overruled in part on other grounds by Brehm v. Eisner, 746 A.2d 244 (Del. 2000),] and Rales v. Blasband[, 634 A.2d 927 (Del. 1993),]–represent the framework in which the Court must determine whether the [p]laintiffs may maintain their derivative claims." In re Ebix *19. The Court must conduct its demand futility analysis "'on a claim-by-claim basis.'" Id. *20 (footnote omitted). The fact that

23

demand may be futile as to one claim does not automatically render it futile as to another claim. E.g., MCG Capital Corp. v. Maginn, 2010 WL 1782271 *18 (Del. Ch. 2010). The Court must also conduct its demand futility analysis on a "'director-by-director,'" In re Ebix *20 (quotation omitted), basis; accordingly, the Court must first ascertain those individuals who were SandRidge Board members when the plaintiffs' claims were first asserted[33] and upon whom demand, if necessary, should have been made.

The parties have agreed that five of those individuals are Brewer, Gilliland, Oliver, Serota and Dobson. The parties have further agreed that the Board also included for purposes of the Court's analysis the four individuals who were appointed directors pursuant to the settlement on March 13, 2013,[34] of TPG-Axon's[35] 2012 solicitation of consents from SandRidge stockholders and the pending proxy contest at SandRidge's 2013 Annual

[33]See Braddock v. Zimmerman, 906 A.2d 776, 786 (Del. 2006)(where complaint is amended with permission following a dismissal without prejudice, even if act or transaction complained of in amendment is essentially same conduct that was challenged in original dismissed complaint, Rule 23.1's demand inquiry must be assessed by reference to board in place when amended complaint is filed).

[34]See n.8 supra. The settlement agreement with TPG-Axon increased the number of Board members from seven (7) to eleven (11). See Doc. 142 at 65-66, ¶ 196; Doc. 142-29. The parties to the settlement also agreed that the Board would investigate alleged transactions with entities affiliated with Ward and would decide whether to remove Ward as chief executive officer.

The parties further agreed that if Ward's employment was not terminated by June 30, 2013, Jordan as well as two other Board members would resign and an additional TPG-Axon nominee would be elected, resulting in control by TPG-Axon nominees. See Doc. 142-26 at 4. Jordan tendered his resignation effective April 29, 2013, see Doc. 142 at 72, ¶ 221, and on June 19, 2013, the Board–Brewer, Dobson, Gilliland, Oliver, Serota, Moneypenny, Beasley, Westbrook and Weber, voted unanimously to terminate Ward's employment as chief executive officer "without cause." See Doc. 142-26; Doc. 142-27.

[35]TPG-Axon Group consisted of TPG-Axon Partners, LP, TPG-Axon Management LP, TPG-Axon Partners GP, L.P., TPG-Axon GP, LLC, TPG-Axon International, L.P., TPG-Axon International GP, LLC, and Dinakar Singh LLC. See Doc. 142-29 at 17.

Meeting: Stephen C. Beasley, Edward W. Moneypenny, Alan J. Weber and Dan A. Westbrook (collectively "TPG-Axon Directors"). See Doc. 142-29 at 2.

Finally, the parties have agreed that the tenth member of the Board is nonparty James D. Bennett, SandRidge's current chief executive officer, who became a director in August 2013. See Doc. 142 at 82-83, ¶ 267.[36] The defendants' challenge under Rule 23.1 requires the Court to examine the plaintiffs' allegations as to each of these ten individuals and decide whether demand would have been futile as to five[37] of them. Having determined, for the reasons set forth herein, that demand would have been futile as to Brewer, Dobson, Serota, Oliver and Gilliland on both claims being asserted in this lawsuit, the Court finds that it need not consider the parties' arguments and authorities in connection with Beasley, Moneypenny, Weber, Westbrook and Bennett.

As stated, the Delaware Supreme Court has recognized two demand futility tests. E.g., Wood, 953 A.2d at 140.

> The Aronson test applies to claims involving a contested transaction i.e., where it is alleged that the directors made a conscious business decision in breach of their fiduciary duties. That test requires that the plaintiff allege particularized facts creating a reason to doubt that "(1) the directors are disinterested and independent [or that] (2) the challenged transaction was otherwise the product of a valid exercise of business judgment. . . . The second (Rales) test applies where the subject of a derivative suit is not a business decision of the Board but rather a violation of the Board's oversight duties. The Rales test requires that the plaintiff allege particularized facts establishing a reason to doubt that "the board of directors could have

---

[36]Bennett was appointed to replace Ward as president and chief executive officer, effective June 19, 2013. See Doc. 142-26 at 2.

[37]For demand to be futile, a majority of board members, or one-half of an evenly-numbered board must be either interested or not independent. E.g., Beam ex rel. Martha Stewart Living Omnimedia v. Stewart, 845 A.2d 1040, 1046 n.8 (Del. 2004).

properly exercised its independent and disinterested business judgment in responding to a demand."

