

IN THE UNITED STATES DISTRICT COURT FOR

SEP 2 2 2014

THE WESTERN DISTRICT OF OKLAHOMA   CARMELITA REEDER SHINN, CLERK
U.S. DIST. COURT, WESTERN DIST. OKLA.
BY _____ ,DEPUTY

IN RE SANDRIDGE ENERGY, INC. ) No. CIV-13-102-W
SHAREHOLDER DERIVATIVE LITIGATION )

Relating to All Derivative Actions

## ORDER

This matter comes before the Court on the Motion to Dismiss filed pursuant to Rule 12(b)(6), F.R.Civ.P., by defendants Tom L. Ward ("Ward") and TLW Land & Cattle, L.P. ("TLW"). Lead plaintiff Paul Elliot, on behalf of the Paul Elliot IRA R/O ("Elliot"), and plaintiff Lisa Ezell have responded in opposition, and Ward and TLW have filed a reply. Based upon the allegations in the first amended verified consolidated shareholder derivative complaint ("Amended Complaint"), the Court makes its determination.

In Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007), the United States Supreme Court set forth the standards that this Court must use in determining whether dismissal, as Ward and TLW have requested, is warranted under Rule 12(b)(6). The Supreme Court held in accordance with Rule 8, F.R.Civ.P., that a complaint need not contain "heightened fact pleading of specifics," 550 U.S. at 570, or "detailed factual allegations," id. at 555 (citations omitted), but it must contain "enough facts to state a claim to relief that is plausible on its face." Id. at 570.

The United States Court of Appeals for the Tenth Circuit has stated that Twombly imposes a "burden . . . on the plaintiff[s] to frame a 'complaint with enough factual matter (taken as true) to suggest' that [they are] . . . entitled to relief." Robbins v. Oklahoma, 519 F.3d 1242, 1247 (10th Cir. 2008)(quoting Twombly, 550 U.S. at 556). Thus, "[t]he allegations [in the Amended Complaint] must be enough that, if assumed to be true, . . .

[the plaintiffs] plausibly (not just speculatively) ha[ve] a claim for relief [against Ward and

TLW]." Id. (footnote omitted).

The Court's task at this stage is to determine whether "there are well-pleaded factual

allegations," Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009), in the challenged pleading,[1] and

if so, the "[C]ourt should assume their veracity and then determine whether they plausibly

give rise to an entitlement to relief." Id.

> A claim has facial plausibility when the plaintiff pleads factual content
> that allows the [C]ourt to draw the reasonable inference that the defendant
> is liable for the misconduct alleged. The plausibility standard is not akin to
> a "probability requirement," but it asks for more than a sheer possibility that
> a defendant has acted unlawfully. Where a complaint pleads facts that are
> "merely consistent with" a defendant's liability, it "stops short of the line
> between possibility and plausibility of 'entitlement to relief.'"

Id. at 678 (citations omitted).

In this connection, a complaint "'must contain either direct or inferential allegations

respecting all the material elements necessary to sustain a recovery under some viable

legal theory.'" Bryson v. Gonzales, 534 F.3d 1282, 1286 (10th Cir. 2008)(quotation and

further citation omitted). While "[t]he nature and specificity of the allegations required to

state a plausible claim will vary based on context," Kansas Penn Gaming, LLC v. Collins,

656 F.3d 1210, 1215 (10th Cir. 2011)(citations omitted), neither "'naked assertion[s]' devoid

of 'further factual enhancement,'" Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at

557), nor "[t]hreadbare recitals of the elements of a cause of action, supported by mere

conclusory allegations, . . . suffice." Id. (citation omitted). "[T]he Twombly/Iqbal standard

---

[1]"In evaluating a Rule 12(b)(6) motion to dismiss, courts may consider not only the
complaint itself, but also attached exhibits and documents incorporated into the complaint by
reference." Smith v. United States, 561 F.3d 1090, 1098 (10th Cir. 2009)(citations omitted).

recognizes a plaintiff should have at least some relevant information to make the claims plausible on their face." Khalik v. United Air Lines, 671 F.3d 1188, 1193 (10th Cir. 2012). "[I]t demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation," Iqbal, 556 U.S. at 678 (citations omitted), and more than "mere 'labels and conclusions,' and 'a formulaic recitation of the elements of a cause of action' . . . ." Kansas Penn Gaming, 656 F.3d at 1214 (quoting Twombly, 550 U.S. at 555).

The plaintiffs brought this derivative action on behalf of nominal defendant SandRidge Energy, Inc. ("SandRidge"),[2] and have contended that the Amended Complaint combines the factual allegations in the original verified consolidated shareholder derivative complaint "of self-dealing, breaches of fiduciary duty, and violations of corporate ethics that . . . Ward committed," Doc. 142 at 5, ¶ 2, with "further evidence of . . . wrongful conduct during the period from October 25, 2010 to the present . . . ." Id. at 6, ¶ 2.[3]

Named as defendants in the Amended Complaint in addition to movants Ward and TLW are members of SandRidge's Board of Directors ("Board"): Jim J. Brewer, Everett R. Dobson, William A. Gilliland, Daniel W. Jordan, Roy T. Oliver, Jr., and Jeffrey S. Serota ("Directors"). These individuals at the time the Amended Complaint was filed were serving

---

[2]SandRidge is a corporation that is organized under Delaware law and has its headquarters in Oklahoma City, Oklahoma. See Doc. 142 at 12, ¶ 22. It was formed in 2006, see id. at 14, ¶ 32, and relying on the description found on SandRidge's website, the plaintiffs have asserted that "Sandridge is an oil and natural gas exploration company that 'focuses on drilling low-risk, conventional, high rate-of-return oil wells in shallow carbonate reservoirs.'" Id. at 12, ¶ 22.

[3]For purposes of this lawsuit, the period from October 25, 2010, to the present is the "Relevant Period." See id. at 6, ¶ 2.

3

or had served as Board members.[4]  The plaintiffs have alleged that these defendants wasted corporate assets and together with Ward[5] breached certain fiduciary duties.

Also named as defendants are WCT Resources, L.L.C. ("WCT"), and 192 Investments, L.L.C. ("192 LLC"), to which, together with defendant TLW, the plaintiffs have collectively referred as "the 'Ward Entity Defendants.'" Id. at 14, ¶ 31. TLW, a limited partnership organized under Oklahoma law, see id. at 13, ¶ 31, was formed by Ward in 2004, see id. at 23, ¶ 59, when Ward was employed at Chesapeake Energy Corporation ("Chesapeake").[6] TLW's original principal place of business was 6200 N. Western Avenue, Oklahoma City, Oklahoma–a Chesapeake address, see id. ¶ 60; TLW now shares the same physical address as SandRidge–123 Robert S. Kerr Avenue, Oklahoma City, Oklahoma, see id. at 24, ¶ 63, and moved to that address when Ward left Chesapeake.

The plaintiffs have asserted that TLW has no employees, see id. at 25, ¶ 65, and "only one general partner, TLW Investments, Inc.," id. at 24, ¶ 61, and that Ward as the president of the same, see id., "orchestrated TLW['s] . . . organization and controls its activities." Id. ¶ 60.  The plaintiffs have further alleged that TLW "is an 'entity in which . .

---

[4]Pursuant to a settlement agreement between SandRidge and TPG-Axon Partners, LP, TPG-Axon Management LP, TPG-Axon Partners GP, L.P., TPG-Axon GP, LLC, TPG-Axon International, L.P., TPG-Axon International GP, LLC and Dinakar Singh LLC (collectively "TPG-Axon") on March 13, 2013, the number of Board members and directors increased from seven to eleven. See Doc. 142-29 at 2, ¶ 1(a)(i). Appointed as directors were Stephen C. Beasley, Edward W. Moneypenny, Alan J. Weber and Dan A. Westbrook. See id. ¶ 1(a)(ii).

