

# FILED

IN THE UNITED STATES DISTRICT COURT FOR CARMELITA REEDER SHINN, CLERK
U.S. DIST. COURT, WESTERN DIST. OKLA.
THE WESTERN DISTRICT OF OKLAHOMA BY _____ ,DEPUTY

IN RE SANDRIDGE ENERGY, INC.    )    No. CIV-13-102-W
SHAREHOLDER DERIVATIVE LITIGATION  )

Relating to All Derivative Actions

## ORDER

This matter comes before the Court on the Motion to Dismiss filed pursuant to Rule

12(b)(6), F.R.Civ.P., by defendants WCT Resources, L.L.C. ("WCT") and 192 Investments,

L.L.C. ("192 LLC"). Lead plaintiff Paul Elliot, on behalf of the Paul Elliot IRA R/O ("Elliot"),

and plaintiff Lisa Ezell have responded in opposition, and WCT and 192 LLC have filed a

reply. Based upon the allegations in the first amended verified consolidated shareholder

derivative complaint ("Amended Complaint"), the Court makes its determination.[1]

In Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007), the United States Supreme

Court set forth the standards that this Court must use in determining whether dismissal,

as WCT and 192 LLC have requested, is warranted under Rule 12(b)(6). The Supreme

Court held in accordance with Rule 8, F.R.Civ.P., that a complaint need not contain

"heightened fact pleading of specifics," 550 U.S. at 570, or "detailed factual allegations,"

id. at 555 (citations omitted), but it must contain "enough facts to state a claim to relief that

is plausible on its face." Id. at 570.

The United States Court of Appeals for the Tenth Circuit has stated that Twombly

imposes a "burden . . . on the plaintiff[s] to frame a 'complaint with enough factual matter

(taken as true) to suggest' that [they are] . . . entitled to relief." Robbins v. Oklahoma, 519

---

[1] The arguments advanced by WCT and 192 LLC regarding the plaintiffs' alleged failure to adequately assert demand futility in the Amended Complaint are addressed in a separate Order issued this date.

F.3d 1242, 1247 (10th Cir. 2008)(quoting Twombly, 550 U.S. at 556). Thus, "[t]he allegations [in the Amended Complaint] must be enough that, if assumed to be true, . . . [the plaintiffs] plausibly (not just speculatively) ha[ve] a claim for relief [against WCT and 192 LLC]." Id. (footnote omitted).

The Court's task at this stage is to determine whether "there are well-pleaded factual allegations," Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009), in the challenged pleading,[2] and if so, the "[C]ourt should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." Id.

> A claim has facial plausibility when the plaintiff pleads factual content that allows the [C]ourt to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'"

Id. at 678 (citations omitted).

In this connection, a complaint "'must contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory.'" Bryson v. Gonzales, 534 F.3d 1282, 1286 (10th Cir. 2008)(quotation and further citation omitted). While "[t]he nature and specificity of the allegations required to state a plausible claim will vary based on context," Kansas Penn Gaming, LLC v. Collins, 656 F.3d 1210, 1215 (10th Cir. 2011)(citations omitted), neither "'naked assertion[s]' devoid of 'further factual enhancement,'" Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at

---

[2]"In evaluating a Rule 12(b)(6) motion to dismiss, courts may consider not only the complaint itself, but also attached exhibits and documents incorporated into the complaint by reference." Smith v. United States, 561 F.3d 1090, 1098 (10th Cir. 2009)(citations omitted).

557), nor "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory allegations, . . . suffice." Id. (citation omitted). "[T]he Twombly/Iqbal standard recognizes a plaintiff should have at least some relevant information to make the claims plausible on their face." Khalik v. United Air Lines, 671 F.3d 1188, 1193 (10th Cir. 2012). "[I]t demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation," Iqbal, 556 U.S. at 678 (citations omitted), and more than "mere 'labels and conclusions,' and 'a formulaic recitation of the elements of a cause of action' . . . ." Kansas Penn Gaming, 656 F.3d at 1214 (quoting Twombly, 550 U.S. at 555).

The plaintiffs brought this derivative action on behalf of nominal defendant SandRidge Energy, Inc. ("SandRidge"),[3] and have contended that the Amended Complaint combines the factual allegations in the original verified consolidated shareholder derivative complaint "of self-dealing, breaches of fiduciary duty, and violations of corporate ethics that . . . [d]efendant [Tom L.] Ward committed," Doc. 142 at 5, ¶ 2, with "further evidence of . . . wrongful conduct during the period from October 25, 2010 to the present . . . ." Id. at 6, ¶ 2.[4]

Named as defendants in Amended Complaint in addition to movants WCT and 192 LLC are Ward, SandRidge's former chief executive officer and Chairman of its Board of

---

[3]SandRidge is a corporation that is organized under Delaware law and that has its headquarters in Oklahoma City, Oklahoma. See Doc. 142 at 12, ¶ 22. It was formed in 2006, see id. at 14, ¶ 32, and relying on the description found on SandRidge's website, the plaintiffs have asserted that "Sandridge is an oil and natural gas exploration company that 'focuses on drilling low-risk, conventional, high rate-of-return oil wells in shallow carbonate reservoirs.'" Id. at 12, ¶ 22.

