## IN THE UNITED STATES DISTRICT COURT FOR
## THE WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| IN RE SANDRIDGE ENERGY, INC. SHAREHOLDER DERIVATIVE LITIGATION | No. CIV-13-102-W<br>Relating to All Derivative Actions<br><br>**JOINT DECLARATION OF MICHAEL BURRAGE AND ROBERT N. KAPLAN IN SUPPORT OF (1) PLAINTIFFS' MOTION FOR FINAL APPROVAL OF PARTIAL DERIVATIVE LITIGATION SETTLEMENT AND (2) AWARD OF ATTORNEYS' FEES AND EXPENSES** |

**KAPLAN FOX & KILSHEIMER LLP**
Robert N. Kaplan (admitted *pro hac vice*)
Jeffrey P. Campisi (admitted *pro hac vice*)
Matthew P. McCahill (admitted *pro hac vice*)
850 Third Avenue, 14th Floor
New York, New York 10022
Telephone:   (212) 687-1980
rkaplan@kaplanfox.com
jcampisi@kaplanfox.com
mmccahill@kaplanfox.com

**WHITTEN BURRAGE**
Michael Burrage, OBA #1350
Reggie N. Whitten, OBA #9576
Randa K. Reeves, OBA # 30695
1215 Classen Drive
Oklahoma City, Oklahoma  73103
Telephone:   (405) 516-7800
mburrage@whittenburragelaw.com
rwhitten@whittenburragelaw.com
rreeves@whittenburragelaw.com

*Co-Lead Counsel for the Plaintiffs*

Dated: November 25, 2015

## <u>TABLE OF CONTENTS</u>

Page(s)

I.    PRELIMINARY STATEMENT .................................................................. 2

II.   FACTUAL BACKGROUND AND SUMMARY OF PLAINTIFFS' CLAIMS ..... 5

III.  PROCEDURAL HISTORY ...................................................................... 6

     A.    Plaintiffs' Counsel's Pre-Filing Investigation and Drafting of the Consolidated Complaint....................................................................... 7

     B.    Briefing on Defendants' First Motions to Dismiss Plaintiffs' Consolidated Complaint....................................................................... 9

     C.    Additional Factual and Legal Investigation for Plaintiffs' Consolidated Amended Complaint Following the Court's Orders Dismissing Certain of Plaintiffs' Claims ............................................................................. 9

     D.    Plaintiffs' Motion to Lift the Stay of Discovery ............................... 11

     E.    Briefing on Defendants' Motions to Dismiss the Consolidated Amended Complaint ....................................................................................... 11

     F.    Plaintiffs' Renewed Motion to Lift the Stay of Discovery ............... 12

     G.    The Court's Orders on the Motions to Dismiss ............................... 12

     H.    Defendants' Motion for Reconsideration of the Court's Orders on the Motions to Dismiss ............................................................ 13

     I.    The SLC's Motion To Stay ............................................................ 14

     J.    Plaintiffs' Counsel's Discovery of Defendants, the Parties' Extensive Discovery Negotiations and Motion Practice Related to Production of the Mayer Brown Materials ....................................................... 15

     K.    Plaintiffs' Efforts to Obtain the Mayer Brown Materials ................ 20

L.    The December 3, 2014 Court Conference and Discovery of the Mayer Brown Materials ........................................................................ 22

M.    The Director Defendants' Motion for Judgment on the Pleadings ................. 25

N.    The May 19, 2015 Court Conference ................................................. 26

O.    Document Discovery Propounded to Plaintiffs ................................. 28

P.    Defendants' Interrogatories Propounded to Plaintiffs ...................... 30

Q.    Depositions of Defendants and Non-Parties ................................. 32

R.    Non-Party Discovery ..................................................... 33

S.    Mediation and Settlement Negotiations ................................... 36

T.    Litigation Continues Against the Non-Settling Defendants ................ 38

IV.    SUMMARY OF THE STIPULATION'S KEY TERMS ......................... 39

V.    THE STRENGTHS AND WEAKNESSES OF THE CASE ................... 42

VI.    THE STIPULATION IS IN THE BEST INTERESTS OF SANDRIDGE AND ITS SHAREHOLDERS ................................................ 44

VII.    THE MOTION FOR ATTORNEYS' FEES AND EXPENSES ............... 44

VIII.    CONCLUSION ................................................ 47

We, Michael Burrage and Robert N. Kaplan, pursuant to 28 U.S.C. § 1746, jointly declare as follows:

1.      I, Michael Burrage, am a partner in the law firm of Whitten Burrage.  I am admitted to the bar of the State of Oklahoma and am in good standing.   I am admitted to practice before this Court and before all courts in the State of Oklahoma.

2.      I, Robert N. Kaplan, am a partner in the law firm of Kaplan Fox & Kilsheimer LLP ("Kaplan Fox").  I am admitted to the bars of the State of New York and the District of Columbia and am in good standing.  I am admitted to this Court *pro hac vice*.

3.      We are counsel of record for Lead Plaintiff Paul Elliot, on behalf of the Paul Elliot IRA R/O ("Elliot") and plaintiff Lisa Ezell (collectively, "Plaintiffs").[1]  Lead Plaintiff and plaintiff Ezell support this settlement and the application for attorneys' fees and reimbursement of expenses.

4.      We have been actively involved in prosecuting and partially resolving the above-captioned action (the "Action"), are familiar with its proceedings, and have personal knowledge of the matters set forth below based upon our active supervision of, or participation in, all material aspects of the Action.

5.       We submit this declaration in support of Plaintiffs' motion, pursuant to Rule 23.1 of the Federal Rules of Civil Procedure, for: (1) final approval of the

---

[1] The Court appointed Whitten Burrage and Kaplan Fox as co-lead counsel for the plaintiffs ("Co-Lead Counsel") and Federman & Sherwood as Liaison Counsel.  (ECF No. 66.)  Co-Lead Counsel and additional plaintiffs' counsel Jackson Walker L.L.P. are referred to collectively here as "Plaintiffs' Counsel."

Stipulation of Settlement (the "Stipulation," dated October 7, 2015 and filed on October 8, 2015, ECF No. 301-1), which in addition to substantial monetary recovery provides nominal defendant SandRidge Energy, Inc. (here, "SandRidge" or the "Company") with important corporate governance reforms; and (2) Plaintiffs' Counsel's application for attorneys' fees and reimbursement of expenses.[2]

## I.   PRELIMINARY STATEMENT

6.     After nearly three years of thorough investigation, hard-fought litigation and a vigorously-negotiated settlement, Plaintiffs and Plaintiffs' Counsel have achieved a substantial and valuable settlement on behalf of SandRidge and its shareholders.  On October 9, 2015, the Court preliminarily approved the settlement in its Order Preliminarily Approving Settlement, Authorizing Notice and Setting Settlement Hearing (ECF No. 302).  For the reasons detailed below, Plaintiffs and Plaintiffs' Counsel believe that final approval of the settlement is warranted and that the application for an award of attorneys' fees and reimbursement of expenses should be granted.

7.     This case has been vigorously litigated from the outset, and Plaintiffs' Counsel continue to vigorously litigate the Action against defendants TLW Land & Cattle, LP ("TLW"), WCT Resources, LLC ("WCT") and 192 Investments, LLC ("192") which are referred to here as the "Non-Settling Defendants."

8.     The Stipulation was achieved only after Plaintiffs' Counsel, *inter alia*: (i) conducted a lengthy and detailed investigation of potential claims against defendant

---

[2] Unless otherwise defined here, all capitalized terms have the same meaning as in the Stipulation.

Ward, defendants Brewer, Dobson, Gilliland, Jordan, Oliver and Serota (the "Director Defendants," who along with defendant Ward are referred to here as the "Settling Defendants") and the Non-Settling Defendants, including numerous witness interviews, the search for and analysis of oil-and-gas records throughout the Mississippian (including expert analysis of the records uncovered during the investigations), review of SandRidge's filings with the Securities and Exchange Commission ("SEC") and investigative materials collected and made public by TPG-Axon Capital ("TPG-Axon"), an activist shareholder who waged a proxy fight against the incumbent SandRidge directors; (ii) compiled and analyzed documents, public filings and land records uncovered during Plaintiffs' Counsel's investigation to prepare a consolidated complaint as well as a consolidated amended complaint; (iii) briefed two comprehensive motions to dismiss filed by the Settling and Non-Settling Defendants and nominal defendant SandRidge; (iv) prepared and negotiated (and, when necessary, litigated) extensive discovery on a range of complex issues, and organized and reviewed millions of pages of documents produced by both parties and non-parties; (v) negotiated with defense counsel on the scope of the document discovery served on Plaintiffs, and reviewed and produced several thousand pages of responsive documents on behalf of plaintiffs Elliott and Ezell; (vi) litigated the proper scope of, and ultimately prepared extensive responses to, numerous contention interrogatories propounded by defendant WCT; (vii) prepared and negotiated dozens of non-party subpoenas and reviewed and analyzed  tens of thousands of documents produced in response to those subpoenas; (viii) briefed motions to compel (filed both by and against Plaintiffs), and defeated a motion to stay the litigation filed by

SandRidge's Special Litigation Committee ("SLC") and prevailed on Director Defendants' motion for judgment on the pleadings; (ix) analyzed the discovery record and compiled extensive witness and exhibit lists in preparation for trial; and (x) participated in lengthy and complicated mediation and settlement discussions with all defendants, and negotiated the terms of the Stipulation with the Settling Defendants, nominal defendant SandRidge and the SLC.