Id. (footnotes omitted).[38]

Under Aronson, which the parties have addressed in connection with the plaintiffs' waste claim, and in accord with Rule 23.1(b)(3), conclusory statements of demand futility are not sufficient; rather, as stated, a plaintiff must plead with particularity facts that show either (1) a majority of the directors are not disinterested or independent[39] or (2) the transactions which the plaintiffs have challenged were not a valid exercise of business judgment. E.g., Aronson, 473 A.2d at 814.[40]

Accordingly, to meet Aronson's first prong, Eliot and Ezell must demonstrate through particularized allegations that Brewer, Dobson, Serota, Oliver and Gilliland are interested

---

[38]"Which of Aronson or Rales applies [therefore] depends on the conduct being challenged and the composition of the board when the derivative action is filed. . . . [T]he Aronson test applies where a stockholder challenges a business decision 'made by the same directors who remain in office at the time [the derivative] suit is filed.' Conversely, the Rales test applies when the stockholder does not challenge a particular business decision or when a majority of the directors who made the business decision at issue have been replaced by the time the derivative lawsuit is filed." In re Ebix *19 (footnotes omitted); e.g., Rales, 634 A.2d at 933 (essential predicate for Aronson test is the fact that a decision of the board is being challenged).

[39]The plaintiffs have argued that the Directors are collaterally estopped from arguing that demand is not excused as to all claims in light of a ruling by the Honorable Patricia Parrish in Hefner v. Ward, No. CJ-2013-63, a shareholder derivative action now pending in the Oklahoma District Court for Oklahoma County, Oklahoma. Because the Court has determined that the instant plaintiffs have satisfied their pleading burden under Rule 23.1, the Court finds it unnecessary to consider the parties' arguments regarding collateral estoppel.

[40]"Thus, a plaintiff has two options to establish a demand futility argument under Aronson. First, the plaintiff may argue that a majority of the board is either interested or lacks independence from those who are interested. Second, the plaintiff may allege particularized facts that demonstrate that the challenged transaction could not be an exercise of valid business judgment." TVI Corporation *6 (footnote omitted).

or not independent,[41] and thus, would be unable to impartially "determine whether [the plaintiffs'] charges of wrongdoing [as to their waste claim] should be investigated and if substantiated, become the subject of legal action." Rales, 634 A.2d at 936.

Because "directors are entitled to a presumption that they [are] . . . faithful to their fiduciary duties," Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart, 845 A.2d 1040, 1048 (Del. 2004)(emphasis deleted)(footnote omitted), the plaintiffs are obligated at this stage of the litigation "to plead particularized facts that create a reasonable doubt sufficient to rebut the presumption that [these five Directors were] independent of [Ward] . . . . Id. at 1050. "A director lacks independence if he . . . is 'beholden' to another's interest such that his . . . business judgment 'would be sterilized' . . . ." In re Ebix *20 (footnote omitted); e.g., Rales, 634 A.2d at 936 (plaintiff must show that directors are so "beholden" or so under another's influence that their discretion would be sterilized); Aronson, 473 A.2d at 816 (independence means that director's decision is based on merits of subject before the board rather than extraneous considerations or influences). The Court has therefore examined the allegations asserted as to each of the relevant Board members and evaluated each member's independence in light of the plaintiffs' waste claim, which the Court has determined, as stated herein, sets forth a plausible claim for relief.

The plaintiffs have first contended that the independence of Oliver, Gilliland, Dobson, and Serota is impaired because they are "beholden to, and financially dependent

---

[41]Although the language in Aronson is phrased conjunctively, the Delaware Supreme Court has made clear that "[a] director will be considered unable to act objectively with respect to a presuit demand if he . . . is interested in the outcome of the litigation or is otherwise not independent." Beam, 845 A.2d at 1049 (footnote omitted).

on," Doc. 142 at 73, ¶ 227; e.g., id. at 76, ¶ 239; id. at 78, ¶ 247; id. at 79, ¶ 252, and/or "dominated and controlled by," id. at 76, ¶ 239; e.g., id. at 68, ¶ 205, Ward. To show that Ward's actions compromised the Directors' ability to exercise independent judgment, the plaintiffs have relied on the fact that Ward "hand-selected" Oliver and Gilliland in 2006, see id. at 72, ¶ 224; e.g., id. at 78, ¶ 247, and Serota in 2007, see id. at 79, ¶ 252, to serve as Directors.

While influence can occur when a director is dominated or controlled, as Delaware courts have recognized,

> it is not enough to charge that a director was nominated by or elected at the behest of those controlling the outcome of a corporate election. That is the usual way a person becomes a corporate director. It is the care, attention and sense of individual responsibility to the performance of one's duties, not the method of election, that generally touches on independence.

Aronson, 473 A.2d at 816. Moreover, "in the demand-futile context a plaintiff charging domination and control of one or more directors must allege particularized facts manifesting 'a direction of corporate conduct in such a way as to comport with the wishes or interests of the corporation (or persons) doing the controlling.'" Id. (quotation omitted). "The shorthand shibboleth of 'dominated and controlled directors' is insufficient," id., and while a plaintiff "need not plead evidence," id., he or she must "allege specific facts," id., that show or from which the Court may infer a lack of independence.