[5]Ward, who is included in the Amended Complaint's definition of "Director," see Doc. 142 at 13, ¶ 30, served as SandRidge's chairman and chief executive officer from June 2006 until his employment was terminated in June 2013. See id. at 12, ¶ 23. Ward also served as SandRidge's president from December 2006 to January 2011. See id.

[6]Ward was a director of Chesapeake and its president and chief operating officer from 1989 to February 2006. See id.

4

. Ward has [admitted] . . . an ownership interest,'" id. ¶ 62, according to SandRidge's disclosures to the Securities and Exchange Commission, and for which he has "signed numerous conveyances . . . ." Id.[7]

WCT is described in the Amended Complaint as an Oklahoma limited liability company, see id. at 13, ¶ 31, the chief executive officer of which is Ward's son, Trent Ward. See id. at 17, ¶ 42. WCT was formed in 2002 by Shannon Self, a member of Chesapeake's Board of Directors, see id. at 16, ¶ 41, and like TLW, WCT had its original place of business at 6200 North Western Avenue, Oklahoma City, Oklahoma, see id. at 17, ¶ 41; it too eventually shared the same address as SandRidge at 123 Robert S. Kerr Avenue, Oklahoma City, Oklahoma, from 2008 to July 2011.   See id. at 19, ¶ 47.

WCT is alleged to have only seven (7) employees and one contract geologist. See at 44, ¶ 126. Members of the limited liability company are trusts that were established and funded by Ward and his wife, Schr'ee Ward, for the benefit of their children:  the Trent Lee Ward Trust, the Romi Norel Ward Trust and the James Davis Ward Trust. See id. at 18, ¶ 44; id. at 13, ¶ 31 (citations omitted).  The trustee of these trusts is Scott C. Hartman, who is alleged to be "Ward's personal employee," see id. at 18, ¶ 45, and although "'listed as a SandRidge employee,'" id. (quotation omitted), Hartman's "'employment is devoted to . . . Ward's business affairs.'"  Id. (quotation omitted).

192 LLC is also an Oklahoma limited liability company, see id. at 13, ¶ 31; it was formed in 2004 by Tom Blalock, see id. at 20, ¶ 48, a partner in the same law firm as Self

---

[7]In the Amended Complaint, the plaintiffs have also referred to a document executed by Ward in September 2012 in a case filed in this judicial district, wherein he averred that he is the owner of TLW.  See Chechele v. Ward, No. CIV-10-1286-M (Doc. 133-1 at 3, ¶ 3).

5

and a former member of Chesapeake's Board of Directors. See id. Like TLW and WCT,

192 LLC had its original place of business at 6200 North Western Avenue, Oklahoma City,

Oklahoma, see id. ¶ 49, and in 2008, it moved to the same address as SandRidge at 123

Robert S. Kerr Avenue, Oklahoma City, Oklahoma. See id. at 21, ¶ 51.

192 LLC, like WCT, has as its members the Trent Lee Ward Trust, the Romi Norel

Ward Trust and the James Davis Ward Trust, see id. at 13, ¶ 31, but unlike WCT, it

allegedly has no employees. See id. at 21, ¶ 53.

In summarizing the alleged wrongful conduct giving rise to this lawsuit, the plaintiffs

have asserted that

> Ward, in violation of his fiduciary duties to SandRidge and its shareholders,
> [SandRidge's] . . . policies and procedures, and his employment agreement,
> wrongfully usurped SandRidge's corporate opportunities, benefitting himself
> and his family[,]

id. at 6, ¶ 3, and through TLW, WCT and 192 LLC, "as surrogates for one another," id. at

7, ¶ 7, "has taken numerous corporate opportunities that should have been offered to

SandRidge, id. ¶ 8, "[b]y front running [SandRidge] . . . ," id. at 34, ¶ 102, by "us[ing] . . .

SandRidge's material confidential and proprietary . . . information and resources . . . ," id.

at 35, ¶ 104, and "by flipping acquired leases to SandRidge without appropriate approvals

of a majority of independent and disinterested [D]irectors . . . ." Id. ¶ 105.

The "corporate opportunities" to which the plaintiffs have referred relate to the

Mississippi Lime formation, also known as the "Mississippian Play," see id. at 14, ¶ 35, in

which SandRidge, as it "transition[ed] away from gas-dominant assets," id., "began to build

an industry-leading leasehold position," id., and be recognized as "a leading developer."

Id. at 15, ¶ 36. Alleged to be SandRidge's "primary focus since at least 2010," id. at 16,

¶ 40, the Mississippian Play "is a limestone formation containing oil and natural gas [that] . . . stretches through more than 17 million acres in northern Oklahoma, southern and western Kansas, and a small corner of Nebraska." Id. at 14, ¶ 35.

According to a SandRidge press release dated January 18, 2013, the Mississippian Play "'is widely considered to be one of the most valuable oil-rich basins in the United States,'" id. at 15, ¶ 36; see Doc. 142-3 at 1, and in describing SandRidge's role in this formation, the plaintiffs have contended

(1) that "[r]obust growth in the Mississippian Play is a key element of SandRidge's overall strategic plan[, and] [t]o that end, SandRidge has been, and remains, active in developing confidential and proprietary information about the Mississippian Play, acquiring mineral rights, conducting drilling and exploration activities, and developing infrastructure across the Mississippian Play[,]" Doc. 142 at 15, ¶ 37;

(2) that "[a]ccording to SandRidge's presentations at the Goldman Sachs Global Energy Conference[8] . . . and the Credit Suisse Energy Summit[9] ['Credit Suisse'] . . . [in 2013], [SandRidge] . . . is 'dominating' the Mississippian Play [as demonstrated by the following]:

> • SandRidge controls the largest acreage position in the Mississippian Play, constituting approximately 2.3 million acres, and it has identified over 11,000 possible horizontal drilling locations.
>
> • SandRidge has more than 40% of the rigs drilling in the Mississippian Play, consisting of 32 rigs across 200 miles.
> • SandRidge has already drilled 600 wells, representing 44% of all wells drilled in the Mississippian Play.

---

[8]See Doc. 142-4.

[9]See Doc. 142-5.

• SandRidge also has 107 disposal wells . . . and 384 miles of power line . . . in the Mississippian Play[; and]

• [a]ccording to the . . . Credit Suisse presentation, SandRidge plans to consolidate its holdings in the Mississippian Play through significant additional acquisitions of mineral rights and to drill 581 wells in 2013 while increasing the number of its rigs from 32 to 41[;]

Id. at 15-16, ¶ 38 (footnote and citations omitted); and

(3) that "according to a [February 2013] SandRidge press release[10] . . . , since January 2010, SandRidge has invested $500 million in the acquisition of mineral leaseholds and over $1.7 billion in development, drilling capital, and infrastructure in the Mississippian Play." Id. at 16, ¶ 39.

In describing Ward's alleged wrongful conduct in connection with their complaints that he used SandRidge's confidential and proprietary information, the plaintiffs have averred:

(1) "Beginning in 2009, SandRidge emerged alongside of Chesapeake as the two horizontal drilling leaders in the [Mississippian] [P]lay. In fact, of the 1,336 horizontal wells drilled since 2009, SandRidge has drilled 839 or 63% of all wells." Id. at 42, ¶ 120.

(2) "[B]ecause companies like SandRidge and Chesapeake typically obscure their lease acquisition activities in order to keep their interest in a given area out of the public spotlight (in an attempt to control the inevitable inflation of lease costs when mineral owners find out that industry leaders are interested in their land), they typically acquire leases utilizing brokers or agents, who subsequently assign title to those mineral lease interests to the company at a later date. . . .   Ward . . . was in a position to know the

---

[10]See Doc. 142-6.

8

identities of brokers and agents acting on behalf of SandRidge and the geographic locations of its acquisitions[,]" id. at 42-43, ¶ 121; and

(3) that "[i]t is not happenstance, [but rather through the use of confidential and proprietary information divulged by Ward,] . . . that [WCT, TLW and 192 LLC] . . . have acquired massive acreage adjacent to SandRidge acreage . . . ." Id. at 43, ¶ 121.