[4]For purposes of this lawsuit, the period from October 25, 2010, to the present is the "Relevant Period." See id. at 6, ¶ 2.

Directors ("Board"),[5] and certain SandRidge Board members: Jim J. Brewer, Everett R. Dobson, William A. Gilliland, Daniel W. Jordan, Roy T. Oliver, Jr., and Jeffrey S. Serota. These individuals at the time the Amended Complaint was filed were serving or had served as Board members.[6] The plaintiffs have alleged that these defendants together with Ward breached their fiduciary duties and wasted corporate assets.

Also named as defendants are three entities to which the plaintiffs have collectively referred as "the 'Ward Entity Defendants,'" id. at 14, ¶ 31: TLW Land & Cattle, L.P. ("TLW") and movants WCT and 192 LLC. TLW, a limited partnership organized under Oklahoma law, see id. at 13, ¶ 31, was formed by Ward in 2004, see id. at 23, ¶ 59, when Ward was employed at Chesapeake Energy Corporation ("Chesapeake").[7] TLW's original principal place of business was 6200 N. Western Avenue, Oklahoma City, Oklahoma—a Chesapeake address, see id. ¶ 60; TLW now shares the same physical address as SandRidge—123 Robert S. Kerr Avenue, Oklahoma City, Oklahoma, see id. at 24, ¶ 63, and moved to that address when Ward left Chesapeake.

The plaintiffs have asserted that TLW has no employees, see id. at 25, ¶ 65, and "only one general partner, TLW Investments, Inc.," id. at 24, ¶ 61, and that Ward as the

---

[5]Ward served as SandRidge's chairman and chief executive officer from June 2006 until his employment was terminated in June 2013. See id. at 12, ¶ 23. Ward also served as SandRidge's president from December 2006 to January 2011. See id.

[6]Pursuant to a settlement agreement between SandRidge and TPG-Axon Partners, LP, TPG-Axon Management LP, TPG-Axon Partners GP, L.P., TPG-Axon GP, LLC, TPG-Axon International, L.P., TPG-Axon International GP, LLC and Dinakar Singh LLC on March 13, 2013, the number of Board members and directors increased from seven to eleven. See Doc. 142-29 at 2, ¶ 1(a)(i). Appointed as directors were Stephen C. Beasley, Edward W. Moneypenny, Alan J. Weber and Dan A. Westbrook. See id. ¶ 1(a)(ii).

[7]Ward was a director of Chesapeake and its president and chief operating officer from 1989 to February 2006. See Doc. 142 at 12, ¶ 23.

president of the latter, see id., "orchestrated TLW['s] . . . organization and controls its activities." Id. ¶ 60. The plaintiffs have further alleged that TLW "is an 'entity in which . . . Ward has [admitted] . . . an ownership interest,'" id. ¶ 62, according to SandRidge's disclosures to the Securities and Exchange Commission, and for which he has "signed numerous conveyances . . . ." Id.[8]

Movant WCT is described in the Amended Complaint as an Oklahoma limited liability company, see id. at 13, ¶ 31, the chief executive officer of which is Ward's son, Trent Ward ("T Ward"). See id. at 17, ¶ 42. WCT was formed in 2002 by Shannon Self, a member of Chesapeake's Board of Directors, see id. at 16, ¶ 41, and like TLW, WCT had its original place of business at 6200 North Western Avenue, Oklahoma City, Oklahoma; it too eventually shared the same address as SandRidge at 123 Robert S. Kerr Avenue, Oklahoma City, Oklahoma, from 2008 to July 2011. See id. at 19, ¶ 47.

WCT is alleged to have only seven (7) employees and one contract geologist. See at 44, ¶ 126. Members of the limited liability company are trusts that were established and funded by Ward and his wife, Schr'ee Ward ("S Ward"), for the benefit of their children: the Trent Lee Ward Trust, the Romi Norel Ward Trust and the James Davis Ward Trust. See id. at 18, ¶ 44; id. at 13, ¶ 31 (citations omitted). The trustee of these trusts is Scott C. Hartman, who is alleged to be "Ward's personal employee," see id. at 18, ¶ 45, and although "'listed as a SandRidge employee,'" id. (quotation omitted), Hartman's "'employment is devoted to . . . Ward's business affairs.'" Id. (quotation omitted).

_____

[8]In the Amended Complaint, the plaintiffs have also referred to a document executed by Ward in September 2012 in a case filed in this judicial district, wherein he averred that he is the owner of TLW. See Chechele v. Ward, No. CIV-10-1286-M (Doc. 133-1 at 3, ¶ 3).

5

Movant 192 LLC is also a limited liability company organized under Oklahoma law, see id. at 13, ¶ 31; it was formed in 2004 by Tom Blalock, see id. at 20, ¶ 48, a partner in the same law firm as Self and a former member of Chesapeake's Board of Directors. See id. Like TLW and WCT, 192 LLC had its original place of business at 6200 North Western Avenue, Oklahoma City, Oklahoma, see id. ¶ 49, and in 2008, it moved to the same address as SandRidge at 123 Robert S. Kerr Avenue, Oklahoma City, Oklahoma. See id. at 21, ¶ 51.