9.      Extensive legal research, a thorough review of the voluminous discovery record, motion practice and the parties' settlement negotiations informed Plaintiffs' Counsel that, while the case against the Settling Defendants was meritorious, there were also risks that had to be carefully evaluated in determining what course of action was in the best interests of the Company (*i.e.*, whether to settle, and on what terms, against the Settling Defendants, or to continue to litigate through summary judgment, trial on the merits and likely appeal).[3]

10.     As summarized below, while Plaintiffs' allegations are supported by legal authority, as well as the evidence discovered during Plaintiffs' Counsel's pre-filing investigations and the documentary and testimonial discovery adduced thus far, victory against the Settling Defendants was not guaranteed.  There were uncertainties with

---

[3] Plaintiffs' brief in support of final approval of the settlement includes additional description of the risks of continued litigation against the Settling Defendants.  However, because the Action continues against the Non-Settling Defendants, Co-Lead Counsel believes that it would be inappropriate to present a detailed summary of all the risks of the case here.  In addition, due to the fact that this declaration is submitted in support of a settlement, it is inadmissible in any subsequent proceedings, other than in connection with this settlement.  In the event the Court does not finally approve the Stipulation, this declaration and the statements contained in it are without prejudice to Plaintiffs' position on the merits of the Action.

respect to Plaintiffs' ability to overcome the factual and legal defenses marshalled by the experienced lawyers representing all defendants.

11.     In addition, while both the Company and the SLC (formed by the SandRidge board of directors on September 26, 2014 to review and investigate the potential SandRidge claims alleged by Plaintiffs and determine whether and how such claims should be asserted on the Company's behalf) actively participated in settlement negotiations and fully endorse and support the Stipulation, Plaintiffs faced, nonetheless, the risk that the SLC could conclude that the claims should not be pursued.

12.     What follows is a summary of the nature of Plaintiffs' claims, the principal events that occurred during the course of the Action, and the legal services provided by Plaintiffs' Counsel.

## II.     FACTUAL BACKGROUND AND SUMMARY OF PLAINTIFFS' CLAIMS

13.     Between December, 2012 and March, 2013, five federal shareholder derivative actions were filed against the Defendants in this district.   All the cases included similar allegations against the Director Defendants: that they breached their fiduciary duties and wasted SandRidge's corporate assets by allowing defendant Ward to engage in self-interested and conflicted behavior and related-party transactions, failing to prevent defendant Ward from taking illegal and improper actions detrimental to SandRidge's best interests, and by granting defendant Ward and other senior executives wasteful compensation.   Certain of the complaints also alleged claims against defendant

Ward for self-dealing, usurpation of the Company's corporate opportunities, and misappropriation of SandRidge's assets.

14.     Following briefing related to the organization and leadership of the related federal derivative cases, on April 10, 2013, the Court consolidated the five cases, appointed plaintiff Elliot as the Lead Plaintiff, appointed Whitten Burrage and Kaplan Fox as Co-Lead Counsel and Federman & Sherwood as Liaison Counsel and ordered a consolidated complaint be filed by May 1, 2013. (ECF No. 66.)

## III.   PROCEDURAL HISTORY

15.     Although Plaintiffs continue to actively litigate their claims against the Non-Settling Defendants, this litigation fell roughly into six stages: (i) extensive pre-filing investigation by Plaintiffs' Counsel and the drafting of the Consolidated and Verified Shareholder Derivative Complaint (here, the "Consolidated Complaint," filed on May 1, 2013, ECF No. 71); (ii) briefing on the defendants' motions to dismiss the Consolidated Complaint; (iii) Plaintiffs' Counsel's additional investigation and the filing of the Consolidated Amended and Verified Shareholder Derivative Complaint (the "Consolidated Amended Complaint," filed on October 9, 2013, ECF No. 142), which followed the Court's September 11, 2013 Orders dismissing the Consolidated Complaint with leave to file an amended complaint on certain of Plaintiffs' claims (ECF Nos. 132-134); (iv) additional briefing on defendants' motions to dismiss the Consolidated Amended Complaint, which the Court denied in part and granted in part in its September 22, 2014 Orders (ECF Nos. 164-166); (v) extensive discovery, including numerous negotiations among the parties on the proper scope of discovery, extensive discovery of

many non-parties, including depositions, and motion practice relating to the production of materials compiled by Mayer Brown LLP, counsel to SandRidge's Audit Committee (the "Mayer Brown Materials"); and (vi) mediation and settlement negotiations.

A. Plaintiffs' Counsel's Pre-Filing Investigation and Drafting of the Consolidated Complaint

16.    In addition to the investigation that we undertook on behalf of the Plaintiffs prior to the Court's consolidation order, which included review of SEC filings and filings from other litigation against SandRidge and defendant Ward by TPG-Axon and other Company shareholders, we actively and aggressively continued our investigation as we drafted the Consolidated Complaint.

17.    In addition to extensive legal research on the availability and viability of the causes of action against the various defendants, we continued to search publicly-available documents to identify facts supporting allegations of, among other things: (i) the extent and scope of defendant Ward's control over, and involvement in the activities of, defendants TLW, 192 and WCT (called the "Ward Entities" where appropriate here); (ii) the extent to which the Director Defendants were not disinterested in pursuing any claims against defendant Ward, which entailed an investigation into all known or likely relationships (be they personal, professional or financial) between all of the Director Defendants and defendant Ward, defendant Ward's family or his entities; (iii) an assessment, which included working with oil-and-gas consultants, of the extent to which defendant Ward or one of his entities had purchased, sold or flipped valuable acreage adjacent to property owned or leased by SandRidge in the Mississippian or had

improperly acquired interests in Company assets, and the degree to which, based on publicly-available information, SandRidge would be expected to have an independent interest in the acreage acquired, sold or flipped by defendant Ward or any of his entities; (iv) a detailed review and assessment of the materials made available by TPG-Axon as part of its consent solicitation, much of which buttressed or confirmed the investigation undertaken by our investigators and consultants; (v) analysis of the compensation for executives of SandRidge's peer companies, which included a review of numerous articles and treatises on executive compensation; and (vi) analysis of SandRidge's SEC filings to develop facts supporting allegations that the Company's directors violated Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act") by issuing materially false and misleading proxy statements concerning defendant Ward's related-party and conflicting transactions.

18.   A critical part of the Consolidated Complaint and the relief sought by Plaintiffs was the implementation of proposed corporate governance reforms, which were developed by Plaintiffs' Counsel with the input of Professor Jesse M. Fried, the Dane Professor of Law at Harvard Law School and a published expert on executive compensation and corporate governance matters.   Professor Fried reviewed the Consolidated Complaint's facts and allegations relating to the related party transactions, defendant Ward's alleged front-running and other conduct and SandRidge's internal controls and director oversight, and advised us on a number of corporate governance proposals aimed at preventing the alleged misconduct from happening in the future and further eroding the value of shareholders' stakes in the Company.

B. Briefing on Defendants' Motions to Dismiss Plaintiffs' Consolidated Complaint

19.    Plaintiffs' Counsel filed the Consolidated Complaint on May 1, 2013 (ECF No. 71), and defendants filed motions to dismiss on June 3, 2013. (ECF Nos. 80, 82, 83 and 85). Defendants' briefs raised a number of defenses to Plaintiffs' claims, and we devoted substantial time and effort to researching and drafting three briefs in opposition to defendants' motions.  (ECF Nos. 95-97.)

20.    On September 11, 2013, the Court granted the Director Defendants' and SandRidge's motion to dismiss Plaintiffs' Exchange Act claims, and gave Plaintiffs leave to re-plead their allegations as to demand futility and their standing to pursue derivative claims against the Director Defendants.  (ECF No. 134.)

C. Additional Factual and Legal Investigation for Plaintiffs' Consolidated Amended Complaint Following the Court's Orders Dismissing Certain of Plaintiffs' Claims

21.    Following the Court's September 11, 2013 orders, we spent considerable effort in analyzing what claims should be pursued against the defendants.   After careful and thorough consideration of the relevant case law and an assessment of the available facts, we decided not to pursue the Exchange Act claims or the claims for constructive fraud and civil conspiracy.

22.    In terms of assessing what causes of action would be included in the Consolidated Amended Complaint, we undertook extensive legal research that informed the scope of Plaintiffs' Counsel's ongoing factual investigation.