Accordingly, the Court has also considered the plaintiffs' allegations concerning the Directors' compensation and the plaintiffs' charge that "[t]he economic benefits conferred on the Director[s] . . . are so substantial that they are not able to impartially consider whether to bring the claims alleged in th[e] [A]mended [C]omplaint." Doc. 142 at 69, ¶ 209. In this connection, the plaintiffs have claimed that Ward, as "holder of a substantial

28

percentage of SandRidge's outstanding common stock . . . , controlled and dominated SandRidge's [B]oard,"[42] id. at 68, ¶ 205, and "conferred great wealth upon . . . Oliver, . . . , Gilliland, Serota, Dobson, and Brewer, who, like Ward, treated SandRidge like their own personal piggybank." Id.; e.g., id. at 69, ¶ 206 (through fees for service on Board, Ward transferred tens of millions of dollars of shareholder money to Directors).

The plaintiffs have alleged as Directors,[43]

(1) Dobson earned $118,753.00 in 2009, including a cash payment of $50,000.00, $400,006.00 in 2010, including a cash payment of $125,000.00, $375,000.00 in 2011, including a cash payment of $100,000.00, and $387,503.00 in 2012, including a cash payment of $112,500.00, see id. at 76-77, ¶ 242;

(2) Gilliland earned $92,385.00 in 2006, including a cash payment of $78,000.00, $129,215.00 in 2007, including a cash payment of $100,000.00, $189,877.00 in 2008, including a cash payment of $125,000.00, $300,006.00 in 2009, including a cash payment of $62,500.00, $400,006.00 in 2010, including a cash payment of $125,000.00, $375,000.00 in 2011, including a cash payment of $100,000.00, and $387,503.00 in 2012, including a cash payment of $112,500.00, see id. at 78, ¶ 250;

(3) Oliver earned $64,385.00 in 2006, including a cash payment of $50,000.00, $129,215.00 in 2007, including a cash payment of $100,000.00, $189,877.00 in 2008, including a cash payment of $125,000.00, $300,006.00 in 2009, including a cash payment of $62,500.00, $400,006.00 in 2010,

---

[42]Ward is alleged to have owned between 5% and 25% of SandRidge's outstanding common stock between 2006 and 2013. See Doc. 142 at 68, ¶ 205. Such allegation is however insufficient to show that he "controlled and dominated SandRidge's Board." Id.; e.g., Aronson, 473 A.2d at 815 (stock ownership alone, if amounting to less than a majority, is not sufficient proof of domination or control).

[43]Although not relevant for purposes of demand futility, the plaintiffs have asserted with regard to Jordan's compensation as a "hand-selected," see Doc. 142 at 70, ¶ 212, Director, who is likewise "beholden to . . . Ward," id., the following: $62,259.00 in 2006, including a cash payment of $50,000.00, $130,564.00 in 2007, including a cash payment of $100,000.00, $189,877.00 in 2008, including a cash payment of $125,000.00, $300,006.00 in 2009, including a cash payment of $62,500.00, $400,006.00 in 2010, including a cash payment of $125,000.00, $375,000.00 in 2011, including a cash payment of $100,000.00, and $387,503.00 in 2012, including a cash payment of $112,500.00, see id. at 72, ¶ 220.

including a cash payment of $125,000.00, $375,000.00 in 2011, including a cash payment of $100,000.00, and $387,503.00 in 2012, including a cash payment of $112,500.00, see id. at 73-74, ¶ 228;

(4) Serota earned $87,500.00 in cash for 2007, $160,308.00 in 2008, including a cash payment of $125,000.00, $300,006.00 in 2009, including a cash payment of $37,500.00, $362,506.00 in 2010, including a cash payment of $87,500.00, $375,000.00 in 2011, including a cash payment of $100,000.00, and $362,000.00 in 2012, including a cash payment of $87,500.00, see id. at 79, ¶ 225; and

(5) Brewer earned $297,937.00 in 2011 and $387,503 in 2012, including a cash payment of $112,500.00. See id. at 80-81, ¶ 260.

The mere recitation in the Amended Complaint of the Directors' compensation is not enough for purposes of pleading demand futility. Absent well-pleaded particular facts in the Amended Complaint that a Director's receipt of fees so tainted his decision-making or the amount received is so unusual in degree or in kind as compared by directors of other comparable-sized corporations[44] that it creates a reasonable doubt about his independence, the Court finds these Directors' receipt of fees, albeit "substantial remuneration" Jacobs v. Yang, 2004 WL 1728521 *4 (Del. Ch. 2004), aff'd 867 A.2d 902 (Del. 2005), or even "lucrative compensation," id., in return for their services as Board

---

[44]The plaintiffs have contended that in 2012, the Board met seventeen (17) times, which resulted in an approximate fee payment of $22,800.00 per director per meeting. See Doc. 142 at 81, n.10. In 2011, the Board met only six (6) times, which resulted in an approximate fee payment of $64,500.00 per director per meeting. See id.