The plaintiffs have further alleged in connection with Ward's disclosure of SandRidge's confidential and proprietary information:

(1) "[T]echnological innovations in horizontal drilling, and multi-stage fracture stimulation (known as 'fracking') completion technologies, have unlocked previously unavailable potential in the [Mississippian] [P]lay. Because of its history as a producing formation, however, there is an incredible amount of historical geological data that any prudent exploration company would analyze before adopting an acquisition strategy." Id. ¶ 122.

(2) "Moreover, a prudent exploration company would develop new geological information to confirm its analysis of the historical data. In fact, between 2007 and 2009 SandRidge drilled mostly vertical wells. . . . [T]hose wells were drilled to confirm geological concepts, gather subsurface geological data in the form of drill cutting samples and cores, update reservoir analysis, and test for the presence and quality of hydrocarbon saturation." Id. ¶ 123.

(3) "An exploration company acquires data at substantial cost, both in the acquisition of historical and third party developed information and by drilling and completing new wells. The cost to analyze and learn from this data, while coordinating the analysis and field efforts between various disciplines (including but not limited to geology, geophysics, land

9

and lease acquisition, reservoir engineering and economics, drilling engineering, and completion and production engineering) can run into the millions of dollars. That is the reason this type of work is most effectively pursued by the large independent exploration companies such as SandRidge, . . . [which] can maintain the internal technical staff and [which has] . . . the financial capability to undertake this type of work." Id. at 44, ¶ 124.

(4) "With 2500 employees, including a staff of geologists, SandRidge is equipped to perform the analysis to exploit the Mississippian Play. . . [and] it has spent hundreds of millions of shareholder dollars doing just that." Id. ¶ 125.

To further support their claim of misuse of confidential and proprietary information, the plaintiffs have alleged that "Ward was privy to data . . . that was developed (at great expense) by . . . [SandRidge] engineers, geologists, and technicians," id. at 93, ¶ 307, and that this data was inter alia compiled and monitored by SandRidge's Reservoir Engineering Department and its geology unit—both of which reported directly to Ward or provided him with information. See id. at 93-94, ¶¶ 307, 308.

The plaintiffs have asserted that in light of the same and because TLW had no employees to investigate, explore, compile or monitor data, "a reasonable inference [can be drawn] that . . . [TLW] relied almost exclusively on SandRidge's activities and information [disclosed by Ward] in making . . . [its] acquisition decisions." Id. ¶ 126.

In describing the "front running" and/or "flipping" in which Ward allegedly engaged or participated through TLW in connection with TLW's acquisitions in the Mississippian Play, the plaintiffs have alleged that TLW, necessarily acting through others, namely, Ward, in the absence of any employees, see id. at 25, ¶ 65, "acquired mineral leaseholds in areas adjacent to SandRidge mineral leaseholds," id. at 27, ¶ 70, and in certain

instances, either acquired property that it "then flipped to SandRidge," id. at 28, ¶ 75, or "acquired land or mineral rights shortly before SandRidge acquired [the] adjacent acreage," id., thereby "increasing the value of the . . . land or mineral rights . . . [TLW] had purchased." Id. The plaintiffs have further alleged that TLW also "sold . . . [its] land or mineral rights to SandRidge competitors . . . and in other instances . . . retained the land or mineral rights, which appreciated due to SandRidge's investments of shareholder resources." Id. at 28-29, ¶ 75.

Examples of corporate opportunities to drill and capture hydrocarbons in the Mississippian Play, see id. at 34, ¶ 103, that allegedly should have been made available to SandRidge, but through TLW's misconduct [allegedly orchestrated and directed by Ward] were lost to SandRidge, include:

(1) on August 22, 2011, TLW, without offering the lease to SandRidge, conveyed to WCT an oil and gas lease[11] covering portions of Section 1, Township 25 North, Range 12 West in Alfalfa County, Oklahoma, see id. at 37, ¶ 111, which "is one of four counties . . . where SandRidge has been focusing its efforts in exploiting the Mississippian Play[,]" id. ¶ 110;[12]

_____

[11]The lease was executed by Ward as "Manager of TLW Land & Cattle Management, L.L.C., General Partner of TLW . . . ." Doc. 142-20 at 4.

[12]The plaintiffs have asserted that

[t]o underscore the significance to SandRidge of the lease TLW . . . conveyed to WCT . . . , the conveyance resulted in WCT . . . and SandRidge sharing adjoining portions of this same section in Alfalfa County. Beginning in March 2011 and continuing through December 2011, SandRidge took a total of six separate leases . . . to amass the drilling rights in half the section; in the midst of those acquisitions WCT . . . acquired its interest in the other half in the transaction . . . Ward authorized on behalf of TLW . . . . As a result, mineral ownership is divided diagonally through the middle of Section 1-25-12, with WCT owning the southeast

11

(2) on November 3, 2011, TLW "leased land and mineral rights in Woods County, Oklahoma[, which 'is recognized . . . as the core of the Mississippian Play . . . [and] a principal focus of SandRidge's . . . activity,' id. at 41, ¶ 117,] to WCT . . . , without first offering them to SandRidge[,]" id. at 29, ¶ 77;[13]

(3) on February 28, 2012, TLW "leased land and mineral rights in Alfalfa County, Oklahoma to WCT . . . , [again] without first offering them to SandRidge[,]" id. ¶ 78;[14] and

(4) on December 14, 2010, TLW "sold the surface rights [in property known as] . . . . Quail Run (Section 16-28N-14W) [in Woods County] to Larry Noble, an individual unrelated to SandRidge," id. ¶ 80, even though this corporate opportunity "should have [been] offered to SandRidge [since SandRidge owned a working interest in the mineral rights in the property]." Id.

To establish that Ward's allegedly competitive and conflicted actions in connection with the Mississippian Play were detrimental to SandRidge and its shareholders and allegedly "materially increased," id. at 6, ¶ 4, the value of Ward and his family members' oil and gas leases, the plaintiffs have relied upon the Board's Corporate Governance Guidelines dated March 1, 2011, which the plaintiffs have contended imposed on each Director, including Ward, "'[t]he basic responsibility . . . to exercise his . . . business

corner and SandRidge the northwest. . . .

Doc. 142 at 38, ¶ 112.

[13]The plaintiffs have alleged that six months later, on May 23, 2012, WCT "flipped those leases to SandRidge," id. at 29, ¶ 77, thereby "improperly profiting from the transaction." Id.

[14]The plaintiffs have alleged in connection with this transaction that WCT, seven months later on August 29, 2012, likewise "flipped those leases to SandRidge," id. ¶ 78, again "improperly profiting [there]from . . . ." Id.

judgment to act in what he . . . reasonably believes to be in the best interests of . . .
[SandRidge] and its stockholders.'" Id. at 50, ¶ 146. The plaintiffs have further complained
that Ward, as evidenced by the allegations in the Amended Complaint "blatantly acted in
violation of," id. at 55, ¶ 163, SandRidge's Code of Business Conduct and Ethics ("Ethics
Code"),[15] and that his conduct "directly conflict[ed] with . . . and violat[ed] [his] . . .

---

[15]The plaintiffs have contended that the "Ethics Code contains standards for, among other
things, . . . : (i) conflicts of interest; (ii) corporate opportunities; and (iii) the protection and proper
use of [SandRidge] . . . assets." Id. at 55, ¶ 163.
    In the section entitled "Conflicts of Interest," the plaintiffs have contended that the Ethics
Code reads:

> A conflict of interest occurs when an officer, director or employee's private interest
> interferes in any way–or appears to interfere–with the interests of . . . [SandRidge].
> Conflicts of interest include, but are not limited to, the following:
>
> • Ownership in an enterprise that does business with, seeks to do business with, or
> is a competitor of [SandRidge] . . . ;
>
> . . . .
>
> • Participation in any outside activity that competes with . . . [SandRidge] or that
> interferes with the performance of an employee, officer or director's duties . . . .
>
> No officer, director or employee shall hold a position of material interest in an entity
> that conflicts with or appears to conflict with, proper performance of [his] . . . duties
> and responsibilities [to SandRidge] or the ability to make independent judgments
> regarding transactions between SandRidge and the entity. Employees, officers and
> directors may not use their positions, [SandRidge] . . . assets, or confidential
> information gained in connection with their employment or involvement with . . .
> [SandRidge] for personal gain or for the benefit of a family member or any outside
> party.