192 LLC, like WCT, has as its members the Trent Lee Ward Trust, the Romi Norel Ward Trust and the James Davis Ward Trust, see id. at 13, ¶ 31, but unlike WCT, it allegedly has no employees. See id. at 21, ¶ 53.[9]

In summarizing the alleged wrongful conduct giving rise to this lawsuit, the plaintiffs have asserted that

> Ward, in violation of his fiduciary duties to SandRidge and its shareholders, [SandRidge's] . . . policies and procedures, and his employment agreement, wrongfully usurped SandRidge's corporate opportunities, benefitting himself and his family[,]

---

[9]To demonstrate Ward's alleged control over and ownership interest in WCT and 192 LLC and the relationship between the two entities, the plaintiffs have set forth the following allegations in the Amended Complaint (all of which describe conduct that occurred before the "relevant period," as that term is defined in the Amended Complaint):

(1) in November 2003, WCT purchased the land on which T Ward's residence was located in Oklahoma County, Oklahoma;

(2) in 2004, WCT transferred title to the land to 192 LLC, claiming that the conveyance was tax-exempt under title 68, section 3202.3 of the Oklahoma Statutes, which applies to a non-sale document from a trust to a limited liability company;

(3) in 2005, 192 LLC then transferred title to the property to Ward and his wife, S Ward, and likewise claimed that the conveyance was tax exempt as a related-party transaction; and

(4) that the deed transferring title to the land from WCT to 192 LCC recites that "the members and membership percentages of WCT . . . are identical to the members and membership percentages of 192 [LLC] . . . ," Doc. 142 at 22, ¶ 55, which, in the plaintiffs' opinion, "reveal[s] that th[e]se two entities are essentially interchangeable." Id.

id. at 6, ¶ 3, and through TLW, WCT and 192 LLC, "as surrogates for one another," id. at 7, ¶ 7, "has taken numerous corporate opportunities that should have been offered to SandRidge, id. ¶ 8, "[b]y front running [SandRidge] . . . ," id. at 34, ¶ 102, by "us[ing] . . . SandRidge's material confidential and proprietary . . . information and resources . . . ," id. at 35, ¶ 104, and "by flipping acquired leases to SandRidge without appropriate approvals of a majority of independent and disinterested [D]irectors . . . ." Id. ¶ 105.

The "corporate opportunities" to which the plaintiffs have referred relate to the Mississippi Lime formation, also known as the "Mississippian Play," see id. at 14, ¶ 35, in which SandRidge, as it "transition[ed] away from gas-dominant assets," id., "began to build an industry-leading leasehold position," id., and be recognized as "a leading developer." Id. at 15, ¶ 36. Alleged to be SandRidge's "primary focus since at least 2010," id. at 16, ¶ 40, the Mississippian Play "is a limestone formation containing oil and natural gas [that] . . . stretches through more than 17 million acres in northern Oklahoma, southern and western Kansas, and a small corner of Nebraska." Id. at 14, ¶ 35.

According to a SandRidge press release dated January 18, 2013, the Mississippian Play "'is widely considered to be one of the most valuable oil-rich basins in the United States,'" id. at 15, ¶ 36; see Doc. 142-3 at 1, and in describing SandRidge's role in this formation, the plaintiffs have contended

(1) that "[r]obust growth in the Mississippian Play is a key element of SandRidge's overall strategic plan[, and] [t]o that end, SandRidge has been, and remains, active in developing confidential and proprietary information about the Mississippian Play, acquiring mineral rights, conducting drilling and exploration activities, and developing infrastructure across the Mississippian Play[,]" Doc. 142 at 15, ¶ 37;

7

(2) that "[a]ccording to SandRidge's presentations at the Goldman Sachs Global
Energy Conference[10] . . . and the Credit Suisse Energy Summit[11] ['Credit Suisse'] . . . [in
2013], [SandRidge] . . . is 'dominating' the Mississippian Play [as demonstrated by the
following]:

> • SandRidge controls the largest acreage position in the Mississippian Play,
> constituting approximately 2.3 million acres, and it has identified over 11,000
> possible horizontal drilling locations.

> • SandRidge has more than 40% of the rigs drilling in the Mississippian Play,
> consisting of 32 rigs across 200 miles.

> • SandRidge has already drilled 600 wells, representing 44% of all wells
> drilled in the Mississippian Play.

> • SandRidge also has 107 disposal wells . . . and 384 miles of power line .
> . . in the Mississippian Play[; and]

> • [a]ccording to the . . . Credit Suisse presentation, SandRidge plans to
> consolidate its holdings in the Mississippian Play through significant
> additional acquisitions of mineral rights and to drill 581 wells in 2013 while
> increasing the number of its rigs from 32 to 41[;]

Id. at 15-16, ¶ 38 (footnote and citations omitted); and

(3) that "according to a [February 2013] SandRidge press release[12] . . . , since
January 2010, SandRidge has invested $500 million in the acquisition of mineral
leaseholds and over $1.7 billion in development, drilling capital, and infrastructure in the
Mississippian Play." Id. at 16, ¶ 39.

---

[10]See Doc. 142-4.