23.    Proposed corporate governance reforms identical to those in the Consolidated Complaint were appended to the Consolidated Amended Complaint following our corporate governance expert's analysis and recommendations (ECF No. 142-31).

24.    We also retained other consultants as part of our investigation prior to the filing of the Consolidated Amended Complaint, including oil-and-gas consultants with experience in the Mississippian who advised Plaintiffs' Counsel as to the extent of acquisitions by the Ward Entities of leaseholds adjacent to or within leaseholds purchased or operated by SandRidge.

25.    On September 16, 2013, Plaintiff Elliot served a books and record demand on SandRidge's board of directors under Section 220 of the Delaware General Corporation Law, which led to the revelation that the Director Defendants knew about certain of defendant Ward's transactions in the Mississippian, as they were considered by SandRidge's board of directors and memorialized such in meeting minutes.

26.    Plaintiffs filed the Consolidated Amended Complaint on October 9, 2013, which re-alleged all of the claims alleged in the Consolidated Complaint, except for the claims for constructive fraud, civil conspiracy and claims under the Exchange Act. (ECF No. 142.)  The Consolidated Amended Complaint asserted: (i) a claim against defendant Ward for breach of fiduciary duties based on usurpation of SandRidge's corporate opportunities; (ii) claims against the Director Defendants for waste of corporate assets and for breach of their fiduciary duties of care pursuant to *In re Caremark International, Inc. Derivative Litigation*, 698 A.2d 959 (Del. Ch. 1996) (the "*Caremark* claims"); (iii)

10

claims against defendants TLW, WCT and 192 for unjust enrichment and for aiding and abetting defendant Ward's breaches of fiduciary duty; and (iv) claims against defendants Ward, TLW, WCT and 192 for misappropriation of SandRidge's confidential and proprietary information.

D. Plaintiffs' Motion to Lift the Stay of Discovery

27.    On August 16, 2013, Plaintiffs moved to compel a Rule 26(f) conference, lift the discovery stay and set the matter for a scheduling conference. (ECF No. 119.) Plaintiffs sought discovery from SandRidge concerning the investigation by the Company's Audit Committee and Mayer Brown, the Audit Committee's outside counsel. After briefing the issue, on October 11, 2013 (ECF No. 143), the Court denied Plaintiffs' motion.

E. Briefing on Defendants' Motions to Dismiss the Consolidated Amended Complaint

28.    On November 15, 2013, Defendants filed separate motions to dismiss the Consolidated Amended Complaint.  (ECF Nos. 146-149.)  We devoted significant time and effort to briefing oppositions to these motions (ECF Nos. 150-152), which involved extensive legal research on novel legal arguments raised by defendants that were not raised during the briefing of defendants' motions to dismiss the Consolidated Complaint.

29.    Among the new arguments defendants asserted in this second round of briefing was defendant Ward's contention (incorporated by reference in the Director Defendants' brief) that the results of the Audit Committee's 2013 investigation of Ward's conduct by outside counsel Mayer Brown exculpated Ward and informed the Director

Defendants' decision to terminate Ward "without cause" (granting him a generous severance payment of $90 million of Company money) in June 2013.

F.   Plaintiffs' Renewed Motion to Lift the Stay of Discovery

30.   We believed that defendants' reliance on the results of Mayer Brown's investigation put those materials squarely at issue in the litigation.  Therefore, on April 1, 2014, we moved to partially lift the still-pending discovery stay and compel defendants to produce the reports prepared concerning the Audit Committee's investigation, along with underlying documents which were produced or reviewed as part of that probe, and any notes, transcripts or recordings of interviews conducted during Mayer Brown's investigation (referred to collectively as the "Mayer Brown Materials").  (ECF No. 156.)

31.   We fully briefed this motion and defendants' oppositions thereto, which included arguments by SandRidge that the Mayer Brown Materials were protected by the attorney-client privilege and the work-product doctrine.  (ECF Nos. 157-163.)

G.   The Court's Orders on the Motions to Dismiss

32.   On September 22, 2014, the Court issued orders: (i) denying the Director Defendants' motion to dismiss in its entirety, finding that the Consolidated Amended Complaint sufficiently alleged demand futility and upholding Plaintiffs' *Caremark* and waste claims (ECF No. 164); (ii) denying defendants' Ward and TLW's motion as to Plaintiffs' claims for misappropriation of SandRidge's assets and denying defendant TLW's motion as to Plaintiffs' unjust enrichment claims (ECF No. 165); and (iii) denying defendants' 192 and WCT's motion as to Plaintiffs' claims for misappropriation of SandRidge's assets and unjust enrichment. (ECF No. 166.)  Defendants' motions to

dismiss were granted as to all of Plaintiffs' other causes of action pleaded in the Consolidated Amended Complaint.

33.     One of the Court's September 22, 2014 orders also granted Plaintiffs' April 1, 2014 motion to lift the discovery stay and determined that because the Director Defendants had asserted that defendant Ward was fired "without cause" following Mayer Brown's investigation, the Mayer Brown Materials were relevant to Plaintiffs' claims against defendant Ward and that Plaintiffs were entitled to "a copy of that report and any documents cited, relied on or referenced therein."   (ECF No. 165.)   We immediately sought production of the Mayer Brown Materials from SandRidge.

   H.   Defendants' Motion for Reconsideration of the Court's Orders on the Motions to Dismiss

34.     On September 25, 2014, SandRidge and the Director Defendants jointly moved for reconsideration or clarification of the part of the Court's September 22, 2014 order allowing Plaintiffs discovery of the Mayer Brown Materials.   (ECF No. 167.) Defendants argued that the Court's September 22, 2014 order had not directly addressed the privilege or work-product arguments raised in defendants' oppositions to Plaintiffs' motion to lift the discovery stay, and sought clarification of the Court's holding as to the relevance of the Mayer Brown Materials.   Defendants' motion alternatively sought reconsideration of the Court's order to the extent it could be interpreted to have found that the Mayer Brown Materials were not protected by either the attorney-client privilege or the work-product doctrine, and submitted affidavits from Mayer Brown lawyers

involved in the investigation in support of defendants' contention that the investigation materials were privileged and protected.

35.     We viewed the Court's September 22, 2014 order as a clear directive that the Mayer Brown Materials be produced, and vigorously opposed defendants' motion for reconsideration while continually pressing the defendants to immediately produce the Mayer Brown Materials.  (ECF No. 168.)

36.     Defendants stood on their motion for reconsideration and rejected our requests for the Mayer Brown Materials.  In light of the clear relevance and importance of those documents, on October 16, 2014, we moved for an order to show cause and for an evidentiary hearing as to why SandRidge and its board refused to comply with the Court's September 22, 2014 order ordering production of the Mayer Brown Materials. (ECF No. 187.)

37.     Before the motion to show cause was fully briefed, on October 22, 2014 the Court held that any protection afforded by the attorney-client privilege or work-product protection had been waived.  (ECF No. 191.)

I.     The SLC's Motion To Stay

38.     In addition to the extensive briefing and negotiations related to the Court's orders on the motions to dismiss and the production of the Mayer Brown Materials, we were faced with the possibility that the Action would be delayed, and possibly dismissed, by the SLC, which since its inception has been represented by lawyers from the New York firm of Debevoise & Plimpton LLP.

39.     After SandRidge's board formed the SLC on September 26, 2014, the SLC appeared in the Action and moved to stay the litigation for six months so the SLC could conduct an independent review, investigation and assessment of the claims Plaintiffs had asserted in the Consolidated Amended Complaint.

40.     We opposed both the SLC's motion and defendants' separate motion to stay the Action pending the Court's resolution of the SLC's stay motion.  After a round of briefing on both motions, on October 22, 2014, the Court denied the SLC's stay motion, which mooted defendants' separate motion to stay (ECF No. 191.)

41.     On October 23, 2014, defendants answered the Consolidated Amended Complaint and asserted a number of affirmative defenses, which we analyzed in anticipation of serving additional discovery as to the basis of many of the asserted affirmative defenses.

J.     Plaintiffs' Counsel's Discovery of Defendants, the Parties' Extensive Discovery Negotiations and Motion Practice Related to Production of the Mayer Brown Materials

42.     The parties held a Rule 26(f) conference on October 1, 2014, and Plaintiffs' Counsel negotiated a proposed discovery schedule with defendants and worked with defense counsel to prepare the parties' joint status report and discovery plan, which was filed on October 15, 2014.  (ECF No.  179.)

43.     We prepared and served Plaintiffs' Rule 26(a) initial disclosures on October 15, 2014, and reviewed and analyzed defendants' initial disclosures, which defendants served on October 30, 2014 following briefing on defendants' motion seeking (among other things) an extension of their initial disclosures deadline.

15

44.     Plaintiffs' first round of discovery was directed at all defendants as well as nominal defendant SandRidge, and Plaintiffs' Counsel researched and drafted a combined total of 100 document requests and five interrogatories, which were served on defendants and the Company on October 17, 2014.