The plaintiffs have asserted that SandRidge ranks in "the top 20 companies in the nation for director compensation[,]" id. at 81, ¶ 262, and that in 2012, Exxon Mobil directors "were paid less . . . than the lowest paid SandRidge director," id., even though in that year, "Exxon Mobil was 125 times larger than SandRidge based on market capitalization." Id. Such assertion alone does not establish that the Directors' compensation was so lavish that they could not make an impartial decision is presented a stockholder's demand, particularly, since, pursuant to the settlement on March 13, 2013, "[t]he current annual compensation of each non-employee director . . . [is] $250,000." Doc. 142-29 at 5.

members is not enough to undermine the presumption that these Directors are independent. E.g., In re Infousa, Inc., 2007 WL 3325921 (Del. Ch. 2007).

However, because "[a] variety of motivations . . . may influence the demand futility inquiry," Beam, 845 A.3d at 1050, including "personal or other relationships," Aronson, 473 A.2d at 815 (citation omitted), the Court has also considered the business relationships and financial ties among and between Ward, SandRidge and these five Directors.

The plaintiffs have alleged that immediately prior to Gilliland's selection as a Board member in January 2006, SandRidge in December 2005 "acquired interests in PetroSource, certain acreage in the Piceance Basin and projects in Missouri and Nevada from Gillco Energy, L.P., an entity controlled by . . . Gilliland, for approximately $21.1 million in SandRidge common stock." Doc. 142 at 78, ¶ 247. Immediately after Gilliland's selection, SandRidge further "acquired an office building in Midland, Texas, from a partnership affiliated with . . . Gilliland for $950,000." Id. ¶ 249.[45]

As to Oliver, the plaintiffs have alleged in the Amended Complaint that immediately following Oliver's selection as a Director in July 2006, SandRidge in September 2006, entered into a lease with Oliver. See id. at 72, ¶ 224. According to the plaintiffs, "[t]he lease extended to August 2009 with annual rental payments of $1.1 million in 2007, $1.4 million in 2008 and $565,000 million in 2009." Id.[46]

---

[45]The plaintiffs' allegation regarding Gilliland's grandson's employment at SandRidge in 2012 provides no support for any argument that Gilliland have been might be less than independent or his objectivity undermined in 2013. See Doc. 142 at 78, ¶ 248.

[46]That lease was not renewed due to SandRidge's relocation, and although "SandRidge reportedly spent $100 million[–a 'massive investment of shareholder wealth,' Doc. 142 at 73, ¶ 226–] to renovate the Kerr-McGee Tower and four other buildings to be called SandRidge Commons into Class A commercial real estate," id. ¶ 225, the plaintiffs have alleged that SandRidge nevertheless "leased approximately 36,000 square feet of Class B commercial space

31

The plaintiffs have further contended that Buffalo Creek Minerals, L.L.C. ("Buffalo Creek Minerals") is an entity in which Oliver maintains an ownership interest, see id. at 74, ¶ 230, and that "Buffalo Creek Minerals is a royalty interest owner in wells that SandRidge operates in northwest Oklahoma[, which was paid by SandRidge in 2012 the sum of] . . . $398,907 . . . related to its royalty interests." Id.

Finally, the plaintiffs have asserted that Oliver has an ownership interest in Leadership Square at 211 North Robinson Avenue, in Oklahoma City, Oklahoma, which is the building that Oklahoma City Thunder ("Thunder") and Professional Basketball Club LLC ("PBC"), in which Ward and Dobson have an ownership interest, lease office space. See id. at 75, ¶ 235.[47]

This business relationship between Ward and Dobson, on which the plaintiffs have relied, concerns their co-investment in the Thunder,[48] a National Basketball Association team. The plaintiffs have alleged that "SandRidge entered into a[ ] [five-year] agreement

_____

on the 12-14th floors of 204 North Robinson Avenue in Oklahoma City, known as City Place, with annual rent being approximately $510,000." Id. ¶ 226. Although the plaintiffs have claimed that "[t]his transaction was material to . . . Oliver because SandRidge occupied approximately 15% of City Place's total square footage," id., the plaintiffs have not explained in the Amended Complaint the connection between Oliver and City Place. See Doc. 71 at 52, ¶ 189 (in the original complaint, the plaintiffs had alleged that SandRidge had "resumed renting space in a building owned by an entity that is partially owned by . . . Oliver with annual rent being approximately $510,000").

[47]The plaintiffs have also relied on Oliver's ownership interest in the building in which both SandRidge's legal counsel and Dorchester Capital Corporation leases space. See Doc. 142 at 75, ¶ 236. The chairman of the latter is Clayton Bennett, who is also Ward and Dobson's partner in the Thunder. See id.