Id. at 55-56, ¶ 164 (emphasis deleted).
    The plaintiffs have further alleged that the Ethics Code, under the heading "Corporate
Opportunities," further provides:

> SandRidge officers, directors and employees are prohibited from (a) personally
> taking advantage of investment opportunities that are discovered through the use
> of [SandRidge] . . . property, information or position; (b) using [SandRidge] . . .
> property, information or position for personal gain; and (c) competing with . . .
> [SandRidge]. Officers, directors and employees owe a duty to [SandRidge] . . . to
> advance its legitimate interests when the opportunity to do so arises.

obligations under," id. ¶ 162, SandRidge's corollary Financial Code of Ethics ("Financial Code").[16]

As stated, the plaintiffs have also complained that Ward's employment agreements forbid the conduct in which he engaged. See id. at 6, ¶ 3 ("Ward, in violation of his . . . employment agreement, wrongfully usurped SandRidge's corporate opportunities"). The plaintiffs have alleged in particular that paragraph 3 of Ward's employment agreement dated June 8, 2006 ("2006 Employment Agreement"), prohibited Ward from "'directly or indirectly invest[ing] in or participat[ing] in or acquir[ing] an interest in any oil and gas business . . . ,'" id. at 49, ¶ 138, and that Ward, despite this prohibition "and in violation of [that] . . . Employment Agreement," id. ¶ 139, nevertheless, "through the Ward Entity Defendants, competed with SandRidge and wrongfully took corporate opportunities from SandRidge." Id.

The plaintiffs have further contended that the 2006 Employment Agreement was amended by the Directors in December 2011 ("2011 Employment Agreement"), allegedly

---

Id. at 56, ¶ 165.

Finally, the plaintiffs have reported that the Ethics Code, in connection with the protection and proper use of SandRidge assets, states:

> All [SandRidge] . . . assets should be used for legitimate purposes and protected against theft, waste, or loss. [SandRidge] . . . assets include, but are not limited to, cash, land, buildings, equipment, inventory, vehicles, appliances, (i.e., telephones, computers, copiers, etc.) and intangible items such as business plans, prospects and . . . records, name, logo and tag line.

Id. ¶ 166.

[16]The plaintiffs have contended that SandRidge's Financial Code, which applies to senior financial officers, including Ward, "requires each senior officer to '[a]ct ethically with honesty and integrity, including the ethical handling of all actual or apparent conflicts of interest between personal and professional relationships,' and to '[r]espect the confidentiality of information acquired in the course of his work.'" Id. at 56-57, ¶ 167.

albeit in violation of their fiduciary duties, see id. at 50, ¶ 143, to permit "Ward to engage in outside oil and gas businesses," id., but only if the businesses were "'in areas not being pursued by . . . [SandRidge]." Id.

Finally, the plaintiffs have contended neither employment agreement, explicitly or implicitly, permitted Ward "to use . . . information . . . [he had] obtained through his position at . . . [SandRidge]," id. at 96, ¶ 312, since such use was restricted by the employment agreements' confidentiality clauses. See Doc. 149-1 at 13, ¶ 7; Doc. 149-2 at 14, ¶ 8.

The plaintiffs have contended that the foregoing conduct gives rise to, and supports two (2) causes of action against Ward:[17] "Breach of Fiduciary Duties for Usurpation of Corporate Opportunities," Doc. 142 at 87, and "Misappropriation of SandRidge's Confidential and Proprietary Information, Including Trade Secrets," id. at 92, and three (3) causes of action against TLW: "Aiding and Abetting," id. at 91, "Misappropriation of SandRidge's Confidential and Proprietary Information, Including Trade Secrets," id. at 92, and "Unjust Enrichment." Id. at 97. Ward and TLW have specifically challenged the

---

[17]Although, as stated, Ward is named as a "Director Defendant," Doc. 142 at 13, ¶ 30, in the Amended Complaint, the plaintiffs have advised in their response that Ward is not a named defendant in the plaintiffs' second cause of action, see id. at 88 ("Breach of Fiduciary Duties"), and third cause of action. See id. at 90 ("Waste of Corporate Assets"). See Doc. 151 at 17 n.6 ("Plaintiffs' Caremark and waste claims are directed at defendants Brewer, Dobson, Gilliland, Jordan, Oliver and Serota").

15

plausibility[18] as well as the actionability of the allegations advanced in support of these

causes of action.[19]

In the first cause of action, the plaintiffs have alleged in support of their charge that

"Ward has breached his fiduciary duties of loyalty, good faith, fair dealing, and due care

. . . ," Doc. 142 at 87, ¶ 282, because Ward

(a) allowed his private interests to interfere with . . . [SandRidge's] interests
. . . ;

(b) has a relationship with one or more entities that competes directly with .
. . [SandRidge];

(c) participated in outside activities that compete directly with . . .
[SandRidge] and/or that interfere with the performance of his duties . . . ; and

(d) used . . . [SandRidge's] assets and confidential information, including
trade secrets . . . , gained in connection with his employment or involvement
with . . . [SandRidge] for personal gain, and/or for the benefit of a family
member[ ] or another outside party, and to compete with and interfere with
. . . [SandRidge] business.

Id. at 87-88, ¶ 282.

The plaintiffs have further contended that "Ward usurped SandRidge business

opportunities for his and his family's benefit," id. at 88, ¶ 283–opportunities that

---

[18]In requiring "plausible grounds" in a complaint, the United States Supreme Court is "not
impos[ing] a probability requirement at the pleading stage." Twombly, 550 U.S. at 556. Rather,
this standard "simply calls for enough fact to raise a reasonable expectation that discovery will
reveal evidence of [the elements of the plaintiffs' causes of action] . . . ." Id. (footnote omitted).
"[A] well-pleaded complaint may proceed even if . . . actual proof of those facts is improbable, and
' . . . a recovery is very remote and unlikely.'" Id. (quotation omitted).

[19]Ward and TLW have joined in the argument regarding demand futility asserted by
SandRidge and the Directors. The Court has addressed that argument in a separate Order issued
this date.

"SandRidge is and was financially able to exploit . . . ," id.,[20] that "were and are within SandRidge's line of business[,]" id., and in which "SandRidge and its shareholders had and have an interest or expectancy . . . ." Id.[21]  The plaintiffs have argued that by doing so, "Ward was placed in a position inimical to, and in conflict with, his duties to SandRidge and its shareholders." Id.

Ward has advanced various arguments why he is entitled to dismissal, the majority of which are grounded on the language of his employment agreements.  He has first argued that his "unique employment contract allowed him to engage in the types of transactions alleged to be improper," Doc. 148 at 8, since his 2006 Employment Agreement not only allowed him to continue to own existing oil and gas royalties, but also permitted him to continue to conduct outside oil and gas activities.  Ward has contended that although he was prohibited from

> directly or indirectly invest[ing] in, participat[ing] in or acquir[ing] an interest in any oil and gas business, including, without limitation, (i) producing oil and gas, (ii) drilling, owning or operating oil and gas leases or wells, (iii) providing services or materials to the oil and gas industry, (iv) marketing or refining oil or gas, or (v) owning any interest in any corporation, partnership, company or entity which conducts any of the foregoing activities,

---

[20]As stated, the plaintiffs have alleged that "since January 2010, SandRidge has invested $500 million in the acquisition of mineral leaseholds and over $1.7 billion in development, drilling capital, and infrastructure in the Mississippian Play.  As a result, SandRidge has an abiding interest in all mineral leases in the . . . [formation]." Doc. 142 at 16, ¶ 39.