[11]See Doc. 142-5.

[12]See Doc. 142-6.

In describing Ward's alleged wrongful conduct in connection with their complaints that he used SandRidge's confidential and proprietary information, the plaintiffs have averred:

(1) "Beginning in 2009, SandRidge emerged alongside of Chesapeake as the two horizontal drilling leaders in the [Mississippian] [P]lay. In fact, of the 1,336 horizontal wells drilled since 2009, SandRidge has drilled 839 or 63% of all wells." Id. at 42, ¶ 120.

(2) "[B]ecause companies like SandRidge and Chesapeake typically obscure their lease acquisition activities in order to keep their interest in a given area out of the public spotlight (in an attempt to control the inevitable inflation of lease costs when mineral owners find out that industry leaders are interested in their land), they typically acquire leases utilizing brokers or agents, who subsequently assign title to those mineral lease interests to the company at a later date. . . . Ward . . . was in a position to know the identities of brokers and agents acting on behalf of SandRidge and the geographic locations of its acquisitions[,]" id. at 42-43, ¶ 121; and

(3) that "[i]t is not happenstance, [but rather through the use of confidential and proprietary information divulged by Ward,] . . . that [WCT, TLW and 192 LLC] . . . have acquired massive acreage adjacent to SandRidge acreage . . . ." Id. at 43, ¶ 121.

The plaintiffs have further alleged in connection with Ward's disclosure of SandRidge's confidential and proprietary information:

(1) "[T]echnological innovations in horizontal drilling, and multi-stage fracture stimulation (known as 'fracking') completion technologies, have unlocked previously unavailable potential in the [Mississippian] [P]lay. Because of its history as a producing

9

formation, however, there is an incredible amount of historical geological data that any prudent exploration company would analyze before adopting an acquisition strategy." Id. ¶ 122.

(2) "Moreover, a prudent exploration company would develop new geological information to confirm its analysis of the historical data. In fact, between 2007 and 2009 SandRidge drilled mostly vertical wells. . . . [T]hose wells were drilled to confirm geological concepts, gather subsurface geological data in the form of drill cutting samples and cores, update reservoir analysis, and test for the presence and quality of hydrocarbon saturation." Id. ¶ 123.

(3) "An exploration company acquires data at substantial cost, both in the acquisition of historical and third party developed information and by drilling and completing new wells. The cost to analyze and learn from this data, while coordinating the analysis and field efforts between various disciplines (including but not limited to geology, geophysics, land and lease acquisition, reservoir engineering and economics, drilling engineering, and completion and production engineering) can run into the millions of dollars. That is the reason this type of work is most effectively pursued by the large independent exploration companies such as SandRidge, . . . [which] can maintain the internal technical staff and [which has] . . . the financial capability to undertake this type of work." Id. at 44, ¶ 124.

(4) "With 2500 employees, including a staff of geologists, SandRidge is equipped to perform the analysis to exploit the Mississippian Play. . . [and] it has spent hundreds of millions of shareholder dollars doing just that." Id. ¶ 125.

To further support their claim of misuse of confidential and proprietary information, the plaintiffs have alleged that "Ward was privy to data . . . that was developed (at great

10

expense] by . . . [SandRidge] engineers, geologists, and technicians," id. at 93, ¶ 307, and that this data was inter alia compiled and monitored by SandRidge's Reservoir Engineering Department and its geology unit–both of which reported directly to Ward or provided him with information. See id. at 93-94, ¶¶ 307, 308.

The plaintiffs have asserted on the other hand that since 192 LLC has no employees and WCT is "[s]taffed with only seven employees and one contract geologist, . . . [rendering WCT inadequately] prepared to undertake its own independent analysis of the Mississippian Play in support of [its] lease acquisition program[,] . . . which . . . exceeds . . . 475,000 acres," id. at 44, ¶ 126, "a reasonable inference [can be drawn] that . . . [both 192 LLC and WCT have] relied almost exclusively on SandRidge's activities and information [disclosed by Ward] in making their acquisition decisions." Id. ¶ 126.

In describing the movants' wrongful conduct in connection with their acquisitions in the Mississippian Play, the plaintiffs have alleged that WCT, with its "wholly inadequate," id. at 26, ¶ 67, staff, and 192 LLC, again in the absence of any employees, necessarily acted through others in "acquir[ing] mineral leaseholds in areas adjacent to SandRidge mineral leaseholds," id. at 27, ¶ 70, and in certain instances, either acquired "property that they then flipped to SandRidge," id. at 28, ¶ 75, or "acquired land or mineral rights shortly before SandRidge acquired [the] adjacent acreage," id. at 28, ¶ 75, thereby "increasing the value of the . . . land or mineral rights . . . [WCT and/or 192 LLC] had purchased." Id. The plaintiffs have further alleged that WCT and 192 LLC also "sold their . . . land or mineral rights to SandRidge competitors . . . and in other instances . . . retained the land or mineral rights, which appreciated due to SandRidge's investments of shareholder resources." Id. at 28-29, ¶ 75.