45.     With respect to Plaintiffs' first set of document requests:

a.     Plaintiffs' First Set of Requests for Production of Documents to defendant Ward ("Plaintiffs' First Ward RFPs") included 26 document requests on a range of important discovery topics, including documents concerning his compensation from SandRidge, land acquisitions in the Mississippian by defendant Ward, his family or any of the entities he was alleged to have controlled, transactions with or involving any of the Ward Entities, as well as documents from prior litigation alleging misconduct by defendant Ward. On November 21, 2014, defendant Ward served his objections and responses to Plaintiffs' First Ward RFPs, and Plaintiffs' Counsel then met-and-conferred with counsel for defendant Ward several times as to those objections and responses.

b.     Plaintiffs' First Set of Requests for Production of Documents to nominal defendant SandRidge ("Plaintiffs' First SandRidge RFPs") included 78 document requests seeking, *inter alia*, a variety of internal Company documents relevant to Plaintiffs' *Caremark* and waste claims against the Director Defendants, as well as categories of documents that we believed would prove Plaintiffs' misappropriation claims against defendants Ward,

TLW, WCT and 192.  By that time, SandRidge was separately represented as to all pre-trial discovery matters by lawyers from the Oklahoma City firm of Connor & Winters, referred to here as "Discovery Counsel." Plaintiffs' Counsel engaged in extensive discussions with SandRidge's Discovery Counsel regarding Plaintiffs' First SandRidge RFPs over a period of several months before ultimately having to move to compel against SandRidge on May 7, 2015 with respect to Plaintiffs' First SandRidge RFPs.  (ECF No. 255).

c. Plaintiffs' First Set of Requests for Production of Documents to defendant TLW ("Plaintiffs' First TLW RFPs") included 27 document requests seeking, *inter alia*, documents related to defendant Ward's involvement with TLW, TLW's activities in the Mississippian, as well as the nature and extent of the relationship between TLW and the Company (*e.g.*, whether SandRidge provided TLW with any services related to TLW's holdings in the Mississippian).  On November 21, 2014, defendant TLW served its objections and responses to Plaintiffs' First TLW RFPs, and Plaintiffs' Counsel then met-and-conferred with counsel for TLW several times as to TLW's objections and responses.

d. Plaintiffs' First Set of Requests for Production of Documents to defendant WCT ("Plaintiffs' First WCT RFPs") included 28 document requests seeking, *inter alia*, WCT's acquisitions or other transactions in the Mississippian, including the terms of any such transactions, as well as

documents concerning the nature of the relationship between defendant Ward and defendant WCT.  On November 20, 2014, defendant WCT served its objections and responses to Plaintiffs' First WCT RFPs, and Plaintiffs' Counsel then met-and-conferred with counsel for WCT several times as to WCT's objections and responses.  WCT began producing documents in response to Plaintiffs' First WCT RFPs in early 2015.

e.  Plaintiffs' First Set of Requests for Production of Documents to defendant 192 ("Plaintiffs' First 192 RFPs") included 27 document requests seeking, *inter alia*, 192's acquisitions or other transactions in the Mississippian, including the terms of any such transactions, as well as documents concerning the nature of the relationship between defendant Ward and defendant 192.  On November 20, 2014, defendant 192 served its objections and responses to Plaintiffs' First 192 RFPs, and Plaintiffs' Counsel then met-and-conferred with counsel for 192 several times as to 192's objections and responses.

f.  Plaintiffs' First Set of Requests for Production of Documents to the Director Defendants ("Plaintiffs' First Director RFPs") included 27 document requests seeking, *inter alia*, documents relating to the relationship the Director Defendants had with defendant Ward or any of the entities Ward was alleged to have controlled, documents concerning the Director Defendants' compensation decisions and the negotiation of defendant Ward's employment agreements and compensation packages, as

well as documents related to defendant Ward's 2013 termination. On November 20, 2014, the Director Defendants served their objections and responses to Plaintiffs' First Director RFPs, and Plaintiffs' Counsel then met-and-conferred with counsel for the Director Defendants several times as to their objections and responses.

46. On November 7, 2014, Plaintiffs served defendants Ward, TLW, 192, WCT and the Director Defendants with Plaintiffs' first set of interrogatories, as follows:

a. Plaintiffs' Counsel researched, drafted and served Plaintiffs' First Interrogatories to the Director Defendants ("Plaintiffs' First Director Interrogatories") seeking: (1) the identity of the personal and business e-mail addresses and telephone numbers that the Director Defendants and certain SandRidge executives used during the time period relevant to Plaintiffs' allegations; and (2) the identity of the entities, referenced in the Director Defendants' affirmative defenses, that advised the Director Defendants as to defendant Ward's compensation, as well as the nature of the services that those entities provided to the Director Defendants. On December 17, 2014, the Director Defendants objected and responded to Plaintiffs' First Director Interrogatories, and provided much of the information requested.

b. Plaintiffs' Counsel also prepared and served Plaintiffs' First Interrogatory to defendants WCT and 192 ("Plaintiffs' First WCT/192 Interrogatory"), seeking e-mail addresses and telephone numbers for certain current or

former WCT and 192 personnel that Plaintiffs' Counsel had determined were likely to have knowledge of facts related to defendant Ward's alleged misconduct and WCT or 192's role in that alleged misconduct.   On December 10, 2014, defendants WCT and 192 objected to Plaintiffs' First WCT/192 Interrogatory but provided most of the information Plaintiffs had sought.

    c.  Plaintiffs also served defendant Ward with Plaintiffs' First Interrogatory to defendants Ward and TLW ("Plaintiffs' First Ward/TLW Interrogatory"), which sought e-mail addresses and telephone numbers for defendant Ward during the time period relevant to Plaintiffs' allegations.   On December 15, 2014, defendants Ward and TLW served their objections and response to Plaintiffs' First Ward/TLW Interrogatory.

47.   We also spent considerable time and effort negotiating the terms of an agreed-upon confidentiality order, which the parties, along with discovery counsel for nominal defendant SandRidge, began negotiating in late October 2014.   The negotiations on the scope and terms of the confidentiality order continued into November 2014.   It was entered by the Court on November 27, 2014 (ECF Nos. 215, 217) after all parties had reached agreement.

    K.  <u>Plaintiffs' Efforts to Obtain the Mayer Brown Materials</u>

48.   The Court's October 22, 2014 order noted that the Court had revisited its September 22, 2014 order solely as to the applicability of attorney-client privilege or work-product doctrine protection of the Mayer Brown Materials, and explicitly held that

"any protection afforded by the attorney-client privilege or the work-product doctrine has been waived," and denied defendants' reconsideration motion as to all other relief sought. (ECF No. 191.)

49.    Shortly after the Court's October 22, 2014 order, SandRidge produced the 175-page summary of the results of Mayer Brown's investigation, which Mayer Brown presented to the SandRidge board of directors on June 10, 2013, and Discovery Counsel also produced the 270 pages of SandRidge documents explicitly cited in Mayer Brown's presentation. We immediately began an analysis of the presentation and the accompanying documents.

50.    However, despite the Court's order compelling production of "any documents cited, relied on or referenced" in the Mayer Brown presentation, SandRidge refused to produce the interview memoranda and the numerous other internal documents that Mayer Brown relied on to create its presentation (which, as Plaintiffs' Counsel discovered during negotiations with Discovery Counsel, amounted to many millions of pages collected by Mayer Brown and Deloitte Consulting ("Deloitte"), the law firm's e-discovery consultant).

51.    We vigorously sought these materials, and conferred with Discovery Counsel and counsel for the Director Defendants on numerous occasions in November 2014.  Despite our efforts to obtain the interview memoranda and all documents made available to Mayer Brown during its investigation, defendants and SandRidge stood on their objection and refused to produce those materials.

52.     We believed that SandRidge and its Discovery Counsel had not complied with the Court's September 22 and October 22, 2014 orders mandating production of all the Mayer Brown Materials, including all interview memoranda and documents collected. Therefore, on November 26, 2014, Plaintiffs filed a motion to show cause (ECF Nos. 218-219) why SandRidge and its Discovery Counsel had not complied with the Court's prior orders.

53.     Defendants opposed the motion arguing that the Court's prior orders did not support a broad waiver of all materials related to the Mayer Brown investigation because the Court did not explicitly hold that defendants had waived privilege or protection for the interview memoranda or the broader collection of documents reviewed during the Mayer Brown probe.

L.  The December 3, 2014 Court Conference and Discovery of the Mayer Brown Materials

54.     Our motion was fully briefed and we argued in support of the motion at the Court's previously-scheduled status conference on December 3, 2014.

55.     Following the status conference, on December 3, 2014, the Court granted in part and denied in part Plaintiffs' motion to show cause, ordering SandRidge to produce the 40 interview memoranda prepared by Mayer Brown.  (ECF No. 224.)

56.     Discovery Counsel produced those memoranda in mid-December 2014 and Plaintiffs' Counsel analyzed those materials.  The Director Defendants also produced an additional four Mayer Brown interview memoranda previously withheld on the basis of relevance, following the Court's February 4, 2015 denial of the Director Defendants'

motion to clarify the Court's December 3, 2014 order as to whether these particular four memoranda needed to be produced pursuant to that order.  (ECF No. 241.)