[48]The plaintiffs have alleged that in 2006, approximately three years prior to Dobson's membership on the Board, he and Ward "were among the eight original partners that purchased the NBA's Seattle SuperSonics and the WNBA's Seattle Storm professional basketball teams for $350 million." Doc. 142 at 76, ¶ 240. In July 2008, the Seattle SuperSonics relocated to Oklahoma City, Oklahoma, and renamed the Thunder. See id. Ward and Dobson are alleged to own 19.23% and 3.85%, respectively, of the basketball team. See id.

related to the sponsorship of the team in September 2008[,] [u]nder [which] . . . SandRidge paid approximately $16.4 million for advertising and promotional activities . . . ." Id. at 76, ¶ 240; e.g., Doc. 147-6 at 35. In October 2009, SandRidge is alleged to have "entered into a[ ] [four-year] agreement to license a suite at the arena where the Thunder plays its home games[,] . . . [under which] SandRidge agreed to pay an annual license fee in return for access to the suite during Thunder games and for other events held at the arena." Doc. 142 at 76, ¶ 241; Doc. 147-6 at 35.[49]

The plaintiffs have further relied on Dobson's ownership of Dobson Ranch LLC, which "owns oil and gas property in Beckham County, Oklahoma in which . . . WCT . . . and SandRidge have had an ownership interest . . . ." Id. at 77, ¶ 243.

As to Serota, the plaintiffs have alleged only that he is a senior partner of Ares Management, LLC, and a director of, and senior advisor to, EXCO Resources, Inc. ("EXCO"). The former entity "in May 2008 sold 2.5 million shares of SandRidge common stock for gross proceeds of $135 million," id. at 79, ¶ 253, but continues to hold, as of June 30, 2013, 2.5 million shares of SandRidge common stock. See id. ¶ 254. The latter entity, EXCO, "purports to be an oil and natural gas company engaged in the exploration, exploitation, development and production of onshore U.S. oil and natural gas properties–including principal operations in the Permian Basin in West Texas," id. at 80,

---

[49]The annual license fee for the first year was reported to be $200,000.00 and subject to an annual increase of up to three percent (3%). See id. ¶ 241; Doc. 147-6 at 35.

33

¶ 257, an area, in which, "in addition to the Mississippian [Play] and other regions, SandRidge focuses its exploration and production activities . . . ." Id. ¶ 258.

While professional relationships among Board members may under certain circumstances impede independent decisionmaking, "[a]llegations of . . . a mere outside business relationship . . . are insufficient to raise a reasonable doubt about a director's independence." Beam, 845 A.2d at 1050 (footnote omitted).[50] Absent particular facts that the foregoing businesses conducted by, or the transactions engaged in, by the Directors and/or companies with which they were affiliated compromised a particular Director's independent discretion, the foregoing ties are not, in the Court's opinion, "of a bias-producing nature." Id. Rather, to show a lack of independence, the plaintiffs were required to advance well-pleaded factual allegations that established that the benefits derived from these businesses or transactions were of "sufficiently material importance, in the context of [a particular] . . . [D]irector's economic circumstances, as to have made it improbable that th[at] [D]irector could perform [his] . . . fiduciary duties . . . without being influenced .

_____

[50]As courts recognize, in establishing that a director is not sufficiently independent,

> [t]he basic hurdle for plaintiffs stems from the fact that the kinds of relationships [generally] alleged in . . . complaint[s] exist at many companies. Directors tend to be experienced and accomplished business persons; those individuals also tend to be comparatively wealthy and have a wide range of professional and charitable affiliations and relationships. It is usually considered in the interests of corporations and their shareholders to attract experienced and accomplished business leaders as directors. So as not to preclude service by such persons, Delaware law creates a very high bar for using the[se] kinds of relationships . . . as a basis for finding a lack of independence and thereby excusing demand in a derivative suit.

Pirelli Armstrong Tire Corporation Retiree Medical Benefits Trust v. Raines, 534 F.3d 779, 793-94 (D.D.C. 2008).

34

. . ." In re General Motors Class H Shareholders Litigation, 734 A.2d 611, 617 (Del. Ch. 1999)(citation omitted).

Upon review of the allegations in the Amended Complaint in their totality and in light of the fact that Ward no longer is chief executive officer, the Court cannot find that these five Directors "are under an influence which [so] sterilizes their discretion," Aronson, 473 A.2d at 814, that they "cannot be considered proper persons to conduct litigation on behalf of . . . [SandRidge]." Id. Accordingly, the plaintiffs' allegations are insufficient to raise a reasonable doubt about whether these Directors would be sufficiently independent in making a decision with regard to the plaintiffs' waste claim.

As stated, Aronson's first prong is disjunctive;[51] accordingly, inquiry into whether these Directors are sufficiently disinterested to pursue this claim is required. In this connection, the plaintiffs have alleged that demand is excused because there is a reasonable doubt about the Board's disinterestedness, namely, that their ability to act impartially on a demand has been compromised because these five Directors face a substantial threat of personal liability.[52]

"While a director has an interest, in some sense, in any decision that involves approving a derivative suit that names the director as a defendant, normally the threat of personal liability against a director is not enough, standing alone, to challenge the

---

[51]See n.41 supra.