[21]The plaintiffs have argued that their allegations as well as published SandRidge statements demonstrate an intent by SandRidge "to develop its strategic interest in, and then fully exploit, the same kind of opportunities . . . Ward took for himself [in the Mississippian Play]," Doc. 151 at 21, and that such "intent to exploit . . . [was] part of a long-term effort." Id. at 22.  The plaintiffs have opined that "[g]iven SandRidge's size and resources (to say nothing of the intensely competitive nature of the industry), it is entirely plausible that, if [SandRidge's] . . . geologists, technicians and executives determined that a profit could be turned from each and every available leasehold, SandRidge would have an interest in developing every single available parcel in th[e] [formation's] 17 million acres." Id.

Doc. 149-1 at 2, ¶ 3(c), he was expressly allowed to own royalty interests in those

instances where he

> owns or previously owned the surface of the land covered by the royalty
> interest and the ownership of the royalty interest is incidental to the
> ownership of the surface estate or the ownership of royalty, overriding royalty
> or working interests that are received by gift or inheritance.

Id. at 3, ¶ 3.1.

> The 2006 Employment Agreement also acknowledged that Ward

> ha[d] in the past conducted oil and gas activities individually and through
> TLW Investments, Inc., . . . and other entities owned or controlled by . . .
> [him],

id. ¶ 3.2, and

> permitted [him] to continue to conduct oil and gas activities (including
> participation in new wells) . . . directly or through [entities owned or controlled
> by him] . . . , but only to the extent such activities are conducted on oil and
> gas leases or interests which [Ward] . . . or [these entities] . . . owned or had
> the right to acquire as of [June 8, 2006, the date of th[e] [Employment]
> Agreement . . . .

Id.

> Ward's 2011 Employment Agreement again prohibited him from

> directly or indirectly invest[ing] in, participat[ing] in or acquir[ing] an interest
> in any oil and gas business, including, without limitation, businesses (i)
> producing oil and gas, (ii) drilling, owning or operating oil and gas leases or
> wells, (iii) providing services or materials to the oil and gas industry, or (iv)
> marketing or refining oil or gas[,]

Doc. 149-2 at 2, ¶ 3(c), but, according to Ward, "clarified the expectation that . . . [he] could

continue to engage in outside activities," Doc. 148 at 14, in all "areas not being pursued

by [SandRidge] . . . ." Doc. 149-2 at 3, ¶ 3.1. The 2011 Employment Agreement expressly

provided in pertinent part that the following "outside oil and gas drilling" activities were not

restricted:

(a) the ownership of royalty interests where [Ward] . . . owns, previously owned or acquires the surface of the land covered by the royalty interest and the ownership of the royalty interest is incidental to the ownership of the surface estate, or the ownership of royalty, overriding royalty or working interests that are received by gift or inheritance subject to disclosure by [Ward] . . . . to [SandRidge] . . . in writing; (b) [Ward's] . . . participation in outside operated oil and gas drilling; or (c) [his] . . . participation as a working interest owner in properties operated by [SandRidge] . . . where wells are proposed in drilling units with respect to which the surface or royalty ownership rights are held by TLW Holdings, L.L.C., . . . 192 [LLC] . . . and entities owned or controlled by . . . [him].

Id.

As to his alleged use of confidential and proprietary information, both employment agreements acknowledged that Ward would "have access to information which constitutes trade secrets, is of a confidential nature, is of great value to [SandRidge] . . . or is the foundation on which the business of . . . [SandRidge] is predicated," Doc. 149-1 at 13, ¶ 7; e.g., Doc. 149-2 at 14, ¶ 8, and he has not disputed that he agreed therein "not to disclose to any person other than [Sandridge] . . . employees or . . . legal counsel or other parties authorized by [SandRidge] . . . to receive confidential information . . . nor use for any purpose, other than the performance of [ ]his [Employment] Agreement[s], any [c]onfidential [i]nformation."[22] Doc. 149-1 at 13, ¶ 7; e.g., Doc. 149-2 at 14, ¶ 8.

---

[22]As defined in both the 2006 Employment Agreement and the 2011 Employment Agreement, the term "confidential information"

includes data or material (regardless of form) which is: (a) a trade secret; (b) provided, disclosed or delivered to [Ward] . . . by [SandRidge] . . . , any officer, director, employee, agent, attorney, accountant, consultant, or other person or entity employed by [SandRidge] . . . in any capacity, any [SandRidge] customer, borrower or business associate . . . or any public authority having jurisdiction over [SandRidge] . . . of any business activity conducted by [SandRidge] . . . ; or (c) produced, developed, obtained or prepared by or on behalf of [Ward] . . . or [SandRidge] . . . (whether or not such information was developed in the performance of th[ese] Employment Agreement[s]) with respect to . . . [SandRidge] . . . or any assets[,] oil and gas prospects, business activities, officers, directors,

Ward has argued that, despite the plaintiffs' protestations to the contrary, it is not plausible to infer that although he received confidential information, he wrongfully exploited such protected information to usurp SandRidge's opportunities for personal gain.    In support of this argument, Ward has relied upon the "independent investigation [conducted] at the behest of TPG-Axon[, which] concluded that . . . [he] had not engaged in any wrongdoing and could not be terminated for cause."    Doc. 148 at 14-15 (footnotes omitted).[23]

_____

employees, borrowers or customers of the foregoing.

Doc. 149-1 at 13, ¶ 7; e.g., Doc. 149-2 at 14, ¶ 8.
    The employment agreements exclude from the definition of "confidential information"

any information, data or material which at the time of disclosure or use was generally available to the public other than by a breach of th[ese] Agreement[s], was available to the party to whom disclosed on a non-confidential basis by disclosure or access provided by [SandRidge] . . . or a third party, or was otherwise developed or obtained independently by the person to whom disclosed without a breach of th[ese] Agreement[s].

Doc. 149-1 at 13, ¶ 7; e.g., Doc. 149-2 at 14, ¶ 8.

[23]A SandRidge press release dated June 19, 2013 , see Doc. 149-3, stated that a

four-month independent investigation was conducted by Mayer Brown LLP ("Mayer Brown"), an internationally recognized law firm, and included the review of hundreds of thousands of documents and the interview of more than 40 persons.    After reviewing the facts developed during the . . . investigation [of SandRidge's Audit Committee, 'which was prompted by allegations of improper related-party transactions in oil and gas properties in the Mississippian [P]lay,'], the non-employee members of the Board unanimously determined that such did not merit a termination for cause.

Doc. 149-3 at 2.
    The plaintiffs have argued in their response to the Motion to Dismiss that they had unsuccessfully asked SandRidge to produce the report giving rise to the press release.    See Doc. 151 at 12.   In light of the Court's findings in the instant Order, because at least one claim remains against Ward and because the Directors have averred to the fact that Ward's employment was terminated without cause, see, e.g., Doc. 147 at 8; Doc. 154; Doc. 154-3, the Court overrules the defendants' objections to disclosure of the Mayer Brown report and finds that the plaintiffs are entitled to a copy of that report and any documents cited, relied on or referenced therein.

Ward has next contended that these employment agreements expressly

superseded any contrary SandRidge corporate policies, and he cannot therefore be held

liable for breach of any fiduciary duties he might owe to SandRidge and its shareholders.

In support of this contention, Ward has relied on Paragraph 2.3 of the 2006 Employment

Agreement and Paragraph 2.2 of the 2011 Employment Agreement, which read,

respectively:

> From time to time, [SandRidge] . . . may issue policies and procedures
> applicable to . . . [Ward] including an Employment Policies Manual. [Ward]
> . . . agrees to comply with such policies and procedures, except to the extent
> such policies are inconsistent with this [Employment] Agreement. . . . In the
> event of a conflict between such policies and procedures and this
> Agreement, this Agreement will control unless compliance with this
> Agreement will violate any law or regulation applicable to [SandRidge] . . . .