11

Examples of corporate opportunities that allegedly should have been made available

to SandRidge or examples of instances where WCT allegedly wrongfully profited, include:

(1) as to properties in Kansas, namely, in Sherman, Thomas, Sheridan, Wallace,

Logan and Gove Counties,

> (a) SandRidge has leased 142,720 acres in over 223 sections while WCT has leased 257,920 acres in over 403 sections, see id. at 27, ¶ 72;
>
> (b) "[m]any of WCT['s] . . . sections are contiguous to SandRidge's sections, and certain of WCT['s] . . . sections are surrounded by SandRidge's sections," id. at 27-28, ¶ 72, resulting in the latter's "sections [being located] . . . directly in SandRidge's key business areas and . . . integral [to] SandRidge['s corporate] opportunities[,]" id. at 28, ¶ 72;
>
> (c) "[a]ccording to deed records in these six counties, . . . WCT . . . acquired its leaseholds in advance of or contemporaneously with SandRidge's acquisition of its leaseholds[,]" id. ¶ 73;
>
> (d) WCT's "leaseholds were in areas that SandRidge had identified at great expense as favorable locations[,]" id.; and
>
> (e) WCT's "acquisitions of [its] . . . leaseholds were in direct competition with SandRidge, [which] were [not] . . . first presented to SandRidge as acquisition prospects . . . [or] corporate opportunities for SandRidge," id.; and

(2) as to properties in Oklahoma, namely, in Pawnee, Woods and Alfalfa Counties,

> (a) "[o]n November 30, 2010, WCT . . . leased mineral rights in Pawnee County, . . . [and] [t]wo months later, on January 20, 2011, WCT . . . flipped those leases to SandRidge," id. ¶ 76;
>
> (b) on November 3, 2011, WCT leased from TLW "land and mineral rights in Woods County, . . . [and] [s]ix months later, on May 23, 2012, WCT . . . flipped those leases to SandRidge," id. ¶ 77;
>
> (c) "[o]n February 28, 2012, WCT leased land and mineral rights from TLW in Alfalfa County, . . . , [and] [s]even months later, on August 29, 2012, WCT . . . flipped those leases to SandRidge," id. ¶ 78; and
>
> (d) "[o]n April 23, 2012, WCT . . . assigned wellbore rights in [property known as] Quail Run [in Woods County] to S[ ] Ward . . . ," id. at 30, ¶ 81, and that

one month later, "SandRidge started drilling in the Quail Run[ ] well . . . ." Id. ¶ 82.

The plaintiffs have also described in their Amended Complaint other sections leased by WCT and/or 192 LLC in Kansas that are either contiguous to, or surrounded by, Sandridge's sections,[13] and they have complained that these acquisitions were made "in advance of or contemporaneously with SandRidge's acquisition of its leaseholds," id. at 28, ¶ 73, and were made "in direct competition with SandRidge, were neither first presented to SandRidge as acquisition prospects nor approved by a majority of independent and disinterested directors . . . , and otherwise would have been corporate opportunities for SandRidge." Id.

The plaintiffs have further complained in connection with these acquisitions

(1) that SandRidge "lost the ability to drill on leaseholds that instead [were] . . . diverted to the Ward Entity Defendants, and it lost the right to capture hydrocarbons from those leaseholds[,]" id. at 34, ¶ 103;

(2) that these leaseholds "were obtained [by the Ward Entity Defendants] through the use of SandRidge's material confidential and proprietary . . . information and resources without adequate consideration to SandRidge[,]" id. at 35, ¶ 104;

---

[13]These examples include

(1) acquisitions in Barber County in June 20, 2011, see Doc. 142 at 30, ¶¶ 84-86, and from June 6, 2011 to July 5, 2011, see id. at 31, ¶¶ 87-88;

(2) acquisitions in Thomas County in November 2011, see id. at 33, ¶¶ 95-96, December 2011, see id. at 31, ¶¶ 89-90; id. at 32, ¶¶ 93-34, and January and February 2012, see id. ¶¶ 91-92;

(3) an acquisition in Finney County in November 2012, see id. at 33, ¶ 97;

(4) acquisitions in Sherman County in April and July 2012, see id. ¶ 98;

(5) an acquisition in Wallace County in August 2012, see id. at 34, ¶ 99; and

(6) an acquisition in Cowley County in January 2011. See id. ¶ 100.

13

(3) that "by flipping acquired leases to SandRidge without appropriate approvals of a majority of independent and disinterested directors, there is no assurance that SandRidge paid the Ward Entity Defendants fair value for the assets[,]" id. ¶ 105; and

(4) that "the Ward Entity Defendants have benefitted, at no cost, from the hundreds of millions of dollars in infrastructure [SandRidge] . . . has developed throughout the Mississippian Play." Id. ¶ 106.