57.     Following the resolution of motion practice (described above) related to the production of the Mayer Brown Materials, we had numerous meet-and-confers with SandRidge's Discovery Counsel about the production of documents collected during Mayer Brown's investigation.

58.      Beginning in January, 2015, Plaintiffs' Counsel researched, drafted and served defendants with a second set of document requests (collectively referred to below as "Plaintiffs' Second RFPs"), which sought responsive documents pre-dating the period of their stock ownership, which Plaintiffs' Counsel determined was appropriate based on our legal research.

59.     On January 12, 2015, Plaintiffs served:

a.   Plaintiffs' Second Set of Requests for Production to Defendants Ward and TLW ("Plaintiffs' Second Ward/TLW RFPs") included 26 document requests and sought various categories of documents referenced in the Mayer Brown Materials, including documents related to defendant Ward or TLW's access to internal SandRidge databases and internal Company reports related to the Mississippian.  Defendants Ward and TLW objected and responded to Plaintiffs' Second Ward/TLW RFPs on February 17, 2015, and Plaintiffs' Counsel engaged in a series of meet-and-confers with counsel for defendants Ward and TLW related to their objections and responses to this discovery.

23

b. Plaintiffs' Second Set of Requests for Production to Defendants WCT and 192 ("Plaintiffs' Second WCT/192 RFPs") included 26 document requests and sought various categories of documents referenced in the Mayer Brown Materials, including defendant WCT or 192's access to internal SandRidge databases and internal Company reports related to the Mississippian, and WCT or 192's dealings with land brokers in the Mississippian. Defendants WCT and 192 objected to Plaintiffs' Second WCT/192 RPFs on February 17, 2015, and Plaintiffs' Counsel engaged in a number of meet-and-confers with counsel for defendants WCT and 192 as to their objections to this discovery.

c. Plaintiffs' Second Set of Requests for Production to Nominal Defendant SandRidge, Inc. ("Plaintiffs' Second SandRidge RFPs") included 27 document requests and sought production of internal Company documents related to SandRidge's interaction with one or more of WCT, 192 or TLW, as well as other categories of documents referenced in the Mayer Brown Materials. Discovery Counsel for SandRidge served the Company's objections and responses to Plaintiffs' Second SandRidge RFPs on February 17, 2015. Plaintiffs' Counsel then met and conferred with SandRidge's Discovery Counsel several times with respect to the Company's objections and responses to this discovery.

d. Plaintiffs' Second Set of Requests for Production to the Director Defendants ("Plaintiffs' Second Director RFPs") included 26 document

24

requests seeking production of documents relating to the Mayer Brown Materials. Counsel for the Director Defendants served objections and responses to Plaintiffs' Second Director RFPs on February 17, 2015, and the parties began a series of extensive meet-and-confers on Plaintiffs' Second Director RFPs.

60. Among the information sought in Plaintiffs' First Director RFPs were documents related to defendant Ward's 2013 termination, defendant Jordan's 2013 resignation from the SandRidge board and information related to any related-party transactions by the Director Defendants.

61. We believed that documents related to defendant Ward's termination were relevant to Plaintiffs' waste claim against the Director Defendants, which the Court upheld in its September 22, 2014 order.

62. During the parties' discovery negotiations, the Director Defendants argued that documents related to defendant Ward's termination were irrelevant because the Consolidated Amended Complaint did not specifically allege that defendant Ward's termination and severance payment constituted waste. Despite the parties' extensive negotiations on the proper temporal and topical scope of Plaintiffs' First RFPs, the parties reached an impasse and two types of motion practice ensued.

M. The Director Defendants' Motion for Judgment on the Pleadings

63. On March 30, 2015, the Director Defendants moved for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c), seeking a ruling that

Plaintiffs had not alleged, and should not be allowed to pursue, a waste claim based on defendant Ward's 2013 termination.  (ECF No. 242.)

64.    We researched and briefed the opposition to the Director Defendants' 12(c) motion, which the Court denied in an April 28, 2015 order.  (ECF No. 252.)

65.    On March 31, 2015, we moved to compel the production of documents: (i) responsive to Plaintiffs' First Director RFPs, that were related to Ward's termination, Jordan's resignation, the Director Defendants' related-party transactions; (ii) documents from before 2010 (the year that Lead Plaintiff Elliot first purchased SandRidge stock) that were responsive to Plaintiffs' First Director RFPs, Plaintiffs' First Ward/TLW RFPs, Plaintiffs' First WCT/192 RFPs, and Plaintiffs' First SandRidge RFPs; and (iii) documents concerning defendant Ward's possession or control of WCT and 192 responsive to Plaintiffs' First Ward/TLW RFPs.  (ECF Nos. 243-244.)

66.    Following a round of briefing, the Court entered an order noting that it would consider the arguments presented in the parties' 12(c) briefing as to the relevance of the discovery sought in Plaintiffs' motion to compel, and scheduled a hearing on the discovery motion for May 19, 2015.   (ECF No. 252.)

N. The May 19, 2015 Court Conference

67.    We extensively prepared for the May 19, 2015 hearing, which in addition to Plaintiffs' motion to compel against the Director Defendants, defendant Ward, defendants WCT, 192 and TLW, and nominal defendant SandRidge, also addressed a different motion to compel against SandRidge filed on May 7, 2015 seeking production of all documents responsive to Plaintiffs' First SandRidge RFPs, including

Electronically-Stored Information, as well as the Company's third-party reserve reports. (ECF No. 255.)

68.     In addition to oral argument on Plaintiffs' motions to compel, the May 19, 2015 hearing included Court-ordered conferences between the parties to attempt to resolve their outstanding discovery disputes without the Court's involvement.  During those intensive and time-sensitive negotiations, the parties agreed to numerous compromises which resolved the bulk of the discovery disputes and which resulted in the production of additional documents from SandRidge, the Director Defendants, defendant Ward, and defendants WCT, 192 and TLW.  We then presented arguments in support of the remaining substantive discovery dispute relating to Plaintiffs' request for documents concerning to defendant Ward's termination.

69.     On June 2, 2015, the Court resolved the parties' remaining substantive discovery dispute and ordered the Director Defendants to produce documents concerning defendant Ward's termination.  (ECF No. 263.)

70.     In May 2015, Plaintiffs' Counsel researched, drafted and served additional interrogatories on defendants Ward, TLW, WCT and 192 (collectively referred to as "Plaintiffs' Second Interrogatories"), which sought the identity of all well interests and proceeds that those defendants had in the Mississippian.  Those defendants served their objections and responses to Plaintiffs' Second Interrogatories on June 8, 2015, and Plaintiffs' Counsel has engaged in meet-and-confers with counsel for defendant WCT and 192 with respect to their responses to Plaintiffs' Second Interrogatories.

O. <u>Document Discovery Propounded To Plaintiffs</u>

71.     Plaintiffs' Counsel has expended considerable time and resources responding to discovery served on Plaintiffs.

72.     On November 25, 2014, the Director Defendants served Plaintiffs with their First Request to Plaintiffs for Production of Documents ("Director Defendants' First RFPs"), which included 18 document requests seeking a number of types of documents including Plaintiffs' transactions in securities (both SandRidge and non-SandRidge securities), as well as documents relating to Plaintiffs' Counsel's investigation of Plaintiffs' claims and Plaintiffs' participation in other litigation.  As we worked with plaintiffs Elliot and Ezell to determine the existence and volume of potentially-responsive documents, Plaintiffs' Counsel drafted and served on December 29, 2014 objections and responses to the Director Defendants' First RFPs.  Plaintiffs' Counsel then engaged in a series of meet-and-confers with counsel for the Director Defendants as to Plaintiffs' objections to the Director Defendants' First RFPs.

73.     Following our negotiations with the Director Defendants, we worked closely with Lead Plaintiff Elliot and plaintiff Ezell to search for, review, analyze, compile and produce thousands of pages of documents responsive to the Director Defendants' First RFPs.

74.     We thoroughly reviewed Elliot and Ezell's transactional records, which, pursuant to Plaintiffs' objections as to the scope of defendants' document requests, were redacted to exclude irrelevant transactions involving non-SandRidge securities.

28

75.     On March 3, 2015, defendant WCT served Plaintiffs with its First Request for Production to Plaintiffs ("Defendant WCT's First RFPs"), which included 42 document requests.  Plaintiffs' Counsel drafted and served on April 6, 2015 Plaintiff's objections and responses to Defendant WCT's First RFPs, and engaged in a number of meet-and-confers with counsel for defendant WCT as to Plaintiffs' objections and responses to this discovery.