[52]For purposes of the instant motion, the Court need not determine whether "substantial threat of personal liability" falls under Aronson's disinterested prong or whether it is a separate "circumstance[ ] in which a director is not entitled to deference when considering a demand analysis[.]" In re China Automotive Systems Inc. Derivative Litigation, 2013 WL 4672059 *6 (Del. Ch. 2013); e.g., id. (in addition to excusal by alleging board is interested or lacking independence, demand may be excused by alleging directors face sufficiently substantial threat of personal liability).

interestedness of a director." Kahn v. Portnoy, 2008 WL 5197164 *9 (Del Ch. 2008) (footnote omitted); e.g., Aronson, 473 A.2d at 815 (mere threat of personal liability for approving questioned transaction, standing alone, insufficient to challenge directors' disinterestedness). That is to say, "[d]emand is not excused simply by naming the[se] [D]irectors as defendants in th[is] suit or alleging that they participated in the challenged transaction." MCG Capital *18 (footnote omitted).

A director may, however, be deemed interested "if the challenged transaction is so egregious on its face that it gives rise to a 'substantial likelihood' of personal liability for the director." Kahn *9 (footnote omitted). Accordingly, the Amended Complaint must contain "facts sufficient to show that [these Directors'] approval of the [challenged] transaction[s] was 'so egregious on its face that . . . a substantial likelihood of director liability exists.'" MCG Capital *18 (footnote omitted). "[S]howing a substantial threat of personal liability does not require [the] . . . plaintiff[s] 'to demonstrate a reasonable probability of success on the[ir] claim," In re China Automotive Systems Inc. Derivative Litigation, 2013 WL 4672059 *6 (Del. Ch. 2013)(footnote omitted); rather, the plaintiffs "need only 'make a threshold showing, through the allegation of particularized facts, that their claim[ ] ha[s] some merit.'" In re China Agritech, Inc. Shareholder Derivative Litigation, 2013 WL 2181514 *16 (Del. Ch. 2013)(quotation omitted).

The plaintiffs have shown that Oliver, Serota, Dobson, Gilliland and Brewer are exposed to a substantial threat of personal liability because of their decisions with regard to executive compensation as well as their decisions that resulted in "the "funnel[ing of] millions of dollars out of . . . [SandRidge] for . . . Ward's [and the Ward Entity Defendants'] benefit," Doc. 142 at 90, ¶ 292, and have further shown that these Directors allegedly

36

permitted Ward, through the Ward Entity Defendants, to "divert[ ] millions of dollars from SandRidge," id. at 49, ¶ 140, and to "compete[ ] with SandRidge and wrongfully [take] corporate opportunities from SandRidge," id. ¶ 139, the Court finds demand is excused as to the plaintiffs' waste claim.

Because the parties have also addressed Aronson's second prong in connection with the plaintiffs' waste claim, the Court has considered the same. Under this prong. which "focuses on the substantive nature of the challenged transaction[s] and the [instant] [D]irectors' approval thereof," Rattner v Bidzos, 2003 WL 22284323 *8 (Del. Ch. 2003) (footnote omitted), "demand will be excused if the plaintiff[s have] create[d] a reasonable doubt that the challenged transaction[s] . . . [were] a product of the Board's valid exercise of its business judgment." Pfeiffer v. Leedle, 2013 WL 5988416 *4 (Del. Ch. 2013). To rebut the business judgment rule, the plaintiffs must "plead[ ] particularized facts that raise a doubt that the Board's action was taken on an informed basis or that the action was taken honestly and in good faith." Id. (footnote omitted).

The business judgment rule "states that courts will not disturb the business decision of a corporate board when that decision is made on an informed basis, in good faith, and in the honest belief that the action was taken in the best interests of the corporation. Conspicuously absent from the business judgment rule's requirements is the need for corporate directors actually to make the 'correct' decision." Id. *5 (footnotes omitted). In most instances, "'the judgment of a properly functioning board will not be second-guessed and [a]bsent an abuse of discretion, that judgment will be respected by the courts.'" Id. (footnote omitted).

37

The business judgment rule will be rebutted, however, and demand excused, where a plaintiff has shown that the Directors were not sufficiently disinterested. See Ross Holding and Management Co. v. Advance Realty Group, LLC, 2014 WL 4374261 *15 (Del. Ch. 2014); Aronson, 473 A.2d at 815 (if challenged transaction is an "interested" director transaction, business judgment rule is inapplicable and inquiry ceases).[53] Because Elliot and Ezell have asserted a plausible waste claim based on one or more theories and have further shown that a reasonable doubt exists about the Directors' interest in avoiding personal liability on this claim, the Court again finds that these five Directors would be disqualified from impartially considering Elliot and Ezell's demand as to this claim.

As case law instructs, the Court must also conduct a separate demand futility analysis as to the plaintiffs' Caremark oversight claim, which, as stated, "premises liability on a showing that the [D]irectors were conscious of the fact that they were not doing their jobs." Guttman, 823 A.2d at 506. A different test applies to this claim, namely, the test articulated in Rales,[54] which requires the Court to "determine whether or not the particularized factual allegations of [the Amended] . . . [C]omplaint create a reasonable doubt that, as of the time the [Amended] [C]omplaint [was] . . . filed, the . . . [D]irectors

---

[53]See Guttman, 823 A.2d at 500 (Aronson's second prong permits plaintiff suing board that is structurally independent and presumptively capable of acting impartially on a demand to proceed with its lawsuit–i.e., a board that passes muster under Aronson's first prong, which focuses on board disinterest and independence-if plaintiff pleads claim for breach of fiduciary duty with particularity).