Doc. 149-1 at 3, ¶ 2.3.

> From time to time, [SandRidge] . . . may issue policies and procedures
> applicable to . . . [Ward]. [He] . . . agrees to comply with such policies and
> procedures . . . .  In the event of a conflict between such policies and
> procedures and this Agreement, this Agreement will control unless
> compliance with this Agreement will violate any law or regulation applicable
> to [SandRidge] . . . .

Doc. 149-2 at 2, ¶ 2.2.

Finally, Ward has argued that dismissal of the plaintiffs' breach of fiduciary duty

claim against him is warranted because this claim as set forth in the Amended Complaint

is governed by his employment agreements and does not give rise to an enforceable

breach of fiduciary claim. The Court agrees, and because it finds this argument to be

dispositive of the plaintiffs' first cause of action against Ward under the circumstances of

this case, the Court has not addressed Ward's foregoing arguments regarding whether the

employment agreements permitted him to engage in the types of transactions alleged to

be improper or whether these agreements expressly superseded any contrary SandRidge corporate policies. The Court has likewise has not addressed under Rule 12(b)(6) whether the first cause of action is devoid of well-pleaded facts. Rather, as Ward has asked, the Court has "accept[ed] for the moment that [p]laintiffs ha[ve] pled sufficient facts to support [their] . . . allegations [of breach of fiduciary duty] . . . ," Doc. 148 at 16, in determining whether Delaware law warrants dismissal of the plaintiffs' first cause of action.

As Delaware courts have recognized, "[i]t is a well-settled principle that where a dispute arises from obligations that are expressly addressed by contract, that dispute will be treated as a breach of contract claim. In that specific context, any fiduciary claims arising out of the same facts that underlie the contract obligations would be foreclosed as superfluous." Nemec v. Shrader, 991 A.2d 1120, 1129 (Del. 2010)(footnote omitted). Thus, Ward's 2006 and 2011 Employment Agreements have "created contract duties that [have] superseded and negated any distinct fiduciary duties arising out of the same conduct that constituted the contractual breach." Id.

Elliot and Ezell have argued that even assuming that their "fiduciary duty claims were defined by . . . Ward's employments," Doc. 151 at 19, and arguably "share a common nucleus of operative facts," Schuss v. Penfield Partners, L.P., 2008 WL 2433842 *10 (Del. Ch. 2008), they may maintain their first cause of action because it "depend[s] on additional facts as well, [is] . . . broader in scope, and involve[s] different considerations in terms of a potential remedy." Id. The plaintiffs have not, however, sufficiently identified what additional and distinct facts exist or what separate and different harms were caused by Ward's alleged misconduct that would permit this case to fall within the "'narrow exception[ ]," Grunstein v. Silva, 2009 WL 4698541 *6 (Del. Ch. 2009), to the general rule.

22

As Delaware courts have observed

> [i]n determining whether a breach of fiduciary duty claim is duplicative of a
> . . . breach of contract claim,[24] the principal inquiry . . . is whether the
> fiduciary duty . . . arises from general fiduciary principles or from specific
> contractual obligations agreed upon by the parties. "Because of the primacy
> of contract law over fiduciary law, if the duty sought to be enforced arises
> from the parties' contractual relationship, a contractual claim will preclude a
> fiduciary claim." This is because a breach of fiduciary duty claim generally
> only survives where it may be maintained independently of the breach of
> contract claim. Where those rights arise from a contract that specifically
> addresses the matter at issue, the court [should] evaluate[ ] the parties'
> conduct within the framework they themselves crafted, instead of imposing
> more broadly defined equitable duties.

Id. (footnote omitted).

A comparison of the allegations in the Amended Complaint and the contractual

obligations imposed on Ward reveals that that the fiduciary duties that Ward allegedly

breached are defined by reference to his employment agreements. In elaborating on

Ward's alleged breach of "his fiduciary duties of loyalty, good faith, fair dealing, and due

care . . . ," Doc. 142 at 87, ¶ 282, in the first cause of action, the plaintiffs have contended

that Ward had "(a) allowed his private interests to interfere with . . . [SandRidge's] interests

. . . ; (b) ha[d] a relationship with one or more entities that compete[d] directly with . . .

[SandRidge]; [and had] (c) participated in outside activities that compete[d] directly with .

. . [SandRidge] and/or that interfere[d] with the performance of his duties . . . ." Id. at 87-

88, ¶ 282.

---

[24]The plaintiffs have attempted to distinguish the cases on which Ward has relied by arguing
that the plaintiffs in those cases brought both a breach of contract claim and a breach of fiduciary
claim. The Court finds artful pleading cannot be used to circumvent the general rule under
Delaware law that a breach of contract claim under these circumstances precludes a breach of
fiduciary duty claim. Moreover, "[a] party does not satisfy the Schuss standard [of alleging distinct
harms] simply by praying for broader relief than [a breach of] . . . contract [claim] permits." AM
General Holdings LLC v. The Renco Group, Inc., 2013 WL 5863010 *11 (Del. Ch. 2013)(footnote
omitted).

The dispute about Ward's alleged usurpation of corporate opportunities and

"conflicted" and "competitive" activities arise from whether he violated his employment

agreements[25] by inter alia

> directly or indirectly invest[ing] in, participat[ing] in or acquir[ing] an interest
> in any oil and gas business, including, without limitation, (i) producing oil and
> gas, (ii) drilling, owning or operating oil and gas leases or wells, (iii) providing
> services or materials to the oil and gas industry, (iv) marketing or refining oil
> or gas, or (v) owning any interest in any corporation, partnership, company
> or entity which conducts any of the foregoing activities.

Doc. 149-1 at 3, ¶ 3(c).

Likewise, in connection with the plaintiffs' charge that Ward breached his fiduciary

duties because he

> used . . . [SandRidge] assets and confidential information, including trade
> secrets . . . , gained in connection with his employment . . . with . . .
> [SandRidge] for personal gain, and/or for the benefit of a family member[ ]
> or another outside party, and to compete with and interfere with . . .
> [SandRidge] business[,]

Doc. 142 at 87-88, ¶ 282, Ward, as stated, in his employment agreements expressly

"agree[d] not to disclose . . . any [c]onfidential [i]nformation . . . [including any] trade

secret[s]." Doc. 149-1 at 13, ¶ 7; Doc. 149-2 at 14, ¶ 8.

The breaches of fiduciary duty that the plaintiffs have alleged and that give rise to

the first cause of action therefore would also constitute breaches of Ward's employment

---

[25]See York Group, Inc. v. Pontone, 2014 WL 896632 *15 (W.D. Pa. 2014)(holding under
Delaware law that employment agreement that specifically provided that defendant "owe[d] a
fiduciary duty of loyalty to act at all times in the best interests of the Company" prohibited defendant
from appropriating corporation's "business opportunities" for his "own benefit"). See Doc. 149-2
at 1, ¶ 2 (Ward "shall perform all such duties, and otherwise conduct himself, in a manner
reasonably calculated in good faith by him to promote . . . [SandRidge's] best interests").

agreements; accordingly, extant case law demands that the first cause of action should be and is hereby dismissed.

As stated, one of the three causes of action in the Amended Complaint that seeks to hold TLW liable is "Aiding and Abetting, " and the Court has looked to Delaware law to determine whether the plaintiffs have stated a viable claim for relief. In this connection, the plaintiffs have alleged in their fourth cause of action that "Ward owed SandRidge and its shareholders fiduciary duties . . . [and that he] breached those duties with the knowledge and substantial assistance of the Ward Entity Defendants."[26] Doc. 142 at 91, ¶ 297. The plaintiffs have further alleged that TLW as one of the three Ward Entity Defendants "performed a critical, and decidedly impermissible, role," id. ¶ 298, in, and was "a necessary component of . . . Ward's efforts to usurp SandRidge's corporate opportunities[.]" Id. ¶ 299.