The plaintiffs have claimed that the foregoing conduct gives rise to three causes of action against WCT and 192 LLC: "Aiding and Abetting," see id. at 91-92, "Misappropriation of SandRidge's Confidential and Proprietary Information, Including Trade Secrets," see id. at 92-96, and "Unjust Enrichment." See id. at 97. Each of these causes of action is grounded on the plaintiffs' assertions in their Amended Complaint and in their response that WCT and 192 LLC as "surrogates" either acted for Ward as his substitute or permitted Ward to act through them based upon his alleged "ownership, domination and control." Doc. 152 at 10. See, e.g., Doc. 142 at 7, ¶ 7 ("Ward makes all decisions for each of them"); id. at 16, ¶ 41 ("Ward's fingerprints are all over WCT"); id. at 7, ¶ 8 ("Ward, through the Ward Entity Defendants, has taken numerous corporate opportunities"); Doc. 152 at 15 (Ward Entity Defendants "provided Ward with the means to do indirectly—under the guise of an 'independent' oil and gas company—the very conduct prohibited"); id. ("Ward Entity Defendants were a necessary component of . . . Ward's efforts to usurp SandRidge['s] corporate opportunities"). Indeed, as this Court stated earlier in these proceedings, one of the Amended Complaint's overarching themes is that "the Ward Entity Defendants do not act independently from Ward." Id. at 11 (emphasis deleted).

14

The Court has looked to the law of Delaware to determine whether the plaintiffs have stated a viable claim of "Aiding and Abetting." In this connection, the plaintiffs have alleged in their fourth cause of action that "Ward owed SandRidge and its shareholders fiduciary duties . . . [and that he] breached those duties with the knowledge and substantial assistance of the Ward Entity Defendants." Doc. 142 at 91, ¶ 297. The plaintiffs have further alleged that WCT and 192 LLC as two of the three Ward Entity Defendants "performed . . . critical, and decidedly impermissible, role[s]," id. ¶ 298, in, and "were . . . necessary component[s] of . . . Ward's efforts to usurp SandRidge's corporate opportunities[.]" Id. ¶ 299.

The plaintiffs have claimed that "Ward established WCT . . . and 192 [LLC] . . . , determined what assets were put into these companies, and participated in their management," id. at 92, ¶ 301, thereby creating "vehicle[s through which Ward was able] to efficiently acquire, retain, and sell land in the Mississippian [Play]." Id. ¶ 299. The plaintiffs have further contended that because "Ward's knowledge of his breaches is imputed to the Ward Entity Defendants[,]" id. ¶ 302, movants WCT and 192 LLC acted "with the full knowledge that their participation would assist [him] . . . in breaching his fiduciary duties." Id.

To survive the movants' request for dismissal, the plaintiffs must advance sufficient well-pleaded factual allegations that show each of the following elements as to each movant: "'(1) the existence of a fiduciary relationship, (2) a breach of the fiduciary's duty, . . . (3) knowing participation in that breach by the [movant then under consideration[14]] . .

_____

[14]As the Court stated in its earlier Orders issued in this matter, Rules 8 and 12(b)(6) require that each defendant be given "'fair notice of what the . . . claim is and the grounds upon which it

. ,' and (4) damages proximately caused by the breach." Malpiede v. Townson, 780 A.2d 1075, 1096 (Del. 2001)(footnote omitted).

Although the Amended Complaint clearly sets forth a fiduciary relationship between Ward and SandRidge and its shareholders, as the Court stated in its Order issued this date, the plaintiffs' claim that Ward breached his fiduciary duties in the first cause of action has been dismissed; such finding requires dismissal of this cause of action against WCT and 192 LLC. E.g., Malone v. Brincat, 722 A.2d 5 (Del. 1998)(absent a claim for breach of fiduciary duty, there can be no claim for aiding and abetting).

WCT and 192 LLC have next challenged the plaintiffs' fifth cause of action–"Misappropriation of SandRidge's Confidential and Proprietary Information, Including Trade Secrets." See Doc. 142 at 92-96. The Uniform Trade Secrets Act ("UTSA"), 78 O.S. § 85 et seq., which was adopted in Oklahoma in 1986 and on which the plaintiffs have relied, requires a plaintiff to show (i) the existence of a trade secret, (ii) misappropriation of that secret by the defendant then under consideration[15] and (iii) the use of the secret to the plaintiff's detriment. E.g., Micro Consulting, Inc. v. Zubeldia, 813 F. Supp. 1514, 1534 (W.D. Okla. 1990); MTG Guarnieri Manufacturing, Inc. v. Clouartre, 239 P.3d 202, 209 (Okla. App. 2010).

---

rests.'" Burnett v. Mortgage Electronic Registration Systems, Inc., 706 F.3d 1231, 1240 (10th Cir. 2013)(quoting Twombly, 550 U.S. at 555)). The plaintiffs nevertheless have again attributed actions to the "Ward Entity Defendants," without identifying the particular actions, if any, in certain situations of each individual defendant. While the Court at this stage has taken as true each well-pleaded allegation as to each defendant, the plaintiffs are advised that at the summary judgment stage, they must identify evidence that demonstrates the specific actions of each defendant and for which each defendant is allegedly responsible.

[15]See n.14 supra.

16

The term "trade secret" as defined in the UTSA

means information, including a formula, pattern, compilation, program, device, method, technique or process, that:

> a. derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and

> b. is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

78 O.S. § 86(4).

The UTSA defines the term "misappropriation" to mean, inter alia,

a. acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means;[16] or

b. disclosure or use of a trade secret of another without express or implied consent by a person who:

(1) used improper means to acquire knowledge of the trade secret; or

(2) at the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was:

> (a) derived from or through a person who had utilized improper means to acquire it; or

> (b) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or

> (c) derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use . . . .