76.     On April 28, 2015, the Director Defendants served Plaintiffs with their Second Requests to Plaintiffs for Production of Documents ("Director Defendants' Second RFPs"), which included seven document requests seeking documents related to Plaintiffs' Counsel's pre-filing investigation as well as documents relating to Plaintiffs' investment activities for companies other than SandRidge.  Plaintiffs' Counsel worked with plaintiffs Elliot and Ezell to determine the existence and volume of potentially-responsive documents, and also drafted objections and responses to Director Defendants' Second RFP, which were served on June 1, 2015.  Plaintiffs' Counsel then met and conferred with counsel for the Director Defendants with respect to Plaintiffs' objections and responses to the Director Defendants' Second RFPs.

77.     On May 3, 2015, in response to a number of letters and e-mails from counsel for the Director Defendants seeking supplementation of Plaintiffs' October 15, 2014 Initial Disclosures with respect to Plaintiffs' computation of damages, Plaintiffs' Counsel prepared and served supplemental disclosures as to Plaintiffs' damages computation.  Following service of Plaintiffs' supplemental initial disclosures, on May 8, 2015, the Director Defendants served Plaintiffs with a Third Request to Plaintiffs for

Production of Documents ("Director Defendants' Third RFPs").  Plaintiffs' Counsel then drafted and served on June 8, 2015 objections to the Director Defendants' Third RFPs.

78.    On August 6, 2015, defendant WCT served Plaintiffs with its Second Requests to Plaintiffs for Production of Documents ("Defendant WCT's Second RFPs"), which included six document requests seeking documents related to Plaintiffs' claims of misappropriation. Plaintiffs' Counsel worked with plaintiffs Elliot and Ezell to determine the existence and volume of potentially-responsive documents, and also drafted objections and responses to Defendant WCT's Second RFPs, which were served on September 11, 2015. Plaintiffs' Counsel then met and conferred with counsel for defendant WCT with respect to Plaintiffs' objections and responses to Defendant WCT's Second RFPs.

P.   Defendants' Interrogatories Propounded to Plaintiffs

79.    In addition to the efforts related to objecting, negotiating and responding to the extensive document discovery propounded on Plaintiffs, Plaintiffs' Counsel has also spent time and resources objecting, negotiating and responding to numerous interrogatories propounded by all defendants.

80.    On December 8, 2014, defendant Ward served his First Set of Interrogatories to Plaintiffs ("Defendant Ward's First Interrogatories"), which included eight interrogatories seeking the factual bases for Plaintiffs' claims against Ward. Plaintiffs' Counsel undertook legal research to determine how to object or respond to these contention interrogatories, which Plaintiffs' Counsel determined were premature given that discovery had barely started as of the time defendant Ward served them.

Following additional research and drafting, on January 12, 2015, Plaintiffs' Counsel served Plaintiffs' objections and responses to Defendant Ward's First Interrogatories.

81.     On May 6, 2015, the Director Defendants served their First Set of Interrogatories to Plaintiffs, which included nine interrogatories seeking information related to a number of Plaintiffs' claims against the Director Defendants. The parties agreed to defer the resolution of these interrogatories pending the outcome of the parties' settlement discussions.

82.     On March 3, 2015, Non-Settling Defendant WCT served Plaintiffs with its First Set of Interrogatories to Plaintiffs ("Defendant WCT's First Interrogatories"), which were comprised of 16 contention interrogatories seeking the factual bases for many of Plaintiffs' claims and allegations. Plaintiffs' Counsel undertook legal research relating to the propriety of contention interrogatories, and drafted Plaintiffs' objections to Defendant WCT's First Interrogatories, which were served on April 6, 2015. Plaintiffs' Counsel then engaged in a series of meet-and-confers in April, May and June, 2015, and which ultimately resulted in motion practice and a hearing with the Court on the sufficiency of Plaintiffs' responses to certain of Defendant WCT's First Interrogatories. (ECF Nos. 269-270, 277-278, 283.)

83.     Plaintiffs' Counsel has expended, and continues to expend, considerable effort and resources in responding to Defendant WCT's First Interrogatories, which have required the identification, marshalling, analysis, synthesis, compilation and listing of thousands of discovery documents.

84. On July 24, 2015, Defendant 192 served Plaintiffs with its First Set of Interrogatories to Plaintiffs ("Defendant 192's First Interrogatories"), which were comprised of eight contention interrogatories seeking the factual bases for many of Plaintiffs' claims and allegations. Plaintiffs' Counsel drafted Plaintiffs' objections and responses to Defendant 192's First Interrogatories, which were served on August 27, 2015. Plaintiffs' Counsel then met and conferred with counsel for Defendant 192 with respect to Plaintiffs' objections and responses to Defendant 192's First Interrogatories.

85. On August 6, 2015, defendant WCT served Plaintiffs with its Second Set of Interrogatories to Plaintiffs ("Defendant WCT's Second Interrogatories"), which were comprised of eight contention interrogatories seeking the factual bases for many of Plaintiffs' claims and allegations. Plaintiffs' Counsel drafted Plaintiffs' objections and responses to Defendant WCT's Second Interrogatories, which were served on September 11, 2015. Plaintiffs' Counsel then met and conferred with counsel for defendant WCT with respect to Plaintiffs' objections and responses to Defendant WCT's Second Interrogatories.

Q. Depositions of Defendants and Non-Parties

86. We also negotiated the scope of, and on January 21, 2015 traveled to Chicago to take, the deposition of non-party Mayer Brown (through the firm's designated representative, William Michael, Jr., a Mayer Brown partner and co-chair of the firm's White Collar Defense & Compliance Practice Group, which led Mayer Brown's investigation on behalf of the Company's Audit Committee) on topics related to the firm's investigation of potential misconduct by defendant Ward. The deposition

involved detailed preparation on issues of e-discovery and document collection, as well as issues related to SandRidge's possible assertions of attorney-client privilege or work-product protection during the course of the deposition.

87.    Based on Mayer Brown's deposition testimony, Plaintiffs served a document subpoena on Deloitte, Mayer Brown's e-discovery vendor, seeking access to the entire database of millions of SandRidge documents that Deloitte had maintained during the course of Mayer Brown's 2013 investigation.  Following receipt of Deloitte's objections, Plaintiffs' Counsel determined that it would be more efficient and ultimately more fruitful to work with SandRidge's Discovery Counsel to obtain the documents Deloitte had gathered, and we withdrew Plaintiffs' subpoena to Deloitte.

88.    In addition to the deposition of non-party Mayer Brown and attending and preparing for the deposition of former WCT contract geologist John Dowds (whose deposition was noticed by defendant WCT in Houston on October 15, 2015), as summarized in the following chart, Plaintiffs' Counsel researched appropriate topics for, prepared and then took the following 30(b)(6) depositions:

| Defendant | Corporate Representative(s) | Deposition Location | Deposition Date |
|-----------|---------------------------|--------------------|-----------------|
| WCT | Kent Benson<br>Trent Ward | Oklahoma City | September 15, 2015 |
| 192 | Kent Benson<br>Trent Ward | Oklahoma City | September 16, 2015 |
| TLW | Chris Osborne | Oklahoma City | September 17, 2015 |

R.  Non-Party Document Discovery

89.    Beginning in October 2014, we identified, and sought discovery from, non-parties that were likely to have information relevant to Plaintiffs' claims.

90. In October 2014, we subpoenaed TPG-Axon for documents and information related to its investigation of potential front-running and related-party transactions that were the basis for TPG-Axon's 2012-2013 proxy contest. Following extensive negotiations with TPG-Axon's outside counsel about the scope of discovery, we reached agreement whereby it would produce all of the factual materials used or relied upon in its investigation, along with a set of additional documents related to the individuals TPG-Axon had proposed to be SandRidge directors during its consent solicitation.

91. We also subpoenaed Longnecker & Associates ("Longnecker"), an executive-compensation consultant hired by SandRidge to assess the compensation of the Company's officers, including defendant Ward. We negotiated with Longnecker's in-house counsel and Longnecker produced a series of executive compensation reports created for SandRidge's Compensation Committee.

92. In addition, beginning in October 2014 and continuing into mid-2015, we researched, drafted and served subpoenas *duces tecum* on nearly two dozen land brokers, land consultants, geologists, special-purpose entities, and oil and gas companies for documents related to the defendants' transactions in the Mississippian.