[54]E.g., id. at 499 (where plaintiffs allege that directors breached their fiduciary duties by failing to ensure that corporation had in place financial control systems necessary to ensure compliance with applicable accounting standards, no specific business judgment of board is challenged and Rales test applies to determine whether demand is excused).

could have properly exercised [their] independent and disinterested[55] business judgment in responding to a demand. If . . . [Elliot and Ezell] satisf[y] this burden, then demand will be excused as futile." Rales, 634 A.3d at 934.

As stated, the allegations in the Amended Complaint are sufficient to state a plausible oversight claim against Dobson, Gilliland, Oliver, Serota and Brewer because they ignored obvious signs of Ward's alleged wrongdoing, and the Court now finds that such allegations further create a reasonable doubt that these five Directors would be sufficiently disinterested[56] in that claim because they face a substantial threat of liability for their breach of fiduciary duty.[57] Accordingly, demand as to the plaintiffs' oversight claim is excused. E.g., Guttman, 823 A.2d at 503 (key inquiry in Rales analysis is whether plaintiffs have pled facts that show that directors face sufficiently substantial threat of personal liability to compromise their ability to act impartially on demand).[58]

---

[55]E.g., id. at 501 (at first blush, Rales test looks somewhat different from Aronson, in that it involves a singular inquiry; upon closer examination, however, that singular inquiry makes germane all of the concerns relevant to both first and second prongs of Aronson).

[56]E.g., id. (when allegations show that majority of the board that must consider a demand acted wrongfully, Rales test addresses concerns similar to Aronson's second prong, namely, if directors face "substantial likelihood" of personal liability, ability to consider a demand impartially is compromised under Rales, excusing demand). See also Rattner *8 (under Rales, demand is excused if particularized facts create a reasonable doubt that majority of board could have exercised disinterested and independent business judgment in responding to plaintiff's).

[57]As the Court has found, the allegations in the Amended Complaint, when viewed in a light most favorable to the plaintiffs, show that these five Directors committed a non-exculpated breach of fiduciary duty.

[58]The Rales test has been described as "a two-prong inquiry requiring courts to analyze whether a complaint pleads particularized facts sufficient to demonstrate that either (1) the underlying conduct being challenged renders any of the directors 'interested' and, if so, whether any of the other directors are compromised in their ability to act independently of the interested directors; or (2) at least half of the directors face a sufficiently substantial threat of personal liability as to the conduct alleged in the complaint to compromise their ability to act impartially on a demand." Desimone v. Barrows, 924 A.2d 908, 928 (Del. Ch. 2007).

Finally, the Court has considered the plaintiffs' allegations in the Amended Complaint that demand is excused because the Directors "face a substantial risk of personal liability," Doc. 142 at 63, ¶ 190, for their "blatant attempt to entrench themselves in response to TPG-Axon's proxy contest . . . ." Id. at 82, ¶ 264.[59] This conclusory statement is grounded on the following allegations:

(1) in November 2012, TPG-Axon challenged Ward's leadership and the Board's control and "informed the Director[s] . . . that it intended to conduct a consent solicitation seeking shareholder support for three proposals: (i) to amend SandRidge's bylaws to de-stagger the [B]oard . . . ; (ii) to remove all of the Director[s] . . . for cause; and (iii) to replace the Director[s] . . . with a slate of TPG-Axon nominees[,]"[60] Doc. 142 at 63, ¶ 190;

---

[59]In light of the plaintiffs' compliance with Rule 10(b), F.R.Civ.P. (to promote clarity, each claim must be stated in separate count), as to their waste and oversight claims, it is unclear whether the plaintiffs' allegations of entrenchment are advanced in connection with the issue of demand futility only, whether such allegations are intended to constitute a separate and independent cause of action or whether such allegations were intended to support the plaintiffs' Caremark claim. See Doc. 142 at 89, ¶ 289 (Directors' "conduct in response to TPG-Axon's consent solicitation breached their fiduciary duties to SandRidge and its shareholders").

[60]Citing Kallick v. SandRidge Energy, Inc., 2013 WL 868942 (Del. Ch. March 8, 2013), the plaintiffs have argued that Chancellor Strine found that the Directors had no reason to withhold their approval of the TPG-Axon nominees and that in doing so were "likely violating their fiduciary duty of loyalty to SandRidge and its stockholders." Id. *7. Chancellor Strine, having further found that Kallick had "a strong likelihood of success on the merits," id. *16, and "the absence of any rational, good faith justification for [the Directors'] . . . nondecision as to approval," id., enjoined the Directors from soliciting consent revocations until they approved the TPG-Axon slate of nominees. Id. *16.
As stated, TPG-Axon and SandRidge eventually entered into a settlement agreement on March 13, 2013, which inter alia increased the number of directors from seven (7) to eleven (11). See Doc. 142-29. The agreement also required SandRidge to reimburse TPG-Axon for approximately $3.5 million for expenses incurred in connection with the latter's consent solicitation and stockholder nominations and the settlement agreement. See Doc. 142 at 66, ¶ 196; Doc. 142-29 at 14, ¶ 23.