The plaintiffs have claimed that Ward "managed," id. at 92, ¶ 301, TLW to such an extent that TLW operated as "a vehicle [through which Ward was able] to efficiently acquire, retain, and sell land in the Mississippian [formation]." Id. ¶ 299. They have argued that TLW as a "surrogate" allegedly either acted through Ward (because it lacked employees) or permitted Ward to act through it (because of his admitted control, see Doc. 148 at 16, n.10), and because "Ward's knowledge of his breaches is imputed to the Ward

---

[26]As the Court stated in its earlier Orders entered in this matter, Rules 8 and 12(b)(6) require that each defendant be given "'fair notice of what the . . . claim is and the grounds upon which it rests.'" Burnett v. Mortgage Electronic Registration Systems, Inc., 706 F.3d 1231, 1240 (10th Cir. 2013)(quoting Twombly, 550 U.S. at 555)). The plaintiffs, however, have persisted in the Amended Complaint to attribute actions to "Ward Entity Defendants," without identifying in certain instances the particular actions, if any, of each individual entity. While the Court at this stage has taken as true each well-pleaded allegation as to each defendant, the plaintiffs are advised that at the summary judgment stage, they must identify evidence that demonstrates the specific actions of each defendant and for which each defendant is allegedly responsible.

Entity Defendants[,]" Doc. 142 at 92, ¶ 302, TLW acted "with the full knowledge that [its] . . . participation would assist [him] . . . in breaching his fiduciary duties." Id.

To survive TLW's request for dismissal, the plaintiffs must advance sufficient well-pleaded factual allegations that support each of the following elements: "'(1) the existence of a fiduciary relationship, (2) a breach of the fiduciary's duty, . . . (3) knowing participation in that breach by [TLW] . . . ,' and (4) damages proximately caused by the breach." Malpiede v. Townson, 780 A.2d 1075, 1096 (Del. 2001)(footnote omitted).

While the plaintiffs may have sufficiently alleged in the Amended Complaint a fiduciary relationship between Ward and SandRidge and its shareholders, they cannot, as the Court has found, assert under the circumstances of this case a breach by Ward of those duties imposed by this relationship. Accordingly, because the third element of this cause of action is knowing participation by TLW in Ward's breach of his fiduciary duties and because there is no legally sufficient underlying claim for breach of fiduciary duty against Ward, the aiding and abetting claim against TLW must likewise fail. E.g., AM General Holdings LLC v. The Renco Group, Inc., 2013 WL 5863010 *12 (Del. Ch. 2013)(in absence of properly pleaded fiduciary duty claims, aiding and abetting claims must be dismissed as well).

Both Ward and TLW have challenged the plaintiffs' fifth cause of action in the Amended Complaint–"Misappropriation of SandRidge's Confidential and Proprietary Information." See id. at 92-96. The Uniform Trade Secrets Act ("UTSA"), 78 O.S. § 85 et seq., which was adopted in Oklahoma in 1986 and on which the plaintiffs have relied, requires a plaintiff to show (i) the existence of a trade secret, (ii) misappropriation of that secret by the defendant then under consideration and (iii) the use of the secret to the

plaintiff's detriment. E.g., Micro Consulting, Inc. v. Zubeldia, 813 F. Supp. 1514, 1534

(W.D. Okla. 1990); MTG Guarnieri Manufacturing, Inc. v. Clouartre, 239 P.3d 202, 209

(Okla. App. 2010).

The term "trade secret" as defined in the UTSA

means information, including a formula, pattern, compilation, program, device, method, technique or process, that:

a. derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and

b. is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

78 O.S. § 86(4).

The UTSA defines the term "misappropriation" to mean, inter alia,

a. acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means;[27] or

b. disclosure or use of a trade secret of another without express or implied consent by a person who:

(1) used improper means to acquire knowledge of the trade secret; or

(2) at the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was:

(a) derived from or through a person who had utilized improper means to acquire it; or

(b) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or

---

[27]The phrase "improper means" for purposes of the UTSA "includes . . . breach or inducement of a breach of a duty to maintain secrecy . . . ." 78 O.S. § 86(1).

> (c) derived from or through a person who owed a duty to the
> person seeking relief to maintain its secrecy or limit its use . .
> . .

<u>Id.</u> § 86(2).

According to the plaintiffs, while "the potential commercial play area [in the Mississippian formation] is vast," Doc. 142 at 42, ¶ 20, the formation "is not equally productive across its whole." Doc. 152 at 18. SandRidge therefore had to compile data "that was developed (at great expense) by . . . [SandRidge] engineers, geologists, and technicians,"[28] Doc. 142 at 93, ¶ 307, to determine the most profitable locations for SandRidge's acquisition of mineral rights. The plaintiffs have further alleged that SandRidge and its shareholders were the sole intended beneficiaries of that data, as analyzed, by SandRidge employees, that such data "was valuable to SandRidge," <u>id.</u> at 95, ¶ 310, and that "SandRidge employees sought to maintain the secrecy of such information." <u>Id.</u>

In reviewing the allegations in the Amended Complaint in the light most favorable to the plaintiffs, the Court finds that Elliot and Ezell have sufficiently identified confidential and proprietary information that qualifies as a "trade secret" under the UTSA's broad definition of that term. The information regarding the Mississippian Play collected by SandRidge through geological exploration and drilling has "independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable

---

[28]The plaintiffs have cited as one example, as set forth in SandRidge's 2010 Form 10-K, SandRidge's eighteen-member Reservoir Engineering Department, which is "comprised of seven degreed engineers and [eleven] engineering analysts/technicians," Doc. 142-30 at 2, and which is responsible for "monitor[ing] asset performance and mak[ing] reserves estimate adjustments," <u>id.</u>, after consideration of "production histories as well as other geologic, economic, ownership and engineering data." <u>Id.</u> <u>See</u> Doc. 142 at 93, ¶ 307.

28

by proper means by, other persons[, including competitors in the formation,] who [could] . . . obtain economic value from its disclosure or use," 78 O.S. § 86(4)(a), and was, as alleged, "the subject of efforts that [were] . . . reasonable under the circumstances to maintain its secrecy." Id. § 86(4)(b); e.g., Doc. 142 at 56-57, ¶¶ 164-167.

The thrust of this cause of action is as the plaintiffs have asserted: "Ward had access to information that qualified as 'trade secrets' . . . , and therefore the Ward Entity Defendants–as surrogates of . . . Ward–had such access." Id. at 93, ¶ 305. However, because mere possession of trade secrets is not sufficient to trigger liability, the Court must also determine whether the plaintiffs' allegations adequately plead misappropriation of those secrets by TLW and Ward and the use of the same to the plaintiffs' detriment. E.g., Micro Consulting, 813 F. Supp. at 1534.

As to Ward, the plaintiffs have alleged

(1) that as SandRidge president, chief executive officer and Board chairman, Ward "was privy to data about the Mississippian [Play]," Doc. 142 at 93, ¶ 307;

(2) that "according to SandRidge's 2010 10-K, the [SandRidge] . . . 18-member 'Reservoir Engineering Department'–which was responsible for monitoring asset performance and tracking production history as well as other geologic, economic, ownership, and engineering data–reported directly to . . . Ward[,]" id. at 93-94, ¶ 307; See Doc. 142-30 at 2;

(3) that Ward therefore not only "had access to internal SandRidge information about the Mississippian [Play]," Doc. 142 at 94, ¶ 307, but also was ensured access to that information as "part of [SandRidge's] . . . 'internal controls' policy[,]" id.;

(4) that in addition, "SandRidge's 15-member geology unit monitored the activity of

29

SandRidge's competitors in the Mississippian [Play] using an expensive subscription service sold by a company called IHS. IHS' subscription database included data on drilling permits and production information throughout the Mississippian [Play], which IHS gathered from state and federal agencies and then sold to subscribers like SandRidge[,]" id. ¶ 308;

(5) that "[r]elying on [IHS'] . . . expertise and judgment, SandRidge's geologists and technicians used this data to estimate the potential exploitability of underground accumulations of oil and natural gas . . . [,]" id. ¶ 308, and "would analyze the IHS data to create color-coded maps showing the activities of SandRidge's competitors in the Mississippian [Play,] . . . [which] were then provided directly to . . . Ward . . . [,]" id. ¶ 309;

(6) that "[t]hese maps provided critical competitive intelligence to SandRidge as it expanded into the Mississippian [Play] after 2009[,]" id. at 94-95, ¶ 309; and

(7) although the data and maps gathered and produced by SandRidge's Reservoir Engineering Department and geology unit were "not meant to be shared with [other] entities," id. at 95, ¶ 310, and were "maintain[ed] . . . [in] secrecy," id., because such disclosure "would have been detrimental to SandRidge[ ] and [its] . . . shareholders," id., "that is exactly what . . . Ward . . . did." Id.