Id. § 86(2).

---

[16]The phrase "improper means" for purposes of the UTSA "includes . . . breach or inducement of a breach of a duty to maintain secrecy . . . ." 78 O.S. § 86(1).

According to the plaintiffs, while "the potential commercial play area [in the Mississippian formation] is vast," Doc. 142 at 42, ¶ 20, the formation "is not equally productive across its whole." Doc. 152 at 18. SandRidge therefore had to compile data "that was developed (at great expense) by . . . [SandRidge] engineers, geologists, and technicians," Doc. 142 at 93, ¶ 307, to determine the most profitable locations for SandRidge's acquisition of mineral rights.[17] The plaintiffs have further alleged that SandRidge and its shareholders were the sole intended beneficiaries of that data, as analyzed by SandRidge employees, that such data "was valuable to SandRidge," id. at 95, ¶ 310, and that "SandRidge employees sought to maintain the secrecy of such information." Id.

In reviewing the allegations in the Amended Complaint in the light most favorable to the plaintiffs, the Court finds that Elliot and Ezell have sufficiently identified confidential and proprietary information that qualifies as a "trade secret" under the UTSA's broad definition of that term. The information regarding the Mississippian Play collected by SandRidge through geological exploration and drilling has "independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons[, including competitors in the formation,] who [could] . . . obtain economic value from its disclosure or use," 78 O.S. § 86(4)(a), and was, as

---

[17]The plaintiffs have cited as one example, as set forth in SandRidge's 2010 Form 10-K, regarding SandRidge's eighteen-member Reservoir Engineering Department, which is "comprised of seven degreed engineers and [eleven] engineering analysts/technicians," Doc. 142-30 at 2, and which is responsible for "monitor[ing] asset performance and mak[ing] reserves estimate adjustments," id., after consideration of "production histories as well as other geologic, economic, ownership and engineering data." Id. See Doc. 142 at 93, ¶ 307.

alleged, "the subject of efforts that [were] . . . reasonable under the circumstances to maintain its secrecy." Id. § 86(4)(b); e.g., Doc. 142 at 56-57, ¶¶ 164-167.

The thrust of this cause of action is as the plaintiffs have asserted: "Ward had access to information that qualified as 'trade secrets' . . . , and therefore the Ward Entity Defendants–as surrogates of . . . Ward–had such access." Id. at 93, ¶ 305. However, because mere possession of a trade secret is not sufficient to trigger liability, the Court must also determine whether the plaintiffs' allegations adequately plead misappropriation of that secret by WCT and/or 192 LCC and the use of that secret to the plaintiffs' detriment. E.g., Micro Consulting, 813 F. Supp. at 1534.

In this connection, the plaintiffs have alleged that WCT and 192 LLC as

> Ward Entity Defendants misappropriated SandRidge's confidential and proprietary information, including [SandRidge's] . . . trade secrets, and further wrongfully used that confidential and proprietary information to SandRidge's detriment by usurping SandRidge's corporate opportunities, which SandRidge was and is financially able to exploit, were and are within SandRidge's line of business, and in which [SandRidge] . . . and its shareholders had and have an interest or expectancy in the opportunities, thus placing . . . Ward in a position inimical to, and in conflict with, his duties to SandRidge and its shareholders.

Id. at 93, ¶ 306. The plaintiffs have contended that WCT and 192 LLC as "Ward Entity Defendants relied almost exclusively on SandRidge's activities and information in making their [own] acquisition decisions," id. at 44, ¶ 126, and that they acquired certain leaseholds (as identified in the Amended Complaint) "through the use of SandRidge's material confidential and proprietary . . . information and resources without adequate consideration to SandRidge." Id. at 35, ¶ 104.

The plaintiffs have suggested that the allegations in the Amended Complaint give rise to the following scenario:

Ward misappropriated SandRidge's trade secrets with regard to the Mississippian [Play] . . . and used such trade secrets to divert corporate opportunities to the [Ward Entity Defendants] . . . controlled by him. With SandRidge's trade secrets in hand, the Ward Entity Defendants then utilized SandRidge's trade secrets to acquire acreage in the advance of or contiguous with SandRidge's acquisition of mineral rights in the same area.

Doc. 152 at 18.

In light of the plaintiffs' well-pleaded allegations regarding Ward's domination and control of these two entities, the Court finds that WCT and 192 LLC knew or had reason to know that SandRidge's confidential and proprietary information was acquired by improper means (that is, through Ward's alleged breach of his duty to maintain the confidentiality of such information[18]), e.g., 78 O.S. § 86(2)(a), or that they used this information, without express or implied consent, knowing or having reason to know that their knowledge of the information was derived from one who had utilized improper means to acquire it. E.g., id. § 86(2)(b).

Because such allegations and the inferences drawn therefrom are sufficient to raise a plausible claim that WCT and 192 LLC misappropriated SandRidge's trade secrets, the plaintiffs have "'nudged their [misappropriation] claim [against both WCT and 192 LLC] across the line from conceivable to plausible.'" Robbins, 519 F.3d at 1247 (quotation omitted). Accordingly, the defendants are not entitled to dismissal of this claim for relief.