93. As summarized in the following chart, we negotiated with these numerous non-parties or their counsel on the production of documents responsive to our subpoenas (which, to the extent these entities had responsive documents, were processed for review and made available to defense counsel pursuant to the terms of the Confidentiality Stipulation):

34

| Non-Party Entity Targeted for Discovery | Number of Documents Produced to Date |
|---|---|
| 3 Harts, LLC | None.  Represented to Plaintiffs' Counsel that they had no responsive documents. |
| 3H Minerals, LLC | None.  Represented to Plaintiffs' Counsel that they had no responsive documents. |
| 7401 Investments | 1 |
| 7-N-Deep, LLC | None.  Represented to Plaintiffs' Counsel that they had no responsive documents. |
| Bent Tree Properties | 42,940 |
| Caribou, LLC | None.  Represented to Plaintiffs' Counsel that they had no responsive documents. |
| Chesapeake Exploration, LLC & Chesapeake Operating, LLC | 2 excel spreadsheets |
| Continental Land Resources | 50,000 |
| Cornerstone Capital Investments, LLC | None.  Represented to Plaintiffs' Counsel that they had no responsive documents. |
| Crescent Consulting, LLC | 23 |
| Heritage Beef Cattle Co., LLC & Heritage Feeders, LP | 4 |
| Jackfork Land, Inc. | 18,950 |
| Longnecker & Associates | 5 |
| Renegade Royalty, LLC | 14 |
| Sam B. Rose Oil & Gas Properties, Inc. | Approximately 7,000 pages. |
| Seaport, Inc. | None.  Represented to Plaintiffs' Counsel that they had no responsive documents. |
| Shell Gulf of Mexico, Inc. & Shell Offshore, Inc. | 2 (146 pages) |
| Sodak Properties II | 4,647 |
| Stable Energy Resources | 2,385 |
| Superior Title Services | 4,457 |
| Tier Hydrocarbon Exploration, LLC | 40 |
| TPG-Axon | 23 |
| TSJ Oil & Gas | 1 |
| West Indies Energy, Inc. | 72 |

94.    Plaintiffs' Counsel's review of those documents (which is ongoing) has informed their analysis of Plaintiffs' claims and the evidence needed to prove their case at trial.

S.  Mediation and Settlement Negotiations

95.    In November 2014, the parties began conferring on the selection of a mediator, and the parties agreed to the selection of former U.S. District Judge Layn R. Phillips ("Judge Phillips"), a mediator with extensive experience settling complex litigation including shareholder derivative cases.  On December 15, 2014, the Court appointed Judge Phillips as mediator for the Action (ECF No. 230) and shortly thereafter the parties agreed to have the first mediation session with Judge Phillips on January 30, 2015 in Newport Beach, California.

96.    Our preparation for the first mediation session included working closely with oil-and-gas industry consultants to prepare a mediation presentation showing the extent of the Ward Entities' leaseholds.  In addition to counsel for all parties, the first mediation session was attended by SandRidge's in-house counsel, a member of the SLC, Edward Moneypenny, and the SLC's counsel, as well as representatives of Settling Defendants' insurance carriers.

97.    The January 30, 2015 mediation session did not result in a resolution of the Action, but at the urging of Judge Phillips, the parties agreed to a second mediation session on March 27, 2015 in Newport Beach, California.

98.    For this second mediation session, we prepared extensive presentations which were provided to defendants and their insurance carriers.  We attended the March 27, 2015 mediation session with Judge Phillips, which like the first mediation session, did not result in a resolution of the Action.  However, following the second mediation session, settlement negotiations with the defendants continued through Judge Phillips;

36

those negotiations also included counsel for the SLC and counsel for the Company's insurance carriers.

99.     After hard-fought, arm's-length negotiations, which included extensive discussions among the parties, on June 22, 2015, the Settling Parties agreed to a mediator's proposal to settle whereby the Settling Defendants' insurance carriers would pay $38 million to settle the claims against the Settling Defendants and that Plaintiffs' Counsel would apply to the Court for an award of attorneys' fees and expenses in an amount not to exceed $13 million.

100.     It took more than three months to negotiate the terms of the Stipulation, which is dated October 7, 2015, and was filed with the Court on October 8, 2015.

101.     Plaintiffs' motion for preliminary approval of the settlement was filed on October 8, 2015 and granted by the Court on October 9, 2015.  (ECF Nos. 301-302.)

     a.     On October 9, 2015, pursuant to Paragraph 5 of the Court's October 9, 2015 preliminary approval order, Kaplan Fox posted copies of the Notice of Proposed Partial Settlement of Shareholder Derivative Litigation (the "Notice") and the Stipulation on the firm's website, which remains posted as of the date of this Joint Declaration.

     b.     On October 26, 2015, pursuant to Paragraph 5(a) of the Court's October 9, 2015 preliminary approval order, SandRidge filed a Form 8-K with the Securities and Exchange Commission which included a copy of the Notice as an exhibit.  *See* Declaration of J. Matthew Thompson Confirming

Compliance with Notice Procedures of Court Order Granting Preliminary Approval to Settlement (the "Thompson Decl."), at ¶ 2 (ECF No. 325-1.)

c.  On October 26, 2015, pursuant to Paragraph 5(b) of the Court's October 9, 2015 preliminary approval order, SandRidge posted a copy of the Stipulation and the Summary Notice of Proposed Partial Settlement of Shareholder Derivative Action (the "Summary Notice") on the Company's corporate website, which remain posted on the Company's corporate website as of the date of this Joint Declaration.  Thompson Decl., ¶ 3.

d.  On November 4, 2015, pursuant to Paragraph 6 of the Court's October 9, 2015 preliminary approval order, SandRidge caused the Stipulation and Summary Notice to be published on *PR Newswire*.  Thompson Decl., ¶ 5.

e.  On November 16, 2015, pursuant to Paragraph 7 of the Court's October 9, 2015 preliminary approval order, SandRidge caused a copy of the Notice to be mailed to all shareholders of record as of October 9, 2015, the date on which the Court entered the preliminary approval order.  Thompson Decl., ¶ 5.

T.  Litigation Continues Against the Non-Settling Defendants

102.  Plaintiffs' Counsel's litigation against the Non-Settling Defendants also includes Plaintiffs' Counsel's ongoing review and analysis of the millions of pages in discovery documents and the compilation and preparation of witness lists and trial exhibits.  Plaintiffs' Counsel anticipates briefing summary judgment and responding to (and overseeing the preparation of) expert reports on the issues related to the

misappropriation and unjust enrichment claims, evidence of which is being continually developed as discovery progresses.

## IV.    SUMMARY OF THE STIPULATION'S KEY TERMS

103.    In exchange for the release of the Settling Parties, the Stipulation gives SandRidge and its shareholders two key forms of relief: (i) a $38 million cash payment by the Settling Defendants' insurers, which will be paid directly to SandRidge to the extent that funds remain after deducting for certain expenses that may be incurred as part of a separate securities class action against SandRidge and certain of its current and former officers and directors, which the Court recently dismissed with leave to re-plead; and (ii) SandRidge's agreement to create and implement a series of corporate governance measures.

104.    We are cognizant of the role we play in protecting the interests of SandRidge and its shareholders in this derivative action.  As part of that role during the settlement negotiations, Plaintiffs' Co-Lead Counsel conferred with counsel for the SLC as to the corporate governance elements of the Stipulation to ensure that the views and concerns of the SLC and the Company were addressed.

105.    Paragraph 3.3 of the Stipulation states the position of the SLC and SandRidge that Plaintiffs' prosecution of the litigation and settlement was a material factor in SandRidge's adoption, implementation or maintenance of corporate governance changes which came about since the inception of the Action, and that the corporate governance terms in the Stipulation confer a material benefit on the Company and its shareholders.

106. Due to Professor Fried's unavailability, Irving Kagan, of Kagan Consultants, reviewed the Corporate Governance Measures included in the Stipulation. Following Mr. Kagan's review and assessment of the Stipulation, he concluded that the Corporate Governance Measures were "an exceptional, invaluable contributing factor in the overall validity of the settlement and disposition of these proceedings and, in turn, that they directly add significant value to the Company by creating a fertile setting for the growth and success of the Company." *See* Declaration of Irving Kagan dated November 23, 2015, ¶ 9, a true and correct copy of which is attached hereto as Exhibit 1.

107. The Corporate Governance Measures included in the Stipulation are:

(i)      an amendment of SandRidge's bylaws to eliminate its staggered board or alternatively to eliminate the bylaws' requirement that bylaw changes affecting the staggered board of directors can be made only by holders of 50% or more of voting shares;

(ii)     amending the Company's corporate governance guidelines to provide that any director who fails to get a majority vote in two consecutive elections will be barred from running for a third election;

(iii)    submitting for shareholder vote the question of amending SandRidge's charter to lower (from 50% to 25%) the minimum number of shareholder votes needed to call a special shareholder meeting;

(iv)    amendment of the Company's bylaws to require that so-called "poison pills" be approved by an affirmative vote of at least 75% of the SandRidge

board and that any poison pills expire after six months unless they are authorized or ratified by a shareholder vote;

(v)     formally separate the positions of chairman of the board and Company CEO;

(vi)    adopting a mandatory education program (including an orientation program for newly-elected directors and newly-hired officers as well as continuing corporate governance education thereafter) for directors and executive officers to ensure that directors fully understand their directorial responsibilities and can fulfill their fiduciary duties, and that Company officers are similarly educated on those duties and responsibilities; and

(vii)   and extensive reformation of SandRidge's executive compensation policies by modifying the Company's corporate governance guidelines to, *inter alia*, reduce executives' ability to engage in insider trading and transactions in derivatives related to SandRidge securities, adopt a strong executive compensation claw-back policy consistent with SEC rules, and move from tri-annual to bi-annual "say-on-pay."