(2) in response, the Directors[61] "made it harder for shareholders to take action by written consent, amended . . . [SandRidge's] bylaws to require an affirmative vote of over 50% of stockholders to amend any part of the bylaws concerning the election of directors, and launched a campaign opposing TPG-Axon's consent solicitation and urging SandRidge shareholders to vote against TPG-Axon's proposals[,]" id. ¶ 191;[62]

(3) "[i]n opposing TPG-Axon's consent solicitation, . . . the Director[s] . . . falsely represented to SandRidge shareholders that the election of the TPG-Axon nominees would constitute a 'change in control' with respect to SandRidge's credit agreements, which would trigger the right of SandRidge's lenders to require SandRidge to repurchase $4.3 billion worth of notes, and that . . . [SandRidge] 'may not have sufficient liquidity to fund' the purchase[,]" id. at 64, ¶ 193;[63]

(4) "[d]uring the proxy contest, TPG-Axon publicly campaigned against the Director[s] . . . based on allegations . . . concerning . . . Ward's relationship to WCT . . . and [its] . . . front running and flipping of leaseholds[,]" id. ¶ 194 (citation omitted);

---

[61]The plaintiffs have complained about the Directors' adoption of a "poison pill." Id. at 63, ¶ 191. The Board, however, terminated SandRidge's "poison pill" in April 2013, well before the Amended Complaint was filed on August 9, 2013. See Doc. 147-2.

[62]The plaintiffs have alleged that the Directors "attempted to restrict the statutory 60-day period for TPG-Axon's consent solicitation by announcing that the period had begun on December 19, 2012, before TPG-Axon filed its definitive or preliminary proxy statements[,]" Doc. 142 at 64, ¶ 192, but that "TPG-Axon filed suit challenging this maneuver, and . . . [SandRidge] later settled this dispute by agreeing that the period began on January 15, 2013, when TPG-Axon filed its definitive proxy statement." Id.

[63]The plaintiffs have further alleged that "[t]he next day, . . . the Director[s] . . . reversed their earlier statement and admitted that there was no danger that . . . [SandRidge's] lenders would require such a repurchase because the debt was trading at prices above the repurchase price." Id. ¶ 193.

(5) in response, SandRidge "on January 25, 2013, . . . issued a press release exonerating . . . Ward[,]" id. (citation omitted), and stating that it had '"reviewed issues related to these allegations several times over [SandRidge's] . . . history and ha[d] found no wrongdoing to have taken place[,]'" id. at 64-65, ¶ 194 (quotation omitted)(emphasis deleted); see Doc. 142-23; and

(6) SandRidge repeated its statements on February 4, 2013, during a shareholder presentation, and again on February 20, 2013, in another press release, see id. at 65, ¶ 194; Doc. 142-24, "mak[ing] it clear that it was not going to take action against . . . Ward." Id.

The plaintiffs have contended that their entrenchment "claim,"[64] Doc. 150 at 21, is grounded on "the Director[s'] . . . desperate and baseless attempt to maintain control through opposing a fair proxy contest." Id. (citation omitted). And, as case law teaches, "[a] plaintiff-shareholder may successfully plead pre-suit demand futility by alleging that 'the "sole or primary purpose" of the challenged board action was to perpetuate the directors in control of the corporation.'" Greenwald v. Batterson, 1999 WL 596276 *5 (Del. Ch. 1999); e.g., In re Fuqua Industries, Inc. Shareholder Litigation, 1997 WL 257460 *10 (Del. Ch. 1997)(plaintiff must ultimately prove that defendant directors engaged in actions which had the effect of protecting their tenure and that action was motivated primarily or solely for the purpose of achieving that effect). "However, the mere allegation that directors have taken action to entrench themselves, without an allegation that the directors believed themselves vulnerable to removal from office, will not excuse demand. A successful claim

[64]See n.59 supra.

42

of demand futility requires an allegation that an actual threat to the directors' positions on the board existed." Greenwald *5 (citations omitted).

The Amended Complaint has alleged in a particularized way that Dobson, Gilliland, Serota, Oliver and Brewer through their opposition to TPG-Axon's consent solicitation and to TPG-Axon's nominees allegedly acted so as to secure their own positions as Board members and to perpetuate their control of SandRidge in disregard of its interests and the interests of its shareholders; because such allegations are sufficient to show an actual threat to their positions, demand as to the plaintiffs' "claim" of entrenchment, if any, based upon the same would be excused.

Based upon the foregoing, the Court DENIES the Motion to Dismiss Plaintiffs' Amended Consolidated Shareholder Derivative Complaint [Doc. 147].

ENTERED this 22nd day of September, 2014.

LEE R. WEST
UNITED STATES DISTRICT JUDGE