As to TLW, the plaintiffs have alleged that it

misappropriated SandRidge's confidential and proprietary information, including [SandRidge's] . . . trade secrets, and further wrongfully used that confidential and proprietary information to SandRidge's detriment by usurping SandRidge's corporate opportunities, which SandRidge was and is financially able to exploit, were and are within SandRidge's line of business, and in which [SandRidge] . . . and its shareholders had and have an interest or expectancy in the opportunities . . . .

30

Id. at 93, ¶ 306. The plaintiffs have contended that TLW "relied almost exclusively on SandRidge's activities and information in making [its] . . . acquisition decisions," id. at 44, ¶ 126, and that it acquired certain leaseholds (as identified in the Amended Complaint) "through the use of SandRidge's material confidential and proprietary . . . information and resources without adequate consideration to SandRidge." Id. at 35, ¶ 104.

The plaintiffs have suggested that the allegations in the Amended Complaint[29] give rise to the following scenario:

> Ward misappropriated SandRidge's trade secrets with regard to the Mississippian [Play] . . . and used such trade secrets to divert corporate opportunities to the [Ward Entity Defendants] . . . controlled by him. With SandRidge's trade secrets in hand, the Ward Entity Defendants[, including TLW,] then utilized SandRidge's trade secrets to acquire acreage in the advance of or contiguous with SandRidge's acquisition of mineral rights in the same area.

Doc. 152 at 18.

In light of the plaintiffs' allegations regarding Ward's domination and control of TLW,[30] the Court finds that TLW knew or had reason to know that SandRidge's confidential and proprietary information was acquired by improper means (that is, through Ward's

---

[29]In connection with this cause of action, the plaintiffs have again attributed actions to "Ward Entity Defendants," without identifying what actions, if any, with one exception, each individual defendant took that give rise to this claim for relief. The only entity to which the plaintiffs have expressly referred is WCT: "WCT . . . employees communicated with SandRidge about WCT['s] . . . projects, via both e-mail and telephone." Doc. 142 at 95, ¶ 310. Nevertheless, the Court finds at this stage of the proceedings that Ward's admitted ownership of TLW and TLW's lack of employees permit the Court to infer that Ward "shared SandRidge's information with [all] . . . Ward Entity Defendants[, including TLW,] to help [their] . . . ventures succeed." Doc. 151 at 30.

[30]Such allegations include Ward's conceded control, see Doc. 148 at 16, n.10, and his admission in Chechele of ownership, see n.7 supra, of TLW, his position as president of TLW's sole general partner, see Doc. 142 at 24, ¶ 61, and TLW's complete lack of employees, which would make impossible TLW's ability to evaluate potential acreage opportunities and make acquisitions

alleged breach of a duty to maintain secrecy), e.g., 78 O.S. § 86(2)(a), or used this information, without express or implied consent, knowing or having reason to know that its knowledge of the information was derived from one who had utilized improper means to acquire it. E.g., id. § 86(2)(b). And because such allegations and the inferences drawn therefrom are sufficient to raise a plausible claim that both Ward and TLW misappropriated SandRidge's trade secrets, the Court finds that the plaintiffs have "'nudged their [misappropriation] claim [against both these defendants] across the line from conceivable to plausible.'" Robbins, 519 F.3d at 1247 (quotation omitted). Accordingly, the Court finds dismissal as Ward and TLW have requested is not warranted.

TLW has next challenged the plaintiffs' sixth cause of action: "Unjust Enrichment." In Oklahoma, "[b]efore a party will be entitled to recover for unjust enrichment, . . . 'there must be enrichment to another, coupled with a resulting injustice.'" City of Tulsa v. Bank of Oklahoma, N.A., 280 P.3d 314, 319 (Okla. 2011)(quoting Teel v. Public Service Co. of Oklahoma, 767 P.2d 391, 398 (Okla. 1985)(superceded by statute on other grounds)). "Unjust enrichment is a condition which results from the failure of a party to make restitution in circumstances where not to do so is inequitable, i.e., the party has money in its hands that, in equity and good conscience, it should not be allowed to retain." Oklahoma Department of Securities ex rel. Faught v. Blair, 231 P. 3d 645, 658 (Okla. 2010) (citing Harvell v. Goodyear Tire & Rubber Co., 164 P.3d 1028, 1035 (Okla. 2006)).

In the Amended Complaint, the plaintiffs have alleged in support of this equitable claim for relief

(1) that TLW, as a Ward Entity Defendant, has "unfairly benefited through the use of [SandRidge] . . . assets and confidential information, gained in connection with . . .

32

Ward's employment or involvement with SandRidge, to directly compete and interfere with SandRidge's business[,]" Doc. 142 at 97, ¶ 315;

(2) that "SandRidge ha[d] a reasonable expectation of being offered all corporate opportunities from . . . Ward relating to the acquisition of mineral interests and development in the Mississippian Play[,]" id. ¶ 316;

(3) that TLW has "unfairly benefited from . . . Ward's usurpation of SandRidge's corporate opportunities[,]" id. ¶ 317;

(4) that "[t]o allow . . . [TLW] to retain the benefits of SandRidge's corporate opportunities wrongfully usurped . . . would result in substantial and unjust enrichment[,]" id. ¶ 319; and

(5) that "[i]n accordance with equity and good conscience, . . . [TLW] ought not to be allowed to retain such a benefit that should have rightfully gone to SandRidge." Id.

In challenging the sufficiency of the allegations supporting this cause of action, TLW has argued among other things that the plaintiffs have failed to articulate how TLW profited or was enriched at SandRidge's expense. The Court is mindful that a "'formulaic recitation of the elements of a cause of action' . . . ," Kansas Penn Gaming, 656 F.3d at 1214 (quoting Twombly, 550 U.S. at 555), is not sufficient. However, in reviewing the allegations in the Amended Complaint as a whole and in a light most favorable to the plaintiffs and after examining those allegations in support of these elements, including the plaintiffs' allegations pertaining to TLW's transactions in Alfalfa County and its alleged misuse of confidential and proprietary information, the Court finds that the plaintiffs have shown "more than a sheer possibility that [TLW] . . . has acted unlawfully," Iqbal, 556 U.S. at 678 (citation omitted), and that the Amended Complaint has alleged facts that are suggestive

of the proscribed conduct. Accordingly, TLW is not entitled to dismissal of this cause of action.

Based upon the foregoing, the Court

(1) GRANTS the Motion to Dismiss [Doc. 148] filed by Ward and TLW to the extent that the plaintiffs' first cause of action against Ward and the plaintiffs' fourth cause of action against TLW should be and are hereby DISMISSED;

(2) DENIES said motion in all other respects; and

(3) as stated herein, see n.23 supra, GRANTS the plaintiffs' Motion to Partially Lift Discovery Stay [Doc. 156].[31]

ENTERED this 22nd day of September, 2014.

LEE R. WEST
UNITED STATES DISTRICT JUDGE

---

[31]Because the Court has granted the plaintiffs' Motion to Partially Lift Discovery Stay [Doc. 156], the Court deems MOOT the plaintiffs' Motion for Leave to File Supplemental Brief in Support of Plaintiffs' Motion to Partially Lift Discovery Stay [Doc. 160].

34