Finally, WCT and 192 LLC have challenged the plaintiffs' sixth cause of action: "Unjust Enrichment." In Oklahoma, "[b]efore a party will be entitled to recover for unjust enrichment, . . . 'there must be enrichment to another, coupled with a resulting injustice.'" City of Tulsa v. Bank of Oklahoma, N.A., 280 P.3d 314, 319 (Okla. 2011)(quoting Teel v.

---

[18]See Doc. 149-1 at 13, ¶ 7; Doc. 149-2 at 14, ¶ 8.

Public Service Co. of Oklahoma, 767 P.2d 391, 398 (Okla. 1985)(superseded by statute on other grounds)). "Unjust enrichment is a condition which results from the failure of a party to make restitution in circumstances where not to do so is inequitable, i.e., the party has money in its hands that, in equity and good conscience, it should not be allowed to retain." Oklahoma Department of Securities ex rel. Faught v. Blair, 231 P. 3d 645, 658 (Okla. 2010)(citing Harvell v. Goodyear Tire & Rubber Co., 164 P.3d 1028, 1035 (Okla. 2006)).

In the Amended Complaint, the plaintiffs have alleged in support of this equitable cause of action:

(1) WCT and 192 LLC, again as Ward Entity Defendants, "have unfairly benefited through the use of [SandRidge's] . . . assets and confidential information, gained in connection with . . . Ward's employment or involvement with SandRidge, to directly compete and interfere with SandRidge's business[,]" Doc. 142 at 97, ¶ 315;

(2) "SandRidge ha[d] a reasonable expectation of being offered all corporate opportunities from . . . Ward relating to the acquisition of mineral interests and development in the Mississippian Play[,]" id. ¶ 316;

(3) WCT and 192, as "Ward Entity Defendants have unfairly benefited from . . . Ward's usurpation of SandRidge's corporate opportunities[,]" id. ¶ 317, to the plaintiffs' and SandRidge's detriment;

(4) "[t]o allow . . . [WCT and 192 LLC] to retain the benefits of SandRidge's corporate opportunities wrongfully usurped . . . would result in substantial and unjust enrichment[,]" id. ¶ 319; and

21

(5) "[i]n accordance with equity and good conscience, . . . [WCT and 192 LLC] ought not to be allowed to retain such a benefit that should have rightfully gone to SandRidge." Id.

WCT and 192 LLC have asserted two grounds that they claim warrant dismissal of this claim for relief.[19] First, they have argued that the plaintiffs have failed to identify any corporate assets acquired by WCT and/or 192 LLC "that should have rightly gone to SandRidge," id., and second, they have again challenged what they describe as the plaintiffs' "unfounded contention that WCT and 192 [LLC] are 'surrogates' of Ward." Doc. 146 at 28.

As the Court has determined, the well-pleaded factual allegations support a finding at this stage of the proceedings that WCT and 192 LLC misappropriated SandRidge's trade secrets to their own benefit and to the detriment of SandRidge and its shareholders. Accordingly, the inference may be drawn that WCT and 192 LLC acquired assets through their alleged misconduct, profited therefrom and have therefore been unjustly enriched by their retention of the same.

"Twombly does not require a court at the motion-to-dismiss stage to consider whether the factual allegations are probably true. . . . [O]n the contrary, [absent exceptions not relevant here,] . . . a court must take the allegations as true, no matter how skeptical the

---

[19]In response, the plaintiffs have first contended that the Court, in addressing WCT and 192 LLC's initial Motion to Dismiss, has already determined that the plaintiffs adequately stated a claim for relief and that "WCT and 192 [LLC] should not be allowed to now reargue the sufficiency of the allegations." Doc. 152 at 6. The Court disagrees.

In their prior motion, WCT and 192 LLC only challenged this claim on the grounds that an adequate remedy of law existed. The Court found that the plaintiffs could plead in the alternative and did not address the sufficiency of the plaintiffs' allegations against these two defendants.

court may [or may not] be." Iqbal, 556 U.S. at 696 (Souter, Jr., dissenting)(citing Twombly, 550 U.S. at 555 (court must proceed on assumption that all well-pleaded allegations are true); id. at 556 (well-pleaded complaint may proceed even if it actual proof of the facts alleged is improbable)(further citation omitted).

Because the Court finds that the plaintiffs have alleged facts, taken as a whole and as true, that are "suggestive of illegal conduct," Twombly, 550 U.S. at 563 n.8 (citation omitted), and have included sufficient "factual enhancement," id. at 557, to show "more than a sheer possibility that [each] . . . defendant has acted unlawfully," Iqbal, 556 U.S. at 678 (citations omitted), in connection with the plaintiffs' claims for misappropriation of confidential and proprietary information and unjust enrichment, the Court

(1) DENIES the Motion to Dismiss [Doc. 146] filed by WCT and 192 LLC to that extent; but

(2) GRANTS said motion to the extent the Amended Complaint seeks to impose liability on these two defendants for aiding and abetting.

ENTERED this 22nd day of September, 2014.

LEE R. WEST
UNITED STATES DISTRICT JUDGE