108.    To the extent that any of these measures are already in place, the Stipulation requires SandRidge to maintain the changes for at least five years (unless the agreed-upon corporate governance reforms need to be modified to comply with any future SEC or New York Stock Exchange rules).

## V.     THE STRENGTHS AND WEAKNESSES OF THE CASE

109.   Based upon the documents and information uncovered in Plaintiffs'
Counsel's investigations, coupled with our understanding of the discovery obtained in the
Action thus far, we believe that Plaintiffs would have uncovered (and will uncover as it
relates to the litigation against the Non-Settling Defendants), substantial evidence to
support Plaintiffs' derivative claims.   However, Plaintiffs and Plaintiffs' Counsel are
cognizant of the risks of continued prosecution of the case against the Settling
Defendants.   All of those risks were carefully considered in evaluating whether the
Stipulation was in the best interests of SandRidge and its shareholders.

110.   Among the litigation risks informing Plaintiffs' decision to enter into the
Stipulation with the Settling Defendants were:

> a.  the risk of prevailing on summary judgment, to say nothing of ultimately
> proving, Plaintiffs' *Caremark* claims, which based on Plaintiffs' Counsel's
> experience and understanding of the relevant case law, is one of the most
> difficult corporate law theories to prove at trial.   While we believe that
> Plaintiffs' *Caremark* claims are meritorious, in order for Plaintiffs to
> overcome summary judgment and prevail at trial on those claims, Plaintiffs
> would have had to prove that the Director Defendants either "utterly failed"
> to implement any reporting or information-system controls, or, having
> implemented such a system, consciously failed to monitor or oversee the
> operation of that system.

b. Plaintiffs' ability to prevail on their two waste theories also presented a risk. Plaintiffs would have had to proffer significant factual and expert support that the Director Defendants wasted SandRidge's corporate assets by (i) giving defendant Ward a massive severance package following his termination in mid-2013, and (ii) that the compensation of defendant Ward and a number of senior SandRidge executives during the relevant time period amounted to waste. While both of these waste theories were meritorious, Plaintiffs would have had to prove that any alleged corporate waste was so excessive such that no business person of ordinary judgment would conclude that the Company received adequate consideration in exchange for the alleged waste. Therefore, while Plaintiffs believed that the waste claims were supported by both the law and the factual record developed to date, the Director Defendants' ability to rely on the business judgment rule presented a substantial risk of prevailing on these waste claims. In addition, the Director Defendants would assert defenses to Plaintiffs' waste theories based on Delaware corporate law, which among other things, insulates directors from liability for business decisions based on the advice of the board's experts or legal advisors, and the Director Defendants asserted that they relied on advice from the board's experts and legal advisors.

c. Finally, the possibility that the SLC (as it is allowed to do) would seek to dismiss all or part of the Action presented a substantial risk.

43

111.    In addition to the risks of being able to prove Plaintiffs' claims against the Settling Defendants, Plaintiffs' Counsel also considered two important practical risks of continuing to litigate the Action against the Settling Defendants.  First, Plaintiffs' Counsel became aware prior to the parties' first mediation session that the Settling Defendants' insurance coverage was limited, and was, in essence, a wasting asset; the ability of insurance proceeds to fund any settlement or judgment decreased the longer the Action against the Settling Defendants continued.  Second, given the volatile nature of the oil-and-gas sector in which SandRidge operates, there was a risk that the Company would declare bankruptcy or be acquired by a competitor who was not interested in settling the Action on the terms proposed by the Plaintiffs.

## VI.    THE STIPULATION IS IN THE BEST INTERESTS OF SANDRIDGE AND ITS SHAREHOLDERS

112.    Having carefully considered the foregoing strengths and weaknesses of Plaintiffs' claims, and having evaluated the considerable defenses available to the Settling Defendants, it is the informed judgment of Co-Lead Counsel, based on the history of this particular litigation and the extensive experience in litigating shareholder derivative actions, that the Stipulation achieved here and now before the Court for final approval is fair, reasonable, adequate and in the best interests of SandRidge and its shareholders.

## VII.    THE MOTION FOR ATTORNEYS' FEES AND EXPENSES

113.    Concurrent with seeking court approval of the Stipulation, Co-Lead Counsel are seeking an award of attorneys' fees and expenses (the "Fee Application") in

44

an amount not to exceed thirteen million dollars ($13,000,000), which is inclusive of Plaintiffs' Counsel's unreimbursed out-of-pocket expenses incurred during the prosecution of this litigation thus far, which total $693,531.63.    As detailed in the accompanying Declaration of Richard J. Kilsheimer in Support of Co-Lead Counsel's Motion for Approval of Attorneys' Fees and Litigation Expenses (the "Kilsheimer Declaration," attached as Exhibit 3), Co-Lead Counsel established, funded and maintained a litigation fund to pay the out-of-pocket costs for all common expenditures made on behalf of Plaintiffs as the litigation progressed.

114.    Plaintiffs' Counsel have prosecuted the Action on a contingency-fee basis, and have paid out-of-pocket expenses for which we now seek reimbursement. Accordingly, Plaintiffs' Counsel seek an award of $12,306,468.37 in attorney's fees, and $693,531.63 as reimbursement for expenses incurred in prosecuting the case.

115.    The Settling Defendants, their insurers, the Company, and the SLC take no position on the amount of the Fee Application.  *See* Stipulation, § 9.1.

116.    As set forth above, Plaintiffs' Counsel's efforts on behalf of SandRidge and its shareholders included extensive work.

117.    The recovery obtained for SandRidge and its shareholders, it is respectfully submitted, is due to the competence, tenacity and perseverance of Plaintiff's Counsel in the face of substantial obstacles to any recovery.

118.    We thoroughly and zealously advocated our clients' positions during the litigation and the mediation process.  As set forth above, we performed a thorough examination of the facts of the case and the applicable law, and performed substantial

45

work and effort in preparing Plaintiffs' case for trial and in presenting our positions in such a way to produce a valuable settlement for SandRidge and its shareholders.

119.   We managed the prosecution of this litigation to achieve the best result for SandRidge and its shareholders and did so in an efficient manner that avoided duplicative or unnecessary work and expenses.

120.   We believe that Plaintiffs' Counsel's request for an attorneys' fee of $12,306,468.37 million of the $38 million settlement fund, and reimbursement of actual litigation expenses of $693,531.63, is reasonable and appropriate given the complexity of this matter and the significant relief obtained by Plaintiffs' Counsel.

121.   Plaintiffs' Counsel respectfully submit that the fees sought in the Fee Application are fair and reasonable for the additional reason that it represents only 1.51 times Plaintiffs' Counsel's collective lodestar of $8,165,815.50, as reflected in the following declarations which accompany this joint declaration as exhibits:

a.   The Declaration of Michael Burrage in Support of Co-Lead Counsel's Motion for Approval of Attorneys' Fees and Litigation Expenses, a true and correct copy of which is attached here as Exhibit 2, stating Whitten Burrage's lodestar of $2,544,512.50 based on 4,602.05 hours of work;

b.   The Kilsheimer Declaration, stating Kaplan Fox's lodestar of $2,007,295.00 based on 3,984.75 hours of work; and

c.   The Declaration of Mark T. Josephs in Support of Co-Lead Counsel's Motion for Approval of Attorneys' Fees and Litigation Expenses, a true and

correct copy of which is attached here as Exhibit 4, stating Jackson Walker's lodestar of $3,614,008.00 based on 6,344.80 hours of work.

122.   Attached hereto are the following unpublished slip opinions cited in Co-Lead Counsel's Motion for Approval of Attorneys' Fees and Litigation Expenses and Memorandum of Law in Support:

>   a.   Exhibit 5 is the order in *Chieftain Royalty Co. v. Laredo Petroleum, Inc.*, No. CIV-12-1319, ECF No. 52 (W.D. Okla. May 13, 2015);
>
>   b.   Exhibit 6 is the order in *Chieftain Royalty Co. v. QEP Energy Co.*, No. CIV-11-212-R, ECF No. 182 (W.D. Okla. May 31, 2013);
>
>   c.   Exhibit 7 is the order in *McNeely v. Nat'l Mobile Health Care, LLC*, No. CIV-07-933-M, ECF No. 82 (W.D. Okla. Dec. 18, 2008); and
>
>   d.   Exhibit 8 is the order in *In re NVIDIA Corp. Derivative Litig.*, No. C–06–06110–SBA (JCS), ECF No. 185 (N.D. Cal. Mar. 18, 2009).

## VIII.   CONCLUSION

123.   For all the reasons detailed above, Co-Lead Counsel respectfully requests that the Court approve the Stipulation and award attorneys' fees and expenses of $13 million.

We declare under penalty of perjury that the statements made above are true and correct to the best of our knowledge.

Executed this 25th day of November, 2015, and respectfully submitted,

*/s/  Michael Burrage*                    */s/  Robert N. Kaplan*
   Michael Burrage                           Robert N. Kaplan

47